No. 21-1506

## UNITED STATES COURT OF APPEALS
### FOR THE FOURTH CIRCUIT

ROBERT UPDEGROVE; LOUDOUN MULTI-IMAGES LLC, d/b/a
BOB UPDEGROVE PHOTOGRAPHY,

*Plaintiffs-Appellants*,

v.

MARK R. HERRING, in his official capacity as Virginia Attorney
General; R. THOMAS PAYNE, II, in his official capacity as Director of
the Virginia Division of Human Rights and Fair Housing,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the District of Virginia (Alexandria)
Case No. 1:20-cv-01141-CMH-JFA – Hon. Claude M. Hilton

## JOINT APPENDIX

Jonathan A. Scruggs
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
jscruggs@ADFlegal.org

John J. Bursch
ALLIANCE DEFENDING FREEDOM
440 First Street, NW, Suite 600
Washington, DC 20001
(616) 450-4235
jbursch@ADFlegal.org

Christopher P. Schandevel
Johannes S. Widmalm-Delphonse
ALLIANCE DEFENDING FREEDOM
20116 Ashbrook Place, Suite 250
Ashburn, VA 20147
(571) 707-4655
cschandevel@ADFlegal.org
jwidmalmdelphonse@ADFlegal.org

*Counsel for Plaintiffs-Appellants*

Jessica Merry Samuels
Deputy Solicitor General
Erin B. Ashwell
Chief Deputy Attorney General
OFFICE OF THE ATTORNEY GENERAL
202 North Ninth Street
Richmond, VA 23219
(804) 786-6835
solicitorgeneral@oag.state.va.us
EAshwell@oag.state.va.us

*Counsel for Defendants-Appellees*

| ECF No. | Document Description | Page |
|---|---|---|
| | District Court Docket Report | JA1 |
| 1 | Complaint | JA12 |
| 1-1 | Exhibit 1 to Complaint – Editorial Policy | JA60 |
| 1-2 | Exhibit 2 to Complaint – Chilled Statement | JA63 |
| 2 | Motion for Preliminary Injunction | JA65 |
| 2-1 | Table of Contents for Appendix to Plaintiffs' Preliminary Injunction Motion | JA70 |
| 3-1 3-2 3-3 | Appendix to Plaintiffs' Preliminary Injunction Motion – Parts 1, 2 and 3 | JA73 |
| 4-1 4-2 | Appendix to Plaintiffs' Preliminary Injunction Motion – Parts 4 and 5 | JA222 |
| 5 | Declaration of Robert Updegrove in Support of Plaintiffs' Preliminary Injunction Motion | JA307 |
| 21 | Defendants' Motion to Dismiss for Lack of Jurisdiction | JA360 |
| 22 | Defendants' Combined Opposition to Preliminary Injunction and Memorandum in Support of Motion to Dismiss | JA363 |
| 22-1 | Exhibit A to Defendants' Combined Opposition and Memorandum in Support – Declaration of Mona Hafeez Siddiqui | JA397 |
| 47 | Brief in Response to Defendants' Motion to Dismiss | JA401 |
| 51 | Defendants' Reply to Response to Motion to Dismiss | JA438 |
| 68 | Transcript of 1/15/21 Motion Hearing | JA464 |
| 60 | Memorandum Opinion | JA499 |
| 61 | Order Dismissing Case | JA513 |

| ECF No. | Document Description | Page |
|---------|---------------------|------|
| 62 | Notice of appeal | JA514 |
| 66 | Declaration of R. Thomas Payne, II, in Support of Defendants' Combined Opposition and Memorandum in Support | JA516 |
| 67 | Declaration of Mona Hafeez Siddiqui in Support of Defendants' Combined Opposition and Memorandum in Support | JA518 |

Query    Reports    Utilities    Help    Log Out

APPEAL,CLOSED

# U.S. District Court
## Eastern District of Virginia - (Alexandria)
### CIVIL DOCKET FOR CASE #: 1:20-cv-01141-CMH-JFA

| | |
|---|---|
| Updegrove et al v. Herring et al | Date Filed: 09/28/2020 |
| Assigned to: District Judge Claude M. Hilton | Date Terminated: 03/30/2021 |
| Referred to: Magistrate Judge John F. Anderson | Jury Demand: None |
| Case in other court: 4th CCA, case manager Anisha Walker,, 21-01506 | Nature of Suit: 440 Civil Rights: Other |
| | Jurisdiction: Federal Question |
| Cause: 42:1983 Civil Rights Act | |

**Plaintiff**

**Robert Updegrove**                     represented by **Charles Douglas Welty**
C. Douglas Welty LLC
2111 Wilson Boulevard
Suite 800
Arlington, VA 22201
(703) 276-0114
Email: cdwelty@weltyblair.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Loudoun Multi-Images LLC**              represented by **Charles Douglas Welty**
*doing business as*                                    (See above for address)
Bob Updegrove Photography                              *ATTORNEY TO BE NOTICED*

**Defendant**

**Mark R. Herring**                       represented by **Jessica Merry Samuels**
*in his official capacity as Virginia*                 Office of the Attorney General
*Attorney General*                                     (Richmond)
202 North 9th Street
Richmond, VA 23219
(804) 786-6835
Fax: (804) 371-0200
Email: jsamuels@oag.state.va.us
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Martine Elizabeth Cicconi**
Office of the Attorney General

JA001

(Richmond)
202 North 9th Street
Richmond, VA 23219
804-786-7773
Fax: 804-371-0200
Email: mcicconi@oag.state.va.gov
*TERMINATED: 01/19/2021*
*LEAD ATTORNEY*

**Toby Jay Heytens**
Office of the Attorney General
(Richmond)
202 North 9th Street
Richmond, VA 23219
(804) 786-7240
Fax: (804) 371-0200
Email: theytens@oag.state.va.us
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**R. Thomas Payne, II**
*in his official capacity as Director of*
*the Virginia Division of Human Rights*
*and Fair Housing*

represented by **Jessica Merry Samuels**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Martine Elizabeth Cicconi**
(See above for address)
*TERMINATED: 01/19/2021*
*LEAD ATTORNEY*

**Toby Jay Heytens**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**American Civil Liberties Union of**
**Virginia**

represented by **Victor Michael Glasberg**
Victor M. Glasberg & Associates
121 S. Columbus Street
Alexandria, VA 22314
(703) 684-1100
Fax: 703-684-1104
Email: vmg@robinhoodesq.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

# JA002

**Eden Brooke Heilman**
ACLU of Virginia
701 E. Franklin Street
Suite 1412
Richmond, VA 23219
(804) 523-2152
Fax: (804) 649-2733
Email: eheilman@acluva.org
*ATTORNEY TO BE NOTICED*

**Nicole Gloria Tortoriello**
American Civil Liberties Union of
Virginia
701 E Franklin Street
Suite 1412
Richmond, VA 23219
(804) 726-6013
Fax: (804) 649-2733
Email: ntortoriello@acluva.org
*TERMINATED: 01/29/2021*

<u>Amicus</u>

**American Civil Liberties Union**               represented by **Victor Michael Glasberg**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Nicole Gloria Tortoriello**
(See above for address)
*TERMINATED: 01/29/2021*
*ATTORNEY TO BE NOTICED*

<u>Amicus</u>

**Americans United for Separation of**           represented by **Victor Michael Glasberg**
**Church & State**                                              (See above for address)
*ATTORNEY TO BE NOTICED*

<u>Amicus</u>

**North Carolina Values Coalition**              represented by **William Randolph Thetford , Jr.**
Simms Showers LLP
305 Harrison St SE
Third Floor
Leesburg, VA 20175
703-771-4671
Fax: 703-771-4681

JA003

Email:
wrthetford@simmsshowerslaw.com
*ATTORNEY TO BE NOTICED*

**Amicus**

**Institute for Faith and Family**    represented by    **William Randolph Thetford , Jr.**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**The Family Foundation, et al.**    represented by    **James Alan Davids**
Founding Freedoms Law Center
707 East Franklin Street
Richmond, VA 23219
804-971-5509
Email: jim@foundingfreedomslaw.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Steven Werner Fitschen**
The National Legal Foundation
2224 Virginia Beach Blvd
Suite 204
Virginia Beach, VA 23452
(757) 463-6133
Fax: (757) 463-6055
Email: nlf@nlf.net
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 09/28/2020 | 1 | Complaint , *Verified* ( Filing fee $ 400, receipt number 0422-7420538.), filed by Robert Updegrove, Loudoun Multi-Images LLC. (Attachments: # 1 Exhibit Exhibit 1 - Editorial policy, # 2 Exhibit Exhibit 2 - Chilled statement, # 3 Civil Cover Sheet Civil Cover Sheet, # 4 Civil Cover Sheet Civ Cover Attachment - Attorneys of Record, # 5 Corporate Disclosure Stmt)(Welty, Charles) (Entered: 09/28/2020) |
| 09/28/2020 | 2 | MOTION for Preliminary Injunction by Loudoun Multi-Images LLC, Robert Updegrove. (Attachments: # 1 Appendix Table of Contents for Linked Appendix Docs)(Welty, Charles) (Entered: 09/28/2020) |
| 09/28/2020 | 3 | NOTICE by Loudoun Multi-Images LLC, Robert Updegrove re 2 MOTION for Preliminary Injunction *Appendix Parts 1 through 3* (Attachments: # 1 Appendix Appendix Part 1, # 2 Appendix Appendix Part 2, # 3 Appendix Appendix Part 3) (Welty, Charles) (Entered: 09/28/2020) |

**JA004**

| 09/28/2020 | 4 | NOTICE by Loudoun Multi-Images LLC, Robert Updegrove re 2 MOTION for Preliminary Injunction *Appendix Parts 4 and 5* (Attachments: # 1 Appendix Appendix Part 4, # 2 Appendix Appendix Part 5)(Welty, Charles) (Entered: 09/28/2020) |
|---|---|---|
| 09/28/2020 | 5 | AFFIDAVIT in Support re 2 MOTION for Preliminary Injunction *Declaration of Robert Updegrove* filed by Loudoun Multi-Images LLC, Robert Updegrove. (Welty, Charles) (Entered: 09/28/2020) |
| 09/28/2020 | 6 | Memorandum in Support re 2 MOTION for Preliminary Injunction filed by Loudoun Multi-Images LLC, Robert Updegrove. (Welty, Charles) (Entered: 09/28/2020) |
| 09/28/2020 | 7 | Proposed Summons re 1 Complaint, *to Mark R. Herring* by Loudoun Multi-Images LLC, Robert Updegrove. (Welty, Charles) (Entered: 09/28/2020) |
| 09/28/2020 | 8 | Proposed Summons re 1 Complaint, *to R. Thomas Payne II* by Loudoun Multi-Images LLC, Robert Updegrove. (Welty, Charles) (Entered: 09/28/2020) |
| 09/28/2020 | 9 | Motion to appear Pro Hac Vice by David Andrew Cortman and Certification of Local Counsel C. Douglas Welty Filing fee $ 75, receipt number 0422-7420585. by Loudoun Multi-Images LLC, Robert Updegrove. (Welty, Charles) (Entered: 09/28/2020) |
| 09/28/2020 | 10 | Motion to appear Pro Hac Vice by Jonathan Andrew Scruggs and Certification of Local Counsel C. Douglas Welty Filing fee $ 75, receipt number 0422-7420586. by Loudoun Multi-Images LLC, Robert Updegrove. (Welty, Charles) (Entered: 09/28/2020) |
| 09/28/2020 | 11 | Motion to appear Pro Hac Vice by Johannes Sten Widmalm-Delphonse and Certification of Local Counsel C. Douglas Welty Filing fee $ 75, receipt number 0422-7420587. by Loudoun Multi-Images LLC, Robert Updegrove. (Welty, Charles) (Entered: 09/28/2020) |
| 09/28/2020 | | Initial Case Assignment to District Judge T. S. Ellis, III and Magistrate Judge John F. Anderson. (dvanm, ) (Entered: 09/29/2020) |
| 09/29/2020 | | Notice of Correction re attachment to Civil Cover Sheet for 1 Complaint. The filing user has been notified that each attorney listed on the attachment must file their individual Notice of Appearance, using their CM/ECF credentials. (dvanm, ) (Entered: 09/29/2020) |
| 09/29/2020 | | Notice of Correction re 2 MOTION for Preliminary Injunction. The filing user has been notified to file a Notice of Hearing Date or a Notice of Waiver of Oral Argument. (dvanm, ) (Entered: 09/29/2020) |
| 09/29/2020 | | Case Reassigned to District Judge Claude M. Hilton. District Judge T. S. Ellis, III no longer assigned to the case. (aott, ) (Entered: 09/29/2020) |
| 09/30/2020 | 12 | Summons Issued as to Mark R. Herring, R. Thomas Payne, II. NOTICE TO ATTORNEY: Print out two electronically issued summons and one copy of the |

**JA005**

| | | |
|---|---|---|
| | | attachments for each defendant to be served with the complaint. (Attachments: # 1 Notice)(dvanm, ) (Entered: 09/30/2020) |
| 10/02/2020 | 13 | ORDER granting 10 Motion for Pro hac vice as to Jonathan Andrew Scruggs. Signed by District Judge Claude M. Hilton on 10/2/2020. (dvanm, ) (Entered: 10/02/2020) |
| 10/02/2020 | 14 | ORDER granting 11 Motion for Pro hac vice as to Johannes Sten Widmalm-Delphonse. Signed by District Judge Claude M. Hilton on 10/2/2020. (dvanm, ) (Entered: 10/02/2020) |
| 10/02/2020 | 15 | ORDER granting 9 Motion for Pro hac vice as to David Andrew Cortman. Signed by District Judge Claude M. Hilton on 10/2/2020. (dvanm, ) (Entered: 10/02/2020) |
| 10/08/2020 | 16 | NOTICE of Appearance by Jessica Merry Samuels on behalf of Mark R. Herring, R. Thomas Payne, II (Samuels, Jessica) (Entered: 10/08/2020) |
| 10/08/2020 | 17 | NOTICE of Appearance by Martine Elizabeth Cicconi on behalf of Mark R. Herring, R. Thomas Payne, II (Cicconi, Martine) (Entered: 10/08/2020) |
| 10/08/2020 | 18 | Joint MOTION for Extension of Time to File Response/Reply as to 1 Complaint, 2 MOTION for Preliminary Injunction *and to Set Combined Briefing Schedule and Consolidated Hearing* by Mark R. Herring, R. Thomas Payne, II. (Attachments: # 1 Proposed Order)(Samuels, Jessica) (Entered: 10/08/2020) |
| 10/09/2020 | 19 | ORDER granting 18 Motion to Set Combined Briefing Schedule and Consolidated Hearing. Signed by District Judge Claude M. Hilton on 10/9/2020. (see order for details) (dvanm, ) (Entered: 10/09/2020) |
| 10/09/2020 | | Set Deadlines as to 2 MOTION for Preliminary Injunction . Motion Hearing set for 1/15/2021 at 10:00 AM in Alexandria Courtroom 800 before District Judge Claude M. Hilton. (motion to dismiss forthcoming but to be heard at same time) (dvanm, ) (Entered: 10/09/2020) |
| 11/16/2020 | 20 | Memorandum in Opposition re 2 MOTION for Preliminary Injunction filed by Mark R. Herring, R. Thomas Payne, II. (Attachments: # 1 Exhibit A - Siddiqui Declaration)(Samuels, Jessica) (Entered: 11/16/2020) |
| 11/16/2020 | 21 | MOTION to Dismiss for Lack of Jurisdiction , MOTION to Dismiss for Failure to State a Claim by Mark R. Herring, R. Thomas Payne, II. (Samuels, Jessica) (Entered: 11/16/2020) |
| 11/16/2020 | 22 | Memorandum in Support re 21 MOTION to Dismiss for Lack of Jurisdiction MOTION to Dismiss for Failure to State a Claim filed by Mark R. Herring, R. Thomas Payne, II. (Attachments: # 1 Exhibit A - Siddiqui Declaration)(Samuels, Jessica) (Entered: 11/16/2020) |
| 11/16/2020 | 23 | Notice of Hearing Date re 21 MOTION to Dismiss for Lack of Jurisdiction MOTION to Dismiss for Failure to State a Claim (Samuels, Jessica) (Entered: 11/16/2020) |
| | | |

## JA006

| 11/17/2020 |    | Set Deadlines as to 21 MOTION to Dismiss for Lack of Jurisdiction MOTION to Dismiss for Failure to State a Claim . Motion Hearing set for 1/15/2021 at 10:00 AM in Alexandria Courtroom 800 before District Judge Claude M. Hilton. (clar, ) (Entered: 11/17/2020) |
|---|---|---|
| 11/23/2020 | 24 | MOTION for Leave to File *Brief of Amici Curiae American Civil Liberties Union and American Civil Liberties Union of Virginia in Support of Defendants* by American Civil Liberties Union of Virginia, American Civil Liberties Union. (Attachments: # 1 Proposed Order, # 2 Proposed Amicus Brief)(Tortoriello, Nicole) (Entered: 11/23/2020) |
| 11/23/2020 | 25 | NOTICE of Appearance by Nicole Gloria Tortoriello on behalf of American Civil Liberties Union, American Civil Liberties Union of Virginia (Tortoriello, Nicole) (Entered: 11/23/2020) |
| 11/23/2020 | 26 | Motion to appear Pro Hac Vice by Lindsey Kaley and Certification of Local Counsel Nicole Tortoriello Filing fee $ 75, receipt number 0422-7511004. by American Civil Liberties Union, American Civil Liberties Union of Virginia. (Tortoriello, Nicole) (Entered: 11/23/2020) |
| 11/23/2020 | 27 | Financial Interest Disclosure Statement (Local Rule 7.1) by American Civil Liberties Union, American Civil Liberties Union of Virginia. (Tortoriello, Nicole) (Entered: 11/23/2020) |
| 11/23/2020 | 28 | NOTICE of Appearance by Eden Brooke Heilman on behalf of American Civil Liberties Union of Virginia (Heilman, Eden) (Entered: 11/23/2020) |
| 11/23/2020 | 29 | Consent MOTION for Leave to File *Amicus Brief* by Americans United for Separation of Church & State. (Attachments: # 1 Supplement Proposed amicus brief, # 2 Proposed Order, # 3 Supplement Financial disclosure statement) (Glasberg, Victor) (Entered: 11/23/2020) |
| 11/23/2020 | 30 | NOTICE by Americans United for Separation of Church & State re 29 Consent MOTION for Leave to File *Amicus Brief WAIVER OF HEARING* (Glasberg, Victor) (Entered: 11/23/2020) |
| 11/24/2020 |    | Notice of Correction re 24 MOTION for Leave to File *Brief of Amici Curiae American Civil Liberties Union and American Civil Liberties Union of Virginia in Support of Defendants.* The filing user has been notified to file a Notice of Hearing Date or a Notice of Waiver of Oral Argument. (dvanm, ) (Entered: 11/24/2020) |
| 11/24/2020 | 31 | NOTICE by American Civil Liberties Union, American Civil Liberties Union of Virginia re 24 MOTION for Leave to File *Brief of Amici Curiae American Civil Liberties Union and American Civil Liberties Union of Virginia in Support of Defendants Waiver of Oral Argument* (Tortoriello, Nicole) (Entered: 11/24/2020) |
| 11/30/2020 | 32 | ORDER granting 26 Motion for Pro hac vice as to Lindsey Kaley. Signed by District Judge Claude M. Hilton on 11/30/2020. (dvanm, ) (Entered: 11/30/2020) |

| 11/30/2020 | 33 | ORDER granting 29 Consent MOTION for Leave to File Amicus Brief. Signed by District Judge Claude M. Hilton on 11/30/2020. (dvanm, ) (Entered: 11/30/2020) |
|---|---|---|
| 11/30/2020 | 34 | ORDER granting 24 MOTION OF AMICI CURIAE FOR LEA VE TO FILE BRIEF INSUPPORT OF DEFENDANT. Signed by District Judge Claude M. Hilton on 11/30/2020. (dvanm, ) (Entered: 11/30/2020) |
| 12/01/2020 | 35 | Motion to appear Pro Hac Vice by Richard Brian Katskee and Certification of Local Counsel Victor M. Glasberg Filing fee $ 75, receipt number 0422-7520291. by Americans United for Separation of Church & State. (Glasberg, Victor) Modified text on 12/1/2020 to correct filer per counsel (klau, ). (Entered: 12/01/2020) |
| 12/01/2020 | 36 | Motion to appear Pro Hac Vice by Sara Ruth Goetz and Certification of Local Counsel Victor M. Glasberg Filing fee $ 75, receipt number 0422-7520316. by Americans United for Separation of Church & State. (Glasberg, Victor) Modified text on 12/1/2020 to correct filer per counsel (klau, ). (Entered: 12/01/2020) |
| 12/01/2020 | 37 | Motion to appear Pro Hac Vice by Kenneth Dale Upton, Jr. and Certification of Local Counsel Victor M. Glasberg Filing fee $ 75, receipt number 0422-7520322. by Americans United for Separation of Church & State. (Glasberg, Victor) Modified text on 12/1/2020 to correct filer per counsel (klau, ). (Entered: 12/01/2020) |
| 12/01/2020 | 38 | ORDER granting 35 Motion for Pro hac vice as to Richard Brian Katskee. Signed by Magistrate Judge John F. Anderson on 12/1/2020. (dvanm, ) (Entered: 12/01/2020) |
| 12/01/2020 | 39 | ORDER granting 36 Motion for Pro hac vice as to Sara Ruth Goetz. Signed by Magistrate Judge John F. Anderson on 12/1/2020. (dvanm, ) (Entered: 12/01/2020) |
| 12/01/2020 | 40 | ORDER granting 37 Motion for Pro hac vice as to Kenneth Dale Upton, Jr.. Signed by Magistrate Judge John F. Anderson on 12/1/2020. (dvanm, ) (Entered: 12/01/2020) |
| 12/14/2020 | 41 | Amicus Brief by North Carolina Values Coalition, Institute for Faith and Family . (Attachments: # 1 Exhibit Amici Curiae Brief, # 2 Proposed Order) (Thetford, William) (Entered: 12/14/2020) |
| 12/14/2020 | 42 | Incorrect document was attached for this filing. The electronic document has been removed. The filing user has been notified to refile the document.NOTICE of Appearance by Steven Werner Fitschen on behalf of Robert Updegrove (Fitschen, Steven) (Main Document 42 replaced on and Modified on 12/15/2020 (ldab, ). (Entered: 12/14/2020) |
| 12/14/2020 | 43 | Incorrect document was attached for this filing. The electronic document has been removed. The filing user has been notified to refile the document. NOTICE |

| | | of Appearance by Steven Werner Fitschen on behalf of Robert Updegrove (Fitschen, Steven) (Main Document 43 replaced on and Modified on 12/15/2020 (ldab, ) (Entered: 12/14/2020) |
|---|---|---|
| 12/14/2020 | 44 | NOTICE of Appearance by Steven Werner Fitschen on behalf of The Family Foundation, et al. (Fitschen, Steven) (Entered: 12/14/2020) |
| 12/14/2020 | 45 | Amicus Brief by The Family Foundation, et al. *with Consent Motion*. (Attachments: # 1 Supplement Financial Disclosure, # 2 Proposed Order Proposed Order)(Fitschen, Steven) (Entered: 12/14/2020) |
| 12/14/2020 | 46 | REPLY to Response to Motion re 2 MOTION for Preliminary Injunction filed by Robert Updegrove. (Welty, Charles) (Entered: 12/14/2020) |
| 12/14/2020 | 47 | RESPONSE in Opposition re 21 MOTION to Dismiss for Lack of Jurisdiction MOTION to Dismiss for Failure to State a Claim filed by Robert Updegrove. (Welty, Charles) (Entered: 12/14/2020) |
| 12/15/2020 | 48 | Consent MOTION for Leave to Appear *as Counsel* by The Family Foundation, et al.. (Davids, James) (Entered: 12/15/2020) |
| 12/16/2020 | 49 | NOTICE of Appearance by William Randolph Thetford, Jr on behalf of Institute for Faith and Family, North Carolina Values Coalition (Thetford, William) (Entered: 12/16/2020) |
| 12/16/2020 | 50 | NOTICE by Institute for Faith and Family, North Carolina Values Coalition re 41 Amicus Brief *waiver of oral argument re Motion for Leave to File* (Thetford, William) (Entered: 12/16/2020) |
| 12/23/2020 | 51 | REPLY to Response to Motion re 21 MOTION to Dismiss for Lack of Jurisdiction MOTION to Dismiss for Failure to State a Claim filed by Mark R. Herring, R. Thomas Payne, II. (Samuels, Jessica) (Entered: 12/23/2020) |
| 01/06/2021 | 52 | ORDERED that 41 the Motion is GRANTED, and the Amicus Curiae Brief submitted by NCVC and IFF is deemed submitted and shall be considered part of the record in this matter. Signed by District Judge Claude M. Hilton on 01/06/2021. (dvanm, ) (Entered: 01/06/2021) |
| 01/06/2021 | 53 | ORDERED that 45 The Motion is GRANTED. The proposed brief submitted simultaneously with the Motion shall be filed in this action upon entry of this Order. Signed by District Judge Claude M. Hilton on 01/06/2021. (dvanm, ) (Entered: 01/06/2021) |
| 01/13/2021 | | Public Teleconference Access Information for District Judge Claude M. Hilton. Teleconference #: 1-888-363-4735 Access Code: 8281778 (jlan) (Entered: 01/13/2021) |
| 01/14/2021 | 54 | NOTICE of Appearance by Toby Jay Heytens on behalf of Mark R. Herring, R. Thomas Payne, II (Heytens, Toby) (Entered: 01/14/2021) |

| 01/15/2021 | 55 | Minute Entry for proceedings held before District Judge Claude M. Hilton:Motion Hearing held on 01/15/2021. Appearance of Counsel. 2 Plaintiffs Motion for Preliminary Injunction and 21 Defendants Motion to Dismiss Motions Argued and taken under advisement and Order to Follow. (Entered: 01/15/2021) |
|---|---|---|
| 01/15/2021 | 56 | MOTION to Withdraw as Attorney by Mark R. Herring, R. Thomas Payne, II. (Attachments: # 1 Proposed Order)(Cicconi, Martine) (Entered: 01/15/2021) |
| 01/19/2021 | 57 | ORDER granting 56 Motion to Withdraw as Attorney. Attorney Martine Elizabeth Cicconi terminated. Signed by Magistrate Judge John F. Anderson on 01/19/2021. (dvanm, ) (Entered: 01/19/2021) |
| 01/28/2021 | 58 | MOTION to Withdraw as Attorney by American Civil Liberties Union, American Civil Liberties Union of Virginia. (Tortoriello, Nicole) (Entered: 01/28/2021) |
| 01/29/2021 | 59 | SO ORDERED re 58 Motion to Withdraw as Attorney. Attorney Nicole Gloria Tortoriello terminated. Signed by Magistrate Judge John F. Anderson on 01/29/2021. (dvanm, ) (Entered: 01/29/2021) |
| 03/30/2021 | 60 | MEMORANDUM OPINION. Signed by District Judge Claude M. Hilton on 03/30/2021. (dvanm, ) (Entered: 03/30/2021) |
| 03/30/2021 | 61 | ORDERED that Defendants' 12(b) (1) Motion to Dismiss is GRANTED, and the case is DISMISSED. Signed by District Judge Claude M. Hilton on 03/30/2021. (dvanm, ) (Entered: 03/30/2021) |
| 04/28/2021 | 62 | NOTICE OF APPEAL as to 61 Order Dismissing Case by Loudoun Multi-Images LLC, Robert Updegrove. Filing fee $ 505, receipt number AVAEDC-7757050. (Welty, Charles) (Entered: 04/28/2021) |
| 04/29/2021 | 63 | Transmission of Notice of Appeal to US Court of Appeals re 62 Notice of Appeal (All case opening forms, plus the transcript guidelines, may be obtained from the Fourth Circuit's website at www.ca4.uscourts.gov) (dvanm, ) (Entered: 04/29/2021) |
| 04/30/2021 | 64 | USCA Case Number 21-1506. 4th CCA, case manager Anisha Walker, for 62 Notice of Appeal filed by Loudoun Multi-Images LLC, Robert Updegrove. (dvanm, ) (Entered: 04/30/2021) |
| 05/13/2021 | 65 | Transcript Order Acknowledgment from USCA re 62 Notice of Appeal : Court Reporter/Transcriber Julie Egal. (dvanm, ) (Entered: 05/13/2021) |
| 05/27/2021 | 66 | Declaration re 20 Memorandum in Opposition *[Decl. of R. Thomas Payne, II, dated May 27, 2021]* by Mark R. Herring, R. Thomas Payne, II. (Samuels, Jessica) (Entered: 05/27/2021) |
| 05/27/2021 | 67 | Declaration re 20 Memorandum in Opposition *[Decl. of Mona Siddiqui, dated May 27, 2021]* by Mark R. Herring, R. Thomas Payne, II. (Samuels, Jessica) (Entered: 05/27/2021) |
| | | |

USCA4 Appeal: 21-1506     Doc: 19     Filed: 07/14/2021     Pg: 15 of 523

| 06/04/2021 | 68 | TRANSCRIPT of Motion Hearing for dates of January 15, 2021, before Judge Claude M. Hilton, re 65 Transcript Order Acknowledgment from USCA Court Reporter/Transcriber Julie Goodwin, Telephone number 571-970-3191. **NOTICE RE REDACTION OF TRANCRIPTS:The parties have thirty(30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov** *Does this satisfy all appellate orders for this reporter? y* **Transcript may be viewed at the court public terminal or purchased through the court reporter/transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 7/6/2021. Redacted Transcript Deadline set for 8/4/2021. Release of Transcript Restriction set for 9/2/2021.(egal, julie) (Entered: 06/04/2021)** |
|---|---|---|

| **PACER Service Center** | | |
|---|---|---|
| **Transaction Receipt** | | |
| 06/14/2021 18:58:19 | | |
| **PACER Login:** | cindyeville | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:20-cv-01141-CMH-JFA |
| **Billable Pages:** | 8 | **Cost:** | 0.80 |

## JA011

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
### ALEXANDRIA DIVISION

| | |
|---|---|
| **Robert Updegrove**, and **Loudoun Multi-Images LLC** d/b/a **Bob Updegrove Photography**, <br><br>          Plaintiffs, <br><br>    v. <br><br> **Mark R. Herring**, in his official capacity as Virginia Attorney General; and **R. Thomas Payne, II**, in his official capacity as Director of the Virginia Division of Human Rights and Fair Housing, <br><br>          Defendants. | Case No. _____ <br><br> **Verified Complaint** |

## Introduction

Plaintiff Robert (Bob) Updegrove is a photographer, living out his passion for creating beautiful works of art by offering customized photography to the public. Bob is also a Christian who has used his photography to promote ideas he believes in. At first, Bob photographed school events and made slide shows while volunteering with a Christian youth ministry. Bob now creates event photography (often for conservative groups) and wedding photography (often for the same kids he photographed back in middle school). Throughout his career, Bob has worked with people from all walks of life and never declined to serve anyone because of who they are. Bob just cannot create certain content for anyone, no matter who they are. But Virginia recently passed a law that forces Bob to do precisely this—threatening to fine Bob into bankruptcy for not creating photography promoting the state's preferred view on marriage.

This law is the Virginia Values Act, which makes it illegal for businesses to discriminate on the basis of sexual orientation. Va. Code § 2.2-3904(B). But Virginia doesn't use this law simply to regulate discriminatory *conduct*. Bob already serves clients in the LGBT community.

Rather, Virginia seeks to regulate Bob's *views*—that marriage should be between a man and a woman—out of existence.

Specifically, Virginia requires Bob to create photography promoting same-sex marriage if he creates photography promoting opposite-sex weddings. The law even makes it illegal for Bob to post a statement on his business website explaining that he can only photograph weddings between a man and a woman or from adopting and distributing an editorial policy explaining his religious beliefs for only creating this wedding content. Va. Code §§ 2.2-3904(B), -3906(A) (forbidding "attempt[s] to refuse" services, "publish[ing] … communication[s]" declining service, and engaging in "pattern and practice" of declining services considered discriminatory).

If Bob does any of this, state officials will deploy investigations, lawsuits, onerous administrative and judicial proceedings, fines of up to $100,000 per violation, plus unlimited damages, attorney-fee awards, and court orders forcing Bob to create photographs against his conscience. Va. Code §§ 2.2-3906, -3907, -3908. Put together, these penalties could eclipse a million dollars and wipe out Bob's livelihood.

So Bob faces a choice no American should: violate the law and risk bankruptcy, compromise his faith, or close up shop. And this was exactly what officials wanted for those with Bob's religious beliefs. Legislators who passed Virginia's law called views like Bob's "bigotry" and acted to expunge them from the public square by threatening "unlimited punitive damages."

But Virginia does not get to decree that citizens can only profess views the state deems politically correct. Virginia cannot force Bob to convey messages against his faith without violating his First Amendment right to free speech and free exercise. These rights ensure each of us can choose what we say and what we celebrate, even when the government disagrees. Bob filed this lawsuit to restore his First Amendment right to do exactly this and to protect the ability

JA013

to speak and think freely for everyone—because a government that can censor Bob's view on marriage today can just as easily censor different views tomorrow.

## Jurisdiction and Venue

1.      This civil-rights action raises federal questions under the First and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983.

2.      This Court has original jurisdiction under 28 U.S.C. §§ 1331 and 1343.

3.      This Court has authority to award the requested declaratory relief under 28 U.S.C. §§ 2201–02 and Federal Rule of Civil Procedure 57; the requested injunctive relief under 28 U.S.C. § 1343 and Federal Rule of Civil Procedure 65; and the requested costs and attorney fees under 42 U.S.C. § 1988 and Federal Rule of Civil Procedure 54.

4.      Venue is proper in this Court under 28 U.S.C. § 1391(b) because a substantial part of the events and omissions giving rise to the claims occur within the Eastern District of Virginia's Alexandria Division, the effects of the challenged statute are felt in this Division, and Defendants can and do perform official duties in this Division.

## Plaintiffs

5.      Bob is a United States Citizen and resides in Leesburg, Virginia.

6.      Bob is the sole member-owner of Loudoun Multi-Images LLC.

7.      Loudoun Multi-Images LLC (doing business as Bob Updegrove Photography) is a for-profit limited liability company organized under Virginia law.

8.      Bob Updegrove Photography's principal place of business is in Leesburg, Virginia, where Bob operates his business out of his home.

JA014

**Defendants**

9.      Virginia Attorney General Mark Herring is the chief executive officer of the Virginia

Department of Law, which includes the Division of Human Rights ("Division"). *See*, *e.g.*, Va.

Code §§ 2.2-500, -520.

10.      Attorney General Herring administers and enforces Virginia law, works with law

enforcement officials, assists with local prosecutions when requested by local Commonwealth

attorneys, and defends Virginia's government throughout the state.

*See* https://www.oag.state.va.us/our-office/about-the-office.

11.      10.      The Attorney General has a regional office located in Fairfax, Virginia, which is

within the Eastern District of Virginia's Alexandria Division.

*See* https://www.oag.state.va.us/contact-us/contact-info?id=268.

12.      Attorney General Herring oversees the Division, designates the Division Director, and

administers and enforces the Virginia Human Rights Act ("Virginia's law" or "the law"), the law

challenged in this lawsuit. *See, e.g.*, Va. Code §§ 2.2-500, -520(B), -3906, -3907(A), -3908(C); 1

Va. Admin. Code § 45-20-20 (defining "Director").

13.      Attorney General Herring is named as a defendant in his official capacity.

14.      Director R. Thomas Payne, II is the Division Director and administers and enforces the

law. *See, e.g.*, Va. Code §§ 2.2-520(B), -3907(A); 1 Va. Admin. Code §§ 45-20-90, -100, -120.

15.      Director Payne is named as a defendant in his official capacity.

16.      Attorney General Herring and Director Payne have the duty and jurisdiction to administer

and enforce Virginia's law throughout the state of Virginia, including Leesburg. Va. Code

§§ 2.2-520, -3900; 1 Va. Admin. Code § 45-20-10, -20 (defining "Director").

JA015

17.     Attorney General Herring may also file suit under Virginia's law in any "appropriate circuit court" and may intervene in any private lawsuit seeking to enforce the law in any general district or circuit court in Virginia. Va. Code §§ 2.2-3906(A), -3908(A), (C).

## Factual Background

Bob operates a photography business.

18.     Bob Updegrove Photography is a for-profit photography business that offers and provides photography services to the general public on a commission basis.

19.     Bob is the only employee and sole photographer for Bob Updegrove Photography.

20.     Bob solicits and receives inquiries for his photography from the general public through his business website, referrals from clients, and referrals from his personal and professional network.[1]

21.     Bob offers several kinds of photography services to the public, including services for religious organizations, corporations, non-profits, and other organizational events.

22.     For example, Bob creates event photography for non-profit organizations like the American Foreign Policy Council, Americans for Limited Government, the Young America's Foundation, the Claremont Institute, and the Clare Booth Luce Center for Conservative Women.

23.     At these events, organizations usually invite distinguished speakers to address members and guests of the organization on current political and social issues.

24.     Bob's event photography involves creating photographs of the speakers, capturing candid moments of the guests socializing, and documenting the details of the event like the food, banners, centerpieces, and other decorations.

---

[1] Unless context indicates otherwise, the remainder of the complaint refers to all plaintiffs collectively as "Bob."

JA016

25.    Bob offers other event photography for organizations like churches, small businesses, or schools.

26.    Bob also offers engagement and wedding photography.

27.    Bob's wedding photography involves documenting the wedding ceremony's most important moments, including the "first look" (the first time the bride and groom see each other on their wedding day), the bride walking down the aisle, the officiant delivering the homily, the couple exchanging vows, the couple kissing before the attendees, and the officiant announcing the couple as husband and wife.

28.    Bob always captures candid and posed photographs of the bride and groom, the wedding party, the bridal couple's family, and the wedding guests, before, during, and after the ceremony.

29.    Bob also always attends all or most of the wedding reception to photograph the wedding party's entrance, the bouquet toss, the best man's speech, the maid of honor's speech, the couple's first dance, the couple's send-off, and other special moments.

30.    Bob always attends and photographs the entire wedding ceremony and would not provide wedding photography if requested to photograph only a part of the wedding ceremony or everything but the wedding ceremony.

Bob's Christian faith motivates his photography and photography business.

31.    Bob is a Christian.

32.    Bob's faith shapes every aspect of his life, including why and how he operates his business.

33.    Bob believes that God created humans to work and to glorify Him through their vocation.

34.    Bob believes that God gives people certain gifts and passions and commands them to steward these in a way that honors and glorifies Him, including by sharing the Gospel.

JA017

35.    Bob believes that God equips some people with creative gifts to create aesthetically beautiful art that reflects God's beauty, artistry, and truth.

36.    Bob believes that God has called him to steward his creative talents to honor and glorify God through photography.

37.    Bob believes that God has called him to use his creative talents to promote messages that are at times counter-cultural in order to convey the truth about God and God's design for the creation.

38.    Hence, Bob's mission is to "create unique art, in a photojournalistic fashion, to promote messages consistent with [Bob's] Christian values." *See infra ¶ 151*, Ex. 1.

39.    Photojournalism is a photography style where photographers use candid and genuine photographs to tell a story.

40.    Bob aspires to create art in a photojournalistic style to tell stories about his subjects that communicate the truth about God, God's beauty, the beauty of God's creation, and the good news that God offers to the world.

41.    Bob also believes he must honor God in how he interacts with others, including current and potential clients and people he meets while creating photography.

42.    Bob seeks to fulfill the biblical command to love others by being honest with current and prospective clients and the public and by treating them with love, honesty, fairness, and excellence.

Bob celebrates God's design for marriage through his photography and posting.

43.    Bob believes that God designed marriage as a gift for people of all faiths, races, and backgrounds and that God ordained marriage to be a lifelong union between one man and one

JA018

woman that symbolizes and points people to Jesus' sacrificial death and everlasting covenant with His bride, the Church.

44.    Bob desires to only celebrate marriages that are consistent with his beliefs in order to promote God's design for marriage as a beautiful and sacrificial relationship that proclaims the significance of the Gospel to his clients, the wedding audience, and the public.

45.    Bob wishes to do this by providing custom photography for engagement sessions and wedding ceremonies celebrating the union of one man and one woman.

46.    To carry this out, Bob evaluates every wedding photography request he receives to determine whether he can fulfill that request consistent with his artistic judgment and religious beliefs.

47.    When Bob receives a request to create photography, he tries to meet with the prospective client in person so he can get to know them and discuss their needs.

48.    If Bob cannot meet with the prospective client in person, he speaks to them over the phone.

49.    Bob also asks prospective clients to agree in writing or in substance to Bob's terms of service.

50.    The form service agreement states that Bob has "full artistic license" and "retains complete editorial control over all content created and reserves the right to reject any request that conflicts with Bob Updegrove Photography's artistic judgment."

51.    If Bob agrees to fulfill a request, he photographs the engagement or wedding ceremony according to his artistic license.

52.    When Bob photographs an engagement session, he always portrays the couple in positive and romantic ways and he constantly makes artistic and editorial decisions in order to create

JA019

aesthetically beautiful photographs that communicate the love, intimacy, and sacrifice of God's design for marriage.

53.     For example, Bob sometimes gives the engaged couple suggestions about the location, the time of day, and what clothes to wear.

54.     Bob directs the engaged couple on how to pose, when to hold hands, when to embrace, and when to kiss in order to elicit and then capture a romantic connection.

55.     When Bob photographs a wedding, Bob also always portrays the couple in positive and romantic ways and he constantly makes artistic and editorial decisions to create aesthetically beautiful photographs that communicate the love, intimacy, and sacrifice of God's design for marriage.

56.     For example, Bob often advises couples to conduct the "first look" before the ceremony, because Bob believes that doing this makes it is easier to capture the couple's genuine and raw emotions.

57.     Bob strategically times his movement and placement during the ceremony to capture special moments like the couple exchanging vows, the couple kissing, and the officiant announcing the couple as husband and wife. *See supra ¶ 27.*

58.     Bob choreographs and directs the bridal couple, members of the wedding party, and the bride and groom's family on how to pose for choreographed photographs.

59.     Bob uses his technical proficiency and knowledge of cameras to utilize the camera's flash, aperture, shutter speed, and ISO setting to portray his subjects in diverse settings and lighting conditions.

60.     After the wedding or engagement session, Bob edits the photos using his artistic license.

JA020

61.     When Bob edits the engagement or wedding photography, he constantly makes artistic and editorial decisions to create aesthetically beautiful photographs that communicate the love, intimacy, and sacrifice of God's design for marriage.

62.     Bob first does a "quick edit" where he reviews the photographs and discards those that are blurry, unflattering, or otherwise do not meet his artistic and religious standards.

63.     Bob color corrects, levels, and checks exposure for each photograph.

64.     Bob also tags photographs that capture a variety of scenes from the wedding (or engagement) and that he believes have potential for further editing.

65.     After the quick edit, Bob then edits the photographs he previously tagged to create an "enhanced" collection of photographs.

66.     For example, Bob will adjust the color balance, saturation, and vibrance of a photograph to create a warmer or cooler appearance or a certain type of mood.

67.     Bob will use tools to reduce a photograph's noise so that it has a less granular appearance.

68.     Bob will often create a black and white version of a photograph or impose a vignette to create a more solemn or nostalgic feel.

69.     These are just some of the tools and techniques that Bob uses when he creates the enhanced collection of photographs.

70.     Bob's ultimate goal is to tell a compelling story, using photographs and photographic techniques to celebrate and positively portray the couple, their wedding (or engagement), and God's design for marriage.

71.     After Bob finishes editing, he delivers the photographs to his clients on a thumb drive.

JA021

72.    Bob also posts all of the edited photographs on his website on certain pages: the "Sample Galleries" page, the "Portfolio" page, the "Private Galleries" page, and the "Engagement Photos" page.

73.    The Sample Galleries page contains publicly accessible galleries of enhanced wedding photographs.

74.    The Portfolio page contains a collection of publicly accessible photographs from different weddings meant to illustrate Bob's photographic style and approach to photography.

75.    The Private Galleries page contains private galleries of wedding photographs.

76.    The Engagement Photos page contains private galleries of engagement photographs.

77.    For engagement sessions, Bob creates a gallery of all the edited (including enhanced) photographs in the Engagement Photos page.

78.    Galleries on the Engagement Photos page are password protected and accessible to the bridal couple and whoever they give their password to.

79.    For weddings, Bob posts a sample gallery of the enhanced photographs in the Sample Galleries page.

80.    Bob has created sample galleries for every wedding he has photographed since approximately 2009, with the exception of two couples who had privacy concerns.

81.    In the future, Bob will always offer to post and will in fact post some of his enhanced wedding photographs on the Sample Galleries page for every wedding he photographs.

82.    For weddings, Bob also creates a gallery of all the edited wedding photographs in the Private Galleries page.

83.    Galleries on the Private Galleries page are password protected and accessible to the bridal couple and whoever they give their password to.

JA022

84.     For weddings, Bob also sometimes posts edited photographs in the Portfolio page to showcase a diverse range of his work to the public and prospective clients.

85.     "Bob Updegrove Photography" is always displayed at the top of each page and every gallery on his website.

86.     For Bob's wedding photography (engagements included), Bob's clients rely on his aesthetic vision and ability to celebrate their engagement and wedding in a meaningful way.

87.     Bob makes most of his editorial decisions without any input from clients.

88.     When clients do offer suggestions, Bob tries to blend his clients' suggestions into his own aesthetic vision so that the final product effectively celebrates the couple's wedding and God's design for marriage.

89.     But usually clients defer to Bob's suggestions and rely heavily on his artistic and editorial judgments.

90.     For all of his engagement and wedding photography, Bob reserves the right to reject any objectionable requests, and retains full editorial control over what to photograph, how to photograph, how to edit the photographs, what to post in the galleries on his website.

91.     Bob does not offer and would not accept any request for wedding or engagement photography that portrayed the couple, their marriage, or their wedding in a negative way.

92.     In all of the ways described above, Bob makes numerous artistic and editorial decisions to positively portray the love, intimacy, and sacrifice of marriage between one man and one woman.

93.     In this way, Bob exercises editorial judgment and control of the engagement or wedding photography to create visual images that tell stories that celebrate the couple and promote God's design for marriage.

JA023

94. Each component of Bob's wedding photography services—his photography and his editing—separately and in combination, is expressive in nature, as it involves images, symbols, or other modes of expression.

95. Many commissioned photographers post engagement and wedding photographs on their website, blogs, or social media sites to celebrate the couples, to associate their business with their photographs and photographic style, and to allow the couple to associate with their business.

96. Similar to these other photographers, Bob's website allows him to provide a preview of photographs to his clients; to publicly celebrate each couple; to publicly associate himself with his wedding photography; to promote his business, artistic style, and approach to photography; to allow the couple to identify with Bob Updegrove Photography; and to allow each couple to publicize their engagement and wedding to a greater audience than they otherwise could.

97. In these ways and more, Bob associates himself with his wedding photography.

98. Bob's website also allows him to proclaim his religious beliefs about marriage by publicly conveying the beauty and sacrificial nature of marriage between a man and a woman.

Bob cannot create photographs or participate in ceremonies contrary to his religious beliefs.

99. Not only do Bob's religious and artistic beliefs inspire what he photographs and participates in, these beliefs also dictate what he cannot create, say, or do.

100. Bob believes that he cannot rejoice in, condone, participate in, celebrate, or promote anything dishonorable to God or contrary to biblical teachings.

101. Bob therefore does not provide photography that requires him to use his photography skills to celebrate anything dishonorable to God, to celebrate anything contrary to biblical teachings, or to participate in anything contrary to biblical teachings.

JA024

102.    So Bob only creates photography, or participates in events and ceremonies, consistent with his editorial, artistic, and religious judgment.

103.    For example, Bob would not provide photography promoting organizations that advocate for socialist policies like the Democratic Socialists of America, because he believes that a free market is the best way to promote freedom.

104.    Bob would not provide photography promoting the restriction of religious expression for organizations like the Freedom From Religion Foundation, or Americans United for the Separation of Church and State because he believes that the freedom of expression and religious liberty are God-given human rights.

105.    Bob would not provide wedding photography that celebrates sacrilegious ideas, such as satanic or voodoo-themed weddings, because Bob believes that all wedding ceremonies are inherently religious events that solemnize and initiate a sacred institution created by God.

106.    Bob would not provide wedding photography that celebrates any marriage not between one man and one woman, such as same-sex, polygamous, or open engagements or marriages, because Bob believes that God created marriage to be an exclusive union between one man and one woman.

107.    Bob cannot create the wedding photography described above because he always creates photography that positively portrays marriage, and creating wedding photography positively portraying same-sex, polygamous, or open-relationship weddings, or weddings with sacrilegious themes, would promote activities contrary to his beliefs, express messages contradicting his beliefs, and express messages contradicting messages that Bob wants to and does promote elsewhere.

JA025

108.    Bob also cannot create the wedding photography described above because he always actively participates in the weddings he photographs.

109.    For example, when Bob photographs a wedding, he always attends and photographs the entire ceremony.

110.    When Bob photographs a wedding, he always interacts with the bride and groom, the officiant, the wedding party, the bridal couple's family, and the wedding guests to capture photographs.

111.    When Bob photographs a wedding, he always expresses his approval of the marriage by joyfully interacting and congratulating the bride and groom and the bridal couple's family on the new union and verbally encouraging them to enjoy and celebrate the wedding.

112.    Bob could not effectively provide his wedding services if he did not personally and joyfully interact with the couple, the wedding party, and the wedding guests in these ways.

113.    Bob also believes that every wedding is inherently religious because the wedding solemnizes and initiates a sacred institution (marriage) created by God.

114.    Many of the weddings Bob has photographed have taken place at a church or involved other overtly religious elements like religious music, religious readings, communion, prayer, and a blessing by the pastor.

115.    Every wedding Bob has photographed has included expressive and symbolic elements meant to solemnize the marriage, like a procession, a homily or speech by an officiant, an exchange of vows, and a pronouncement of the couple as husband and wife.

116.    If Bob were compelled to photograph the ceremonies described above, he would feel coerced to remain silent and respectful during the ceremony and to express his approval of the wedding by rejoicing with and congratulating the couple and their family on the new union.

JA026

117.    Bob therefore also cannot provide photography services for same-sex, polygamous, or open-marriage engagements or weddings because photographing about these events would force Bob to participate in ceremonies that violate his religious beliefs.

118.    It is standard industry practice for commissioned photographers to decline to create content that violates or compromises their beliefs or editorial discretion in this way.

119.    For these reasons, it is Bob's formal policy, pattern and practice, and standard operating procedure to only offer wedding photography services celebrating weddings between one man and woman and to decline any photography requests celebrating any other weddings—including those for same-sex engagements or weddings—no matter who asks him to do so.

120.    Bob also desires to be transparent about his desire to only photograph weddings between one man and one woman by posting a statement on his website explaining the types of weddings he can and cannot celebrate. *See infra ¶¶ 162–65*; Ex. 2.

121.    Bob also desires to be transparent and honest about his reasons for only celebrating weddings between one man and one woman by adopting an editorial policy that he can hand out to prospective clients or the public upon request. *See infra ¶¶ 150–52*; Ex. 1

122.    Whenever Bob receives a request he cannot fulfill because of a conflict with his beliefs, he tries to refer that request to another photographer who can do so.

123.    Bob's pattern and practice of only offering wedding photography services celebrating weddings between a man and a woman and for declining requests for photography services celebrating same-sex, polygamous, or open-marriage engagements or weddings are never about the person requesting these services.

124.    Instead, Bob's pattern and practice of not offering to photograph these ceremonies is an objection to promoting and participating in a sacred event that violates his religious beliefs.

JA027

125.    For example, Bob will create photographs for individuals who identify as LGBT or create event photography for a business owned and operated by LGBT individuals.

126.    Bob will create wedding photographs depicting a wedding between a man and a woman when requested and paid to do so by an LGBT parent of those getting married.

127.    Bob will create wedding photographs for the union of one man and one woman where one or both of the individuals identify as gay, lesbian, or bisexual, so long as the couple intends the marriage to be a lifelong union between one man and one woman.

128.    Research institutes estimate that approximately thirteen percent of adults who identify as LGBT are married to members of the opposite sex. *E.g.*, Jeffrey M. Jones, *In U.S., 10.2% of LGBT Adults Now Married to Same-Sex Spouse*, GALLUP (June 22, 2017), https://news.gallup.com/poll/212702/lgbt-adults-married-sex-spouse.aspx.

129.    Bob will create photographs described above so long as the photographs themselves do not require Bob to participate in a ceremony or express a message that violates his religious beliefs.

130.    On the other hand, because it is Bob's pattern and practice to decline requests to create photographs that violate his religious beliefs, Bob does not accept every request to photograph an engagement or wedding between a heterosexual man and a heterosexual woman. *See supra ¶¶ 105–06*.

131.    For example, Bob would not photograph a stylized wedding shoot for a bridal magazine or other business depicting and promoting a wedding between two men or women, whether those persons identify as LGBT or not.

132.    When evaluating whether any request for photography is consistent with Bob's religious beliefs, Bob considers, and it is his pattern and practice to consider, the message conveyed by the

JA028

requested services and whether these services require him to create a message he opposes or participate in a ceremony he objects to, not the identity of who requests these services.

Virginia's law threatens Bob's wedding photography and business.

133. Bob desires to operate his business consistent with his religious beliefs and to express some of his religiously motivated beliefs.

134. The Virginia Values Act threatens Bob's ability to do this.

135. The Virginia Values Act amended the Virginia Human Rights Act, Va. Code § 2.2-3904 *et seq.*, effective July 1, 2020.

136. Among other things, Virginia's new law prohibits "unlawful discrimination because of" sexual orientation in "places of public accommodation." Va. Code § 2.2-3900(B)(1).

137. The law defines a "place of public accommodation" as "all places or businesses offering or holding out to the general public goods, services, privileges, [or] advantages …." Va. Code § 2.2-3904(A).

138. Bob Updegrove Photography is a for-profit business offering goods, services, privileges, and advantages to the general public through photography.

139. Bob Updegrove Photography also promotes its goods, services, privileges, and advantages to the general public on its website and through word-of-mouth.

140. Bob Updegrove Photography is therefore a place of public accommodation under and subject to Virginia's law.

141. The law prohibits "unlawful discrimination" in public accommodations (§ 2.2-3904(B)) through two clauses: First, an "Accommodations Clause," and second, a "Publication Clause."

142. The Accommodations Clause (§ 2.2-3904(B)) makes it unlawful "for any person … to refuse, withhold from, or deny any individual, or to attempt to refuse, withhold from, or deny

18

JA029

any individual, directly or indirectly, … or to segregate or discriminate against any [] person in

the use [of]" any "advantages, … services, or privileges made available in any place of public

accommodation … on the basis of … sexual orientation."

143.    The Accommodations Clause prohibits Bob from:

- asking prospective clients whether they want him to photograph a same-sex
  wedding;

- exclusively offering wedding photography services that promote and celebrate
  engagements and weddings between one man and one woman;

- declining requests for wedding photography services that promote and celebrate
  same-sex engagements and weddings if he offers these services when they
  promote and celebrate opposite-sex engagements and weddings;

- maintaining a written editorial policy or de facto editorial practice of offering or
  providing wedding photography services only for engagements and weddings
  celebrating marriage between one man and one woman;

- maintaining a written editorial policy or unwritten editorial practice of uniformly
  declining requests to create photography services celebrating same-sex
  engagements and weddings while accepting requests for photography services
  celebrating opposite-sex engagements and weddings; and

- providing any unequal treatment when providing wedding photography services
  celebrating same-sex engagements and weddings compared to requests
  celebrating opposite-sex engagements and weddings.

144.    As to the last point, the Accommodations Clause also makes it unlawful for Bob to treat

wedding-photography requests for same-sex weddings different from wedding-photography

requests for opposite-sex weddings—whether by responding to requests to photograph same-sex

weddings more slowly or by offering any part of his services for opposite-sex ceremonies but not

JA030

same-sex ceremonies, such as posting wedding photographs for opposite-sex weddings on his website but not posting wedding photographs for same-sex weddings.

145.    In short, the Accommodations Clause forces Bob to provide photography services for same-sex engagements or weddings and would require Bob to promote messages that violate his religious beliefs or require him to participate in religious ceremonies that violate his religious beliefs, something he cannot do. *See supra ¶¶ 99–117*.

146.    By forcing Bob to provide these services, the Accommodations Clause:

- undercuts Bob's message (expressed elsewhere in his photographs and website) celebrating marriage between one man and one woman;

- harms Bob's reputation among his past and prospective clients; and

- adversely affects Bob's ability to share biblical truths about marriage with others.

147.    The Publication Clause (§ 2.2-3904(B)) makes it unlawful for any person "to publish, circulate, issue, display, post, or mail, either directly or indirectly, any communication, notice, or advertisement to the effect that any of the accommodations, advantages, … privileges, or services of any such place [of public accommodation] shall be refused, withheld from, or denied to any individual on the basis of … sexual orientation."

148.    The Publication Clause, and the Accommodations Clause's prohibition on "attempt[ing] to refuse, withhold from, or deny" a service on the basis of sexual orientation, prohibit Bob from:

- explaining on his website and directly to prospective clients, his religious beliefs about marriage and what types of wedding photography he provides;

- distributing a written editorial policy offering wedding photography services only for engagements and weddings celebrating marriage between one man and one woman;

JA031

- distributing a written editorial policy uniformly declining requests to create photography services celebrating same-sex engagements and weddings while accepting requests for photography services celebrating opposite-sex engagements and weddings.

<u>Virginia's law imposes insurmountable burdens on Bob's wedding photography.</u>

149.    The Accommodations and Publication Clauses impose significant pressures and burdens on Bob and on how he operates Bob Updegrove Photography.

150.    For example, Bob wants to adopt an editorial policy as an addendum to his company's operating agreement that explains his artistic and religious beliefs for choosing to promote certain ideas but not others.

151.    A true and correct copy of the editorial policy Bob desires to adopt is attached to this complaint as Exhibit 1.

152.    Bob wants to adopt this policy to bind his company to only create materials consistent with his beliefs and to distribute to potential clients or the public when they have questions about the types of services his business provides so that he can thoroughly and consistently explain his method for deciding whether or not to provide a service.

153.    But the Accommodations Clause prohibits Bob from adopting Bob Updegrove Photography's desired editorial policy because the policy binds Bob Updegrove Photography to not photograph same-sex weddings, which Virginia equates to refusing, attempting to refuse, segregating, or discriminating against someone according to their sexual orientation.

154.    The Accommodations and Publication Clauses also prohibit Bob from distributing his desired editorial policy because Virginia would consider distributing the policy to be an attempt to refuse or withhold services or publishing, circulating, issuing, or posting a communication indicating that a business would deny services because of a person's sexual orientation.

JA032

155.    Because of the Accommodations and Publications Clauses, Bob Updegrove Photography has not and will not formally adopt or distribute the editorial policy (Exhibit 1).

156.    By forbidding Bob from adopting and distributing his desired written editorial policy, the Accommodations Clause undercuts Bob's ability to exercise editorial judgment over his wedding photography and photography business, hinders his ability to bind future owners and employees to promote messages Bob agrees with, hinders his ability to plan his business, and effectively requires Bob to accept projects promoting messages contrary to his beliefs.

157.    By forbidding Bob from adopting and distributing his desired written editorial policy, the Accommodations and Publication Clauses hinder Bob's ability to operate his business as efficiently as possible because Bob will not have a prepared explanation of his religious and artistic beliefs that he can distribute upon request to prospective clients or members of the public.

158.    The Accommodations and Publication Clauses hinder Bob's ability to operate his business as efficiently as possible in other ways as well.

159.    For example, Bob wants to ask prospective clients whether they are seeking photography services celebrating same-sex engagements or weddings so that he can be transparent with them and let them know he does not create these photographs.

160.    But the Accommodations Clause forbids Bob from asking this question and therefore Bob will have to research every wedding photography request he receives to determine if the request seeks services that violate his beliefs.

161.    Doing this research will take time and effort and reduce the amount of time and effort Bob can spend on operating his business.

JA033

162.    The Accommodations and Publication Clauses also prohibit Bob from posting on his business website a statement explaining his religious motivations for why he only promotes marriages between one man and one woman.

163.    A true and correct copy of this statement is attached to the complaint as Exhibit 2.

164.    Bob wants to post this statement to briefly explain his services and beliefs to the public and to prospective clients because Bob is religiously motivated to be transparent and honest with clients, potential clients, and the public, *see supra* ¶ 120, and he desires to avoid giving any false impression about the services Bob Updegrove Photography will provide.

165.    Bob also wants to make statements materially similar to Exhibit 2 on his website and directly to prospective clients when called upon to explain his services.

166.    If Bob posted his desired statement (Exhibit 2) or materially similar statements on his website or made materially similar statements directly to prospective clients, he would violate the Accommodations Clause and the Publication Clause.

167.    Because of the Accommodations and Publication Clauses, Bob has not and will not post his desired statement (Exhibit 2) or materially similar statements on his website or make materially similar statements directly to prospective clients.

168.    By preventing Bob from effectively communicating the photography services he can and cannot provide, Bob must spend additional time and effort researching the requests he receives and reduce the amount of time and effort Bob could spend on operating his business.

169.    By preventing Bob from effectively communicating the photography services he can and cannot provide, the Accommodations and Publication Clauses also cause reputational harm by preventing Bob from clearly and honestly communicating his religious and artistic beliefs to prospective clients and the public.

JA034

170.    If not for the Accommodations and Publication Clauses, Bob would immediately initiate or restart activities motivated by his religious beliefs.

171.    For example, if not for the Accommodations Clause, Bob would immediately sign and formally adopt his desired editorial policy (Exhibit 1) and pass out that policy upon request.

172.    If not for the Accommodations Clause, Bob would immediately begin asking prospective clients whether they are seeking photography services for a same-sex engagement or wedding.

173.    If not for the Accommodation and Publication Clauses, Bob would immediately post the statement in Exhibit 2 or materially similar statements on his business website and make materially similar statements directly to prospective clients.

174.    Bob is refraining from the activities described above because he faces a credible threat and substantial risk that he will be investigated or prosecuted under Virginia's law for doing these activities.

175.    Bob is also refraining from these activities because he faces a credible threat and substantial risk that he will receive requests to provide photography services for same-sex engagements or weddings, thereby increasing the chances of his being investigated or prosecuted under Virginia's law because Bob will always decline these requests.

176.    For example, four percent of all weddings in Virginia are same-sex weddings. *See* https://www.nbc12.com/2019/09/27/marriages-virginia-have-been-same-sex-unions/.

177.    And between 2015 and 2018, almost 9,000 same-sex couples have gotten married in Virginia. *See*

https://apps.vdh.virginia.gov/HealthStats/documents/pdf/Marriage%20Data%202015.pdf;

https://apps.vdh.virginia.gov/HealthStats/documents/pdf/Marriage%20Data%202016.pdf;

JA035

https://apps.vdh.virginia.gov/HealthStats/documents/pdf/2017_by_issuance_and_same_sex.pdf;
and

https://apps.vdh.virginia.gov/HealthStats/documents/pdf/2018_by_issuance_and_same_sex.pdf.

Virginia's law uses aggressive enforcement mechanisms and devastating penalties.

178.    Virginia's law allows Attorney General Herring and Director Payne to enforce the law

against Bob in numerous ways.

179.    For example, Virginia's law allows the Attorney General to file a civil action in the

appropriate circuit court if he "has reasonable cause to believe that any person or group of

persons is engaged in a pattern or practice of resistance to the full enjoyment of any of the rights

granted" by Virginia's law. Va. Code § 2.2-3906(A).

180.    The Attorney General considers a public accommodation's policy and practice of

offering expressive services (like photography) celebrating opposite-sex weddings but not same-

sex weddings or declining these services for same-sex weddings while offering them for

opposite-sex weddings to be "a pattern or practice of resistance to the full enjoyment of"

Virginia's law.

181.    In fact, the Attorney General has taken the formal position that public accommodations

discriminate on the basis of sexual orientation if they (A) have a policy and practice of offering

expressive services celebrating opposite-sex weddings but not same-sex weddings; (B) have a

policy and practice of or actually decline to provide expressive services celebrating same-sex

weddings while offering them for opposite-sex weddings; or (C) publish communications with

the effect of declining expressive services celebrating same-sex weddings but not opposite-sex

weddings. *See* Br. of Mass. et al. as Amici Curiae in Supp. of Resp., *Masterpiece Cakeshop, Ltd.*

*v. Colo. Civil Rights Comm'n* at 29–37, 138 S. Ct. 1719 (No. 16-111), 2017 WL 5127307 (joined

JA036

by Attorney General Herring); Br. for Mass. et al. as Amici Curiae in Support of Defs.,

*Telescope Media Grp. v. Lindsey* at 25–28, 936 F.3d 740 (No. 17-3352), 2018 WL 1414316,

at *14 (same); Br. for Mass. et al. as Amici Curiae in Support of Defs. at 13–14, 26–27, *303*

*Creative LLC v. Elenis* (10th Cir. 2020) No. 19-1413 (Apr. 29, 2020) (same).

182.    After another wedding photographer recently challenged Virginia's law, Attorney

General Herring confirmed that he would enforce the law against artists who cannot in good

conscience photograph same-sex weddings, stating: "Attorney General Herring believes that

every Virginian has the right to be safe and free from discrimination no matter what they look

like, where they come from, or who they love," and "LGBT Virginians are finally protected from

housing and employment discrimination under Virginia law and Attorney General Herring looks

forward to defending the Virginia Values Act in court against these attacks." Katherine Hafner,

*Norfolk wedding photographer sues Virginia, says new law forces him to promote LGBT*

*couples*, The Virginian-Pilot (July 1, 2020),

https://www.pilotonline.com/government/virginia/vp-nw-wedding-photographer-lawsuit-

20200701-kobahftzy5bcnlvrypsoxfbafa-story.html.

183.    Virginia's law also empowers the Attorney General to file a civil action in the appropriate

circuit court if he "has reasonable cause to believe … that any person or group of persons has

been denied any of the rights granted by this chapter and such denial raises an issue of general

public importance." Va. Code § 2.2-3906(A).

184.    The Attorney General considers it an issue of general public importance if a public

accommodation offers expressive services (like photography) celebrating opposite-sex weddings

but not same-sex weddings or if a public accommodation declines to provide expressive services

celebrating same-sex weddings while offering these services for opposite-sex weddings or if a

JA037

public accommodation publishes communications with the effect of denying these services celebrating same-weddings but not opposite-sex weddings.

185.    In fact, the Attorney General has publicly stated this official position elsewhere. Br. of Mass. et al. as Amici Curiae in Supp. of Resp., *Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 138 S. Ct. 1719 (No. 16-111), 2017 WL 5127307, at *18–23 (joined by Attorney General Herring); Br. for Mass. et al. as Amici Curiae in Support of Defs., *Telescope Media Grp. v. Lindsey*, 936 F.3d 740 (No. 17-3352), 2018 WL 1414316, at *16–20 (same); Br. for Mass. et al. as Amici Curiae in Support of Defs. at 16–22, *303 Creative LLC v. Elenis*, No. 19-1413 (Apr. 29, 2020).

186.    If Bob publishes his belief statement (Exhibit 2) on his business website, or passes out his editorial policy (Exhibit 1) to prospective clients, he faces a substantial risk that the Attorney General (or someone else) would learn about this statement and seek to enforce the Act against him.

187.    The Virginia legislature appropriated additional funds to the Attorney General for fiscal year 2020–2021 and 2021–2022 so that additional attorneys "be directed to the Division of Human Rights for enforcement related to" Virginia's law. HB 30, Item # 61, 2020 Reg. Sess. (Va. 2020), https://budget.lis.virginia.gov/get/amendmentpdf/4100/.

188.    In addition, Virginia's law empowers any "person claiming to be aggrieved by an unlawful discriminatory practice" or the Attorney General or Director on behalf of such person to file a complaint with the Division. Va. Code § 2.2-3907(A).

189.    The Division may also "[i]nquire into incidents that may constitute unlawful acts of discrimination" and "[s]eek through appropriate enforcement authorities, prevention of or relief from an alleged unlawful discriminatory practice." Va. Code § 2.2-520(B)(3)-(4).

JA038

190.    After receiving a complaint, the Division must serve the complaint on the person alleged to have engaged in an unlawful discriminatory practice (the "Respondent"). Va. Code § 2.2-3907(B); 1 Va. Admin. Code 45-20-20 (defining "Respondent").

191.    Also, after receiving a complaint, the Division must conduct an investigation "to determine whether there is reasonable cause to believe the alleged discrimination occurred." Va. Code § 2.2-3907(D).

192.    During this investigation, the Director has authority to request position statements and additional information from the Respondent, and the Attorney General can compel production of that information. Va. Code § 2.2-521; 1 Va. Admin. Code 45-20-80(A)-(B).

193.    The Director may also hold fact-finding hearings and formal hearings with the complaining party and the Respondent. *See* Va. Code §§ 2.2-520(B)(1), -4020(C)-(D); 1 Va. Admin. Code 45-20-80(C).

194.    Among other things, these hearings require the Respondent's or its counsel's attendance, allow an administrative officer to take evidence, and authorize this officer to make a written determination of whether unlawful discrimination has occurred. *See* Va. Code §§ 2.2-520(B)(1) (authorizing the Division to "hold hearings pursuant to the Virginia Administrative Process Act § 2.2-4000 *et seq.*)"), -4019(A), -4020(C)-(D).

195.    The Division may also use other means during its investigation. 1 Va. Admin. Code 45-20-80(D).

196.    The investigatory process imposes a significant burden on Bob in that the Division is required to investigate every complaint "sufficient to determine whether there is reasonable cause to believe the alleged discrimination occurred." Va. Code § 2.2-3907(D).

197.    This investigation occurs in an adversarial process where the Division investigates the Respondent on the complaining party's behalf.

198.    The Division can also compel Respondent to respond to the complaint and supply additional information and participate in informal and formal hearings during its investigation.

199.    The Division's investigation may last up to six months. Va. Code § 2.2-3907(H).

200.    Once the Division completes its investigation, it issues a reasonable-cause report. Va. Code § 2.2-3907(D).

201.    If the Division concludes there is reasonable cause to believe the Respondent committed the alleged unlawful discriminatory practice, the Division "shall immediately endeavor to eliminate any alleged unlawful discriminatory practice by informal methods such as conference, conciliation, and persuasion." Va. Code § 2.2-3907(F).

202.    Because of the severely intrusive nature of the Division's investigative and administrative process, the fear of going through this process has forced Bob to refrain from adopting and distributing Bob Updegrove Photography's editorial policy (Exhibit 1) for fear of attracting a complaint to the Division.

203.    Likewise, the fear of going through this process has caused Bob to refrain from posting his desired statement (Exhibit 2) or materially similar statements on his website or directly to prospective clients. *See supra ¶¶ 162–67*.

204.    If the Division cannot settle the complaint or determines that settlement "is unworkable and should be bypassed," the Division closes the case and gives notice to the complaining party of his or her right to file a civil action. Va. Code § 2.2-3907(F).

205.    At any time after issuing a right-to-sue notice, the Division or the complaining party may petition a court to enjoin the Respondent from doing anything "that would render ineffectual an order that a court may enter with respect to the complainant." Va. Code § 2.2-3907(G).

206.    Once a complaining party receives a right-to-sue notice, he or she may file suit in a general district or circuit court with jurisdiction over the Respondent. Va. Code § 2.2-3908(A).

207.    If a court determines that a public accommodation has violated Virginia's law by committing unlawful discrimination, that court has substantial remedial powers.

208.    In civil actions filed by the Attorney General, the court may find unlawful discrimination and then award remedies including:

- "preventive relief, including a permanent or temporary injunction, restraining order, or other order against the person responsible for a violation … as is necessary to assure the full enjoyment of the rights granted by this chapter,"

- a civil penalty "not exceeding $50,000 for a first violation" and "not exceeding $100,000 for any subsequent violation,"

- "compensatory damages and punitive damages," and

- "reasonable attorney fees and costs." Va. Code § 2.2-3906(B)(1)–(3), -3906(C).

209.    Any "aggrieved person" may intervene in an action filed by the Attorney General. Va. Code § 2.2-3906(D).

210.    If an aggrieved party intervenes and the court finds unlawful discrimination has occurred, the court may award the aggrieved person the remedies described above in addition to remedies awarded to the Attorney General. *See also* Va. Code §§ 2.2-3906(D), -3908(B).

211.    In civil actions filed by an aggrieved person who obtains a right-to-sue notice, the court may find unlawful discrimination and then award remedies to the aggrieved person including:

JA041

- "any permanent or temporary injunction, temporary restraining order, or other order, including an order enjoining the defendant from engaging in such practice,"

- "compensatory and punitive damages," and

- "reasonable attorney fees and costs." Va. Code § 2.2-3908(B).

212.    The Attorney General may also intervene in a civil action filed by an aggrieved person if the case is of "general public importance." Va. Code § 2.2-3908(C).

213.    If the Attorney General intervenes in such an action and the court finds that unlawful discrimination has occurred, the court may award the Attorney General the remedies described above in addition to the remedies awarded to the aggrieved person. *See also* Va. Code § 2.2-3908(B)–(C).

214.    The Virginia legislature designed the punitive damages to be especially severe.

215.    For example, Delegate Marcus Simon (D-53) made the following comment during a House General Laws Committee meeting:

> I've actually looked at the [uncapped punitive damages in Virginia's law] language … and I think it's actually doing exactly what we intended for it to do. If you don't want to be subject to unlimited punitive damages, don't discriminate on the basis of sexual orientation ….
>
> I mean, this wasn't meant to be a non-punitive bill. We created a private right of action for a reason. And so I think the bill accomplishes exactly what it's intended to do in the form that it's intended to do it.

*Hearing on SB 868 before the Comm. on Gen. Laws*, H.D. 2020, Reg. Sess. (Feb. 13, 2020), available at: https://virginiageneralassembly.gov/house/chamber/chamberstream.php.

216.    As Delegate Simon indicated, the Act is intended to force Bob and people with beliefs like him to choose between either being punished for his religious convictions and risking bankruptcy or abandoning their business altogether.

JA042

Virginia's law only bans views the government disfavors.

217.    The Attorney General interprets Virginia's law to allow some public accommodations to decline to create custom expressive work that is contrary to their creator's artistic or editorial judgment, while requiring other public accommodations to create custom expressive work that is contrary to their creator's artistic or editorial judgment.

218.    For example, according to the Attorney General, public accommodation laws (like Virginia's law) gives a cakeshop the discretion to decline requests for custom cakes with "offensive messages about LGBTQ people" based on the cakeshop's non-religious objections, even though a cakeshop cannot decline requests for custom wedding cakes celebrating a same-sex marriage based on the cakeshop's religious objections. Br. of Mass. et al. as Amici Curiae in Supp. of Resp., *Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n* at 27–28, 138 S. Ct. 1719 (No. 16-111), 2017 WL 5127307 (joined by Attorney General Herring).

219.    This distinction treats religious objections to creating expressive works worse than non-religious objections to creating expressive works.

220.    As applied to Bob, Virginia's law prohibits him from promoting and celebrating his religious views about marriage by providing wedding photography services exclusively for engagements and weddings celebrating one man and one woman, but this law allows other wedding photographers to promote and celebrate their views supporting same-sex marriage.

221.    This distinction in treatment is based on the particular view that a photographer holds about marriage and the content that photographer expresses, both through the photographer's services and on the photographer's website.

222.    Many photographers in Virginia offer to photograph opposite-sex and same-sex engagements and weddings.

JA043

223.    For example, Wedding Wire is an online service that allows individuals to search for wedding vendors (including wedding photographers), and it lists over 800 wedding photographers in Virginia: https://www.weddingwire.com/c/va-virginia/wedding-photographers/10-sca.html.

224.    The Wedding Wire's Terms of Use prohibits its vendors—including wedding photographers—from "refusing to provide or accept services" based on sexual orientation. https://www.weddingwire.com/corp/legal/terms-of-use.

225.    Upon information and belief, there are at least 800 photographers in Virginia who will photograph same-sex and opposite-sex weddings.

226.    Many Virginia-based photographers also promote and celebrate same-sex marriage on their social media sites, blogs, and websites.

227.    For example, many Virginia-based photographers write statements on their websites or social media sites expressing their support for same-sex marriage, their willingness to photograph same-sex weddings, and their celebration of same-sex marriage, and they display photographs of same-sex weddings on their websites, blogs, and social media sites that positively depict and celebrate same-sex weddings. *See*, *e.g.*, *Matt & Greg's Fall Jewish Wedding | King Family Vineyards*, AARON WATSON PHOTOGRAPHY, https://www.aaronwatsonphoto.com/charlottesville-same-sex-wedding-photographers/.

228.    Bob is in direct competition with the photographers identified above in terms of competing for clients seeking a photographer for opposite-sex engagement sessions or weddings.

229.    But Virginia's law imposes increased regulatory burdens on Bob that it does not impose on these other Virginia businesses.

JA044

230.    For example, to avoid being harmed by Virginia's law, Bob must refrain from publishing his desired statement, adopting and distributing certain editorial policies, and tailoring his services and operating his business in certain ways, while these other Virginia businesses do not face these burdens because they willingly promote opposite-sex and same-sex weddings.

231.    These differences make it harder for Bob to compete and intensify the competition in the wedding photography market, make it easier for his competition to compete against him, lower the costs and effort other businesses exert when offering wedding photography, illegally structure a competitive environment, make it harder for Bob to promote his business in comparison to these other businesses, and impose a reputational harm on his business that these other businesses do not suffer.

232.    Additionally, although Virginia's law restricts Bob's desired activities, it makes several exemptions from its discrimination provisions for public accommodations, employers, and landlords. *See, e.g.*, Va. Code §§ 2.2-3904(D)(i) (exempting public accommodations from serving individuals under eighteen for any reason), -3905(A)-(B)(1)(a)-(b) (exempting employers with less than fifteen employees from antidiscrimination provisions for some employment decisions), -3905(B)(8) (allowing employers to state preferences in postings for bona fide occupational qualifications); § 36-96.2 (exempting landlords who own less than three single-family houses from certain discrimination provisions).

233.    These exemptions undermine any basis for compelling Bob to create wedding photography celebrating same-sex weddings.

234.    Bob supports the rights of other photographers to communicate their beliefs, to conduct their business in a way that promotes their beliefs, and to decline requests for expressive work that is inconsistent with the owners' beliefs.

JA045

235.    Bob simply wants to enjoy this same freedom.

<u>Virginia passed its law to target and punish those with Bob's religious beliefs.</u>

236.    Many Virginia legislators have explicitly stated their hostility towards religious beliefs defining marriage as between one man and one woman.

237.    This animosity was evident before Virginia's law passed.

238.    For example, SB 41 2016 was a bill that would have allowed religious persons to object to solemnizing a marriage "in accordance with a sincerely held religious belief … that marriage is or should be recognized as the union of one man and one woman." SB 41, 2016, Reg. Sess. (Va. 2020) https://lis.virginia.gov/cgi-bin/legp604.exe?161+ful+SB41ER+pdf.

239.    Senator Adam Ebbin (D-30) opposed this bill stating, "[T]his bill carves out a space for bigotry cloaked under the guise of religious freedom." *Debate on SB 41*, S. 2016, Reg. Sess. (Va. Feb. 12, 2016), available at:

https://www.youtube.com/watch?time_continue=17&v=cBHftN0pEVA&feature=emb_logo.

240.    Senator Ebbin was the chief patron of Virginia's law.

241.    Likewise, HB 773, 2016 was a bill that would have prohibited a government entity from making adverse tax, contracting, licensing, entitlement, and certain other decisions "against a person … on the basis that such person believes, speaks, or acts in accordance with a sincerely held religious belief or moral conviction that (i) marriage is or should be recognized as the union of one man and one woman." HB 773, 2016, Reg. Sess. (Va. 2016), https://leg1.state.va.us/cgi-bin/legp504.exe?161+ful+HB773H1+pdf.

242.    Delegate Mark Sickles (D-43) called the bill "a discrimination bill" and explained the bill "authorizes blatant discrimination." *Debate on HB 773*, H.D. 2016, Reg. Sess. (Va. Feb. 16, 2016), available at: https://www.youtube.com/watch?v=zFPSrUvs1Q8&feature=youtu.be;

JA046

*Delegate Mark Sickles' Statement on Passage of HB 773 – "Government Nondiscrimination Act,"* (Feb. 16, 2016), http://www.marksickles.com/press-releases/delegate-mark-sickles-statement-passage-hb-773-government-nondiscrimination-act.

243.    Delegate Simon said the bill was "a license to discriminate." *Debate on HB 773*, H.D. 2016, Reg. Sess. (Va. Feb. 16, 2016), available at: https://www.youtube.com/watch?v=Q-0iBqkBWO0

244.    Delegate Charniele Herring (D-46) said the bill gave "a free pass to discriminate." Michael K. Lavers, *Va. House approves 'Kim Davis' religious freedom bill*, Washington Blade (Feb. 16, 2016), https://www.washingtonblade.com/2016/02/16/va-house-approves-kim-davis-religious-freedom-bill/.

245.    Delegate Sam Rasoul (D-11) said the bill "gives state approval to discriminate against others," "sends a terrible message," and "sets an unwelcoming and hostile tone to people." *House passes bill giving businesses license to discriminate against LGBTs*, Augusta Free Press (Feb. 16, 2016), https://augustafreepress.com/house-passes-bill-giving-businesses-license-to-discriminate-against-lgbts/.

246.    The animosity surfaced during debates on Virginia's law.

247.    For example, during a debate in the Virginia House of Delegates over an amendment to Virginia's law which would have excluded "a religious corporation, association, society, or unincorporated house of worship" from the definition of public accommodations, *see* HB 1663, 2020, Reg. Sess. (Va. 2020), https://lis.virginia.gov/cgi-bin/legp604.exe?201+amd+HB1663ASE, Delegate Joshua Cole (D-28) said:

> I understand we have theological disagreements and we have theological beliefs of what we're supposed to carry out, but if you are a public organization, your doors are supposed to be open to everyone in the public. Now I don't know what type of Christianity you

JA047

come from, but the type of Christianity I come from, the Apostle Paul said "Try with everything within you to live peaceably with all men."

…

The Bible also says "And they shall know us by our love." What are we doing with our witness when we allow organizations to say just because we have St. Peter's behind it, or Christian behind it, … that we don't like you so don't come over here…. Madame Speaker as an ending thought, I will let you know that in Jesus' day the sinner was not his enemy. It was the church.

*Debate on HB 1663*, H.D. 2020, Reg. Sess. (Va. March 6, 2020), available at:

https://virginiageneralassembly.gov/house/chamber/chamberstream.php.

248.    During that same debate, Delegate Mark Levine (D-45) stated that "religious bigotry is bad," which in context implied that religious organizations were bigoted if they objected to hiring someone who violated the organization's views on sexual ethics and sexual orientation.

*Debate on HB 1663*, H.D. 2020, Reg. Sess. (Va. March 6, 2020), available at:

https://virginiageneralassembly.gov/house/chamber/chamberstream.php

249.    Upon information and belief, many legislators applauded after both of these statements.

250.    Likewise, the Virginia legislature rejected amendments to SB 868 2020 which would have (1) allowed "a religious organization" to "require that all employees or applicants for employment conform to the religious tenets of such organization"; (2) exempted "a religious corporation, association, educational or charitable institution, or society from taking such action as it deems necessary to promote the religious principles by which it is established or maintained"; and (3) allowed "a religious organization, association, or society, or any nonprofit institution or organization operated, supervised, or controlled by or in conjunction with a religious organization, association, or society, from taking such action as it deems necessary to promote the religious principles by which it is established or maintained." SB 868, 2020, Reg.

Sess. (Va. 2020), https://lis.virginia.gov/cgi-bin/legp604.exe?201+amd+SB868AHR and

https://lis.virginia.gov/cgi-bin/legp604.exe?201+amd+SB868ASR.

251.    The Virginia legislature also failed to enact HB 1663 2020 due to a Senate amendment

which would have exempted (1) religious organizations from "provid[ing] employment that

would be inconsistent with its deeply held religious beliefs regarding sexual orientation" and (2)

"a religious corporation, association, society or unincorporated house of worship" from the

definition of a public accommodation. HB 1663, 2020, Reg. Sess. (Va. 2020),

https://lis.virginia.gov/cgi-bin/legp604.exe?201+amd+HB1663ASR.

252.    The animosity also manifested during debates on HB 1049, a bill that incorporated sexual

orientation and gender identity language into several Virginia statutes on discrimination.

253.    For example, after Delegate David LaRock warned that the bill could be "weaponized"

against Christians and other religious persons with sincerely held religious beliefs, Delegate

Danica Roem called legislatures who opposed HB 1049 for these reasons, "discriminatory

politicians." *Debate on HB 1049*, H.D. 2020, Reg. Sess. (Va. February 5, 2020), available at:

https://virginiageneralassembly.gov/house/chamber/chamberstream.php

254.    Upon information and belief, many legislators applauded after Delegate Roem's

statements.

255.    And in a Senate committee hearing on HB 1049, Jeffrey Caruso of the Virginia Catholic

Conference proposed an amendment to the bill because the "religious tenets of our organization

would be that, that marriage is the union of a man and a woman and we would expect that

employees of our organization would adhere to that standard of conduct." *Hearing on HB 1049*

*before the Comm. on Gen. Laws and Tech.*, S. 2020, Reg. Sess. (Va. Feb. 19, 2020), available at:

http://virginia-

JA049

senate.granicus.com/MediaPlayer.php?view_id=3&clip_id=3113&eType=EmailBlastContent&e
Id=a892ddee-6f76-4e77-b55f-cf72688553c6.

256.    Senator Ghazala Hashmi (D-10) responded, "I just have a real problem with that line of
argument. As a Commonwealth, we are committed to nondiscrimination…. And so I have an
issue with that argument." *Hearing on HB 1049 before the Comm. on Gen. Laws and Tech.*, S.
2020, Reg. Sess. (Va. Feb. 19, 2020), available at: http://virginia-
senate.granicus.com/MediaPlayer.php?view_id=3&clip_id=3113&eType=EmailBlastContent&e
Id=a892ddee-6f76-4e77-b55f-cf72688553c6.

257.    All of the state representatives listed above voted in favor of passing Virginia's law. SB
868, 2020, Reg. Sess. (Va. 2020), https://lis.virginia.gov/cgi-bin/legp604.exe?201+mbr+SB868
(listing patrons), and https://lis.virginia.gov/cgi-bin/legp604.exe?201+vot+HV1245+SB0868
(house vote).

### Legal Allegations

258.    Plaintiffs are subject to and must comply with Virginia's Accommodations and
Publication Clauses.

259.    These clauses violate Plaintiffs' constitutional rights, and chill and deter Plaintiffs from
exercising their constitutional rights.

260.    As a direct and proximate result of the Defendants' violation of the Plaintiffs'
constitutional rights, Plaintiffs have suffered and will suffer ongoing irreparable harm and
economic injury (including lost business), entitling Plaintiffs to declaratory and injunctive relief.

261.    Plaintiffs do not have an adequate monetary or legal remedy for the loss of their
constitutional rights.

JA050

262.     Unless Defendants are enjoined, Plaintiffs will continue to suffer irreparable harm and economic injury.

First Cause of Action<br>First Amendment: Freedom of Speech, Association, and Press

263.     Plaintiffs repeat and reallege each allegation contained in paragraphs 1–262 of this complaint.

264.     The First Amendment's Free Speech and Press Clauses protects Plaintiffs' ability to speak; to create, publish, sell, and distribute speech; to associate with others for expressive purposes; and to associate with messages of Plaintiffs' choosing.

265.     The First Amendment also protects Plaintiffs' ability not to speak; to exercise editorial control over their speech; to decline to create, publish, sell, or distribute speech; and to decline to associate with others and with other messages for expressive purposes.

266.     The First Amendment also protects Plaintiffs' right to be free from content, viewpoint, and speaker-based discrimination.

267.     The First Amendment also prohibits the government from conditioning a benefit on the relinquishment of any First Amendment right.

268.     Plaintiffs' wedding photography, and all activities associated with this service, are forms of protected speech and expressive association, and Plaintiffs publish their speech to the public.

269.     As applied to Plaintiffs, the Accommodations Clause compels speech Plaintiffs object to, interferes with their editorial judgment, compels them to sell, publish, and disseminate speech they object to, compels them to engage in expressive associations they deem objectionable, forbids them from tailoring their business and from adopting certain policies, and regulates speech, association, and publication based on content, viewpoint, and speaker identity.

JA051

270.    As applied to Plaintiffs, the Accommodations Clause conditions their ability to participate in the wedding industry and to create wedding photography promoting marriage between one man and one woman on the requirement that Plaintiffs also create wedding photography promoting marriages other than those between one man and one woman.

271.    As applied to Plaintiffs, the Accommodations and Publication Clauses are a content, viewpoint, and speaker-based regulation that bans, chills, and burdens Plaintiffs' desired speech (and publication of that speech) on Bob Updegrove Photography's website and directly to prospective clients, and that inhibits Plaintiffs from forming expressive associations they desire to form and from avoiding expressive associations they want to avoid.

272.    Plaintiffs have not and will not engage in certain protected speech because of the Accommodations and Publication Clauses.

273.    If not for the Accommodations and Publication Clauses, Plaintiffs would immediately begin to engage in this protected speech again.

274.    Defendants do not serve any compelling or even valid interest in a narrowly tailored way by infringing on Plaintiffs' free speech, free association, and free press rights.

275.    Accordingly, as applied to Plaintiffs, the Accommodations Clause and Publication Clause violate the First Amendment's protections for free speech, free association, and free press.

Second Cause of Action
First Amendment: Free Exercise of Religion

276.    Plaintiffs repeat and reallege each allegation contained in paragraphs 1–262 of this complaint.

277.    The First Amendment's Free Exercise Clause protects Plaintiffs' right to operate their business, to create expression, to not create expression, to participate in religious exercises, to

JA052

not participate in religious exercises, to speak, to not speak, to associate, and to not associate in accordance with their religious beliefs.

278.    The First Amendment also protects Plaintiffs from having special disabilities imposed on the basis of stating disfavored religious views, being subject to individualized assessments, being subject to laws that lack neutrality and general application, being targeted for their religious beliefs, and being punished for exercising their religious beliefs.

279.    Plaintiffs exercise their religion under the First Amendment when they operate their business, adopt patterns and practices consistent with their religious beliefs, exercise their editorial judgment consistent with their religious beliefs, honestly communicate with clients and prospective clients about the photography they can and cannot create, participate in wedding ceremonies, and celebrate marriages between one man and one woman.

280.    As applied to Plaintiffs, the Accommodations and Publication Clauses substantially burden Plaintiffs' sincerely held religious beliefs by requiring them either to operate their expressive business in ways that violate their religious beliefs or to close their business, by preventing them from maintaining patterns and practices consistent with their religious views on marriage, by stopping them from being honest with prospective clients by barring them from stating what messages they will not express due to their religious beliefs, by preventing their religiously motivated speech, by compelling speech that they are religiously obligated to avoid, and by forcing their participation in activities prohibited by their religious beliefs.

281.    The Accommodations and Publication Clauses do not force nonreligious persons and businesses, or persons and business with favored religious views, to choose between these same options when faced with requests to promote messages they disagree with or when they must decide how to explain why they decline to promote certain messages.

JA053

282.    The Accommodations and Publication Clauses impermissibly prefer secular views over religious views, and certain religious views over others, by allowing those who own and operate public accommodations to express beliefs (religious or otherwise) in favor of same-sex marriage but not allowing them to express religious beliefs against same-sex marriage.

283.    The Accommodations and Publication Clauses are not facially or operationally neutral or generally applicable, are hostile towards religion, target and show favoritism towards certain religious beliefs, and impose special disabilities on Plaintiffs due to their religious beliefs.

284.    The Accommodations and Publication Clauses are not neutral or generally applicable because they contain several categorical exemptions, yet Defendants refuse to grant a religious exemption to Plaintiffs.

285.    The Accommodations and Publication Clauses also violate Plaintiffs' free-exercise rights under the hybrid rights doctrine because they implicate free exercise rights in conjunction with other constitutional protections, like the rights to free speech, association, and press.

286.    The Accommodations and Publication Clauses impose severe coercive pressure on Plaintiffs to change or violate their religious beliefs and to stop operating their business according to their religious beliefs.

287.    Plaintiffs have not and will not engage in certain religiously motivated conduct because of the Accommodations and Publication Clauses.

288.    If not for the Accommodations and Publication Clauses, Plaintiffs would immediately begin to act in ways motivated by their religious beliefs.

289.    The Accommodations and Publication Clauses are also facially unconstitutional because they regulate and prohibit certain activities because they are undertaken for religious reasons, ban activities only because of the religious beliefs those activities display, disfavor a particular

JA054

religion, target a specific religious belief for punishment, have the object of singling out a disfavored religious belief for punishment, were promulgated to achieve these goals, and were promulgated based on hostility toward particular religious views.

290.    Defendants do not serve any compelling or even valid interest in a narrowly tailored way by infringing the rights to freely exercise their religion.

291.    Accordingly, both facially and as applied to Plaintiffs, the Accommodations Clause and Publication Clause violate the First Amendment's protections to freely exercise religion.

<u>Third Cause of Action</u>
<u>First Amendment: Establishment Clause</u>

292.    Plaintiffs repeat and reallege each allegation contained in paragraphs 1–262 of this complaint.

293.    The First Amendment's Establishment Clause protects Plaintiffs' right to participate and to not participate in religious exercises in ways consistent with their religious beliefs.

294.    The Accommodations Clause forces Plaintiffs to participate in religious exercises contrary to their sincere religious beliefs.

295.    Defendants do not serve any compelling or even valid interest in a narrowly tailored way by compelling Plaintiffs to participate in religious exercises contrary to their sincerely held religious beliefs.

296.    Accordingly, as applied to Plaintiffs, the Accommodations Clause violates the First Amendment's protections to be free from religious establishments.

**Prayer for Relief**

Plaintiffs respectfully ask this Court to enter judgment against Defendants and provide the following relief:

1.      A preliminary and permanent injunction to stop Defendants and any person acting in concert with them from:

> a.  enforcing the Accommodations and Publication Clauses as applied to Plaintiffs' constitutionally protected speech, association, free press, religious exercise rights, and their right to be free from religious establishments; and

> b.  enforcing the Accommodations and Publication Clauses facially because they were adopted and are enforced based on religious hostility.

2.      A declaration that the Accommodations and Publication Clauses violate and are currently violating Plaintiffs' First Amendment rights under the United States Constitution to engage in speech, association, press, free exercise of religion, and to be free from the establishment of religion as applied to Plaintiffs' constitutionally protected activities;

3.      A declaration that the Accommodations and Publication Clauses facially violate the United States Constitution's First Amendment protections for free exercise of religion because they were adopted and are enforced based on religious hostility;

4.      That this Court adjudge, decree, and declare the rights and other legal relations of the parties to the subject matter here in controversy so that these declarations shall have the force and effect of a final judgment;

5.      That this Court retain jurisdiction of this matter for the purpose of enforcing its orders;

6.      That this Court award Plaintiffs' costs and expenses in this action, including reasonable attorneys' fees, in accordance with 42 U.S.C. § 1988;

7.      That this Court issue the requested injunctive relief without a condition of bond or other security required of Plaintiffs; and

JA056

8.    That this Court grant any other relief that it deems equitable and just in the

circumstances.

JA057

Respectfully submitted this 28th day of September, 2020.

By: _s/ C. Douglas Welty_

Jonathan A. Scruggs
Arizona Bar No. 030505*
**Alliance Defending Freedom**
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
(480) 444-0028 (facsimile)
jscruggs@ADFlegal.org

David A. Cortman
Georgia Bar No. 188810*
**Alliance Defending Freedom**
1000 Hurricane Shoals Rd. NE
Suite D-1100
Lawrenceville, GA 30043
(770) 339-0774
(770) 339-6744 (facsimile)
dcortman@ADFlegal.org

Johannes S. Widmalm-Delphonse
Minnesota Bar No. 396303*
**Alliance Defending Freedom**
20116 Ashbrook Place, Suite 250
Ashburn, VA 20147
(571) 707-4655
(571) 707-4656 (facsimile)
jwidmalmdelphonse@ADFlegal.org

C. Douglas Welty
Virginia Bar No. 29480
**C. Douglas Welty PLC**
2111 Wilson Boulevard
Suite 800
Arlington, Virginia 22201
(703) 276-0114
(844) 456-7800 (facsimile)
cdwelty@weltyblair.com

JA058

## DECLARATION UNDER PENALTY OF PERJURY

I, BOB UPDEGROVE , a citizen of the United States and a resident of the State of

Virginia, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing

is true and correct to the best of my knowledge.

Executed this **26** day of **SEPTEMBER** , 2020, at **LEESBURG** , Virginia.

_____
BOB UPDEGROVE

JA059

# EXHIBIT 1

JA060

<u>Editorial Policy</u>

"But as for me and my house, I will serve the Lord." Joshua 24:15

**<u>My mission</u>**

I started my journey as a photographer while volunteering with a Christian youth ministry. I discovered that I could use my camera as a tool to tell stories and that these stories allowed me to connect with students. Since then, my Christian faith has been an integral part of my photography and my business. I seek to create unique art, in a photojournalistic fashion, to promote messages consistent with my Christian values.

To be transparent about what my editorial process looks like, and the types of photographs my company can and cannot create, Bob Updegrove Photography adheres to the following principles.

**<u>Guiding principles</u>**

**Creative:** Photojournalists aspire to tell a story. I draw on over thirty years' experience to capture subjects spontaneously and candidly and to create a final product that is unique and artistic. But to craft a genuine narrative, I must be able to freely exercise my artistic discretion. While I sometimes capture choreographed poses and scenes at a client's request, I do not photograph from a "shot list" or guarantee that the photographs will look a certain way. I always retain full artistic license to capture the scenes I want to capture, and to edit the photographs as I see fit.

**Respectful:** I believe that all people are created in the image of God. As such, my photography treats individual subjects the same way that I would like to be treated and photograph them the way I would like to be photographed—with respect and dignity, but also with an eye to keeping things light-hearted.

**Reverent:** I believe that everything I create should reflect God's artistry and creativity as well as His goodness and truth. My ultimate goal is to create photography that honors Him and that encourages others to value actions and ideas that are good and true. I will not promote messages that contradict Biblical teachings or participate in events that violate my religious beliefs.

These principles inform the content I create and the messages I promote. I work with any person—regardless of race, color, religion, national origin, sex, or sexual orientation—when the services they request promote messages, causes, and platforms that are consistent with my guiding principles. I cannot, however, work

with any client in a way that promotes messages, causes, or platforms contrary to my guiding principles.

For example, as a company based upon Christian values, I believe that religious liberty is a human right and that a free market is the best way to promote individual freedom. Hence, I have created photography promoting conservative organizations that support these views, like the American Foreign Policy Council, Young America's Foundation, the Claremont Institute, the Clare Booth Luce Center for Conservative Women, and the Center for American Liberty. By the same token, I cannot create photography that promotes platforms or organizations supporting the censorship of religious beliefs or socialist government policies like the Human Rights Campaign, the Freedom from Religion Foundation, or the Democratic Socialists of America.

I also believe in the nuclear family and that it has never been more important to promote counter-cultural ideas about God's design for marriage. Hence, I will gladly photograph weddings, and I've photographed hundreds of them over the course of my career. But because I believe marriage is a sacred union between one man and one woman and weddings are sacred ceremonies, I cannot create photographs that promote concepts of marriage contrary to these views, such as photographs for same-sex weddings, weddings celebrating open-relationships, or weddings that contain sacrilegious themes. Nor can I participate in wedding ceremonies that honor, celebrate, or use prayers to solemnize these unions.

I adhere to these principles because the mission of Bob Updegrove Photography is not just to make a profit, but to serve as a ministry and help spread the Gospel. When I cannot fulfill a particular request, I make every effort to refer the person to capable photographer who can.

These policies of Bob Updegrove Photography are adopted this _____ day of _____, 2020, by:


_____

Bob Updegrove, Member

# EXHIBIT 2

JA063

Early in my career, I had little interest in wedding photography. I mostly did multi-image work (slideshows overlaid with audio) for school events. Back then, the shows were a novelty. Students loved them, I really enjoyed the creative and interpersonal side of working with students.

Eventually, the kids I photographed in school grew up. They started getting married. And suddenly I had lots of clients asking me to photograph their weddings. The more weddings I shot, the more I really enjoyed them. Making a lifelong commitment is no small thing in this day and age. I find it's something *worth* celebrating, now more than ever.

If you're interested in hiring me, please take a look at my portfolio to get to know my photography style. It's important to find a photographer who is a good fit for capturing your event.

In the same vein, I want to be sure that I can honestly celebrate your wedding. That produces the best photographs. And because of my Christian faith, I cannot genuinely celebrate every concept of marriage out there. I believe marriage is a sacred covenant between one man and one woman. So I cannot photograph same-sex weddings, weddings that incorporate irreverent themes, or any wedding celebration that contradicts what the Bible teaches about marriage.

I know these ideas may be a bit old-fashioned. That is why I think it is important to publicly celebrate them, and why I want to be transparent about the services I can provide. I thank you in advance for your understanding.

I have been fortunate in my life to pursue my passion as my career. I'm grateful for your time and interest in my photography.

USCA4 Appeal: 21-1506 Doc: 19 Filed: 07/14/2021 Pg: 69 of 523

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| **Robert Updegrove**, and **Loudoun Multi-Images LLC** d/b/a **Bob Updegrove Photography**, <br><br> Plaintiffs, <br><br> v. <br><br> **Mark R. Herring**, in his official capacity as Virginia Attorney General; and **R. Thomas Payne, II**, in his official capacity as Director of the Virginia Division of Human Rights and Fair Housing, <br><br> Defendants. | Case No. _____ <br><br> **Plaintiffs' Motion for Preliminary Injunction** |

## Motion

Consistent with Federal Rule of Civil Procedure 65, Plaintiffs Robert (Bob) Updegrove and Bob Updegrove Photography (collectively "Bob") request a preliminary injunction to stop Defendants Mark R. Herring and R. Thomas Payne, II from enforcing § 2.2-3904(B) of the Virginia Human Rights Act as applied to Bob's constitutionally protected activities.

Virginia Code § 2.2-3904(B) contains two provisions relevant here. First, Virginia Code § 2.2-3904(B) makes it unlawful for public accommodations "to refuse, withhold from, or deny any individual," "to attempt to refuse, withhold from, or deny any individual" or "to segregate or discriminate" against any individual in the use of the public accommodation "on the basis of … sexual orientation." For clarity, Plaintiffs call this clause the Accommodations Clause. Second, Virginia Code §2.2-3904(B) makes it unlawful "to publish, circulate, issue, display, post, or mail, directly or indirectly, any communication, notice, or advertisement to the effect

JA065

that" services "shall be refused, withheld from, or denied to any individual on the basis of …

sexual orientation." Plaintiffs call this clause the Publication Clause.

Scope of injunction and persons bound

Bob seeks a preliminary injunction to enjoin Defendants, their officers, agents, servants,

employees, and attorneys, and other persons in active concert or participation with Defendants,

who receive actual notice of this motion, from taking these actions:

1.  Enforcing the Accommodations Clause to force Bob to offer or provide his
    wedding photography services (photographing, editing, and posting) for same-
    sex weddings or engagements.

2.  Enforcing the Accommodations Clause to prevent Bob from asking prospective
    clients whether they seek photography services celebrating a same-sex wedding
    or engagement or from asking materially similar questions.

3.  Enforcing the Accommodations Clause to prevent Bob from adopting his desired
    editorial policy (Verified Complaint Exhibit 1).

4.  Enforcing the Accommodations and Publication Clauses to prevent Bob from
    distributing his desired editorial policy (Verified Complaint Exhibit 1).

5.  Enforcing the Accommodations and Publication Clauses to prevent Bob from
    posting his desired statement (Verified Complaint Exhibit 2) on his website or
    from making materially similar statements on his website or directly to
    prospective clients.

Reasons for injunction

Without a preliminary injunction, Defendants seek to compel Bob's speech, regulate

Bob's speech based on content, and compel Bob to participate in religious ceremonies, causing

irreparable harm and violating the First Amendment. In support of his motion, Bob relies on any

filed pleadings, including:

JA066

- The Verified Complaint and the attached exhibits;

- Plaintiffs' Brief in Support of their Motion for Preliminary Injunction;

- Appendix to Plaintiffs' Motion for Preliminary Injunction;

- Bob Updegrove's Declaration in Support of Plaintiffs' Motion for Preliminary Injunction;

- Plaintiffs' Reply in Support of their Motion for Preliminary Injunction (when filed); and

- Any other supporting documents (if any filed).

Bob asks the Court to grant oral argument in support of his motion at a time and date set by the Court.

<u>Security</u>

Bob also asks this Court to waive any bond because the requested injunction serves the public interest by vindicating his rights under the First Amendment. *See Pashby v. Delia*, 709 F.3d 307, 332 (4th Cir. 2013) (district court may waive security requirement); *Moltan Co. v. Eagle-Picher Indus., Inc.*, 55 F.3d 1171, 1176 (6th Cir. 1995) (upholding district court's decision to waive bond requirement given the strength of movant's arguments and the public interest involved); *Thomas v. Andino*, No. 3:20-cv-01552-JMC, 2020 WL 2617329, at *24 (D.S.C. May 25, 2020) (waiving bond due to public interest); *Hassay v. Mayor*, 955 F. Supp. 2d 505, 527 (D. Md. 2013) (requiring $1 bond because injunction to prevent likely First Amendment violation had "minimal or nonexistent" costs).


Respectfully submitted this 28th day of September 2020.

JA067

By: *s/ C. Douglas Welty*

Jonathan A. Scruggs
Arizona Bar No. 030505*
**Alliance Defending Freedom**
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
(480) 444-0028 (facsimile)
jscruggs@ADFlegal.org

David A. Cortman
Georgia Bar No. 188810*
**Alliance Defending Freedom**
1000 Hurricane Shoals Rd. NE
Suite D-1100
Lawrenceville, GA 30043
(770) 339-0774
(770) 339-6744 (facsimile)
dcortman@ADFlegal.org

Johannes S. Widmalm-Delphonse
Minnesota Bar No. 396303*
**Alliance Defending Freedom**
20116 Ashbrook Place, Suite 258
Ashburn, VA 20147
(571) 707-4655
(571) 707-4656 (facsimile)
jwidmalmdelphonse@ADFlegal.org

C. Douglas Welty
Virginia Bar No. 29480
**C. Douglas Welty PLC**
2111 Wilson Boulevard
Suite 800
Arlington, Virginia 22201
(703) 276-0114
(844) 456-7800 (facsimile)
cdwelty@weltyblair.com

ATTORNEYS FOR PLAINTIFFS

*Motions for *Pro Hac Vice* admission filed concurrently

JA068

## CERTIFICATE OF SERVICE

I hereby certify that on the 28th day of September, 2020, I electronically filed the foregoing paper with the Clerk of Court using the ECF system, and I hereby certify that the foregoing paper will be served via private process server with the Summons and Complaint to the following participants:

Mark R. Herring, Attorney General
Commonwealth of Virginia
Office of the Attorney General
202 North Ninth Street
Richmond, VA 23219

R. Thomas Payne, II, Director
Civil Rights Unit/SAAG Fair Housing
Division of Human Rights and Fair Housing
Office of the Attorney General
202 North Ninth Street
Richmond, VA 23219

*s/ C. Douglas Welty*
C. Douglas Welty
*Attorney for Plaintiffs*

JA069

## TABLE OF CONTENTS: APPENDIX TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

| Description | Appendix Page Number(s) |
|---|---|
| Loudoun Multi-Images LLC's Registration | 1 |
| Bob Updegrove Photography's Operating Agreement | 2 |
| Bob Updegrove Photography's Website Pages | 15 |
| Bob Updegrove Photography's Blog | 35 |
| Cornerstone Chapel's Articles of Faith | 48 |
| Calvary Chapel's Articles of Faith | 50 |
| Bob Updegrove's Sample Service Agreement | 53 |
| Bob's Engagement Photographs | 59 |
| Bob's Wedding Photographs | 66 |
| Bob's Edited Photographs | 75 |
| John Piper - "Would you Attend a Gay Wedding?" | 79 |
| Kevin DeYoung - "Should I attend a Homosexual Wedding?" | 81 |
| Cristina Mittermeier Statement | 83 |
| Engaged Legal Collective – "5 Must-Have Wedding Photography Cont15ract Terms" | 86 |
| Alina Thomas Photography Statement | 95 |

JA070

| | |
|---|---|
| Brittany Lowe Photography Statement | 100 |
| Amanda Summerlin Statements | 101 |
| Susan Stripling Statements | 110 |
| Robert & Kathleen Photographers Statement | 122 |
| Creatrix Photography Statements and Photographs of Polygamous Engagement and Wedding Photographs | 123 |
| Zoe Larkin – "Open Marriage, Transitioning and Play Parties: One Couple's Story of Their Thriving Poly Love Life" | 136 |
| Love and Marij Cannabis Friendly Wedding Photographers Statement | 147 |
| Rachel Artime's Cannabis Statement and Photographs | 150 |
| Misfit Weddings Satanic Wedding Article and Photographs | 151 |
| Washingtonian – "One Part Wedding, Two Parts Halloween, and One Part Viking Funeral" | 158 |
| Creatrix Photography – "Austin Vampire Wedding" | 165 |
| Equally Wed Statement and Posts | 171 |
| Bakerture Photography and Video - "The Exorcist Wedding Styled Shoot" | 177 |
| Williams Institute Report | 182 |
| Gallup Poll Report | 189 |
| Shawnee Custalow Statement and Photographs of Same-Sex Engagements and Weddings | 195 |
| Shawnee Custalow Instagram Post | 205 |

| | |
|---|---|
| Crystal Image Photography Statement and Same-Sex Engagement and Wedding Photographs | 206 |
| Aaron Watson Photography – "Matt & Greg's Fall Jewish Wedding" | 208 |
| Jon Fleming Photography Blog Post and Same-Sex Wedding Photographs | 213 |
| 3 Cats Photo Blog Post and Same-Sex Engagement and Wedding Photographs | 217 |
| Other Photographer's Same-Sex Engagement and Wedding Photographs | 222 |
| Bob Updegrove Photography Additional Blog Posts | 228 |



 APP. 001

# OPERATING AGREEMENT
## of
## Loudoun Multi-Images LLC

**This Operating Agreement** (the "Agreement") made and entered into this _____ day of July, 2017 (the "Execution Date"),

BY:

Robert Updegrove of ▮▮▮▮▮▮▮▮▮, Leesburg, Virginia 20175

(the "Member").

BACKGROUND:

A.     The Member wishes to be the sole member of a limited liability company.

B.     The terms and conditions of this Agreement will govern the Member within the limited liability company.

**IN CONSIDERATION OF** and as a condition of the Member entering into this Agreement and other valuable consideration, the receipt and sufficiency of which is acknowledged, the Member agrees as follows:

### Formation

1.     By this Agreement, the Member forms a Limited Liability Company (the "Company") in accordance with the laws of the Commonwealth of Virginia. The rights and obligations of the Member will be as stated in the Virginia Limited Liability Company Act (the "Act") except as otherwise provided in this agreement.

### Name

2.     The name of the Company will be Loudoun Multi-Images LLC.

JA074    APP. 002

### Sole Member

3.   While the Company consists only of one Member, any reference in this Agreement to two or more Members and that requires the majority consent or unanimous consent of Members, or that requires a certain percentage vote of Members, should be interpreted as only requiring the consent or vote of the sole Member.

### Purpose

4.   Photography.

### Term

5.   The Company will continue until terminated as provided in this Agreement or may dissolve under conditions provided in the Act.

### Place of Business

6.   The Principal Office of the Company will be located at ▆▆▆▆▆▆▆. SW, Leesburg, Virginia 20175 or such other place as the Member may from time to time designate.

### Capital Contributions

7.   The following table shows the Initial Contributions of the Member. The Member agrees to make the Initial Contributions to the Company in full, according to the following terms:

| Member | Contribution Description | Value of Contribution |
|---|---|---|
| Robert Updegrove | All Photographic equipment. All computer equipment. | $20,000.00 |

### Allocation of Profits/Losses

8.   Subject to the other provisions of this Agreement, the Net Profits or Losses, for both accounting and tax purposes, will accrue to and be borne by the sole Member:

Robert Updegrove of ▆▆▆▆▆▆▆, Leesburg, Virginia 20175.

 APP. 003

9.      Where the Company consists of two or more Members, no Member will have priority over any other Member for the distribution of Net Profits or Losses.

### Nature of Interest

10.     A Member's Interest in the Company will be considered personal property.

### Withdrawal of Contribution

11.     Where the Company consists of two or more Members, no Member will withdraw any portion of their Capital Contribution without the unanimous consent of the other Members.

### Liability for Contribution

12.     A Member's obligation to make their required Capital Contribution can only be compromised or released with the consent of all remaining Members or as otherwise provided in this Agreement. If a Member does not make the Capital Contribution when it is due, he is obligated at the option of any remaining Members to contribute cash equal to the agreed value of the Capital Contribution. This option is in addition to and not in lieu of any others rights, including the right to specific performance that the Company may have against the Member.

### Additional Contributions

13.     Capital Contributions may be amended from time to time, according to the business needs of the Company. However if additional capital is determined to be required and an individual Member is unwilling or unable to meet the additional contribution requirement within a reasonable period, and where the Company consists of two or more Members, the remaining Members may contribute in proportion to their existing Capital Contributions to resolve the amount in default. In such case, the allocation of Net Profits or Losses and the distribution of assets on dissociation or dissolution will be adjusted accordingly.

14.     Any advance of money to the Company by any Member in excess of the amounts provided for in this Agreement or subsequently agreed to, will be deemed a debt due from the Company rather than an increase in the Capital Contribution of the Member. This liability will be repaid with interest at such rates and times to be determined by a majority of the Members. This liability will not entitle the lending Member to any increased share of the Company's profits nor to a greater voting power. Repayment of such debts will have priority over any other payments to Members.

USCA4 Appeal: 21-1506    Doc: 19    Filed: 07/14/2021    Pg: 81 of 523

### Capital Accounts

15.   An individual capital account (the "Capital Account") will be maintained for each Member and their Initial Contributions will be credited to this account. Any Additional Contributions made by any Member will be credited to that Member's individual Capital Account.

### Interest on Capital

16.   No borrowing charge or loan interest will be due or payable to any Member on their agreed Capital Contribution inclusive of any agreed Additional Contributions.

### Management

17.   Management of this Company is vested in the Member.

### Authority to Bind Company

18.   Only the following individuals have authority to bind the Company in contract: Bob Updegrove only.

### Duty of Loyalty

19.   Any Member may invest in or engage in any business of any type, including without limitation, a business that is similar to the business of the Company whether or not in direct competition with the Company and whether or not within the established or contemplated market regions of the Company. Neither the Company nor any Member will have any right to that opportunity or any income derived from that opportunity.

### Duty to Devote Time

20.   Each Member will devote such time and attention to the business of the Company as the majority of the Members will from time to time reasonably determine for the conduct of the Company's business.

### Member Meetings

21.   Where the Company consists of two or more Members, a meeting may be called by any Member providing that reasonable notice has been given to the other Members.

22.   Regular meetings of the Members will be held only as required.

 APP. 005

### Voting

23.   Each Member will be entitled to cast votes on any matter based upon the proportion of that Member's Capital Contributions in the Company.

### Admission of New Members

24.   No new Members may be admitted into the Company.

### Voluntary Withdrawal of a Member

25.   A Member may not withdraw from the Company without the unanimous consent of the remaining Members. Any such unauthorized withdrawal will be considered a wrongful dissociation and a breach of this Agreement. In the event of any such wrongful dissociation, the withdrawing Member will be liable to the remaining Members for any damages incurred by the remaining Members including but not limited to the loss of future earnings.

26.   The voluntary withdrawal of a Member will have no effect upon the continuance of the Company.

27.   It remains incumbent on the withdrawing Member to exercise this dissociation in good faith and to minimize any present or future harm done to the remaining Members as a result of the withdrawal.

### Involuntary Withdrawal of a Member

28.   Events leading to the involuntary withdrawal of a Member from the Company will include but not be limited to: death of a Member; Member mental incapacity; Member disability preventing reasonable participation in the Company; Member incompetence; breach of fiduciary duties by a Member; criminal conviction of a Member; Operation of Law against a Member or a legal judgment against a Member that can reasonably be expected to bring the business or societal reputation of the Company into disrepute. Expulsion of a Member can also occur on application by the Company or another Member, where it has been judicially determined that the Member: has engaged in wrongful conduct that adversely and materially affected the Company's business; has willfully or persistently committed a material breach of this Agreement or of a duty owed to the Company or to the other Members; or has engaged in conduct relating to the Company's business that makes it not reasonably practicable to carry on the business with the Member.

29.   The involuntary withdrawal of a Member will have no effect upon the continuance of the Company.

APP. 006

USCA4 Appeal: 21-1506    Doc: 19    Filed: 07/14/2021    Pg: 83 of 523

### Dissociation of a Member

30.  Where the Company consists of two or more Members, in the event of either a voluntary or involuntary withdrawal of a Member, if the remaining Members elect to purchase the interest of the withdrawing Member, the remaining Members will serve written notice of such election, including the purchase price and method and schedule of payment for the withdrawing Member's Interests, upon the withdrawing Member, their executor, administrator, trustee, committee or analogous fiduciary within a reasonable period after acquiring knowledge of the change in circumstance to the affected Member.

31.  Valuation and distribution will be determined as described in the Valuation of Interest section of this Agreement.

32.  Any remaining Members retain the right to seek damages from a dissociated Member where the dissociation resulted from a malicious or criminal act by the dissociated Member or where the dissociated Member had breached their fiduciary duty to the Company or was in breach of this Agreement or had acted in a way that could reasonably be foreseen to bring harm or damage to the Company or to the reputation of the Company.

33.  A dissociated Member will only have liability for Company obligations that were incurred during their time as a Member. On dissociation of a Member, the Company will prepare, file, serve, and publish all notices required by law to protect the dissociated Member from liability for future Company obligations.

34.  Where any remaining Members have purchased the interest of a dissociated Member, the purchase amount will be paid in full, but without interest, within 90 days of the date of withdrawal. The Company will retain exclusive rights to use of the trade name and firm name and all related brand and model names of the Company.

### Right of First Purchase

35.  Where the Company consists of two or more Members, in the event that a Member's Interest in the Company is or will be sold, due to any reason, the remaining Members will have a right of first purchase of that Member's Interest.

### Assignment of Interest

36.    In the event that a Member's interest in the company is transferred or assigned as the result of a court order or Operation of Law, the trustee in bankruptcy or other person acquiring that Member's Interests in the Company will only acquire that Member's economic rights and interests and will not acquire any other rights of that Member or be admitted as a Member of the Company or have the right to exercise any management or voting interests.

### Valuation of Interest

37.    Where the Company consists of two or more Members, a Member's financial interest in the Company will be in proportion to their Capital Contributions, inclusive of any Additional Capital Contributions.

38.    In the absence of a written agreement setting a value, the value of the Company will be based on the fair market value appraisal of all Company assets (less liabilities) determined in accordance with generally accepted accounting principles (GAAP). This appraisal will be conducted by an independent accounting firm agreed to by all Members. An appraiser will be appointed within a reasonable period of the date of withdrawal or dissolution. The results of the appraisal will be binding on all Members.

39.    No allowance will be made for goodwill, trade name, patents or other intangible assets, except where those assets have been reflected on the Company books immediately prior to valuation.

### Dissolution

40.    The Company may be dissolved by a unanimous vote of the Members. The Company will also be dissolved on the occurrence of events specified in the Act.

41.    Upon Dissolution of the Company and liquidation of Company property, and after payment of all selling costs and expenses, the liquidator will distribute the Company assets to the following groups according to the following order of priority:

   a.    in satisfaction of liabilities to creditors except Company obligations to current Members;

   b.    in satisfaction of Company debt obligations to current Members; and then

   c.    to the Member.

 APP. 008

### Records

42.    The Company will at all times maintain accurate records of the following:

    a.    Information regarding the status of the business and the financial condition of the
          Company.

    b.    A copy of the Company federal, state, and local income taxes for each year, promptly after
          becoming available.

    c.    Name and last known business, residential, or mailing address of each Member, as well as
          the date that person became a Member.

    d.    A copy of this Agreement and any articles or certificate of formation, as well as all
          amendments, together with any executed copies of any written powers of attorney pursuant
          to which this Agreement, articles or certificate, and any amendments have been executed.

    e.    The cash, property, and services contributed to the Company by each Member, along with
          a description and value, and any contributions that have been agreed to be made in the
          future.

43.    Each Member has the right to demand, within a reasonable period of time, a copy of any of the
       above documents for any purpose reasonably related to their interest as a Member of the
       Company, at their expense.

### Books of Account

44.    Accurate and complete books of account of the transactions of the Company will be kept in
       accordance with generally accepted accounting principles (GAAP) and at all reasonable times
       will be available and open to inspection and examination by any Member. The books and records
       of the Company will reflect all the Company's transactions and will be appropriate and adequate
       for the business conducted by the Company.

### Banking and Company Funds

45.    The funds of the Company will be placed in such investments and banking accounts as will be
       designated by the Member. All withdrawals from these accounts will be made by the duly
       authorized agent or agents of the Company as appointed by unanimous consent of the Members.
       Company funds will be held in the name of the Company and will not be commingled with those

USCA4 Appeal: 21-1506    Doc: 19    Filed: 07/14/2021    Pg: 86 of 523

of any other person or entity.

### Audit

46.   Any of the Members will have the right to request an audit of the Company books. The cost of the audit will be borne by the Company. The audit will be performed by an accounting firm acceptable to all the Members. Not more than one (1) audit will be required by any or all of the Members for any fiscal year.

### Tax Treatment

47.   This Company is intended to be treated as a disregarded entity, for the purposes of Federal and State Income Tax.

### Annual Report

48.   As soon as practicable after the close of each fiscal year, the Company will furnish to each Member an annual report showing a full and complete account of the condition of the Company including all information as will be necessary for the preparation of each Member's income or other tax returns. This report will consist of at least:

a.   A copy of the Company's federal income tax returns for that fiscal year.

b.   Income statement.

### Goodwill

49.   The goodwill of the Company will be assessed at an amount to be determined by appraisal using generally accepted accounting principles (GAAP).

### Governing Law

50.   The Members submit to the jurisdiction of the courts of the Commonwealth of Virginia for the enforcement of this Agreement or any arbitration award or decision arising from this Agreement.

### Force Majeure

51.   A Member will be free of liability to the Company where the Member is prevented from executing their obligations under this Agreement in whole or in part due to force majeure, such as earthquake, typhoon, flood, fire, and war or any other unforeseen and uncontrollable event where the Member has communicated the circumstance of the event to any and all other Members and where the Member has taken any and all appropriate action to satisfy his duties and obligations to

APP. 010

the Company and to mitigate the effects of the event.

### Forbidden Acts

52.     No Member may do any act in contravention of this Agreement.

53.     No Member may permit, intentionally or unintentionally, the assignment of express, implied or apparent authority to a third party that is not a Member of the Company.

54.     No Member may do any act that would make it impossible to carry on the ordinary business of the Company.

55.     No Member will have the right or authority to bind or obligate the Company to any extent with regard to any matter outside the intended purpose of the Company.

56.     No Member may confess a judgment against the Company.

57.     Any violation of the above forbidden acts will be deemed an Involuntary Withdrawal and may be treated accordingly by the remaining Members.

### Indemnification

58.     All Members will be indemnified and held harmless by the Company from and against any and all claims of any nature, whatsoever, arising out of a Member's participation in Company affairs. A Member will not be entitled to indemnification under this section for liability arising out of gross negligence or willful misconduct of the Member or the breach by the Member of any provisions of this Agreement.

### Liability

59.     A Member or any employee will not be liable to the Company or to any other Member for any mistake or error in judgment or for any act or omission believed in good faith to be within the scope of authority conferred or implied by this Agreement or the Company. The Member or employee will be liable only for any and all acts and omissions involving intentional wrongdoing.

### Liability Insurance

60.     The Company may acquire insurance on behalf of any Member, employee, agent or other person engaged in the business interest of the Company against any liability asserted against them or incurred by them while acting in good faith on behalf of the Company.

### Life Insurance

61.    The Company will have the right to acquire life insurance on the lives of any or all of the Members, whenever it is deemed necessary by the Company. Each Member will cooperate fully with the Company in obtaining any such policies of life insurance.

### Amendment of this Agreement

62.    No amendment or modification of this Agreement will be valid or effective unless in writing and signed by all Members.

### Title to Company Property

63.    Title to all Company property will remain in the name of the Company. No Member or group of Members will have any ownership interest in Company property in whole or in part.

### Miscellaneous

64.    Time is of the essence in this Agreement.

65.    This Agreement may be executed in counterparts.

66.    Headings are inserted for the convenience of the Members only and are not to be considered when interpreting this Agreement. Words in the singular mean and include the plural and vice versa. Words in the masculine gender include the feminine gender and vice versa. Words in a neutral gender include the masculine gender and the feminine gender and vice versa.

67.    If any term, covenant, condition or provision of this Agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, it is the Members' intent that such provision be reduced in scope by the court only to the extent deemed necessary by that court to render the provision reasonable and enforceable and the remainder of the provisions of this Agreement will in no way be affected, impaired or invalidated as a result.

68.    This Agreement contains the entire agreement between the Members. All negotiations and understandings have been included in this Agreement. Statements or representations that may have been made by any Member during the negotiation stages of this Agreement, may in some way be inconsistent with this final written Agreement. All such statements have no force or effect in respect to this Agreement. Only the written terms of this Agreement will bind the Members.

69.    This Agreement and the terms and conditions contained in this Agreement apply to and are binding upon each Member's successors, assigns, executors, administrators, beneficiaries, and representatives.

70.    Any notices or delivery required here will be deemed completed when hand-delivered, delivered by agent, or seven (7) days after being placed in the post, postage prepaid, to the Members at the addresses contained in this Agreement or as the Members may later designate in writing.

71.    All of the rights, remedies and benefits provided by this Agreement will be cumulative and will not be exclusive of any other such rights, remedies and benefits allowed by law.

## Definitions

72.    For the purpose of this Agreement, the following terms are defined as follows:

    a.    "Additional Contribution" means Capital Contributions, other than Initial Contributions, made by Members to the Company.

    b.    "Capital Contribution" means the total amount of cash, property, or services contributed to the Company by any one Member.

    c.    "Distributions" means a payment of Company profits to the Members.

    d.    "Initial Contribution" means the initial Capital Contributions made by any Member to acquire an interest in the Company.

    e.    "Member's Interests" means the Member's collective rights, including but not limited to, the Member's right to share in profits, Member's right to a share of Company assets on dissolution of the Company, Member's voting rights, and Member's rights to participate in the management of the Company.

    f.    "Net Profits or Losses" means the net profits or losses of the Company as determined by generally accepted accounting principles (GAAP).

    g.    "Operation of Law" means rights or duties that are cast upon a party by the law, without any act or agreement on the part of the individual, including, but not limited to, an assignment for the benefit of creditors, a divorce, or a bankruptcy.

h.    "Principal Office" means the office whether inside or outside the Commonwealth of Virginia where the executive or management of the Company maintain their primary office.

i.    "Voting Members" means the Members who belong to a membership class that has voting power. Where there is only one class of Members, then those Members constitute the Voting Members.

**IN WITNESS WHEREOF** the Member has duly affixed their signature under hand and seal on this _____ **17** _____ day of July, 2017.

**SIGNED, SEALED, AND DELIVERED**

in the presence of:

Witness: _Richard H. Hickman_ (Sign)

Witness Name: **Richard H. Hickman**

R.Lt Up-G

Robert Updegrove (Member)

©2002-2017 LawDepot.com™

## BOB UPDEGROVE PHOTOGRAPHY
Leesburg · Loudoun County · Washington D.C. Metro Area Wedding & Event Photography

HOME    WEDDINGS    PEOPLE    PLACES    INFO

"Oh, that men would give thanks to the Lord for His goodness."
Psalm 107:8





Weddings          Organizations & Events          CORT

For best viewing on a device, download the free Smugmug app and browse for: upde

iOS app (iPad and iPhone)       Android app

Recommended Links:

YOUNG LIFE WESTERN LOUDOUN    CORNERSTONE CHAPEL    STROBIST    DEALMAC    AMERICAN THINKER

APP. 015

# BOB UPDEGROVE PHOTOGRAPHY
Leesburg • Loudoun County • Washington D.C. Metro Area Wedding & Event Photography

🏠 › Weddings



## Folders

Sample Galleries

Weddings (Private Galleries)

APP. 016

JA089
APP. 017



APP. 018



BOB UPDEGROVE PHOTOGRAPHY
Leesburg - Loudoun County - Washington D.C. Metro Area Wedding & Event Photography

HOME    WEDDINGS    PEOPLE    PLACES    INFO

FOLDERS

Jablonski Family    Su Chuang    Hoplin Family    Jensen Family 2018

Alex and Katie    Ryan Family    Kannappan Family 2017    Nukta Family 2017

Bender Family 2016    Adam and Ana Engagement    Blakeney Family    Kushins

JA092    APP. 020



APP. 021



APP. 022



JA095  APP. 023

## BOB UPDEGROVE PHOTOGRAPHY
Leesburg • Loudoun County • Washington D.C. Metro Area Wedding & Event Photography

HOME    WEDDINGS    PEOPLE    PLACES    INFO

🏠 › ENGAGEMENT PHOTOS

## Engagement Sessions


Seth and Leigh-Ann


Colin and Arina E-Session


Milosz and Eleni E-Session


Nick and Blakeley E-Session



George and Sarah E-Session



Steve & Nicole E-Session



Albert and Tanya E-Session


Maurrie and Maria E-Session


Clay and Dana E-Session


IJ and Niti E-Session


Tom and Brandi E-Session


Tim and Tatum E-Session

JA096    APP. 024

Case 1:20-cv-01141   Document 3-1   Filed 09/28/20   Page 25 of 72 PageID# 95



JA097   APP. 025

USCA4 Appeal: 21-1506    Doc: 19    Filed: 07/14/2021    Pg: 102 of 523

BOB UPDEGROVE PHOTOGRAPHY

Leesburg • Loudoun County • Washington D.C. Metro Area Wedding & Event Photography

HOME    WEDDINGS    PEOPLE    PLACES    INFO

🏠 › Nostalgia

# NOSTALGIA

## FOLDERS


Ashland High School Oregon


Wittenberg University


George C. Marshall High School


Leesburg Community Bible Church .

## Galleries


Rogue Valley Campus Life


Medford Mid and High School Late 70's/Early 80's


Old Falls Church

Powered by SmugMug    Owner Log In

JA099    APP. 027



BOB UPDEGROVE PHOTOGRAPHY
Leesburg • Loudoun County • Washington D.C. Metro Area Wedding & Event Photography

HOME    WEDDINGS    PEOPLE    PLACES    INFO

🏠 › Videos

## Galleries

Miscellaneous Videos    Pat Dorsey    Private    Brady

PSEA Slide Shows    PSEA Launch Videos    PSEA Joke Videos    Marshall Family

Nostalgic Videos

Powered by SmugMug    Owner Log In

JA100    APP. 028

# BOB UPDEGROVE PHOTOGRAPHY

Leesburg – Loudoun County – Washington D.C. Metro Area Wedding & Event Photography

🏠 › Places › LOUDOUN COUNTY VIRGINIA

## Galleries



War Reenactments



Dulles International Airport



Waterford Fair



Snow Scenes



August Court Days 2004



Barn Scenes



Horses



Leesburg



Loudoun County Sample Gallery

JA101   APP. 029

## BOB UPDEGROVE PHOTOGRAPHY
Leesburg • Loudoun County • Washington D.C. Metro Area Wedding & Event Photography

HOME    WEDDINGS    PEOPLE    PLACES    INFO

Places > SCENIC LOCATIONS

# SCENIC LOCATIONS

## Galleries


VICTORIA, B.C.


CHAUTAUQUA, N.Y.


WASHINGTON, D.C.


ACAPULCO, MEXICO


BANFF, CANADA


YOSEMITE


Bermuda


Bethany Beach

JA102    APP. 030

# BOB UPDEGROVE PHOTOGRAPHY
Leesburg · Loudoun County · Washington D.C. Metro Area: Wedding & Event Photography

HOME    WEDDINGS   PEOPLE    PLACES    INFO



Not many people get to take their hobby ... their passion ... and make it their career. I have been fortunate to do just that.

It started with slide shows. Actually it started with a camera I bought for $5 during college. An Argus C3 ... a brick of a camera, but it took pictures, and I liked that. After obtaining my Political Science degree from Wittenberg University in Ohio, I bought a real camera. This time it was a fully manual Pentax Spotmatic. I learned a lot with that camera: exposure, composition, patience. Soon I was taking photos of my family, high school kids, sports, anything I could. And before long I was playing around with two and three  projector slide shows with music, narration, and a story. My photography hobby turned into more of a multi-media production hobby, and soon that turned into my career.

Over recent years I have drifted back to mostly photography, although I still enjoy doing the occasional production work. Today I photograph weddings, events, corporate head shots and families. I also enjoy getting out on my own to shoot some landscape images.

If you have any questions or if I can be of assistance with your photography needs, please contact me here.

JA103   APP. 031

**BOB UPDEGROVE PHOTOGRAPHY**
Leesburg · Loudoun County · Washington D.C. Metro Area Wedding & Event Photography

HOME    WEDDINGS    PEOPLE    PLACES    INFO

⌂ › Information › Contact Bob

Bob Updegrove
25 Catoctin Circle SE #4262
Leesburg, VA 20177

Email Bob

Have a question or comment? Please let me know.

**Name** *

First        Last

**Email** *

**Confirm Email** *

**Comment/Question**

f

Powered by SmugMug    Owner Log In

JA104    APP. 032

BOB UPDEGROVE PHOTOGRAPHY
Leesburg – Loudoun County – Washington D.C. Metro Area Wedding & Event Photography

HOME     WEDDINGS     PEOPLE     PLACES     INFO

🏠 › Information › Slide Shows

ONLINE ORDER FORM

## Looking for old Loudoun school slide shows?

I am in the process of converting the old slide shows over to DVD. These conversions are taken from the master tapes. The quality should be better than the original VHS. Please take a look at the online order form to place your order.



Powered by SmugMug     Owner Log In

APP. 033

## BOB UPDEGROVE PHOTOGRAPHY
Leesburg - Loudoun County - Washington D.C. Metro Area Wedding & Event Photography

HOME    WEDDINGS    PEOPLE    PLACES    INFO

I have been changing my schedule for wedding photography to better accommodate other obligations. Please go ahead and submit this form and I can let you know about my availability as well as pricing information. Thank you. Bob

### Wedding Information & Pricing Request

Bride's Name *

First        Last

Groom's Name *

First        Last

Email *

Email Confirm *

Wedding Location (If Known)

Date of Wedding (If Known)

Additional Information

Powered by WUFOO
by SurveyMonkey

Powered by SmugMug    Owner Log In

JA106    APP. 034



| | More | | | Create Blog | Sign In |

FAITH - POLITICS - PHOTOGRAPHY

**FRIDAY, JUNE 22, 2012**

## Some Wedding Advice From A Photographer

Every once in awhile I like to offer my unsolicited wedding advice. Of course my interest here is from a photographic perspective. I'm not a wedding planner and I am not a bride, so my interests and priorities are not always in line with theirs. And that is fine. I realize I cannot have things happen the way I deem would be best, and that I have to defer to the wishes of my clients. It is their wedding after all, and I have no interest in imposing my will or wishes on them. But I have been to a lot of weddings over the years, which means I have some experience as a photographer that I believe can be helpful in making a person's wedding a better experience for them. With that in mind, I humbly offer here a few suggestions, again from one photographer's perspective. These are thoughts that I have carried with me for some time now. Here they are, in no particular order:

1. First dance/Father-Daughter dance/Mother-Son dance: There are basically two times for these dances to take place, before dinner or after dinner. It probably does not matter too much when you have it, but what I believe does matter is having the full attention of your guests for those dances. Oftentimes during these dances, I will look around the room. I am looking for emotionally engaged people, with a tear in their eye or a big smile as they watch the bride and her father dance together. These are great photos when they happen. What I often see though are people with their backs to the dance floor, or people off in the corner laughing, or people munching on their salad. And as I am taking photos of the couple dancing, I know that in the background there will be people with their back to the dance floor, or people off in the corner laughing, or people munching on their salad . . all unengaged with this special moment. I'm not sure what the secret is for fully engaging your guests, but my first guess is that it probably starts with your deejay. I would recommend talking with the deejay during your planning process to see what they recommend and what they can do to pull everyone's attention to the dance floor. Now I understand that for some couples, these dances might be important to them, but not so important that they need everyone's full attention. But

**KEEPING IT SIMPLE**

Give me a Diet Coke or a nice tall glass of iced tea, and I am one happy guy. Yeah, it doesn't take much. I like keeping things simple and uncomplicated. That is the way God created me. It is probably what draws me so much to the beach. It doesn't get much simpler than the beach: some sand, lots of water, and all the time in the world to just daydream. It is also what draws me to photography: a camera, a subject, and a little bit of my own creativity. I love capturing an awesome image. So what do I do to add some confusion and angst into my life? I follow politics. I have my opinions, and I like having a tool for expressing those opinions. It's also nice to have a vehicle for sharing my relationship with Jesus. So give me a Diet Coke, or a nice tall glass of iced tea (with lots of ice and lots of refills), and I'm sure we could talk for hours. I might need a bathroom. Yeah, definitely will need a bathroom.

Visit my website:
**www.bobupdegrove.com**

**LABELS**

again, from a photographic perspective, it sure makes for better photos when you have guests who are watching.

2. Ceremony and the Vows: This is very minor and probably difficult for a couple to do while in the moment, but oftentimes during the wedding ceremony, when the couple are facing each other, they tend to look too much at the officiant. The officiant is speaking, so it is understandable that they would look at him (her). When they are looking at the officiant however, they are not looking at each other; and their heads are turned away from the crowd and usually away from the camera. This again is minor because there are of course times when they are looking at each other; but I have done enough weddings where I was mumbling to myself "Please, look at each other" to know that it can be a problem, at least for photos. My advice, stay focused on each other.

3. Go ahead and see each other prior to the ceremony. I, sometimes too passionately, always introduce this concept to couples as an option. Sometimes for practical reasons it just makes better sense to do it this way, but I am convinced from experience that it just makes sense period. I have to be careful here because I am not dogmatic about it, and I don't want potential clients to believe I am dogmatic about this. Some photographers will only photograph a wedding if the couple agrees to do all their photos prior to the ceremony. I certainly have not gotten to that point yet, but I can understand why these photographers prefer the photo session this way.

To me there is no downside to doing all the photos before the ceremony, unless you have a huge amount of down time between the ceremony and the reception, or if the ceremony is real early in the morning. At least a third of the weddings I have done have been done this way, and in every case the couple was enthusiastically glad they did it that way. The first look becomes much more special to them, they get to spend some time talking with each other, all the stress and anxiety is immediately gone . . they can enjoy a relaxed photo session with few distractions, and when the ceremony is over there is not this fast pace, dizzying photo time away from their guests. I will get myself in trouble here, so please be clear that this is just my opinion: most times people don't want to see each other because it is not "traditional" and/or it is considered bad luck. I'm just not sure I can understand basing your wedding on a superstition; and what tradition? When I think tradition I think a church wedding, yet very few weddings I do take place in a church.

I tend to be a romantic, and to me, if done right, a first look can be much more romantic. I've seen more grooms in tears during a first look than I ever have when they see other the first time walking down the aisle. Everyone is different though, and I know that I cannot impose my own thoughts regarding this on anyone else. In the end the photos always seem to work out. The entire day however just seems to go significantly better for everyone when a couple goes ahead and sees each other prior to the ceremony. That at least is my experience.

4. Be on time. Kind of hard for a bride to control her time prior to the ceremony when she is dependent on hair stylists and make up artists and bridesmaids and wardrobe malfunctions. All I can say here is that it seems rare for a bride to be ready on time. I think what might be helpful is to have someone there who is keeping you on track with your timelines. Most wedding coordinators are dealing with the actual ceremony and reception and not with getting the bride ready on time for photos. I would recommend for any bride to have a go person who can do that for you. It needs to be someone who doesn't mind keeping an eye on the clock and is bossy enough to keep you on time. As a bride you have too many other distractions that you can easily lose track of your own time. Having someone there to help keep you on track might be a good thing.

No comments:

Post a Comment

Cartoons/Videos (41)
Faith (9)
Family Photos (6)
Global Warming? (20)
Health Care Debate (21)
Obama (82)
Photo Tips/Reviews (24)
Politics (82)
Sample Photos (46)
Wedding Photography Advice (15)

**SEARCH THIS BLOG**

Search

**SUBSCRIBE TO**

Posts

Comments

| | More | | | Create Blog | Sign In |



**MONDAY, OCTOBER 28, 2013**

High ISO Low Light Photography

One of the biggest advancements in digital photography over the past 3-4 years has been the ability to shoot without flash in low light conditions. If you are new to photography and are mostly playing around with your aperture and shutter settings, that is great, but don't forget about the ISO settings. ISO refers to light sensitivity. The higher the number you set ISO, effectively the more light the sensor can pick up. 8-10 years ago the best you could get away with was a setting of 1600 ISO. At that point and beyond, if available, images would start to break down with noise. Even 800 ISO was pushing it back then. Today those numbers are at 6400, and even 12,800; and on some cameras the number goes up beyond 100,000. In layman terms, this means that it can be dusk outside, or low light inside, and you can still get a decent hand held shot. But despite the great improvements with ISO and sensors, you still need to be careful with how you take high ISO images. Noise is still an issue, especially if you do not expose correctly. So below I offer some advice on high ISO images.

1. Regardless of your situation, just because you have high ISO capability on your camera, you should always lean toward the lowest ISO possible to still get the image. Lower ISO gives you better color and less noise, higher ISO gives you less color and more noise. So don't crank up your ISO just because your camera has it. Always default first to maximizing your aperture and shutter speeds to get the most light, then use the ISO to give you more latitude if you need it.

2. Proper exposure is imperative. If anything, you should compensate a bit toward over exposing your image. If you underexpose your image and then try to correct it in your favorite image editing software, you will end up with quite a lot of noise. Over exposing of course risks blowing out highlights, so you have to be careful there too, but I would rather error on that side than with underexposing the image.

**KEEPING IT SIMPLE**

Give me a Diet Coke or a nice tall glass of iced tea, and I am one happy guy. Yeah, it doesn't take much. I like keeping things simple and uncomplicated. That is the way God created me. It is probably what draws me so much to the beach. It doesn't get much simpler than the beach: some sand, lots of water, and all the time in the world to just daydream. It is also what draws me to photography: a camera, a subject, and a little bit of my own creativity. I love capturing an awesome image. So what do I do to add some confusion and angst into my life? I follow politics. I have my opinions, and I like having a tool for expressing those opinions. It's also nice to have a vehicle for sharing my relationship with Jesus. So give me a Diet Coke, or a nice tall glass of iced tea (with lots of ice and lots of refills), and I'm sure we could talk for hours. I might need a bathroom. Yeah, definitely will need a bathroom.

Visit my website:
**www.bobupdegrove.com**

**LABELS**

APP. 037

3. Take multiple images at different exposures so you have choices afterwards.

4. Shoot raw, if your camera has it. Raw files give you a lot more latitude in correcting your images.

5. Use noise reduction software. Even though noise is not as bad as it used to be at lower ISO, it is still a problem as you reach your camera's ISO limitations. Noise reduction software can do a pretty good job of reducing that noise. You have to be careful with this software though because it can soften an image.

The image here was taken at 6400 in a very low lit church. I added some noise reduction to it. This shot would have been much harder to obtain 10 years ago, and even harder back in the film days when ISO film pretty much only went up to 1600. Click to enlarge.



No comments:

Post a Comment

Enter your comment...

Comment as:  Google Accour ▾

Publish    Preview

Newer Post                 Home                 Older Post

Subscribe to: Post Comments (Atom)

**LABELS**

photography (55)

**BLOG ARCHIVE**

► 2015 (2)

► 2014 (3)

Cartoons/Videos (41)

Faith (9)

Family Photos (6)

Global Warming? (20)

Health Care Debate (21)

Obama (82)

Photo Tips/Reviews (24)

Politics (82)

Sample Photos (46)

Wedding Photography Advice (15)

**SEARCH THIS BLOG**

Search

**SUBSCRIBE TO**

Posts ▾

Comments ▾



| | | | | | More | | | Create Blog   Sign In |

# BOB UPDEGROVE PHOTOGRAPHY

## FAITH - POLITICS - PHOTOGRAPHY

**SUNDAY, SEPTEMBER 23, 2012**

### Shooting In The Dark

This photo is by no means a great photo. It has its problems. I'm posting it here though because when you consider the conditions that it was taken, it is pretty impressive. It was dark. How dark? I was standing maybe 120 feet away, and while I could see the outline of the boat, I could not see the couple or anyone else on the boat. Those two big lights in the back were not all that bright. Between the darkness, distance and engine noise, the couple could not hear me or see me. To me it is pretty amazing that in near pitch darkness an image like this could be captured. Exposure details: iso of 6400, f-stop of 2.8, 1/15 shutter speed hand held.



No comments:

### KEEPING IT SIMPLE

Give me a Diet Coke or a nice tall glass of iced tea, and I am one happy guy. Yeah, it doesn't take much. I like keeping things simple and uncomplicated. That is the way God created me. It is probably what draws me so much to the beach. It doesn't get much simpler than the beach: some sand, lots of water, and all the time in the world to just daydream. It is also what draws me to photography: a camera, a subject, and a little bit of my own creativity. I love capturing an awesome image. So what do I do to add some confusion and angst into my life? I follow politics. I have my opinions, and I like having a tool for expressing those opinions. It's also nice to have a vehicle for sharing my relationship with Jesus. So give me a Diet Coke, or a nice tall glass of iced tea (with lots of ice and lots of refills), and I'm sure we could talk for hours. I might need a bathroom. Yeah, definitely will need a bathroom.

Visit my website:
**www.bobupdegrove.com**

**LABELS**

JA111   APP. 039



**THURSDAY, DECEMBER 16, 2010**

### You Have To Love Digital

This may only be of interest to my photo enthusiast friends, but you have to love what digital can do. This image was taken at this past Saturday's wedding. It is a nice photo, but what you need to appreciate is that the lighting was really poor when this was taken. It was late afternoon and there was a pretty heavy overcast. In film days I would have said "forget about it". Even Saturday I was lamenting the poor quality of light. I cranked up the ISO to 3200 and just hoped all would be well. I knew my camera (Nikon d700) was capable of good clean photos at 6400 ISO, but still get nervous with it, especially when photographing people. Anyhow, I'm impressed with how well this photo held up under the conditions. You would think this was taken under much better lighting conditions than what was really the case. No flash used. Digital rocks.

## KEEPING IT SIMPLE

Give me a Diet Coke or a nice tall glass of iced tea, and I am one happy guy. Yeah, it doesn't take much. I like keeping things simple and uncomplicated. That is the way God created me. It is probably what draws me so much to the beach. It doesn't get much simpler than the beach: some sand, lots of water, and all the time in the world to just daydream. It is also what draws me to photography: a camera, a subject, and a little bit of my own creativity. I love capturing an awesome image. So what do I do to add some confusion and angst into my life? I follow politics. I have my opinions, and I like having a tool for expressing those opinions. It's also nice to have a vehicle for sharing my relationship with Jesus. So give me a Diet Coke, or a nice tall glass of iced tea (with lots of ice and lots of refills), and I'm sure we could talk for hours. I might need a bathroom. Yeah, definitely will need a bathroom.

Visit my website:
**www.bobupdegrove.com**

## LABELS

APP. 040



Cartoons/Videos (41)

Faith (9)

Family Photos (6)

Global Warming? (20)

Health Care Debate (21)

Obama (82)

Photo Tips/Reviews (24)

Politics (82)

Sample Photos (46)

Wedding Photography Advice (15)

## SEARCH THIS BLOG

[ ] Search

## SUBSCRIBE TO

🔲 Posts    ⌄

🔲 Comments    ⌄

No comments:

## Post a Comment

Enter your comment...

**Comment as:**    Google Accour

Publish    Preview

Newer Post          Home          Older Post

Subscribe to: Post Comments (Atom)

## LABELS

photography (55)

## BLOG ARCHIVE

► 2015 (2)

JA113



Search [   ]  More                                    Create Blog   Sign In

**THURSDAY, APRIL 8, 2010**

Photography 101: Session 05

Flash Photography

(Macworld must be reading my mind. This session is dealing with flash photography, and right in time Macworld online posted an article dealing with the same subject. I would encourage you to read it, but I will go over some of the things they mention in my own article below.)

Probably nothing is more confusing and frustrating for photographers, even the most seasoned ones, than flash photography. When to use it, how to use it, how to make it look natural, how to get the most out of your flash . . these are the things that fill volumes of books and pack expensive seminars and workshops. All of that to say that if you are looking for quick easy ways to master flash photography, that just won't happen. You have to experiment over and over again, in different environments and conditions, mindful of what you are doing each time. There is a big gap between reading and watching how to do it versus actually going out and putting it into practice. Nothing beats practice and just playing around. The nice thing with digital and on camera monitors is that you can instantly see what is happening with each shot, making adjustments as you go. So practice. I will give you a few hints below, some which are also covered in the Macworld article I mentioned above. But you will have to go out in the field and practice using some of these techniques in order to see for yourself what works and what doesn't.

First of all, when it comes to using flash indoors, I always shoot with the camera in manual mode (as opposed to aperture or shutter priority, or auto. Manual mode gives you much more control over the shutter and the aperture. Typically I will set the aperture somewhere between the largest aperture (2.8 on most of my lenses). I want the most light possible to come through the lens. Usually the smallest aperture I will use is 5.6. I'll opt for 5.6 over the 2.8 when I am shooting group shots or if I have the ISO cranked up.

**KEEPING IT SIMPLE**

Give me a Diet Coke or a nice tall glass of iced tea, and I am one happy guy. Yeah, it doesn't take much. I like keeping things simple and uncomplicated. That is the way God created me. It is probably what draws me so much to the beach. It doesn't get much simpler than the beach: some sand, lots of water, and all the time in the world to just daydream. It is also what draws me to photography: a camera, a subject, and a little bit of my own creativity. I love capturing an awesome image. So what do I do to add some confusion and angst into my life? I follow politics. I have my opinions, and I like having a tool for expressing those opinions. It's also nice to have a vehicle for sharing my relationship with Jesus. So give me a Diet Coke, or a nice tall glass of iced tea (with lots of ice and lots of refills), and I'm sure we could talk for hours. I might need a bathroom. Yeah, definitely will need a bathroom.

Visit my website:
**www.bobupdegrove.com**

**LABELS**

JA114    APP. 042

Secondly, in most cases you will want your flash to be set to "ttl" or "i-ttl". TTL stands for "through the lens". Basically your camera is determining the proper exposure based on the light coming through the lens. This includes the light coming from the flash. With TTL, your camera will moderate how much light is being emitted from the flash. Generally speaking, TTL is pretty accurate, so in most cases that is what you want to use. There are occasions where it is best to set flash to manual for more control, but for introductory purposes, leave it at TTL.

Shutter speed is where you can really change the affect of flash photography. I will typically shoot with my shutter speed set at around 60 or 90 for my longer lenses, and at about 30 or 60 with my wider angle lenses. The slower your shutter speed, the more ambient light you are allowing to affect the image; but the slower the shutter speed, the more blur you will get in your image. With flash however, you can freeze movement within that blur. Without getting too technical, the light coming from your flash unit comes with a burst that lasts something like 1/100,000 of a second. That is a lot quicker than your shutter speed of let's say 1/15 of a second. So at 1/15 of a second, your image is pulling in ambient light (and possibly blur, depending on how much movement there is), but the flash will take place during only a fraction of that 1/15 time, freezing whatever movement was taking place in that 1/100,000 timeframe.

I know this might sound confusing, which is why you need to experiment for yourself to see how just changing your shutter speed will affect your flash images. Just keep this in mind: the slower your shutter speed, the more ambient light is being used. You know how your flash images can look really dark in the background, while everything close to you is brightly lit. If you shoot with a fast shutter speed, you are relying on your flash to completely light the scene. Your flash will only light so much. By using a slower shutter speed, you are letting more ambient light affect the scene, so your background will start to show up, not because it is being lit by the flash, but because of the ambient light.

So set your camera to manual mode, set your aperture to something like f4 or f5.6, then play with your shutter speed between 1/125 all the way down to maybe 1/10 of a second. Try it with subjects that are fairly stationary versus subjects that are moving. Maybe experiment as well with your ISO as well. Try it at 200, then 400, then 800, then at 1600.

On more setting your camera might have (see you camera manual for this) for flash photography is something called "rear curtain". By default your camera is usually set with this turned off. When off, when you shoot with flash, the flash goes off at the beginning of the exposure. That 1/100,000 flash will happen during the first part of the 1/60 of a second exposure, freezing any movement before the movement takes place. With rear curtain, the flash is emitted at the end of the exposure, or at the end of the movement. For most images, this is a more natural looking effect. I keep my setting at rear curtain all the time.

Next session will go over some techniques that will help give you more natural flash lighting.

No comments:

Post a Comment

Cartoons/Videos (41)

Faith (9)

Family Photos (6)

Global Warming? (20)

Health Care Debate (21)

Obama (82)

Photo Tips/Reviews (24)

Politics (82)

Sample Photos (46)

Wedding Photography Advice (15)

**SEARCH THIS BLOG**

[ ] [Search]

**SUBSCRIBE TO**

Posts

Comments

APP. 043



| | More | | Create Blog | Sign In |

**SATURDAY, JANUARY 10, 2009**

### The Value In A Professional Photographer

In our digital age it seems like everyone has a decent camera. It doesn't mean that they know how to use it or that they can take decent photos, but carry a big enough camera and people think you know what you are doing. Don't get me wrong, there are quite a few amateurs out there that really do know what they are doing. Just because they are not making a living out of their picture taking doesn't mean they are inferior to what a professional could do. But you have to admit that there are a lot of people out there with a nice camera that just don't know what they are doing with that camera, or they don't have the eye to capture above average images. I admit that I'm a bit biased. As someone who does make my living by my photography, and as someone who takes it seriously, I believe there is value in hiring a professional to cover an important event, especially someone that you are confident will get the kind of images you want.

Along that line, we also live in a time when people want and expect fast results. Digital images can be posted online moments after they are taken. We go to a wedding and the day after everyone is posting their images on Facebook. So why does it take the professional photographer so long to get their images online? Not too long ago, about a week after one of my weddings, I stumbled upon a blog written by the bride. I know there was absolutely nothing nasty meant in what she wrote, but she was writing about the wedding and said they were still waiting on the images from the photographer (me) . . one week after the wedding (I was on schedule to post the images just a couple days after her post). If you are curious as to why most wedding photographers take awhile to get through their images, I would highly recommend reading a blog posting by Anne Ruthmann. She does a nice job of walking people through the process. Generally speaking, I deliver my images within 2-3 weeks of the wedding. I deliver all the images I take, and I go through and color correct, crop, level, and check exposure on every image. Anne is right in saying that today the photographer is the lab. It is time consuming work, and it is tough at least for me to spend long periods of time doing the work. My creativity and my body can only take so much of it at any given time. Add

**KEEPING IT SIMPLE**

Give me a Diet Coke or a nice tall glass of iced tea, and I am one happy guy. Yeah, it doesn't take much. I like keeping things simple and uncomplicated. That is the way God created me. It is probably what draws me so much to the beach. It doesn't get much simpler than the beach: some sand, lots of water, and all the time in the world to just daydream. It is also what draws me to photography: a camera, a subject, and a little bit of my own creativity. I love capturing an awesome image. So what do I do to add some confusion and angst into my life? I follow politics. I have my opinions, and I like having a tool for expressing those opinions. It's also nice to have a vehicle for sharing my relationship with Jesus. So give me a Diet Coke, or a nice tall glass of iced tea (with lots of ice and lots of refills), and I'm sure we could talk for hours. I might need a bathroom. Yeah, definitely will need a bathroom.

Visit my website:
**www.bobupdegrove.com**

**LABELS**

APP. 044

other weddings and projects to the equation, recognize there is only so much time available, and you realize why images just cannot be posted the day after the wedding. Hopefully though it is all worth the wait.

## No comments:

## Post a Comment

Enter your comment...

**Comment as:** Google Accour ▾

Publish    Preview

Newer Post                 Home                 Older Post

Subscribe to: Post Comments (Atom)

### LABELS

photography (55)

### BLOG ARCHIVE

► 2015 (2)
► 2014 (3)
► 2013 (13)
► 2012 (19)
► 2011 (43)
► 2010 (86)
► 2009 (111)
► 2008 (88)

Cartoons/Videos (41)
Faith (9)
Family Photos (6)
Global Warming? (20)
Health Care Debate (21)
Obama (82)
Photo Tips/Reviews (24)
Politics (82)
Sample Photos (46)
Wedding Photography Advice (15)

### SEARCH THIS BLOG

Search

### SUBSCRIBE TO

Posts ▾
Comments ▾

Picture Window theme. Powered by Blogger.



# BOB UPDEGROVE PHOTOGRAPHY

## FAITH - POLITICS - PHOTOGRAPHY

**SUNDAY, APRIL 12, 2009**

## Digital Photography Can Sure Be Fun





One of the things I have really enjoyed with digital photography is being able to play around with photos after they have been captured. Both Adobe Lightroom and Photoshop are powerful tools for today's photographer. Personally I don't like manipulating my images too much. As much as possible I like to keep their original integrity. But there is still plenty of room in my mind to be creative, play with the colors, and alter the mood of the image. Here is one image from Jay and Jaime's April 4 wedding that demonstrates how one

### KEEPING IT SIMPLE

Give me a Diet Coke or a nice tall glass of iced tea, and I am one happy guy. Yeah, it doesn't take much. I like keeping things simple and uncomplicated. That is the way God created me. It is probably what draws me so much to the beach. It doesn't get much simpler than the beach: some sand, lots of water, and all the time in the world to just daydream. It is also what draws me to photography: a camera, a subject, and a little bit of my own creativity. I love capturing an awesome image. So what do I do to add some confusion and angst into my life? I follow politics. I have my opinions, and I like having a tool for expressing those opinions. It's also nice to have a vehicle for sharing my relationship with Jesus. So give me a Diet Coke, or a nice tall glass of iced tea (with lots of ice and lots of refills), and I'm sure we could talk for hours. I might need a bathroom. Yeah, definitely will need a bathroom.

Visit my website:
**www.bobupdegrove.com**

### LABELS

JA118    APP. 046



image can look different in five ways. My guess is that as you look at them your eye might be drawn to one particular style, while someone else might be drawn to another. I'm sure there is some psychological reason for that, maybe not.

Cartoons/Videos (41)
Faith (9)
Family Photos (6)
Global Warming? (20)
Health Care Debate (21)
Obama (82)
Photo Tips/Reviews (24)
Politics (82)
Sample Photos (46)
Wedding Photography Advice (15)

**SEARCH THIS BLOG**

[            ] Search

**SUBSCRIBE TO**

Posts ▼
Comments ▼



No comments:

Post a Comment

Enter your comment...

Comment as:  Google Accour ▾

Publish    Preview

# ARTICLES OF FAITH

*i.* We believe there is one living and true God, eternally existing in three persons: the Father, the Son, and the Holy Spirit, equal in power and glory; that this triune God created all, upholds all, and governs all;

*ii.* We believe in God, the Father, an infinite, personal Spirit, perfect in holiness, wisdom, power, and love; that He concerns Himself mercifully in the affairs of men; that He hears and answers prayer; and that He saves from sin and death all who come to Him through Jesus Christ;

*iii.* We believe in Jesus Christ, God's only begotten Son, conceived by the Holy Spirit. We believe in His virgin birth, sinless life, miracles, and teachings; His substitutionary atoning death; bodily resurrection; ascension into heaven; perpetual intercession for His people; and personal, visible return to earth. We believe that He is one and the same as God. He was fully human and fully God;

*iv.* We believe in the Holy Spirit, who came forth from the Father and Son to convict the world of sin, righteousness, and judgment and to regenerate, sanctify, and empower in ministry all who believe in Christ. We believe the Holy Spirit indwells every believer in Jesus Christ and that He is an abiding Helper, Teacher, and Guide. We believe that Jesus Christ baptizes the seeking believer with the Holy Spirit and power for service, either at the time of or subsequent to regeneration, which is a separate work from the indwelling Spirit for salvation. We believe in the present ministry of the Holy Spirit and in the exercise of all biblical gifts of the Spirit as reflected through the fruit of that same Spirit;

*v.* We believe that all the Scriptures of the Old and New Testaments are the Word of God, fully inspired and without error in the original manuscripts, and that they are the infallible rule of faith and practice;

*vi.* We believe all people are by nature separated from God and responsible for their own sin, but that salvation, redemption, and forgiveness are freely offered to all by the grace of our Lord Jesus Christ. When a person repents of sin and accepts Jesus Christ as his/her personal Lord and Savior, trusting Him to save, that person is immediately born again and sealed by the Holy Spirit, all of his/her sins are forgiven, and that person becomes a child of God, assured of spending eternity with the Lord;

*vii.* We believe in the universal Church, in the living spiritual body, of which Christ is the head and all regenerated persons are members;

*viii.* We await the pre-tribulation rapture of the Church, and we believe in the literal Second Coming of Christ with His saints to rule the earth, which will be personal and visible. This motivates us to holy living, heartfelt worship, committed service, diligent study of God's Word, regular fellowship, and participation in baptism and Communion;

*ix.* We believe the Lord Jesus Christ committed two ordinances to the Church: 1) baptism, and 2) the Lord's Supper. We practice baptism by immersion and regularly celebrate Communion according to the Scriptural guidelines found in 1 Corinthians 11:17-34;

*x.* We believe in the laying on of hands for the sending out of pastors and missionaries, and in conjunction with the anointing of oil by the elders for the healing of the sick;

*xi.* We believe that marriage is exclusively the union between one man and one woman in a lifetime commitment to each other (Genesis 2:23-24; Matthew 19:4-6). Marriage reflects the relationship between Christ and the Church and provides for procreation, intimate companionship, and we believe is the only basis for any form of sexual expression (1 Thess. 4:3; Ephesians 5:3). We believe that any intimate sexual activity outside of marriage is a sin and that God disapproves any attempt to alter one's gender by surgery or appearance (Genesis 19:5; Lev. 18:1-30; Romans 1:26-29; 1 Cor. 5:1, 6:9; Hebrews 13:4).

APP. 048



COPYRIGHT © MMXX CORNERSTONE CHAPEL • 650 BATTLEFIELD PARKWAY SE, LEESBURG, VA 20175 • PHONE (703) 771-1500

CONTACT US • PRAYER REQUESTS • EMPLOYMENT • PRIVACY POLICY

APP. 049



♡ Donate (https://pushpay.com/g/calvarychapelcom?src=hpp)   ✉ Subscribe (http://eepurl.com/bHsfbj)

f (https://www.facebook.com/CalvaryChapel)   ⊙ (https://www.instagram.com/calvarychapelglobal)   🐦 (https://twitter.com/CalvaryChapel)   V (https://vimeo.com/calvarychapel)

**calvarychapel**.com (/)

Your one-stop online-hub for Calvary Chapel



## WHAT WE BELIEVE

**We are Evangelical:**

- *We believe* the Bible is the inspired, inerrant, and authoritative Word of God. We believe the Bible is the final authority in every area it addresses for every individual Christian, as well as for the church collectively. (2 Timothy 3:16-17 (https://biblia.com/bible/esv/2%20Tim%203.16-17), 2 Peter 1:21 (https://biblia.com/bible/esv/2%20Pet%201.21), John 10:35 (https://biblia.com/bible/esv/John%2010.35))

- *We believe* there is one God who eternally exists as three persons: Father, Son, and Holy Spirit. We believe that all things were created by Him and for Him. (Deuteronomy 6:4 (https://biblia.com/bible/esv/Deut%206.4), Isaiah 45:21-22 (https://biblia.com/bible/esv/Isa%2045.21-22), Matthew 28:19 (https://biblia.com/bible/esv/Matt%2028.19), Colossians 1:16 (https://biblia.com/bible/esv/Col%201.16))

- *We believe* that God the Son became a human being in the person of Jesus Christ. That He was conceived of the Holy Spirit, born of the Virgin Mary, lived a sinless life (for He was without sin), died a substitutionary death for all mankind, was raised from the dead the third day, ascended into heaven, and is seated at the right hand of God until His enemies are made His footstool. (John 1:1 (https://biblia.com/bible/esv/John%201.1), 14 (https://biblia.com/bible/esv/John%201.14), Matthew 1:18-25 (https://biblia.com/bible/esv/Matt%201.18-25), 2 Corinthians 5:21 (https://biblia.com/bible/esv/2%20Cor%205.21), 1 Peter 3:18 (https://biblia.com/bible/esv/1%20Pet%203.18), 1 Corinthians 15:3-4 (https://biblia.com/bible/esv/1%20Cor%2015.3-4), Hebrews 10:12-13 (https://biblia.com/bible/esv/Heb%2010.12-13))

- *We believe* the Holy Spirit was sent by the Father and the Son to convict the world of sin, righteousness, and judgment. We believe the Holy Spirit regenerates, indwells, and seals believers in the Lord Jesus Christ, and that He empowers them to live as His witnesses. (John 14:16-17 (https://biblia.com/bible/esv/John%2014.16-17), John 16:7-11 (https://biblia.com/bible/esv/John%2016.7-11), Titus 3:5-6

Titus 3:5-6), Romans 8:9
(https://biblia.com/bible/esv/Rom%208.9), 1 Corinthians 6:19-20
(https://biblia.com/bible/esv/1%20Cor%206.19-20), Ephesians 1:13-14
(https://biblia.com/bible/esv/Eph%201.13-14), Acts 1:8
(https://biblia.com/bible/esv/Acts%201.8), Romans 12:6-8
(https://biblia.com/bible/esv/Rom%2012.6-8), 1 Corinthians 12-14, 1 Peter 4:10-11
(https://biblia.com/bible/esv/1%20Pet%204.10-11))

- *We believe* that God created human beings, male and female, in His own image. He created
  them sinless, equal in value, dignity, and worth. (Genesis 1:26-28
  (https://biblia.com/bible/esv/Gen%201.26-28), Ephesians 5:22-6:4
  (https://biblia.com/bible/esv/Eph%205.22-6.4), 1 Timothy 3:1-7
  (https://biblia.com/bible/esv/1%20Tim%203.1-7))

- *We believe* that, as a result of the Fall, all people are sinners by nature and in need of a Savior,
  and that Jesus Christ is the one and only Savior of the world. That salvation is by grace alone
  through faith alone in Him. We believe that all who call on the name of the Lord shall be saved
  eternally. (Romans 3:10 (https://biblia.com/bible/esv/Rom%203.10), Romans 3:23
  (https://biblia.com/bible/esv/Rom%203.23), Romans 5:18-19
  (https://biblia.com/bible/esv/Rom%205.18-19), Matthew 1:21
  (https://biblia.com/bible/esv/Matt%201.21), 1 John 4:14
  (https://biblia.com/bible/esv/1%20John%204.14), John 14:6
  (https://biblia.com/bible/esv/John%2014.6), Acts 4:12
  (https://biblia.com/bible/esv/Acts%204.12), Ephesians 2:8-9
  (https://biblia.com/bible/esv/Eph%202.8-9), Romans 10:9
  (https://biblia.com/bible/esv/Rom%2010.9))

- *We believe* there is one church, the body of Christ, consisting of men and women from every
  tribe, tongue, people, and nation. We believe that each local congregation is an expression of
  that universal church. We believe in the spiritual unity of believers in our Lord Jesus Christ.
  (Ephesians 4:4 (https://biblia.com/bible/esv/Eph%204.4), 1 Corinthians 12:12-13
  (https://biblia.com/bible/esv/1%20Cor%2012.12-13), Revelation 5:9
  (https://biblia.com/bible/esv/Rev%205.9), Acts 2:42-47
  (https://biblia.com/bible/esv/Acts%202.42-47))

- *We believe* in the resurrection of the dead. Believers will be raised to life, and unbelievers to
  shame and everlasting contempt (hell). (Daniel 12:2
  (https://biblia.com/bible/esv/Dan%2012.2), John 5:25-29
  (https://biblia.com/bible/esv/John%205.25-29), Revelation 21:1-22:5
  (https://biblia.com/bible/esv/Rev%2021.1-22.5))

**We are Continuationists:**

- *We believe* that all of the gifts of the Holy Spirit mentioned in Scripture are available to, and
  active in His church today. (John 14:16-17 (https://biblia.com/bible/esv/John%2014.16-17),
  John 16:7-11 (https://biblia.com/bible/esv/John%2016.7-11), Titus 3:5-6
  (https://biblia.com/bible/esv/Titus%203.5-6), Romans 8:9
  (https://biblia.com/bible/esv/Rom%208.9), 1 Corinthians 6:19-20
  (https://biblia.com/bible/esv/1%20Cor%206.19-20), Ephesians 1:13-14
  (https://biblia.com/bible/esv/Eph%201.13-14), Acts 1:8
  (https://biblia.com/bible/esv/Acts%201.8), Romans 12:6-8
  (https://biblia.com/bible/esv/Rom%2012.6-8), 1 Corinthians 12-14, 1 Peter 4:10-11
  (https://biblia.com/bible/esv/1%20Pet%204.10-11))

**We are Complementarian:**

- *We believe* that God created human beings, male and female, in His own image. He created
  them sinless, equal in value, dignity, and worth. According to His purpose and design, God
  created to fulfill distinct but complementary roles in the contexts of marriage, family, and the
  local church." (Genesis 1:26-28 (https://biblia.com/bible/esv/Gen%201.26-28), Ephesians 5:22-
  6:4 (https://biblia.com/bible/esv/Eph%205.22-6.4), 1 Timothy 3:1-7
  (https://biblia.com/bible/esv/1%20Tim%203.1-7))

JA123    APP. 051

**We are Premillennial:**

- *We believe* in the pre-millennial return of Christ to the earth, to sit upon the throne of David and rule over the house of Jacob (Israel), and the entire cosmos, forever. (Revelation 20:1-6 (https://biblia.com/bible/esv/Rev%2020.1-6), Luke 1:31-33 (https://biblia.com/bible/esv/Luke%201.31-33), Isaiah 9:6-7 (https://biblia.com/bible/esv/Isa%209.6-7))

**We are Pre-tribulational**

- *We believe* the church will be delivered from the "hour of trial" which will come upon all who dwell on the earth, being "caught up" in the clouds to meet the Lord in the air (the Rapture). (1 Thessalonians 4:16-17 (https://biblia.com/bible/esv/1%20Thess%204.16-17), 1 Corinthians 15:51-55 (https://biblia.com/bible/esv/1%20Cor%2015.51-55), Revelation 3:10 (https://biblia.com/bible/esv/Rev%203.10))

## CALVARY CHAPEL (INDEX.HTML)

A one-stop online-hub for Calvary Chapel



(https://www.facebook.com/CalvaryChapelGlobal) (https://twitter.com/CalvaryChapel) (https://www.youtube.com/user/calvarychapelglobal) (https://www.instagram.com/calvarychapelglobal) (https://vimeo.com/calvarychapel) (/calvarychapelArticles.rss)

**MONTHLY NEWSLETTER**

Stay current with all things Calvary by subscribing to this monthly newsletter.

Enter your email

Subscribe

(http://eepurl.com/bVUR59)

Copyright CalvaryChapel © 2020. All Rights Reserved | Privacy Policy (/privacy-policy)

 (https://www.facebook.com/CalvaryChapel)  (https://www.instagram.com/calvarychapelglobal)  (https://twitter.com/CalvaryChapel)  (mailto:cgn@calvarychapel.com?subject=From Calvary Chapel Website)

APP. 052

## Bob Updegrove, Photographer
25 Catoctin Circle SE #4262
Leesburg, VA 20177

www.bobupdegrove.com

Wedding Date _____

Ceremony Location _____

Ceremony Time _____

Reception Location _____

## The Bride
Name(s)_____
Address_____
City_____State _____Zip _____
Phone_____Email _____

## The Groom
Name(s)_____
Address_____
City_____State _____Zip _____
Phone_____Email _____

## Client (if different from Bride & Groom)
Name_____
Address_____
City_____State _____Zip _____
Phone_____Email _____

JA125

APP. 053

## Signatures

The parties have read all pages of this contract and agree to all of the terms and conditions

Bride_____Date _____and/or

Groom_____Date_____and/or

Parent_____Date _____

Bob Updegrove_____Date _____

# Terms and Conditions

This photography contract is between Bob Updegrove Photography (hereinafter "Bob Updegrove Photography" or "Photographer") and _____ (hereinafter "Client") relating to his/her wedding that will take place at _____ on _____.

### Exclusive photographer

Bob Updegrove Photography shall be the exclusive photographer retained by the Client for the purpose of photographing the wedding day. Family and friends will be permitted to photograph at the wedding as long as they do not interfere with the duties of the Photographer.

### Deposit and payment

The Client shall pay a deposit of $500.00 to secure the services and product specified herein. Upon signing this contract the amount of the deposit shall be applied to reduce the total balance of the package. The final balance of $1795 (Package A) or $2495 (Package 2) must be paid in full no later than (30) days before the wedding day. Photographer will provide 7 hours of coverage under this agreement. Additional time will be billed at $100 per half hour.

### Cancellation or postponement

If the Client should cancel the event for any reason, the deposit will not be refunded. If canceling this contract, the Client must notify the Photographer in writing.

To consider a date change, the Photographer must first receive a written release of the current contracted date, which will null and void this written contract. If the Client needs to change the event date all monies paid will transfer to the new date per a newly written and signed contract IF that date is available for the Photographer. The new date must be within six months of the original date or the new contract will be subject to the Photographer's current rates. If the new date is unavailable with the Photographer, the contract will be cancelled and the retainer will not be refunded.

If the client cancels this contract and the Photographer is able to rebook the contracted date, the deposit may be subject to a refund.

### Copyright and reproductions

All photographic materials, including but not limited to the digital files, shall remain the property and copyright of Bob Updegrove Photography. Clients shall have a perpetual license to use and reproduce all of the images for personal use only. Bob Updegrove Photography retains exclusive rights for commercial use of images, including, but not limited to: the right to make reproductions for the Client or for the Photographer's portfolio, studio samples, self promotions, entry in photographic contests or exhibitions, instructional purposes, editorial use, or for within or outside of Bob Updegrove Photography's studio. Any such use will be judicious and consistent with the highest standards of tastes and judgement.

APP. 055

**Failure to perform**
If the Photographer is unable to perform this agreement due to fire, casualty, act of God, illness, or any other cause beyond the control of the Photographer, then Bob Updegrove Photography shall return all monies paid and shall have no further liability with respect to this contract. This limitation of liability shall also apply in the event that photographic materials are damaged in processing, lost through camera or memory card malfunction, lost in the mail, or otherwise lost or damaged without fault on the part of the Photographer. In the event Bob Updegrove Photography fails to perform for any other reason, Bob Updegrove Photography shall not be liable for any amount in excess of the value of the Client's package.

**Photographer substitution**
In the extremely unlikely event of severe personal illness or other extreme Acts of Nature beyond the control of Bob Updegrove Photography which precludes the Photographer from performing the duties of coverage, Bob Updegrove Photography will do all he can to arrange for a substitute photographer of high qualification, per Client approval of said photographer.

**Limits of Liability**
Photographer takes the utmost care with respect to exposure, transportation, and processing the photographs. However, in the unlikely event that the photographs have been lost, stolen, or destroyed for reasons within or beyond photographer's control, photography liability is limited to the return of all payments received for the event package. The limit of liability for a partial loss of originals shall be a prorated amount of the exposures lost based on the percentage of total number of originals.

In addition, the Photographer will not be held responsible for the lack of coverage caused for the following reasons: The Bride, Groom or wedding party not being on time, members of the wedding party or family are unavailable when called on for a posed photograph, if the wedding is running late or if restrictions regarding photography at the desired location of the wedding are in force.

**Standard price list**
The charges in this contract are based on Bob Updegrove Photography's standard price list. The album price list is adjusted periodically and any future orders or additions to this contract shall be charged at the prices in effect at the time when the order is placed or change requested. Album or print orders require full payment in advance.

**Proofs and custom prints**
Proof images are individually edited for color correction, contrast adjustments, tonal adjustments, and conversion to black and white (if applicable). The proof images are used for the proof magazine, online proofing, digital negatives, dvds and proof books. The custom print includes a variety of techniques to create the Photographer's interpretation perfect print. Steps taken may include and are not limited to: realistic retouching, blemish removal, selective toning of colors, tonal adjustments and color enhancements, removal of distracting elements, etc. Custom prints are included in wedding albums, custom books, and custom prints and enlargements.

APP. 056

**Officiant and venue restrictions**

The Photographer may be necessarily limited by the guidelines or rules of the ceremony official, ceremony venue, or reception venue. Client understands and agrees that Bob Updegrove Photography will abide by such guidelines or rules and that they are outside the control of Bob Updegrove Photography. The Client agrees to hold Bob Updegrove Photography harmless for the impact such guidelines or rules may have on the resulting photographs.

**Requested photos**

While Bob Updegrove Photography will make every reasonable effort to capture specifically requested photos, the Client understands that a wedding is an uncontrolled event and that due to the varieties of the weather, available light, and willingness or availability of subjects, Bob Updegrove Photography cannot guarantee that any particular requested photos will be captured.

**Artistic license**

Bob Updegrove Photography shall be granted full artistic license over every aspect of his services, including the poses and content photographed, the locations used, the subsequent edits to all photographs, and the photographs placed on Bob Updegrove Photography's website. Bob Updegrove Photography retains complete editorial control over all content created and reserves the right to reject any request that conflicts with Bob Updegrove Photography's artistic judgement. The Client understands that Bob Updegrove Photography does not photograph from a "shot list" throughout the wedding day. The hallmark of Bob Updegrove Photography's photographic approach is non-posed, journalistic coverage of actions in real time. Long lists and frequent requests for posed photographs by the Client or wedding attendees reduce the capability to explore and obtain photographs of genuinely occurring moments. The Client acknowledges that they have been shown a complete set of wedding images and they understand that Bob Updegrove Photography will produce images of like quality and style for their wedding.

**Event food service**

A meal is required for Bob Updegrove Photography for events 6 hours or longer. If no meal is provided, it is understood that the Photographer will leave the event to purchase a meal.

**Delivery**

Bob Updegrove Photography shall have all images and the Starter Book available for Client pickup within 3 weeks of the ceremony. This will include the online gallery. It shall be understood that in the case of illness to the Photographer, this timing could be delayed by a week or two. If any other conditions should become apparent that might cause a delay (scheduled vacations, unusual seasonal workload), the Photographer will give the Client notice upfront that there could be delay in delivery.

**Package Inclusion**

Bob Updegrove Photography shall provide the following:

 APP. 057

Package A

- Full set of digital images on thumb drive, including high resolution files, plus images that Photographer custom enhanced;
- 1 30 page 5x7 Starter Book;
- Roughly 150 images custom enhanced;
- 20 8x10 professional prints, chosen by the Photographer;
- 50 5x7 professional prints, chosen by the Photographer;
- Up to 7 hours of wedding day coverage;
- Public access to sample online gallery Bob Updegrove Photography's website;

Package B

- Package A + one 10x10 32 page Bijou album with prints.

APP. 058







 APP. 061



APP. 062



 APP. 063



 APP. 064







 APP. 067



 APP. 068



 APP. 069



 APP. 070





   APP. 072





 APP. 074





APP. 076



 APP. 077

USCA4 Appeal: 21-1506 Doc: 19 Filed: 07/14/2021 Pg: 154 of 523



 APP. 078



**Interview with** John Piper
Founder & Teacher, desiringGod.org

| Subscribe | | Apple | Spotify | Email |
|---|---|---|---|---|

**Audio Transcript**

*Pastor John, if one of your family members invited you to their so-called same-sex marriage ceremony, would you attend it?*

Just contemplating that thought is heartbreaking. My answer is no. I wouldn't. And that would be a kind of shattering of the cornerstone of a father's broken heart at that moment. Here is why. I assume that is what they really want to know — not just whether I would go or not, but why. Why wouldn't I?

## Defining 'Marriage'

One, it is not a wedding, because it is not a marriage. Therefore, attending it as a wedding is to be false, like everyone there is being false. There is no such thing as a so-called same-sex marriage.

God has defined marriage as a covenantal union for life between a man and a woman as husband and wife. This isn't that. Therefore, this is not a marriage, and this is not a wedding. I am not going to lie about it by going.

## How Heaven Fastens

Two, this union — if you can dare to call it that — is not being joined in heaven. Jesus said, "What therefore God has joined together, let not man separate" (Matthew 19:6). This is what makes weddings awesome. They are not human accomplishments. God joins a man and a woman.

In Mark 10:9 Jesus said that marriage is made in heaven — not between two people merely or by a pastor or a judge. This pairing of two men or two women is not being joined in heaven. And to give the impression that it is, is an offense to heaven.

## Celebrate No Sin

Three, the blessing of this event would be hateful. It would be hateful for me to do it, because it would be confirming a life and a lifestyle that will lead to hell. The apostle Paul said, "Do not be deceived: neither the sexually immoral, nor idolaters, nor adulterers, nor men who practice homosexuality, nor thieves, nor the greedy, nor drunkards, nor revilers, nor swindlers will inherit the kingdom of God" (1 Corinthians 6:9–10). They won't.

To celebrate this lifestyle is to celebrate the destruction of human beings, and that is hateful. It would be like gathering to celebrate theft, gathering to celebrate drunkenness, gathering to celebrate swindling. It would be like saying, "Let's all have a meeting and celebrate greed. Let's all have a meeting and celebrate adultery." Anybody that joins in celebrating sin is sinning. I shouldn't sin.

## Cherishing the Covenant

Four, this ceremony will defile the drama of Christ and the church. God designed marriage to display Christ's covenant to his bride, the church. To celebrate a brideless union as marriage is to distort and deface the parable of the most beautiful act in the world.

## Sorrowful, Yet Open-Armed

JA151

APP. 079

Five, I wouldn't go because the weight of sorrow and love and revulsion would probably overwhelm me. I don't think I could probably get through the ceremony.

And the last thing I would say is: My not going is not my drawing away from my child — but his drawing away from me. I am where I have always been: arms wide open to the home-coming prodigal, ready to forgive anything.

APP. 080

# Should I Attend a Homosexual Wedding?

*by* **Kevin DeYoung (/learn/teachers/kevin-deyoung/)**

Why might a Christian refuse to attend, cater, or participate in a same-sex marriage ceremony? For simplicity's sake, let's assume this is a discussion among traditional Christians who believe—as the church has always believed and as most of the global church still believes—that same-sex behavior is sinful and that marriage is a covenantal, conjugal union of a man and a woman.

With that clarifying comment, we can address the question head-on: Why would a Christian feel conscience bound not to attend or participate in a gay wedding? It's not because of bigotry or fear or because we are unaware that Jesus spent time with sinners that leads us to this conclusion. It's because of our desire to be obedient to Christ and because of the nature of the wedding event itself.

A wedding ceremony, in the Christian tradition, is first of all a worship service. So if the union being celebrated in the service cannot be biblically sanctioned as an act of worship, we believe the service lends credence to a lie. We cannot in good conscience participate in a service of false worship. I understand that does not sound very nice, but the conclusion follows from the premise, namely, that the "marriage" being celebrated is not in fact a marriage and should not be celebrated.

Moreover, there has long been an understanding that those present at a marriage ceremony are not just casual observers, but they are witnesses who are granting their approval and support for the vows that are to be made. That's why the traditional language speaks of gathering "here in the sight of God, and in the face of this congregation." That's why one of the sample marriage services in the Presbyterian Church in America still has the minister say:

> *If any man can show just cause why they may not lawfully be wedded, let him now declare it, or else hereafter forever hold his peace.*

Quite explicitly, the wedding is not a party for friends and family. It's not a mere ceremonial formality. It is a divine event in which those gathered celebrate and honor the "solemnization of matrimony."

Which is why—as much as I might want to build bridges with a lesbian friend or reassure a gay family member that I care for him and want to have a relationship with him—I would not attend a same-sex wedding ceremony. I cannot help with my cake, with my flowers, or with my presence to solemnize what is not holy.

In taking such a position, I've often heard things like this in response:

> *But Jesus hung out with sinners. He wasn't worried about being contaminated by the world. He didn't want to turn people off to God's love. He was always throwing open the floodgates of God's mercy. He would say to us, "If someone forces you to bake one cake, bake for him two."*

Okay, let's think through these objections. I mean actually think for a few sentences, and not just with slogans and vague sentimentality.

*Jesus hung out with sinners.* True, sort of (depends on what you mean by "hung out"). But Jesus believed marriage was between a man and a woman (Matt. 19:3–9). The example of Christ in the Gospels teaches us that we should not be afraid to spend time with sinners. If a gay couple next door invites you over for dinner, don't turn them down.

*He wasn't worried about being contaminated by the world.* That's not the concern here. This isn't about cooties or sin germs. We have plenty of those ourselves.

*He didn't want to turn people off to God's love.* But Jesus did so all the time. He acted in ways that could be unintentionally, and more often deliberately, antagonistic (Matt. 7:6, 13–27; 11:20–24; 13:10–17; 19:16–30). Jesus turned people off all the time. This is no excuse for us to be unthinking and unkind. But it should put to rest the unbiblical notion that says if someone feels hurt by your words or unloved by your actions that you were ipso facto sinfully and foolishly unloving.

*He was always throwing open the floodgates of God's mercy.* Amen. Let's keep preaching Christ and preach as He did, calling all people to "repent and believe in the gospel" (Mark 1:15).

*If someone forces to you bake one cake, bake for him two.* This is, of course, a true and beautiful principle about how Christians, when reviled, must not revile in return. But it hardly can mean that we do whatever people demand no matter our rights (Acts 4:18–20; 16:35–40; 22:22–29) and no matter what is right in God's eyes.

JA153

APP. 081

A wedding is not a dinner invitation or a graduation open house or retirement party. Even in a completely secular environment, there is still a sense—and sometimes the wedding invitations say as much—that our presence at the event would honor the couple and their marriage. It would be difficult, if not impossible, to attend a wedding (let alone cater it or provide the culinary centerpiece) without your presence communicating celebration and support for what is taking place. And, as painful as it may be for us and for those we love, celebrating and supporting homosexual unions is not something God or His Word will allow us to do.

*First published in* **Tabletalk Magazine (https://tabletalkmagazine.com)** *an outreach of Ligonier. For permissions, view our* **Copyright Policy (/copyright-policy)**

APP. 082



CRISTINA MITTERMEIER
adventurer, conservationist, writer and photographer

# FAQ

### How did you get started in your photography career?

I actually didn't start out seeking a career in photography. I started out as a scientist, and my primary interest was always to find ways to help protect nature. I have always had a deep love for the natural world and the knowledge of indigenous people, but my passion has always been accompanied by a tremendous concern for what's happening to our planet, and especially to our oceans. From a very young age, I wanted to do something to help. I went to university and became a Marine Biologist and became part of the scientific community but I soon realized that my knowledge as a scientist was not the right tool for me to help protect the ocean. Photography was something I stumbled upon by accident. I borrowed a camera and soon discovered that I had some talent for it. It was drawn to the power of imagery as a way to show the world what is happening to our environment and I saw an important need, a gap in communication, that storytelling could address, and I decided to go back to school. I went to the Corcoran College for the Arts and have been using my camera as my passport to the world ever since.

### How did you build a career out of conservation photography?

I began as a volunteer photographer with Conservation International but soon transitioned into the Communications Department, where I eventually became the Senior VP of Visual Communications. This is where I began exploring the power of imagery and where I first realized that our failure to protect the environment stems from a failure to communicate at scale. As a community we have not yet made the appropriate investments in communications at the same level as we have the science. My entire career has been focused on increasing the amount of communication around conservation issues through storytelling.

### How did the International League of Conservation Photographers come about?

When I began my career as a professional photographer, I realized that many nature photographers were not interested in using their images to promote conservation. There was a handful, however, who did. In 2005 I convened a meeting of photographers at the 8th World Wilderness Congress in Alaska, and we decided to create an organization that would serve as a platform to empower conservation photographers, and that would allow us to raise money for conservation projects that focused on imagery and storytelling. I served as Executive Director and President of the ILCP until 2010.

### What is Conservation Photography?

In the late 1990s and early 2000s, the idea of being an "environmentalist" was very polarizing. I wanted to differentiate between those photographers who simply take pictures from those who are engaged in real conservation efforts. The work of the conservation photographer begins after the shutter has closed, that is when the real work of making sure our stories and images make an impact begins. You work in such challenging environments.

### Do you get scared?

It is a very human thing to get scared. Of course, I get scared, but when I feel a little fear, that is when I know that I am in the right place. The important question is how do you channel that fear? I call all the little voices in my head, the "Peanut Gallery," and they are constantly telling me to be cautious, to stay in my comfort zone, to take the safe route. I make a constant effort to silence those voices. They are the voices that tell us that women don't deserve the same opportunities, or that the world is a dangerous place for a girl, or that we don't deserve the achievements we conquer. Whether I am making a speech or diving with sharks, I change my inner-dialogue into a conversation about empowerment. If I'm not willing to take this next step, I might as well go sit down on my couch for the rest of my life. I take the responsibility of telling a story that is bigger than myself seriously.

### What advice do you have for someone starting a career in photography?

That's not an easy question to answer. There are lots of factors at play, all connected to individual circumstances – skills, networks, abilities, and opportunity. That said, I believe that education is key. Get a strong foundation of knowledge and theory on the subjects you are passionate about and then work incredibly hard and practice. Study the work of other photographers and look for opportunities to learn in the field. Become a photography assistant to a professional photographer so that you can learn field techniques, from writing proposals to organizing gear, to managing the logistics of a shoot. Being a photographer is not easy; most of us work as freelancers, which allows great freedom but comes with no guarantees of income or benefits. This is a profession that demands some hustling and some assertiveness, and it isn't as glamorous as people think. The competition is steep as there are so many talented photographers out there, and it's challenging to make a real living from it. So, if you are serious about making a profession as a photographer, set some goals for yourself. Become a good writer, learn business practices, be an effective communicator with potential clients, be serious about your work as a volunteer, and do everything you possibly can to get closer to those goals. Most importantly, know that it won't happen overnight.

### Do you see yourself as a photographer, an activist or a journalist?

For the longest time, I saw myself as a journalist, but I can no longer sit idly by. If being active means I am an activist, then that is what I am. There is so much work to be done around issues of climate change, biodiversity and cultural loss and women's empowerment! I get up every day knowing that my images have the power to make change and that motivates me to find avenues for solutions. I am always thinking about how to get my images in front of the people who make decisions.

### What do you aim to achieve with your images?

I want my images to make people care. I want to move people away from apathy and into action. I want people to be so overwhelmed by emotion that they are inspired to, first of all, be aware of what impact their choices have on our environment, and then make some changes that are in alignment with sustainability and climate changes solutions. I want my images to communicate a story of hope by capturing a glimpse into the lives of my subjects, whether that be human, animal or environment, and I want my images to present a dignified portrait that emphasizes empathy and our common humanity. I want my images to show people a new way of seeing things and take them to places that they might never get to visit themselves with the aim of highlighting how everything on this planet is connected. If my work can inspire an army of people who care, then I have done my job.

### Can I assist, intern or volunteer with you?

I get many requests for internship and assistant work, and I wish I could accommodate them all. The work I do as a photographer is typically on assignment for magazines like National Geographic or for conservation organizations, like SeaLegacy. This means I usually work with a small team of trained assistants. It is my policy only to hire people who have experience in international travel (in particular to remote locations), who speak at least one additional language, who are trained as divers and have rescue skills, and that have camera skills for BTS, social media and editing. We have a limited intern program through my non-profit organization, SeaLegacy, (www.sealegacy.org), with only one to two spots available each year. If you would like us to keep your resume on file, please forward it via email to info@CristinaMittermeier.com with an introduction.

### Will you come and talk to our organization? How do we book you?

I spend most of my time on expedition and/or on tour with National Geographic Live. There are occasions, however, when I am available to present at conferences and other events. There is a fee associated with this, to cover expenses and to fund my non-profit, SeaLegacy. To book me as a speaker, please contact my agent Andrew.Pudvah@natgeo.com. If you are interested in more "grassroots" engagements,

please get in touch with Kait Burgan at kait@cristinamittermeier.com to inquire about other SeaLegacy speakers.

## What is your approach to Social Media?

Social Media is an extremely important aspect of my work. It serves as a type of digital portal that I use to virtually bring people into the field with me and it also a business platform. I look at Social Media as a place to show the world what is happening to our environment and build a connection between cultures but also a place to showcase my work to potential sponsors, partners, and clients. I use it as both a place to share information and educate, but also to rally collective passion as a catalyst for real-world action. Social Media, for me, is an extension of my storytelling platform. I don't shy away from "stirring the pot" and encourage healthy debate through comments and the sharing of ideas and experiences. Social Media has incredible power as a tool to motivate and connect with people in a global community.

## How can I purchase your work?

My work is available exclusively as Fine Art Prints through Toronto Image Works and the Paul Nicklen Gallery. A large percentage of the profits of Fine Art sales goes directly to support SeaLegacy. Please contact Cristina@cristinamittermeier.com for more information.

## What gear do you use?

Since 2008 I have been a Sony Artisan of Imagery, so my main camera kit consists of the latest and greatest Sony gear.

### This is a list of the gear I use for "above water" photography:

- Sony A7S2 for Low light video
- Sony A7R3 for most of my scenic and 'people work
- Sony A9 for my wildlife work
- Sony VG-C3EM Vertical Grip
- Really Right Stuff L-Plate Set for Sony Alpha a9
- Sony FE 16-35mm f/2.8 GM Lens
- Sony FE 24-70mm f/2.8 GM Lens
- Sony FE 70-200mm f/2.8 GM OSS Lens
- Sony FE 100-400mm f/4.5-5.6 GM OSS Lens
- Sony HVL-F45RM Wireless Radio Flash
- Manfrotto tripod
- Mavic DJI drone

### For my underwater photography I use:

- Sony A7II Nauticam NA-A7II housing
- Sony 12-24 f/4 G Lens
- Sony FE 16-35mm f/2.8 GM Lens
- Sony FE 28mm f/2 Lens
- 45° Enhancing Viewfinder
- Fiber optic cables for Ikon or Ikelite
- Ikon and Ikelite strobes
- Wide Lens (WWL-1)
- 12 inch Zen dome

## How do you pack your gear?

I have tried every bag you can find and I've realized that there is not a perfect bag for every assignment. It takes flexibility. The main thing I have realized is that the way you travel with gear is different than the way you shoot. You typically want to be able to access your camera really fast and not have to lay a bag on the ground in order to get your camera out. All of my gear is packed into a variety of ThinkTank bags. My favorites bags are:

- Think Tank Airport Security™ roller bag
- Think Tank Logistics Manager® 30 roller bag
- Think Tank Video Rig 18 to carry my underwater housing
- Think Tank StreetWalker® Pro V2.0 backpack
- Think Tank Shape Shifter® 15 V2.0 backpack
- Think Tank Speed Racer™ V2.0 shoulder bag

## What is the best camera if you are on a budget?

For price and value I can't recommend a better camera than the Sony A6500. It is in a price range that most can afford and provides an incredibly fast frame rate in a small and powerful package. It is the best in its class for FPS, autofocus and sensor size. The lenses are great and constantly growing.

## What is the biggest mistake you think rookie photographers make?

The assumption that making a few photos makes you a photographer. This is a complex, all-consuming career that demands boundless energy, thick skin for rejection, a lot of persistence, patience and the ability to withstand uncomfortable situations. It is an incredibly competitive profession, where you have to create your own opportunities and craft your own path. If you are able to work harder than everyone else, come up with a vision that is uniquely yours, and most importantly, if you are able to give your work a sense of purpose, this is, without a doubt, the most rewarding profession.

## What tips do you have for someone wanting to learn to do underwater photography?

Water photography can take years to master and it demands that you first become a strong and accomplished swimmer and a competent diver.

### Sign up for Cristina's Newsletter

for intimate access to inspiring stories about adventure
and the grit it takes to work as a conservation photographer,
as well as tips and information about the gear she uses.

| Your Email | | Sign Up |

  APP. 084

© 2020 CRISTINA MITTERMEIER

APP. 085



Home    Shop Templates    Blog    Freebies    Meet Caroline    Contact    ⚙ COVID-19 RESOURCES

 



# ALL THE INFO.
# NO JUDGMENTS.

## 6.5 Must-Have Wedding Photography Contract Terms



We're on week 2 of our "**Must Haves for Wedding Pro Contracts**" series, and we're looking at **Wedding Photography Contracts** this week!  (Last week was Wedding Planners, if you are interested.)

## GET SOCIAL

   

## FIND WHAT YOU NEED

Search

## BROWSE BY TOPIC

BUSINESS

JA158    APP. 086

USCA4 Appeal: 21-1506 Doc: 19 Filed: 07/14/2021 Pg: 163 of 523

I'm calling this one "6-and-a-half Must-Have Wedding Photography Contract Terms" because well... there's a few "related side notes" thrown in here with this one. I couldn't stop! 😂📸

Now **remember**, there are obviously a LOT of different clauses that need to go into ANY contract. **The ones I have listed here are those that apply uniquely to a Wedding Photography Agreement**. This isn't a complete list of things to include in your contract! Just some "extras" that apply to my photographer crew. Don't forget the boilerplate mainstays— a specific scope of work, dates and times of the wedding day, who is held liable for damage to property, jurisdiction, terms for termination and/ or rescheduled events, force majeure, and many, many others, just as examples!



Buckled in? Let's do this.

## 1. ENFORCEABLE NONREFUNDABLE DEPOSIT

Ok, ok, we're starting with an easy one.

You want to write in an enforceable non-refundable deposit clause. Notice I said "enforceable." 😊

The issue here is that a lot of states *reeeeeeeaaaaally* don't like nonrefundable deposits. Wait, WHAT?!

Yep, you read that right. The legal system actually *likes* **people to be able to get in and out of contracts** as they want to— even though that sounds counter intuitive.

So really, nonrefundable deposits are an **uphill battle** from square one.

That's why you need to draft a non-refundable deposit clause that doesn't look like a penalty for cancellation, and instead looks like a way to **compensate** you for the time you've spent putting in work

## LEGAL

## FREEBIES

## NEWS

---

## GET ON OUR LIST!

Bi-weekly emails with the latest news about how the law affects your Wedding & Events Business

Name *

| | |
|---|---|
| First Name | Last Name |

Email Address *

Instagram
We wanna follow you on Instagram!

@username

I want IN! *
☐ HECK YES!

JOIN THE CLUB!

---

## NEW TO THE GAME? START HERE!

APP. 087

for the event, OR to compensate you for **taking that day out of your availability**. 🖤🖤🖤

The term "liquidated damages" is a "magic word" here that helps set up this type of payment structure. Also, a more staggered payment schedule— three or four— instead of one up-front 50/50 deposit/ remaining balance-- will help show this.  I know, I know, that's annoying to request from a client— but *I am just relaying the message that the courts have said loud and clear.*

## 2. ARTISTIC DISCRETION

You're an **artist**, not a dancing monkey.

You've been hired to use **your discretion** to produce images in your own style, with your own eye, and with your own editing techniques.

Make sure you defend your right to take certain photos— and, almost more importantly, the right to *not take certain photos*— by reserving "artistic discretion" and promising "no specific images." Also reserve the right to edit photographs in the styles you choose, so long as they are reflective of your portfolio as a whole.  This way, you won't have people demanding for "more white in this photo" or "can you make this photo brighter?!"

*Semi-related side note:* Make sure you're including a statement about **RAW image files** as well.  Tell the couple something along the lines that "under no circumstances shall RAW images be released or delivered to the couple."  Why? It's like giving someone a painting when the ink isn't even dry!  Don't feel guilty about protecting your art— and your brand!

## 3. COPYRIGHT: WHO OWNS WHAT?

You photographers are probably a bit more in-the-know about copyright law than some of the other wedding pros, so I am going to get a little detailed here. Hang onto your Rothys.



https://blog.engagedlegal.com/start-here

Start Here. Baby Steps.



Top 10 "I-Dos" for Wedding Businesses



5 Contracts Every Wedding Pro Must Have

JA160  APP. 088

You probably know that as the creator of images, you are the copyright holder.  Boom, that's more than a lot of people, so high five there!

You need to decide whether you are i) keeping the copyright in your images and granting the couple an license, or ii) granting the couple a copyright transfer and then licensing back your photos for your own portfolio/ marketing use.

This is a personal decision from photographer to photographer.  I've worked with some photographers who want to keep copyrights, and I have worked with some who say "the client paid for them, so they can have the copyright."  So how do YOU decide what to do?

When **deciding your own process**, consider the following thoughts/ notes:

1. How much is the couple **paying**? (Also, if you're licensing and the couple wants to have the copyright transferred to them, that's a possible upsell.... just a thought).

2. If you transfer the copyright to the couple completely, you don't have the right to use the photos in any way that you haven't specifically licensed back to yourself, so make sure you've **carved out that license well**.

3. If someone steals the images and puts them on a billboard, only the copyright holder can go after the infringer (known as "standing"). Would your couple want to do that? Would *you?*

4. A lot of couples want the copyrights to their photos so they don't feel "held captive" by a photographer's license (roll with me here, I've asked around about this). Couples get scared that the photographer will somehow take the photos back or make them pay more.  Simply transferring a copyright to them completely may help eliminate this fear.

5. However, if a major brand decides they want to use your photo for something, you want the right to say yes, no, or "sure, if you pay me!"  In this situation, you'd WANT to keep the copyright.












JA161    APP. 089

mediums you will be using.  I put these in every contract I write, so the Couple signs off as part of their event.

However, *don't forget to get guests to sign off too* if you know you'll be using photos from this event in your portfolio (yes, I know it's a pain, but don't shoot the messenger here).  The couple can't sign off on their guests' behalf!  So if you shoot a great photo of that little flower girl bustin a move on the dance floor and you want to slap that up on your portfolio...... go find mom, pull out a digital release form, and get her to sign a model release.

*Tip From Experience*: this gets more and more critical the higher dollar value the event, or if the event involves individuals who are celebrities or public figures.  Their people will be on you like white-on-rice if you use an image of a celeb on your social media promoting your business.

[Another tip— if you don't have a Model Release, we have one in the shop as well]

## 5. TRAVEL RESERVATIONS AND REIMBURSEMENT

Here's a tip I want to drive home: *I want you to start estimating travel costs and including them in your nonrefundable deposit fee whenever possible.*

Do some upfront research. **Estimate**.  Use a travel planning website like Kayak to get a plan together and show costs.  You can indicate that it's a travel fee, you can require a daily allowance (also known as a "per diem," and estimates are available here) and you can estimate a little over the cost to give yourself a buffer— whatever you need to do— but try as **hard as you can** to take those travel fees up front.

Why?

Sit down and gather round.

WHEW. So many things to weigh here! You can see why there are no easy answers. 🤷

.....also, this is why I have a job 😂

But honestly, this comes down to **YOUR personal decision** that is often made on a couple-by-couple basis. Our Wedding Photography Contract Template (as well as Wedding Videography Template) include *both a license and a full copyright transfer*, so **rest easy if you're an ELC contract template purchaser**.

*Related Side Note:* Practically speaking, I know that most of my photographers aren't going to sue a couple for putting a filter on an image and posting it to Instagram— as annoying and upsetting as that "Sierra" filter may be. However, as a legal copyright holder, you *could* threaten that. A way to nicely **educate** a couple that filters are a NO GO and *remind* a couple that they can't put stickers/ filters/ weird crops on photos is to **include a section about filters in the copyright section of your contract and make them initial it.** Then, if they start posting weird images, you can refer them back to "Paragraph 8 of your contract..."

## 4. MODEL RELEASE



Here's the truth: to use a photograph or image (or "likeness") of someone in relation to your business, you need an Image Release, also known a a Model Release.

This includes your blog, social media, marketing materials, ads, client spotlights, website photos, portfolio, **ANYTHING at all related to your business**.

Without this permission, the individual can sue you for *misappropriation* of their image and likeness.

You need to get in writing irrevocable (they can't "take it back") client permission to use their "image and likeness" throughout all

First, and most obviously, because travel fees are often **large sums** of money, and they are usually non-refundable (or only partially refundable).  And when the client agrees to pay travel fees, but then cancels a wedding, breaks up, or refuses to pay you, you're left paying for a flight and rental car to Timbucktu West Virginia in October with a couple refusing to pay you back.

Second, I also push this for **safety reasons.**  A lot of times as a photographer, you're alone, flying out to a new place, and it's you solo (or you and a second shooter).  Especially when you're first starting out, you are less assertive, desperately seeking work, and take jobs that are less-than-glamorous. If someone else is making your reservations, booking your flights, or reserving your hotel room, *their name is on it too.* They can cancel the flight after the wedding and leave you stranded. Or they can **get into your hotel room**.  Be smart and *make your own reservations.* It's more work for you, yes— but it is much, **much safer.**

In the words of a favorite podcast: Stay Sexy and Don't Get Murdered #SSDGM.

## 6. BEHAVIOR OF GUESTS AND/ OR HOUSE RULES

Finally, I want to hit on something that is out of your control: wedding guests and/ or venue rules **interfering with your final product.**

I've always been aware that certain "house rules" can **prevent a photographer from taking certain photos,** or inadvertently have an **effect on the quality of the resulting images**. You can't help it if Father McFarland won't let you in the chapel balcony for that overhead-cathedral-veil-shot!  Let's make sure that you address this in your contract, and remind the couple that they will "hold [you] harmless for the effects of 'house rules' on final product.

Obnoxious Uncle Bill (everyone has one) taking pictures with his fancy new Cannon Rebel or Crazy Aunt Edna snapping photos with her iPad as the bride is walking down the aisle can create the same problems. 😣 Contractually "remind" your couples that it's not

APP. 092

your fault, you are not held responsible for pictures full of multiple flashes and iphone screens, and they don't get a refund for their crazy guests.

But on another note I've noticed more and more photographers— both women AND men— speaking out about sexual harassment by guests— or *other wedding pros*—  at weddings.

Please, please, PLEASE put a clause in your contract that says if you are subject to an incident of sexual assault or unwanted touching, you can document the situation and walk out.

You deserve to be safe in your workplace. You don't deserve to get groped, creepily hit on, or followed out to your car and harassed by the father of the groom (this actually happened).  Include a clause stating that if you are sexually assaulted, you can leave immediately with no refund granted to the Couple.  Otherwise, legally you may be required to refund part of your fee, when YOU are really the victim.

---

There's obviously a lot more that needs to be in any contract, but these are some specific clauses and protections that I really push for my Wedding Photography contracts.

What are clauses that YOU'VE found are critical in a contract? What's something you learned the hard way needs to be included?

---

💬 Comment                                    ♡ 0 Likes    🔗 Share
🔖 Legal
🏷 Contracts, Photographers

---

‹  How to Edit Default Dubsado ...    5 Must-Have Wedding Planner ...  ›

APP. 093

Comments (0)                    Newest First    Subscribe via e-mail

Preview    POST COMMENT...



Powered by Squarespace.





## ALINA THOMAS
PHOTOGRAPHY

# WEDDING PHOTOGRAPHY CONTRACT – ASSOCIATE PHOTOGRAPHER

This is a contract, please read carefully, and don't hesitate to contact me if you have any questions!

**CLIENT:**

**Bride's Name** *

| | |
|---|---|
First       Last

**Phone Number** *

###  -  ###  -  ####

**Groom's Name** *

| | |
|---|---|
First       Last

**Phone Number** *

###  -  ###  -  ####

**Address** *

Street Address

City                State / Province / Region

Postal / Zip Code          United States

Country

**Wedding Date** *

MM / DD / YYYY

This Contract is between the Client, whose name and address is listed above, and Alina Thomas Photography, LLC, herein referred to as the Photographer.

## 1. Retainer and Payments

The Client shall make a non-refundable retainer payment for the Photographer to perform the services specified herein. The retainer shall be equal to 50% of the total service charge (including sales tax). Upon payment of retainer, the Photographer will reserve the time and date agreed upon

JA167    APP. 095



by both parties. The remaining balance shall be paid in full no later than 30 days prior to the wedding date listed herein. A late fee of $100.00 per day shall be applied to any payments made after the agreed upon date. No digital images shall be provided to the Client until total contract price has been paid in full.

## 2. Engagement Session

A complimentary 30 minute engagement session is included with all wedding collections and is to take place within a 45 mile radius of Leesburg, VA 20175. The session shall take place at least one week prior to the wedding date. If, for any reason, the Client declines or fails to schedule the session with the Photographer, the Photographer shall not be held liable for the lack of the session and will not be required to schedule a replacement session of any kind. If, for any reason, the Client wishes to reschedule the engagement session, they may do so, provided the Photographer is available and given at least a 7 day notice. If the Client is late arriving to the session, the Client will have the amount of time late deducted from the time allotted for the session. If the Client is more than 20 minutes late to the session, it will be considered by the Photographer as a "no-show", forfeiting the session and the Photographer shall not be held liable for the lack of the session and will not be required to schedule a replacement session of any kind.

## 3. Cancellation

If, for any reason, the Client cancels this Contract prior to, or on the wedding date, the Photographer shall keep the retainer and any monies paid through the date of cancellation. All cancellations must be made in writing and signed by all contracted parties. If the Client fails to supply written cancellation, or cancels within thirty (30) days of the contracted date, the Client shall be required to pay the full balance of the Contract.

## 4. Rescheduling

If, for any reason, the Client reschedules the wedding, the retainer may be applied to the new date, provided the Photographer is available. All monies paid may be applied to wedding coverage within one year of original date, provided the Photographer is available. A new Contract will be required to reflect the changes. In the event the reschedule occurs outside of one year of the original wedding date, no monies shall be refunded to the Client.

## 5. Artistic Rights

The Photographer retains the right to edit and release only the images that are deemed professional in quality and within the Photographer's artistic standards. The Photographer shall make gallery proofs available through an online gallery proofing website. These proofs shall be available to the Client within 4-8 weeks of the photographic event. Once the online proofing gallery is delivered, it shall remain open for 30 days from delivery. If the Client requests to extend the time, or reopen the online proofing gallery, a $150.00 un-archival fee shall apply.

## 6. Copyright and Reproductions

The Photographer shall retain copyright ownership of all works created in the course of this Contract, including but not limited to all images in their original and processed formats. The Photographer shall have the exclusive right to make reproductions for, including but not limited to, marketing materials, portfolio entries, sample products, editorial submissions and use, or for display within or on the Photographer's website and/or studio. It is understood that any duplication or alteration of original images is strictly prohibited without the express written permission of the Photographer.

## 7. Client's Usage

The Client shall only use the prints, including digital files, in accordance with the permissions within this Contract. The Client's prints are for personal use only and shall not be submitted to contests or reproduced for commercial use. The Client may not edit the photographs in any way, including but not limited to application of filters, cropping, or modifications of any kind. If further editing of the images beyond what the Photographer has delivered is desired by the Client, it is the Client's responsibility to contact the Photographer and request any re-edits. Charges for re-edits may be applied at the Photographer's discretion.

## 8. Safe Working Environment

The Client agrees to undertake the best efforts to ensure that guests and attendees at the wedding treat the Photographer and the Photographer's team with respect and dignity and that the Photographer is provided with a safe working environment. The Photographer retains the right to

APP. 096



cancel the remainder of any photography session in the event guests and/or attendees of the wedding commit any instances of sexual harassment, violence, threats or other similar behavior that would lead a reasonable person to feel unsafe in such an environment. In the event of such cancellation the Client shall not be entitled to any refund.

### 9. Exclusive Photographer
The Photographer and the Photographer's team shall be the sole photographers for coverage of the event. At no time may any guest or family member use any images from the Client's wedding to promote themselves in any photography service, including, but not limited to, editing the images. The Client is responsible for contacting anyone violating this agreement and having the image(s) removed.

### 10. Coverage Liability
The Photographer is not responsible for compromised coverage due to causes beyond their control, such as other people's camera flash, the lateness of the bride, groom, family members and bridal party members, or other principles, weather conditions, schedule complications, rendering of decorations, or restrictions of the venues or officiate. The Photographer is not responsible for existing backgrounds or lighting conditions which may negatively impact or restrict the photography coverage.

### 11. Failure to Perform
In the event that the Photographer is unable to perform any of the photographic duties prescribed under the selected package, due to unforeseen illness, emergency, fire, casualty, strike, act of God or causes beyond the control of the Photographer, another competent and equally skilled photographer will be provided as available. If no replacement photographer is available, all payments made will be refunded to the Client. No further liability may be held against the Photographer. Furthermore, in the unlikely event that images/files have been lost, stolen, or destroyed for reasons within or beyond the Photographer's control, the Photographer's liability is limited to the prorated amount of the exposures lost based on the percentage of the total number of originals captured. In the unlikely event that a mechanical failure should occur to the Photographer's equipment and the Photographer is unable to provide the Client with the agreed upon photographic services and/or products, responsibility and liability is limited to the return of all monies received for the event. The Photographer and the Client agree that the Photographer is not responsible for any other damages, emotional or otherwise.

### 12. Substitute Photographer
The Photographer reserves the right to substitute with another photographer. The substitute photographer is chosen at the discretion of the Photographer and does not constitute a breach of this agreement. The Photographer warrants the substitute photographer to be of comparable quality and professionalism.

### 13. Independent Contractor — Second Photographer
The Photographer shall supply an additional professional photographer to assist on the wedding day. The Photographer reserves the right and discretion to select the appropriate additional photographer. In the event that the bride and groom's getting ready locations are farther than five (5) miles away from each other, the second photographer will assist the main photographer at the bride's getting ready location.

### 14. Photographer's Standard Price List
The charges in this Contract are based on the Photographer's standard price list. This price list is adjusted periodically and future orders shall be charged at the prices in effect at the time when the order is placed.

### 15. Meals and Breaks
A meal is required for every member of the Photographer's team in a location separate from the wedding guests for coverage that lasts more than six (6) hours. A fifteen (15) minute break is required for every member of the Photographer's team for coverage that lasts more than 6 hours.

### 16. Album Orders
Image selection for album orders shall be done within 30 days of the online gallery becoming

APP. 097



available to the Client. If album image selections are not made by the Client as listed above, the Client will forfeit all rights to receiving said album, or pay a fee of $350.00 to move forward with the album order. The Client must complete the album design approval within 90 days from the wedding date.

### 17. Price Protection

The Photographer warrants all prices quoted for professional services and albums are valid for a period of six months following the date of the event. Orders placed after that are subject to the Photographer's current published pricing.

### 18. Venue Guidelines

The Photographer is bound to guidelines and policies of venue, officials or management. The Client agrees to accept the technical results of their imposition on the Photographer. Negotiation with the officials for modification of guidelines and/or policies is the Client's responsibility. Any additional permits or fees required by the venue or local jurisdiction shall be the responsibility of the Client.

### 19. Expense Reimbursements

The Client agrees to reimburse the Photographer for all reasonable expenses relating directly to the event itself (i.e. parking fees, destination travel fees, accommodations, etc.). Both parties agree to discuss this thoroughly to avoid any surprises as to what will constitute an expense.

### 20. Acceptable Payment Types

The Photographer accepts personal or business checks, cash, or most major credit/debit cards. Credit/Debit cards will be charged an additional 3.5% for processing fees. If a client check is returned for insufficient funds, a $40.00 fee will be charged to the Client, due immediately and not included with the rest of the wedding package.

### 21. Arbitration

Any controversy or claim arising out of or relating to this Contract, or the breach thereof, shall be settled by arbitration, administered in accordance with the Commercial Arbitration Rules of the American Arbitration Association, administered by a licensed Arbitrator in the jurisdiction closest to the Photographer's office and the arbitration award may be entered for judgment in any court having jurisdiction thereof. Notwithstanding the foregoing, either party may refuse to arbitrate when the dispute is for a sum less than $500.00. In no event shall an award in an arbitration initiated under this clause exceed the contracted price of the controversy in dispute.

### 22. Indemnification

The Photographer shall be held harmless for any and all injury to the Client during the course of the photographic event and the immediately surrounding events.

### 23. Attorney's Fees

If either party of this Contract brings a legal action against the other contracted party to secure the specific performance of this Contract, collect damages for breach of this Contract, or otherwise enforce or interpret this Contract, the prevailing party shall recover reasonable attorney's fees and all costs, premiums for bonds, fees, and other expenses expended or incurred in the action in addition to any other relief that may be awarded.

### 24. Signing of Contract

Contract is solely for exclusive consideration of Bride & Groom and Photographer. Contract must be signed by both Bride and Groom. A third party may make full or partial payment, with the agreement that Payer acknowledges the amount paid is a gift to the couple and not purchase of consideration or benefit. The third party payer relinquishes all rights to dispute, lay claim, or indemnify Photographer.

**The $3,200.00 Wedding Collection Includes** *

☐ Up to 8 Hours of Continuous Coverage by two ATP
Associate Photographers | Password Protected Online

JA170    APP. 098

USCA4 Appeal: 21-1506    Doc: 19    Filed: 07/14/2021    Pg: 175 of 523



Gallery | PIN # for Immediate Download | Print Release | Custom Wedding Day Timeline | Discounted Annual Anniversary Sessions | 60 miles of travel for wedding day (.57 per additional mile)

**Additional Options**

☐ Gift Album Set $2,295.00 (10x10 30 Page Legacy Album, two 8x8 30 Page Parent Albums & A Free 20x30 canvas gallery wrap)

☐ Wedding Album $1,095.00 - Album is $1,500.00 if not included at time of booking.

☐ Parent Album (with the order of a wedding album only) $695.00 - Album is $997.00 if not included at time of booking.

☐ Bridal Portrait Session $450.00

☐ After Wedding Session $450.00

☐ Wedding Site/Venue Visit $450.00

☐ USB $227.00

☐ Additional Hours $450.00/Hour

**Number of Additional Hours**

---

CONTACT US

alina@alinathomas.com

---



NORTHERN VIRGINIA WEDDING PHOTOGRAPHER
SERVING NORTHERN VIRGINIA, WASHINGTON DC AND BEYOND.

---

GET SOCIAL

   

© 2019 ALINA THOMAS PHOTOGRAPHY: NORTHERN VIRGINIA WEDDING PHOTOGRAPHER | TERMS & CONDITIONS | PRIVACY POLICY | SITE DESIGN BY MESMERIZING DESIGNS | PROPHOTO BLOGSITE | BY THE DESIGN SPACE CO

JA171   APP. 099

# Brittany Lowe

ABOUT ME      GALLERIES      Richmond Virginia Wedding Photographer      DETAILS      BLOG      CONTACT



Hey there! My name is Brittany and I'm a full-time wedding and portrait photographer based out of Richmond, Virginia with a love of traveling.

I use natural lighting (as much as I can!) to create a clean, bright, and airy feel to every photograph I take. Candid, real life moments and emotions are the foundation to building memories. I love capturing the little details as I feel like these are the little things that get forgotten so easily. I love giving my clients the ability to look back at their special day and remember every moment.

I want to create genuine relationships with my clients, so during our time together you can expect us to talk, laugh, and get to know one another. I'm not aiming to take just a few pictures of you, I'm aiming to capture you as you are in that moment and deliver you the story of our time together.

When I'm not behind the camera, I'm a wife to my awesome husband, a crazy busy mom to four incredible kids and our pup Avett. I have a strong love for DIY projects and coffee full of sugar. My husband and I even bought our first house just for the purpose of fixing it up. And in case you're wondering about our dogs name, I'm The Avett Brother's number 1 fan. :)

*Meet Brittany*

*"Always remember, there was nothing worth sharing, like the love that let us share our name.."*
*-The Avett Brothers*

## Things I Love

My family

Apple products

The Avett Brothers

→

*Contact*

BRITTANY@BRITTANYLOWEPHOTOGRAPHY.COM
RICHMOND, VIRGINIA WEDDING PHOTOGRAPHER

## BL

Richmond Wedding Photographer
COPYRIGHT BRITTANY LOWE PHOTOGRAPHY
*ALL RIGHTS RESERVED*

*Follow Along*

JA172     APP. 100



EMAIL ME



AMANDA SUMMERLIN



## WEDDING PHOTOGRAPHER FUQS

*learn all the things*

### FREQUENTLY UNASKED QUESTIONS ABOUT WEDDING PHOTOGRAPHY

Typically when I'm working with a couple who's planning a wedding, they are pretty new at wedding planning and are having to become experts on weddings as they go along. (Does that sound about right to you?) Most of the time, you are hiring a professional photographer for the first time, and generally just doing lots of stuff for the first time. So you spend a lot of time reading wedding magazines and wedding blogs and they all tell you to ask wedding photographers the same Frequently Asked Questions, right? But what about the stuff that you don't know you should ask? That's this page. These are the things I try to explain to people when we have wedding consultations, all the things you're too overwhelmed to think about now, but will wonder later. And a couple of bonus fun questions too.

---

### WHAT DO YOU THINK ABOUT UNPLUGGED WEDDINGS?

I think that if an unplugged wedding will make you happy, then that's exactly what you

JA173    APP. 101



should do. I completely understand why you would want your guests to put their gadgets down and engage in the moment. After all, I've lived with teenagers.

But if you're thinking about having an unplugged wedding because you think I need you to, then I want you to reconsider. I know it's pretty trendy right now for photographers to post images of people at weddings holding up cell phones and publicly shame them for daring to want to make a photo, but I'm not one of those photographers. I promise that your guests aren't ruining anything if they make some photos on their phones, and I promise that I will never ever publicly shame your family and friends on the internet like so many photographers have done recently.

It's true that sometimes people get excited and enthusiastic and want to make photos at weddings. Who can blame them? *But I've never found myself in a situation that a polite request made quietly in the ear of the offender didn't immediately solve.* Personally, I really think most of the whinging you see on the internet about unplugged weddings is the result of the inability of wedding photographers to tactfully interact with wedding guests. And viral marketing. Obviously.

So you should definitely have an unplugged wedding if it will make you happy. But don't feel like you have to do it for me, because I'm a professional and I'll make amazing photos for you either way.

---

## HOW LONG HAVE YOU BEEN TAKING PHOTOS PROFESSIONALLY, AND HOW LONG HAVE YOU BEEN A PROFESSIONAL WEDDING PHOTOGRAPHER?

Long answer: I learned film photography in college a really long time ago, and have been in love with photography ever since. In 2009, I became a professional portrait photographer. Shortly after that, I began assisting other experienced professional wedding photographers around Atlanta. In 2010, I photographed my first wedding as a professional working under my own name, although I've photographed many weddings over the years as favors for friends. Basically, I've been a professional working artist for 20 years, and a wedding photographer for almost 9 years.

TL;DR, About 9 years, and I've photographed over 200 weddings as the primary photographer.

---

## WHY SHOULD I HIRE A PROFESSIONAL PHOTOGRAPHER?

The most important thing to remember is that you're not hiring a professional wedding photographer for only what they do when you can see them, you're hiring them for the finished product. You're hiring them because you want someone at your wedding with a camera (or four) who knows how to make a good photo no matter what happens, what time of day it is, whether it's dark, or raining, or kittens are falling from the rafters (hey, that sounds like a really neat wedding!). You're hiring a professional because you want kick ass photos and because you don't want to have to worry about this one thing. And of course, that's the kind of expertise that only comes from years of perfecting a craft.

APP. 102



## HOW MANY HOURS OF COVERAGE DO I REALLY NEED?

There are a lot of variables involved here, but the short answer is probably at least 8. We offer a 6 hour package, and that's tempting to a lot of people, but six hours of coverage is really best for people who are having very small (think elopements) weddings with very few guests (less than 40) and very short receptions, or no reception at all. If you want photos of things like getting ready, details, and reception coverage of at least the toasts and cake cutting, then you need to plan for at least 8 hours of coverage. If you'd like to have the least amount of stress, or if you'll be changing locations during the day ( such as from hotel to church to reception venue), then you're going to probably need to bump up to 10 hours. Our bookings are pretty evenly split between people who choose 8 hours and people who choose 10 hours.

If you ask me what I would prefer that you book, I'd say that I want you to book whichever coverage will let us plan to have at least an hour to make creative portraits together, and plenty of time to make portraits of your wedding party and family. It's not that making photos takes a long time, it's getting ready to make a photo that takes up all our time together. Walking from one area in the garden to another takes time. Arranging the train of a wedding dress takes time. Helping you relax takes time. All those little things add up quickly and before you know it, portrait time is over.

## WHAT DO YOU MEAN WHEN YOU SAY THE PHOTOS ARE PROFESSIONALLY EDITED?

Photos don't just come out of a camera ready to hang on your wall. Unless it's a Polaroid. Truth is, a professional SLR camera actually takes a pretty boring photo. Shaking it like a Polaroid won't help, either. The image is meant to be a blank slate so that the photographer can have complete artistic freedom. So I take your photos into my secret photography laboratory and I process them. I prefer a classic fine art film look to my wedding photos, so I keep the colors clean and the skin tones natural. If you have a blemish, my magic wand makes it disappear. If there's a spot on your suit, I use a spot treatment to remove it. If there's a random street sign in an otherwise perfect photo, I chop it out. There's lots of little remodels that I do to make your images just right. It takes a village... of software programmers... to create a finished wedding photograph.

## WHY DO YOU TAKE SO MANY PHOTOS, BUT GIVE US SO FEW? CAN WE HAVE ALL OF THEM?

On a typical wedding day, I will take about 2000 photos, but the majority of those photos are taken in big bursts. Anytime I have a group of people in front of me, I will take 10-15 (ok, 50) photos every time. That's because it's really hard to get a photo of a group of people with everyone's eyes open and their mouths closed. So, out of that burst of photos, you'll get 2, because in all the other photos people are blinking or reciting epic poetry or whatever they're doing that isn't what they should have been

APP. 103



doing. It's kind of the same for pictures of people doing anything. Have you ever seen a series of photos of your Uncle Raymond dancing? It take a few dozen shots to get a good one because he always makes weird faces at the camera. And since it takes a bunch of time to edit all those photos, only the good photos are pulled out and edited for you. In the end, you get a beautiful set of perfect photos showing everyone at their best, and you don't have to weed through a bunch of crummy ones to find them. That's why professional wedding photographers are so awesome.

## WHAT DOES THE COPYRIGHT RELEASE ALLOW ME TO DO WITH MY PICTURES?

The copyright release gives you personal use rights to your photos. This means you can plaster them all over Facebook and Pinterest and MySpace until your heart's content. You can blog about your special day. You can run down to the local drug store and order 150 wallet prints of your Cousin Becky putting 37 cocktail shrimp in their mouth and send a copy to every one of your guests.

What you can't do with your wedding photos is say that you took them, re-edit them in Instagram-o-matic splendor, or post them anywhere that requires that you claim sole ownership of the photos (you know, pretend that you made them). That includes entering them in most contests.

However, I do really want you to be excited about your wedding photos, and if you want to share them on your favorite forums and blogs, we will just need to communicate about it first. Most blogs just want to be sure they have original content, and not images that are already on 17 other blogs. So if you want to share your pictures somewhere more public, just send me an email and we can discuss how to get it done just right.

## WHAT DO YOU DO TO MAKE YOUR BUSINESS ENVIROMENTALLY FRIENDLY?

Everything I can! To begin with, my office is pretty green. Well, it's actually Zone 5 grey (true story... we had the paint matched and everything), but it's earth-friendly. I use Canon photographic equipment, Apple computers, and Western Digital Caviar Green hard drives. All my battery powered camera equipment uses rechargeable batteries, especially the ones designed to use AAs and AAAs. My home and office have all CFL & LED bulbs, and our household participates in a local recycling program for all home and office waste. I conduct most of my business electronically, so there's almost no paper. We've even cut back on the number of paper airplanes we make, and we always use paper out of the trash for the few we still make. At home, we drink filtered tap water instead of bottled water, and have switched from paper napkins to cloth, and from paper towels to washable cotton terry towels for cleaning. And, not to be forgotten, since it's just us and the dogs in the office, we often work in our pajamas (heh-heh... jealous?), which in turn reduces laundry water and energy consumption. We also make our own laundry detergent, glass cleaner, and a few other household cleaning supplies from common household ingredients that are more environmentally friendly, yet still darn effective. And finally, we use the library. A lot. You can read a

APP. 104



whole nerdy blog post about our efforts to be a green photography business if you want to know more.

### WHY DOES IT TAKE YOU SO LONG TO ANSWER MY EMAIL?

Being a one-woman show means I have to totally rock the Google calendar around here. Most of the camera work is done on evenings and weekends, since that's when you guys are free. My work day is kind of the reverse of your work schedule. When y'all are at work I'm in the studio, and when you're off work I'm out taking super sweet pictures of you. And I don't stop in the middle of a shoot to answer phone calls or emails, because it's kind of tricky to hold a camera and a cell phone at the same time. So, if you email me on Wednesday afternoon while I'm out shooting an epic sunset engagement session, I'll email you back promptly on Thursday morning. And if you send me an email on a Saturday when I'm at a riduculously amazing wedding taking an insane number of mind-blowing photos, I am absolutely going to email you back. On Tuesday, because Monday is my only day off.

### WHAT MODE OF TRANSPORTATION DO YOU USE TO TRAVEL BACK AND FORTH BETWEEN HOME AND DESTINATION WEDDINGS, ESPECIALLY ONES IN OTHER STATES OR COUNTRIES?

That depends. I have many friends and family scattered around the country (you were wondering how I could travel so cheaply!), and sometimes I will be combining working trips with visiting them. So, sometimes I will drive my car and sometimes I will fly. If I fly, I will use an airplane.

### DO YOU FIND IT HARDER TO SHOOT WEDDINGS THAT REQUIRE TRAVEL? WHAT KIND OF LOGISTICAL HURDLES DO YOU ENCOUNTER IN DESTINATION WEDDING PHOTOGRAPHY?

I'm a professional photographer who doesn't maintain a traditional studio, so everything I do requires complete mobility. I can carry an entire studio to a location and set it up and create amazing photos that no one would ever suspect might have been made in your kitchen. Traveling is what I do for every job, even the ones that are in Atlanta. So I don't really encounter any serious logistical hurdles for destination wedding photography, other than having to take my shoes off at the airport if I fly. That's pretty annoying. Yay flip flops.

### WHAT ABOUT TRAVEL FEES AND LODGING? IS THERE A MINIMUM PACKAGE REQUIRED FOR TRAVEL?

APP. 105



There are no travel fees for anyone who purchases six hours or more of wedding photography coverage in the continental United States. Are you getting married anywhere in the Lower 48? Cool. I'm not gonna charge you any travel fees. This whole process should be pain-free for you. I want you to be able to quickly and easily understand the actual cost of your wedding photography so we can start talking about the fun stuff sooner. We have a whole page about our free travel for wedding photography if you want to learn more.

## DO YOU WORK WITH AN ASSISTANT?

Depending on the type and location of the wedding and the number of obstacles expected, I sometimes work with assistants (also known as voice-activated light stands). It can be nice to have someone to carry all the photography crap, or have another pair of eyes on the wedding party to make sure no one is sleeping while we make the group photos. However, most of the time I'm just a lone wolf. With mad ninja skillz.

## ARE YOU WILLING TO ACCEPT A LIST OF "MUST-HAVE" PHOTOS?

That's a loaded question, and the answer is, it depends. I always send my wedding couples a questionnaire and ask for a list of five photos that they think are the most important photos for me to make, and then five more that they would like me to make if I can. When I arrive on your wedding day, you and I have already created a wedding photography schedule for the day and I have a plan of what kinds of photos need to be made based on our talks. We'll do group photos and individual portraits and detail shots and all of that stuff. But if you need to hand me a seven-page list to follow with checkboxes and you'll be crushed if I don't get *every single one*, then I won't be able to make any of the wonderful candid photos that you see in my portfolio for you because I'll have my nose buried in that list all night. This is one of those defining moments where you have to decide if our philosophies match or not. However, rest assured that you won't have to tell me to get the standards, like cutting the cake, or the first kiss. If I didn't know that, I wouldn't still be in business.

## WHAT SHOULD I DO TO KEEP MY PHOTOS SAFE?

Once your wedding photos are edited, you will get two copies of each photo on a custom flash drive, a large file for printing and a small file for uploading to social media like Facebook. Your flash drive is stored in a beautiful box that is custom made for you, so you can leave it out on the bookshelf and show it to all your friends. Over. And over. And over. We also currently store your edited photos online in the cloud so that you can share them all with family and friends.

However, we all know how fleeting things in the interwebs can be, and obviously I can't promise to keep your files forever, or even for very long at all. **So the first thing**

APP. 106



**you should do when you receive your files is make a copy.** You should put this copy in a safe deposit box, or something equivalent (not your sock drawer) in order to protect your data from stuff like animal stampedes and glitter tornadoes, which have been on the rise in recent years. You should also copy the photos to your computer and back them up again. That's your safety net, in case anything happens to one copy, you have multiple back ups of every file. As far as keeping your prints and/or wedding albums safe, all the common sense stuff applies; don't get them wet, don't put your coffee cup on them, don't prop your television up with them…..you know the drill.

## WHAT CAN I DO WITH ALL MY PHOTOS?

The best thing to do with them is to PRINT them and frame them and hang them on your wall. Or even better, since you're going to have so many amazing photos that you'll run out of wall space, you should make a wedding album. Or get one of those neato digital photo frames. But whatever you do, don't just leave them on your hard drive all alone and never let them feel the sweet kiss of daylight. That's just sad.

## WHY SHOULD I GET A WEDDING ALBUM?

Because you are a rock star. Your wedding is probably the most important day in your life to date, except for that time you saw Bill Murray buying a diet soda and a pack of gummy bears at the gas station. You've spent months agonizing over every detail, right down to the color of the ribbon to tie on those cute little bubble bottles, and this is the perfect way for you to celebrate your wedding day as the major moment that it is in your life. A wedding album tells the story of your wedding day, from the earliest moment of "getting ready" to the confetti hitting the getaway car as you make your escape. As an added bonus, it's totally portable, and doesn't need to be plugged in or recharged for you to inflict it on your friends and family.

On a more practical note, while I provide your photos to you on a flash drive, what happens if you get all responsible and actually stick it in your safety deposit box, and then ten years from now you want to get a copy of that picture of Aunt Martha wearing the bowler hat and feather boa in the photo booth, but Whoops! NOBODY uses flash drives anymore. This can totally happen, since technology marches ever onward. Seriously, I've got a pile of floppy disks in my filing cabinet (that's the analog version of a desktop folder) that haven't been near a computer since 1992.

Digital back-ups are all smart and stuff, until they get obsolete. Your best bet for preserving important memories will always be a physical printed copy, like a wedding album. Besides, it will really impress the grandkids when you pull out an Actual Book and sit on the sofa and show them your wedding day. I know how much I always loved looking through the family photo album with my Grandma.

## WHAT IS A FLUSH MOUNT WEDDING ALBUM?

JA179    APP. 107



Only the coolest way to see your amazing photos. Ever. First your photos are silver halide printed on high quality archival photographic paper, just as if they were going to be framed. Then they are mounted on a thick archival substrate, which makes a luxuriously stiff page about 2mm thick. Kinda like a children's board book, only exponentially more fashionable and gorgeous (and not appropriate for teething). Our albums can be leather bound, silk-covered, or have custom printed covers. And they are beautiful. We call them heirloom wedding albums because these hand made archival albums will truly last for generations. We know you want the grandkids to know just how bad-ass you were back in the day, and now we can give you the technology to do it.

### WHAT IS PRESS PRINTING?

Press printing is high-quality printing, but it is not printed on photographic paper. More like a coffee-table book or a high-end magazine. The pages are thicker than regular book pages, but still thin enough to be flexible. Sadly, unlike most other topics here, press printing really isn't all that funny.

### HOW DO I KNOW IF YOU'RE THE RIGHT PHOTOGRAPHER FOR ME?

If you've read this far, you have learned a lot about me, and what a professional wedding photographer should do for you. Do you feel like I'm someone you would want to spend a day with? (Remember, your wedding photographer is a vendor you'll actually spend time with on your wedding day, so it's important that they don't creep you out.) Do you think I seem like someone you trust to make the kind of photos you want to see of your wedding day? If the answer is yes, or even maybe, you should email me right now. We should have a chat and get to know each other a little better. If you live near the Atlanta area, we can meet up and have a cup of coffee and talk about your plans. If you live elsewhere, we can Skype and do the same thing.

Also, it's ok if I'm not the perfect wedding photographer for you. Hopefully you've learned a little something here to help you find the perfect professional wedding photographer for your day. No matter what, remember: It's your day, and it should be perfect on your terms.

JA180    APP. 108



## YOU MIGHT ALSO LIKE

   



*@theamandasummerlin*

   

### CONTACT

Send me an email.

Let's get coffee.

My treat!

AMANDA SUMMERLIN

Making neat pictures of nice people since 2009. You're not like everybody else, your pictures shouldn't be either.

### CONNECT

  

©2019 AMANDA SUMMERLIN PHOTOGRAPHY | PROPHOTO PHOTOGRAPHY THEME | BY THE DESIGN SPACE CO



Home » Info and FAQ » Wedding Photography » Frequent Questions

# FREQUENTLY ASKED QUESTIONS

A COLLECTION OF COMMON QUESTIONS AND ANSWERS



## The big question : Why should we hire YOU for our wedding?

Why should I be your wedding photographer? Because I will take care of you as if you were my family. I will help you craft a timeline that allows your day to be *your day,* just how you want it. Because I will be here for you, as a resource with almost two decades of experience (and that's a lot of weddings!) Because weddings can be stressful and overwhelming, and I will be right with you the entire time - I promise.

I'll be your problem-solver. I'll be your family-wrangler. I will be your advocate. I will help ensure that your day is exactly what you want, captured as beautifully as you deserve. I will be your eyes on your day, so that you can focus on the amazing gathering of everyone you love best in the world and trust that your photography is in extremely skilled hands.

If it rains, if it snows, if it gets dark early, if your venue is unexpectedly covered in scaffolding, if hair and makeup run late, if we get stuck in traffic - I've got you, and your images will still be amazing. My job is to take great pictures for you, yes, but also to help remove all of the stress from your wedding day so that you can enjoy it completely!

APP. 110



## COVERAGE + TRAVEL

I am often asked questions involving my prices, travel policies, timelines for delivery, albums, and other wedding coverage details. I've compiled the most-asked questions here for you. I hope you find these answers helpful! Please don't hesitate to contact the studio if you have any questions not answered here. I hope to hear from you soon!

### What is your pricing?

I can absolutely understand wanting to find pricing information without having to ask. Truly I can. My detailed rates and collections aren't listed for public viewing on my site for a variety of reasons. First, rates and collections vary by location. Some weddings outside of the NYC/Long Island/New Jersey/Philadelphia area require travel, which would not be included in a local wedding rate. Destination weddings are different as well. I also create custom collections for many clients, which is something that I can absolutely do for you! If you'd like to obtain detailed rate information for your wedding, simply drop me an email and I will send you all of the information that you need! I promise to respond ASAP, and I look forward to chatting further!

Local wedding rates begin at $5,500 for our signature coverage. Elopements and small weddings begin at $950.

### Do you work with a second photographer?

Sometimes yes, and sometimes no. Allow me to explain! I spent the last almost twenty years shooting weddings as a solo photographer, and have since added several extraordinarily talented associate photographers to the studio. They are wonderful documentary photographers, and great assets to the wedding day coverage when the day requires a second vantage point! Wedding day coverage always has an assistant who does light photography, but some packages have a second photographer as well. Elopements and engagements are all solo-photographer coverage by myself.

### Do you edit all of our photographs?

Yes, I do! Every image that you receive has been hand-edited, one at a time, without batching in bulk groups or mass-producing the results. My highly trained editing team also often selects a few favorites for special attention above and beyond the individual image editing.

### Where do you live and how far will you travel?

 APP. 111

I live in Brooklyn, New York - which is where my studio is. I also have a home base just outside of the Philadelphia area. I've been all over the world to photograph weddings, to the Caribbean and Bahamas, to South America, California, Wisconsin, Georgia, my former home state of Florida, North Carolina, France, Finland, and many, many other places. I am a destination wedding specialist with tons of frequent flier miles and a keen ability to fall asleep sitting up on a plane. I am very, very comfortable traveling for events. Rest assured that should you commission me to cover your wedding and travel to you then you are hiring someone very experienced with travel for business. Travel is billed very simply - if airfare and hotel and rental car are needed, all you are responsible for is a direct reimbursement for the charges.

In terms of local weddings, I have a car, and I *love to drive*. Really, I do!

### Do you also provide video services?

We do not. I'm a photographer, and I choose to specialize in photography to give you the very best of this specific art form. I do know many extraordinary cinematographers at all budget levels and would be thrilled to help match you to the best company so that you can have a team that focuses on videography the way we focus on photography!

### Do you have an assistant?

My assistant photographer functions as both a photographer and an assistant. He or she is occasionally a second vantage point for some of the key moments of the day, while providing aid with lighting, organizing, and managing logistics of other key parts of the event.

### Do you have past clients we can speak to as references?

I can absolutely understand why you'd ask this. After all, if you're applying for a job, it's customary to list your previous places of employment as references. I don't provide client references to prospective wedding couples for a few reasons. First of all, any reference I would give you would be biased - of course I'd choose clients that I know would speak most glowingly about myself and my services! Second of all, I truly respect my clients' investment in my services and work, and could never ask a client to market for me on their own time. I'd also recommend that you talk to any vendors you have already commissioned for your wedding date and ask what the experience of working with me is like!



### We want to take pictures in a super cool location on our wedding day. Do you know if we need a permit?

I would love to help you with this, but the answer is that I'm not sure. If you're getting married on-site, the chances that you'll need a permit are very small. If you're leaving your venue and going somewhere else, a

APP. 112

permit might be required. There are many places that do require you to get a permit (Philadelphia's Washington Square Park and New York's Grand Central Terminal come to mind), but the permit has to be obtained by the client, not the photographer. If you have a question about a location, just let me know and I will help you figure out if a permit is needed. If we try to shoot in a location that requires a permit, and we don't have one, we'll be asked to leave. I don't want that to happen to us!

### Can some of our photos be delivered in both black & white and color?

They can! ALL images are delivered in black and white AND in color! This way you can choose between the two!

### How long does it take before we receive our products and photographs?

Online galleries are posted within six weeks of the wedding date, and this is when your digital files are released as well. If you have printed proofs in your collection, they are available three weeks after your gallery goes live. Upon final approval of album designs, most albums are ready for delivery within twelve weeks.

### Are our digital files watermarked?

They are not. The high resolution files do not bear any watermarks.

### How many pictures will we receive?

The number of photographs taken depends on many things - the number of guests, hours of coverage, types of events, hours of dancing, and so forth. My average for an eight hour day with a second photographer is 650 images, but those numbers may vary depending on the day itself. If you have questions about image quantity, I'd love to hear more about your plans! This would help me provide you with a more detailed explanation and estimate.

### Do we get to keep the negatives?

I provide the selected, edited high-resolution digital files (the digital equivalent of negatives). When the files are released to you, I can provide you with a list of resources from which to get quality prints if you so desire. I do retain the copyright to the images and the right to use them for promotional purposes, competition, professional review, and so on. If you need, I'm glad to provide you with a written release that will allow you to make unlimited personal reproductions and copies for your friends and families.



### Do we get the copyright of the images?

APP. 113

Copyright is something that I get asked about often. Many photographers include a "copyright release" in their contracts, which generally just means the same as a release to have your images printed by yourself, or any lab you choose. That's not the same as obtaining copyright! Copyright simply means that I am the creator of the images, and I "own" the copyright. Selling or obtaining "the copyright" is not possible, but you will have the ability to print and share your images as much as you'd like!

## Do we receive the raw, unedited files?

The raw, unedited files aren't available for viewing or purchase. This is very much like asking your caterer to give you the leftover ingredients used to make your dinner! The images selected for editing and final delivery reflect my very high standards and everything else isn't archived in the studio. Please rest assured that any images not delivered truly *are* outtakes! We do not cull to meet a certain number of delivered images, so every viable image is edited carefully and delivered.

## Can we see the outtakes and all of the images that didn't make the "final cut"?

The images delivered to you are very loosely edited, taking out only eyes-closed, flash-didn't-fire, person-walked-in-front-of-the-lens true outtakes. If there are a handful of images of you together with your mom laughing, for example, I'm going to include everything that isn't an absolute duplicate and so forth. The images not selected aren't archived and therefore aren't available.

## Do you need to attend our rehearsal?

Rehearsal dinner coverage is available if you'd like to add it to your collection; otherwise I don't attend the rehearsals. We will talk about the timing of your day and the flow of the event, and one of the things is the ceremony. I'd love to hear about the timing of the ceremony itself, but please rest assured that not attending the rehearsal doesn't impact your coverage in any way!

## What if we want to order extra prints? How does that work?

Your digital files are delivered via direct download in a password-protected online image gallery. This is also a cart/ordering system for prints. You can order extra prints directly through your online gallery. Since you will also have access to your digital files, you can order prints yourself at any lab you choose. We highly suggest that you order through our lab, as we can make sure the prints go through a rigorous quality control process. We cannot guarantee the quality of any prints that are not created through our preferred lab. If you'd like to print images yourselves, please let us know and we can recommend some labs that we trust!



## How does the album design process work?

APP. 114

My wedding album is one of my dearest possessions, and we are so excited to create wedding albums for our clients. They're a tangible, beautiful record of the day your life began as a family. We know that life often gets in the way of creating these heirlooms, so we promise to make this process as easy as possible for you! Starting in 2016, we've begun pre-designing client albums as a courtesy to you. We will include your album design when delivering your digital files and online gallery. After you've had a chance to look at your album, we'll set up a time to Skype, Facetime or meet in person to finish your design.

## What will my album look like once it's completed?

With the fresh, modern books I design, the images are printed directly onto the pages, much like in a coffeetable book you'd buy at the bookstore. I strive to keep the designs clean and classic, creating a book that will be a heirloom for future generations.I do have a few options for upgrades to a matted album, should you like that more traditional style!

## What is the "online gallery" you mention in your collections?

The online gallery is a private, password protected section on my website where all of your wedding photographs will be placed online for you and your family and friends to view. It is also a secure shopping cart - which allows you (and your family and friends) to order prints and cards and select album prints online. All you have to do is provide the password to anyone who you want to be able to view the images. It's also the way we deliver your wedding day digital files. You'll have a download option with a PIN, and can begin downloading the second you receive the gallery!

## We want everything documented! Can we have more images?

Please understand that the galleries all vary based on many different things. Length of the day, amount of coverage, number of events covered in a day, rehearsal dinner coverage, full weekend coverage, etc. Every wedding is different and all are covered to my best ability - and since each is different each will result in a differing number of final images. If you're concerned about the coverage, you can always add on a second, or even a third photographer to document alongside myself!

## Do you offer engagement sessions?

Yes, I do! I adore engagement sessions! Please take note that most engagement sessions have to be done Tuesday-Thursday because of a heavy wedding schedule, but there's occasionally Friday or Monday availability. Sessions are photographed either in Manhattan, Brooklyn, or the Philadelphia area. I'm available to travel elsewhere for your engagement session (and would love to!); certain travel rates may apply to areas outside my usual geographic location. The sessions are generally shot at 3pm during the winter months, and 4:30 or 5pm in the summer months. Night shoots are available on Fridays only, and an additional fee may apply. If you have any

APP. 115

questions about your engagement session, please don't hesitate to contact me!



## STYLE

I hope these frequent style questions will help explain my approach on the wedding day. While I hope the work shared in my portfolio tells a clear story, if you have any further questions about my style of photography please don't hesitate to ask.

### How would you describe your style of photography?

I cover weddings in a very journalistic style but I don't think photography should be limited by a "genre." While I'm very hands-off and unobtrusive in my coverage of the day, I do believe that there is a time and place for gorgeous, casually posed images of the couple together. So while I won't stop you and make you pose while cutting the cake, I'd like about an hour (or more!) alone with you both (if possible) sometime during the day to create some images of you without your wedding party or guests looking on. I also believe strongly in preserving all of the details of the wedding; from your cake to your shoes, so my work is very flush with detail images. My images of the guests at the wedding are almost 100% journalistic and I won't stop entire tables at the reception and make them pose for "table shots." I prefer instead to capture them laughing, smiling, dancing, drinking, and having a great time.

### Do you take posed family photos?

Absolutely. I strongly believe in those family images, as they're records of your entire family at an important time in their history together. A few weeks before your wedding I'll send you a questionnaire covering the details of the day and among the other questions is a list of posed images - these are the family groupings that I traditionally photograph at each wedding I cover. You'll have space to write in your own additional groupings. Please bear in mind that the hallmark of my coverage is journalistic and real-time, so a very long list of posed images will hinder my ability to cover the event in a documentary manner. I provide you with nine groupings and strongly suggest your final list include no more than twelve or thirteen total. These groupings are quick, easy, and largely informal and I try to make them pleasant and enjoyable for everyone involved!

### Can you take fewer photos that have dark shadows and bright highlights?

If what you're looking for is a more evenly lit style of photography then I might not be the photographer for you. I use a great deal of shadow and light in my natural light images as well as my flash/lit images during the receptions. Please make sure that you look through all of my sample galleries provided when you inquire with me

 APP. 116

to make sure that the style you see in the galleries reflects the style that you want for your wedding day photography.

### Can we provide you with a "shot list" or "must take pictures"?

Other than the family groupings, I'd prefer that you didn't - and let me explain why! It's very helpful to know what important relatives and friends are coming to your day, and if any events bear special significance, but repeated requests for posed images and having me work "from a checklist" is counterproductive to the work you've seen here on my website, and will result in a very different look to your gallery of images. "Shot lists" provided by many major wedding magazines are a great idea in theory, but please understand that I generally will capture those images without prompting. Providing me with a very long list of college groupings or high school friends or extended family at the reception will result in a lesser amount of documentary coverage and more time spent rounding up guests to check the groupings off of a list. Also providing me a list of images you've seen on Pinterest reduces my ability to capture naturally occurring moments for you, as we'd be working from a list instead of creating unique work for you.



# BUSINESS + DETAILS

I am often asked important questions about the business side of working with me as your wedding photographer. This section includes all of those questions, from business insurance to food! As always, if you have any further questions about anything at all, please don't hesitate to contact me.

### Do you have insurance?

Yes. Absolutely. 100%. For sure. Yes, yes, yes!

### What kind of equipment do you use?

I use top of the line professional Canon equipment and extensive backups. I love gear, I'm a bit of a gear hoarder. It's good for shooting, but bad for my back - gear hoarding is very heavy, you see.

### Can you provide my venue with a certificate of insurance?

Of course. I do request that you let me know at least two months in advance of the wedding as it does take time for our insurance company to process and provide that document. Please feel free to put your venue or your

APP. 117

coordinator in touch with me and we can work out those details easily, each venue has different requirements and we can provide certificates to meet all their needs.

### How long have you been in business? How many weddings have you photographed?

I've been in business since 2001 and have photographed over eight hundred weddings. And I remember them all. I really do! I've shot on beaches, in churches, on the side of mountains, on boats, in the rain, in hurricanes, and everywhere in between. I am always deeply honored when I'm commissioned to document a wedding, and I take that responsibility very seriously.

### Can you hold a date for me?

I'm so sorry, but I can't hold the date or pencil you in. To be fair to everyone I can't "hold" a date without a retainer and a signed contract. I accept bookings on a first come/first served basis.

### What is your payment schedule?

A booking fee/retainer of approx. $1,500 is due to reserve your date. You'll have two more payments after that. 50% of your balance will be due approx. ninety days from your wedding date, with the final balance due two weeks prior to your wedding date. I'll send you an email reminder when your payments are due. I like to make things as easy as possible for you - I know you've got a lot on your plate!

### Can we pay you part of the amount after the wedding?

I do require full payment before the event. Payment for overtime, album upgrades, or additional products beyond your wedding day contract, however, are all due post-wedding. If you have any concerns about the payment schedule, I'd love to chat with you about them!



### If I need to cancel my wedding, is the retainer refundable?

The retainer fee and all monies paid are non-refundable. The retainer guarantees that I'll hold the date exclusively for you and once you've signed the contract I do turn down all other commissions for that date.

### What if you die?

If I die I can *guarantee* I will not be at your wedding - which would be super sad. However, Susan Stripling Photography (to be honest, probably just my husband and my incredibly grief-stricken friends) will still supply you with coverage from my contracted assistant or second shooter. I'm also a member of many national and local organizations and networking groups upon which the aforementioned grief-paralyzed people could call to

APP. 118

USCA4 Appeal: 21-1506 Doc: 19 Filed: 07/14/2021 Pg: 195 of 523

find you a replacement photographer. My husband is also a wedding photographer, and while my untimely demise would pain him terribly, he would be able to work to find you a suitable replacement photographer.

### Okay, maybe not DIE, per say, but what if you're super sick?

In over a decade and a half of shooting weddings, I have never missed a wedding for any reason. Please know that I take the responsibility of shooting your wedding extremely seriously, and wouldn't just "call in sick" without a very grave, serious reason behind it. If that were to happen, we would find you a replacement photographer at the same skill level that I possess. If this is something that concerns you, please contact the studio and we can chat! I promise that this is a situation that we plan for carefully, and hope we never have to execute that plan!

### When should we book you for our wedding?

ASAP. Since I can't "hold" dates or "pencil you in" dates are booked when...well, when they're booked. Most of my commissions contract me within a year of the wedding date, sometimes as close as two months prior, sometimes a full calendar year or more in advance. It's easy to predict what will be popular weekends, but not always easy to predict when those weekends will book up!

### If we're running late, will you stay later than you were scheduled?

Surely! I do have an overtime rate and it goes into effect only with your permission and approval that I continue coverage. I'll bill you for those hours after you return from your honeymoon. Overtime includes everyone working at the event, which would be myself, my associate photographer (if one is part of your collection), and our assistant.

### Do you offer discounts for off-season or non-Saturday events?

Occasionally discounts are available but are based on time of year, my travel schedule, and availability. If you have concerns about your budgetary needs, please contact me and let me know.



### Do we need to feed you at the reception?

It would be really kind if you did, but it's not a contracted requirement. Feeding us ensures I stay cheerful, mobile, and that I don't faint from starvation, or end up eating a stale protein bar that's been in my camera bag since 2002. I prefer to be fed when you are fed, not afterwards, because when you're eating you're not at your most photogenic. And when you're done, I want to be done as well to continue your coverage. We do bring our own food and water to weddings, but a hot meal is always a lovely treat during a long work day!

APP. 119

**Can our family and friends take pictures with their cameras?**

Of course they can and it doesn't bother me in the least bit! I do request they not swarm the family photographs right away because I'd prefer all eyes facing me in your images, but I don't mind at all if they snap away from the background. I don't allow family or friends to come along for the solo images or the images of you two alone for privacy purposes and because, frankly, other people can be distracting! I welcome other cameras during dancing, cake cutting, and other events just ask politely if people could please not push me out of the way and respect my presence.



# FOR PHOTOGRAPHERS

For those wedding photographers perusing this site - hi there! I have compiled a list of the most frequently asked questions in regards to my work, gear, vendors that I adore, and resources that will help you with your own wedding photography.

**I'm a photographer and I love this FAQ! Can I copy it and put it on my website?**

Please tell me you didn't really just ask me that. *No, please don't steal from this FAQ for your site.* Bad photographer! Like investing the time to perfect your photography skills takes time, writing good website copy to educate and help your clients takes time. I really care for everyone that I work with and have written this to best help them answer their questions and work on their wedding day plans. When you take this without permission it's not cool to me or your clients. I thank you for taking the time to research what questions YOUR clients need answering and writing something original to best serve them!

**Can I be heavily influenced by this FAQ and sort of rewrite it so that it sounds like me but uses your framework and all of your questions?**

Oh, please don't. Like...just...no.

**What cameras and lenses do you use?**

You can see my entire gear list here!

**Do you ever teach or give workshops?**

Yes, I do! I have two classes available on Creative Live. The first is a three day course called Creative Wedding Photography, and you can learn more about the course and purchase it here. I also have a really fun class on sale with Creative Live, entitled Thirty Days of Wedding Photography. It is actually thirty days of wedding photography education, everything from marketing to shooting, business to workflow. You can learn more about 30 Days of Wedding Photography and purchase the course here! At this time I do not give any in-person workshops or have a mentorship program.

I am also one of the founders of The Wedding School, which provides real, honest education to wedding photographer worldwide. THIS is my best resource for wedding photographers, as it is current and continually updating. If you'd like to learn more, visit our site and hop on our mailing list.

## Do you have any partners or sponsors?

I am deeply honored to be a Canon Explorer of Light, which is one of the highest honors a photographer can be given. I have also been named a Legend of Light by Profoto. Most recently, I was chosen as a MagMod Ambassador - which is pretty kickass.

## Can I come watch you photograph a wedding?

I totally understand wanting to just come observe, but I don't allow anyone to just come watch me work. I have a full-time assistant who helps me at weddings. I firmly believe that each wedding requires 100% of my respect and attention, and having a photographer come observe me at work is not in the best interest of the client. If you do want to watch me shoot a whole wedding, you can tag along for a whole 14-hour day in this class here!

## I'm coming to New York! Can I buy you coffee and pick your brain for awhile?

You are so sweet to ask, but probably not. I love meeting new photographers, but my schedule doesn't often permit coffee breaks like these!

## Are you hiring?

All of our current job postings are available here!

## Who built your website?

I built this website with the help of the team at Good Gallery. I chose Good Gallery because their sites are super fast, their mobile websites are badass, and their SEO capabilities are simply amazing and without equal.

If you're looking for a website, I wholeheartedly recommend that you look at them! And, if you decide to sign up for a site of your own, I've arranged for a $49 discount code that will reduce your Startup Fee from $99 to only $50. Just enter the code SUSANSTRIPLING when you sign up!

## Do you really like shooting weddings? Why?

Actually, I do. I have a degree in theatre, and that will always be my first love. I spent years dancing and training for a career in theatre, only to graduate from college and think "Eh, this might not be for me." A summer spend interning at a Broadway theatre and a handful of very stressful auditions later, and I knew that I didn't want to make my career as a performer. I adore weddings because they marry everything that I love about the theatricality of a stage production with the beautiful drama that is everyday life. I love witnessing moments unfold and unfurl. I love watching a day grow and swell from beginning to end. I love the delicate three-act structure of a wedding day. I'm not a swooning newbie proclaiming that *I love love*, but I do love weddings. Honestly.

## Do you have hobbies outside of the wedding world?

Oh yes I do! I am a hugely voracious reader, barreling through book after book (often in lieu of sleeping). I love lifting weights, hate yoga, and barely tolerate running. I see as many theatrical productions as I can. I love to travel. I love horror movies - but the scary-ghost kind, not the slasher-jump kind. Mostly, I just love being in the presence of my family. I have a really great husband, some excellent step-daughters, and two wonderful, delightful daughters. I am also wildly, deeply, insanely in love with Chloe, who is honestly the best dog ever.

Privacy Policy.

**OUR APPROACH**

We bring a Fine Art approach to wedding photography, thinking of each wedding as the opportunity to create custom works of art with the two of you, and the way you feel about each other, in the center of it.

We define our work as clean, elegant and timeless.  Our photographic style is reflective of our own personal style where we strive to blend the old with the new to create something fresh yet reminiscent.  We use digital cameras alongside medium format and 35mm film cameras in order to capture classically beautiful images that are modern and timeless at the very same time.

We photograph weddings with a photojournalist style, capturing the candid and unexpected moments while also providing gentle direction during portrait times, giving couples a collection of images that truly encompass the raw emotion of a wedding day.



ROBERT & KATHLEEN PHOTOGRAPHERS

350 FIFTH AVENUE, 59TH FLOOR, NEW YORK, NY 10118

1055 WEST 7TH STREET, 33RD FLOOR, LOS ANGELES, CA 90017

PHONE: 212.518.1612 (NEW YORK) | 323.795.8776 (LOS ANGELES)



ROBERT & KATHLEEN PHOTOGRAPHERS

Select Page ☰

# POLYAMORY ENGAGEMENT PHOTOS

*by Jenna | Jun 20, 2019 | LGBT Clients, Portraits | 0 comments*



## CHECK OUT THESE SUPER FUN POLYAMORY ENGAGEMENT PHOTOS!

Looking for info about polyamory engagement photos? What about polyamory in general?? Ah, polyamory. The misunderstood step-child of the monogamy culture we live in. I remember the first time I heard about it, it was when I met up with Daley and Logan for the first time. They've been polyamorous their whole relationship and really, a standing testament to how much joy polyamory can bring to their lives.

I've been polyamorous for over two years now and boy, it's....been interesting. Polyamory is certainly harder than a lot of relationship styles. It takes a LOT of work. A lot. A LOT. It takes patience, communication and lots of self-reflection. I don't think I could do it any other way though. Monogamy is awesome for some folks, but lots of loves is awesome for others. Different strokes and all that! In the last year, I've photographed quite a few polyamorous couples (although I do not usually post about it, since a lot aren't open, thanks to the government and friends/family that are judgey). But they're there, they're in the world, gettin' married and infiltrating the world. LOL *We're coming to take over!*

JA195

APP. 123

Enter stage left, these three. I had a friggin' blast with their polyamory engagement photos! Man, I am SO EXCITED ABOUT THIS WEDDING. I met these three a few different times, at a couple different expos. I was VERY excited when they finally booked me, because triad weddings are just not common yet. Though, when I say "wedding," in this case I mean love party. They are going to have one epic shindig, if their engagement session is any testament!

There aren't a love of polyamorous engagement sessions out there, so posing really just takes some imagination and skill. It ALWAYS helps when people are cool in front of the camera and David was certainly a ham! Doing a split session, with fancy ish first and then the holi powder second, that was such a great idea!!! I'm a fan of polyamory engagement photos, because they're a challenge but they're also never boring!



APP. 124





 APP. 125





APP. 126





 APP. 127

Select Page ≡

# A POLYAMORY WEDDING

*by Jenna | Nov 30, 2019 | Weddings | 0 comments*



## I CAN'T WAIT TO SHOW YOU THIS POLYAMORY WEDDING!

Before we get to this polyamory wedding, I want to share a little bit about what polyamory is.

Polyamory is almost never what people think it is. It's also rarely what people want it to be. There is a lot to be said about polyamory, which is entirely dependent on who you talk to. The most major confusion concerning polyamory, across the board, is that people assume it's about sex. Hell, even "polyamorous" people think it's mostly about sex.

It's not.

Polyamory is literally defined as multiple loves. It means you *love* multiple people, not *boink* multiple people. I'll never forget how my sister, when I first came out as polyamorous, just asked me to not discuss my orgies on Facebook. I don't think I stopped laughing for at least five minutes. I once spoke to a family member about being polyamorous, just casually talking about my situation and partners at the time. She said cautiously, "you know, that isn't for everyone, right?" As if I was attempting to

APP. 128

convert her to my cult, where we drink Amortentia potions daily and just want you to become *one of us one of us* one of us.

There is no right way to relationship. Polyamory simply isn't a threat to monogamy. Monogamy is often its own worst enemy, with or without outside influence. Every relationship is different. I've seen polyam relationships grow and fizzle just as rapid and often as monogamous relationships.

Another common remark is, "I could never do that, I'd be too jealous." It fascinates me how people use jealousy as a relationship badge of honor or a warm soft protective blankie. As if they're REALLY in love, because they have BIG FEELINGS if their partner even looks at someone else. Here's a not-so-secret: polyamorous people get jealous too! We just sit down and evaluate WHY we're jealous, try to work through the feelings and decide to not let our emotions rule the way we function in our relationships (theoretically, of course). And no, this does not mean we're better than anyone else, it just means we're probably more experienced at relationship-based BIG FEELINGS regulation. That's all.

I could throw all kinds of studies and info at you, but that's not why we're really here. We're here because these three humans fell in love and created a dynamic that is quite beautiful. Stunning, really. I have a theory that humans are really meant to come in threes. All over the world, some of the best things come in threes. Three course meals, trilogies, the Hanson brothers, three piece suits (drool), the Sanderson sisters and of course, Jolene, Stephani and David.

I loved this wedding. I loved this throple! We had so much at their engagement session, so I knew we would have an amazing time on their big day!

One of best things about the day was the proud family attending, I loved the friends supporting, I adored how often David looked like a fat cat that ate every canary ever. It was so darn cute!I had never done a polyamory wedding before, but I think we handled it all pretty well. Everything took just a little longer, like family formals or the ceremony, which is totally fine! It was a wonderful day, with gorgeous light, stunning weather and happiness galore. I especially loved the copious amounts of jello shots. Every guest was handed a jello shot, which was taken at the end of the ceremony! How awesome is that!

So enough of the blathering, here's the good good for you to see!

Most was DIY, but shout out to Hecho and Queso for always having amazing food, including gluten free brisket tacos!

APP. 129





JA202 APP. 130





 APP. 131





APP. 132





 APP. 133





APP. 134





APP. 135





## ARTICLES

Home    /    Marriage + More    /    Open marriage, transitioning and play parties: one couple's story of their thriving poly love life



MARRIAGE + MORE

# OPEN MARRIAGE, TRANSITIONING AND PLAY PARTIES: ONE COUPLE'S STORY OF THEIR THRIVING POLY LOVE LIFE

 Zoe Larkin, 2 years ago          0          15 min

| TAGS | #OPEN MARRIAGE | #POLY | #QUEER | #TRANS | #TRANSITIONING |

JA208   APP. 136

A ndy and Raj are a San Francisco couple in an open marriage and part of a thriving poly community. Andy is a bisexual trans man, and his husband Raj is straight, cis and male. They love each other deeply, have sex with other people, attend play parties, and manage to make it all work. They opened up to us in a candid conversation to chat about surgery, sex-positive communities, jealousy and supporting each other.



### Equally Wed: Tell us about your gender identity and sexual orientation journeys.

Raj: I identify as straight, cis and male. I have experimented to see if I have any queer orientation and have been part of sexually open communities long enough that if there was something else to it, I would have discovered it by now!

Andy: I'm a trans man and I'm bi. I have known that I was bi—attracted to both boys and girls—for as long as I can remember, at least since first grade. Then I remember finding out about genderqueer people, and finding I was attracted to them too. I use the word bi because that's the word I used when I first came out, and I think of it as being attracted to my own gender as well as genders that are not my own.



## Tell us a little about Andy's transition journey and how that impacted your relationship.

Andy: I grew up in Houston, walking distance from NASA's mission control, where the only thing that mattered was that you could grow up to be a rocket scientist. That means it didn't matter who you dated—as long as they were smart, as long as they could grow up to work at NASA. To my parents' credit, I was taught that girls could be anything. "You want to be a race car driver? Here are awesome female race car drivers! You want to be a physicist? Here are all these strong women in physics." It just never occurred to me that I was a boy, because there wasn't anything boys could do that I couldn't do.

So I went to college, went to graduate school, and then moved to San Francisco in 2014 for work. And that's where the gender journey really started.

As soon as I landed in San Francisco, I started getting to know lots of queer, sex-positive communities. Pretty early on, I had a friend and lover who went through top surgery. After recovery, I saw them in a T-shirt without a bra, and found myself incredibly jealous. That sparked a year of questioning and experimenting: Why am I jealous? What do I really want here: the feeling of a T-shirt against my skin, or a flat chest, too? At the time, I had a 34F bra size, and spent a year going without a bra, to see how that felt. I just got catcalled a lot. I kept noticing all these guys on the street in T-shirts and jeans, and thought, "If I'm wearing the same shirt, why don't I look like that?" I needed top surgery.

  APP. 138

Fast-forward several months, and I saw Jiz Lee reading from their book Coming Out Like a Porn Star at Writers With Drinks. If you don't know them, they're a porn star, model and author, and they write really smart things about gender. As soon as they began speaking, I realized, "I don't want my voice to sound that high." Then I realized that to have a deeper voice I needed to take testosterone. I hadn't been planning on that, but it was such a visceral reaction.

Around the same time, I spent a weekend with another friend and lover. On Sunday morning, out of the blue, he started referring to me as he and using male terms to describe my body. I cried. A lot. I felt so seen and loved and cared for. He saw me as a man before I did—he put words to what I didn't know how to say.

There wasn't a single moment where I realized I was trans. As Jamison Green writes in Becoming a Visible Man, transitioning is like lighting candles in the dark—you light one candle, and see where you are. Then you light another, and another. You thought that you were in this tiny hallway and then it turns out to be a huge, beautiful room, bigger and wider and more gorgeous than you thought possible.



T hroughout this journey, I was seeing a gender therapist and talking to Raj about it. I was terrified. Raj is a straight guy, even though he's been in queer communities since we met in 2008. This was 2014—we had been married for four years and together for six. I couldn't imagine being married to anybody else. He's my best friend, lover, teammate, person I want to grow old with and travel the world with. If I'd had to choose between transition and marriage, I would have chosen my marriage.

APP. 139

*If I'd had to choose between transition and marriage, I would have chosen my marriage.—Andy*

In late 2016, we took a trip to Morocco and Spain. In Marrakech, I got a notebook engraved with the name I'd chosen for myself—Andrew Miles. I had decided to come out to all my friends, family and coworkers. Then, back in Sevilla, we stayed up all night watching the presidential election unfold with increasing horror. I was devastated. I thought I wouldn't be able to have access to testosterone or surgery, or there'd be more hate crimes so it wouldn't be safe for me to transition anymore. So we came home and didn't do anything immediately, waiting to see what would happen.

## What was Raj's involvement with Andy's transition, and how did he encourage Andy to take that step?

Raj: When Andy decided to transition, it wasn't really a surprise to me, given the non-binary gender journey he'd already been on, and his attitude to certain things like clothes and his body. I listened to him complain for 10 years that he hates his breasts, so getting rid of them seemed like the next logical step.



As a straight guy, honestly, I had hoped it would stop at being non-binary and not go to the transition stage. There were a couple of reasons. One, given that I'm straight, I just assumed that I should be married to a woman. Second, when we were on a flight to Morocco, it occured to me that we'd be perceived on future

JA212    APP. 140

journeys as a gay male couple. That's an experience I wasn't really ready for—at least being perceived as an identity that I'm not.

However, Andy was getting very miserable. I wasn't sure I wanted to be married to somebody that miserable for the rest of my life! Eventually, I suggested that he try this for a few months. Testosterone has some irreversible effects, but at least it's not surgery. My therapist also recommended that we go slow.

Andy: Raj came out one day and said, "I think you should take testosterone!" I asked if he was sure, and he said, "Look, we've talked about this as much as we possibly can. The only way we'll know if it works is by trying it." So I said, "OK, I made a doctor's appointment, but I don't have to go." Raj said, "It's OK, really, go!" Then I went to the appointment and said, "OK, I got a prescription, but I don't have to fill it!" And he said, "It's OK, fill it." Then I came home with my testosterone and said, "OK, I filled the prescription, but I don't have to use it!"

Then one morning he came to me with my testosterone in one hand and chai in the other hand and said, "Honey, I brought you your T." I have the most amazing husband in the world. That was February 22, 2017.

> 99   *Honey, I brought you your T.*

We decided I would use topical testosterone. It's an alcohol-based gel that smells like hand sanitizer. I put it on my shoulders every morning. We did that for two reasons. One, I hate needles. Two, it's a smaller dose, and it's more gradual and consistent. You don't have these huge mood swings, or if you decide to stop, it leaves your system faster. Your voice changes a lot more slowly.

I checked in with Raj after about three months. He said, "Well, you seem a lot happier, and we don't fight about the thermostat anymore!" I used to be cold all the time, but after T, I run warmer.

Then I had top surgery in July 2017, five months to the day after starting T.

APP. 141



## How did you come to the arrangement of being in an open marriage?

Andy: We started dating in February 2008. A few years in, I really missed sleeping with women, so I asked if there was a way that I could still do that. Around the time we got married, Raj introduced me to a friend of his.

Raj: She was a close friend of mine from grad school. I knew that she had been in a relationship with a couple before. Andy and I lived in Atlanta. This friend lived in Houston. I told her about it and she was interested. She came over and everything worked out really well. She was our girlfriend for about a year and ended up visiting us about once a month.

She ended up deciding to date someone exclusively, which was always in the cards from the start, so it was an amicable split. But the experience was encouraging even though it was 2010, it was Atlanta, and we were doing it on the downlow as many people do. Then after it ended, Andy met someone at grad school when he was a student at Georgia Tech.

Andy: I fell in love with another woman at school, which was really challenging because she was a lesbian, so she couldn't date both of us. That was the only relationship model that we knew at the time.

Raj: That was challenging for both of us, partly because we were trying to figure this out on our own. Andy and the lesbian woman dated for a couple of years and we were good friends, but it caused a bit of a strain on the relationship because we had this notion that things needed to be equal and fair. I had no idea how to find someone of my own. We had no community.

APP. 142

Andy: We read all of the books we could find on open relationships, and they weren't very helpful. We tried a poly-friendly therapist and that wasn't very helpful. We came out to our friends in Atlanta as poly and we ended up losing about half of them.

Raj: Once Andy and this woman broke up after a couple of years, we realized that Atlanta wasn't going to be a long-term place for us. We discovered some poly communities there after we left, but those communities are pretty quiet about it. We also decided we want to move out and explore some other city—someplace more bike friendly with better transit. As Andy finished his PhD he ended up getting a job in San Francisco.

Andy: A friend introduced me to someone who hosts a lot of sex-positive events and has a really strong network of sex educators and sex therapists, so through that community I met a lot of wonderful people who became our good friends. Then we began exploring all that San Francisco has to offer.

Raj: Remember, we were very early in our experiences. We hadn't learned to explore any of this. Andy had gone ahead of me to San Francisco while I was in Atlanta hearing all of this on the phone. I was freaking out! Every time we spoke on the phone he would be telling me about the new people he had sex with and the play parties he'd been to. It was disorienting for me and caused a lot of conflict. About eight months later I moved to San Francisco. I didn't feel like I was comfortable in those spaces that Andy was in. I ended up freaking out at the play parties. It was hard. Those were the times we thought about separating.

> *When queer people come out, they don't have a playbook.—Raj*

Over time I began exploring that a little more seriously. I started seeing a relationship coach. I realized that as a straight guy in a patriarchal society, I have never had to question what I want in a relationship. If you follow traditional gender roles, which we had been doing, you're given a part by society. When queer people come out, they don't have a playbook. They are forced to figure out what their needs, desires, preferences and boundaries are. They have to find out what the menu of options is. Straight people, guys in particular, don't have to do that.

When the question came up with my coach of, "What kind of relationship do you want?," I didn't even know that there was something to create. I thought relationships were just one thing. By nature I'm curious so I began exploring that process. I began to figure out what kind of relationship I wanted in the first place!

All of that was a two-year journey for me, to get to a point where Andy already was. Finally, I began to see that our relationship doesn't have to be predefined in a certain way. We can create our own.

## How do you deal with feelings of jealousy, especially now that you're not seeing the same person together?

Raj: Initially we dealt with it really badly. During Andy's two-year relationship with the lesbian woman in Atlanta, I felt so much jealousy and insecurity. One of the things you read about in open marriage books is the true nature of jealousy. We see it as this destructive, deal-breaking emotion, but usually it's just an indicator of something else that's being triggered. You can stop at your jealousy or you can reflect on what it is that's at the root of the jealousy. It's hard, but that helps mitigate the effects of the jealousy. One of our friends within the community says, "Jealousy is often the end of a conversation whereas it should be the beginning."

^

Usually when couples open up their marriage, in a bid to reduce the jealousy, they set up all kinds of rules. We did that too. A common one is you can have sex with others but you can't fall in love. Or there are silly ones like one that Andy made up with the first person we dated, that I could kiss her on the lips but not on the forehead. That was a gesture of intimacy that was reserved only for Andy.

Andy: Raj had a rule in the beginning that I could sleep with other women but not other men.

Raj: This is a very common one, but also reflected my insecurity. It's known in the poly community as a one-penis policy, or OPP. Once you start investigating with a therapist where the insecurity comes from, the need for those rules goes away.

Andy: Jealousy can be really helpful, though. I realized that I needed to have top surgery because I saw someone else's flat chest and I was jealous. Jealousy is useful information.

Raj: Now, we have tools to deal with jealousy. It's never going to go away but we're equipped.

Andy: One of the things I appreciate most about having an open marriage and each of us having multiple partners is the greater social support that we have during hard times. When Raj's father passed away in March, it was a really hard time. The day that we got the phone call, my girlfriend was over, she was spending the night. She woke up and she held us both and drove us to the airport, and she kept me company while Raj was in India and I couldn't go because I didn't have the visa set up after my name change. It's amazing to have that close of a relationship. Of course, some people get that through friendships.



JA217    APP. 145

Raj: One reason it works for us is because we've put in the work to navigate our relationship. When I tell people I'm straight, a lot of people ask me questions like "Why are you married to a man?", or "How do you have sex?" Like a lot of long term couples, Andy and I weren't really having a lot of sex before he transitioned. As a straight man, I'm not attracted to him sexually. We want to stay married because our marriage is very, very strong in other ways. We've put in a lot of work to build this relationship.

The fact that we had already put a lot of work into our open marriage meant that Andy's transition wasn't really a big factor. We knew our sex life wouldn't change that much, and we have other partners to meet our sexual needs, so why not keep what works? I see a lot of my friends getting divorced, and I can see how difficult it is to create a good marriage that lasts a long time where you have this level of communication and trust. We've managed to do this. It didn't feel right to throw all that away over one thing like gender.

Andy: And now we want to have kids!

*Interview and photos by Zoe Larkin, an Equally Wed preferred photographer*

---



DESTINATION WEDDINGS, HONEYMOONS, TRAVEL
LGBTQ+ honeymoon spotlight: Cape Town, South Africa

REAL LGBTQ+ WEDDINGS
You'll want to a be a guest at this couple's Beauty and the Beast inspired wedding





Zoe Larkin



JA218    APP. 146





# Photographers, Videographers & Photobooths

### Cannabis Friendly Wedding Photographers

All    Alabama    Alaska    ALL CANADA    ALL USA    Arizona    Arkansas    California - Central

California - Northern    California - Southern    Colorado    Connecticut    Delaware    Florida    Georgia    Hawaii

Idaho    Illinois    Indiana    Iowa    Kansas    Kentucky    Louisiana    Maine    Maryland    Massachusetts

Michigan    Minnesota    Mississippi    Missouri    Montana    Nebraska    Nevada    New Hampshire    New Jersey

New Mexico    New York    North Carolina    North Dakota    Ohio    Oklahoma    Ontario    Oregon    Pennsylvania

Rhode Island    South Carolina    South Dakota    Tennessee    Texas    Utah    Vermont    Virginia    Washington

West Virginia    Wisconsin    Worldwide    Wyoming



New Moon Saloon





Aeron Reinhardt
Photography

Rachel Artime Photo



USCA4 Appeal: 21-1506    Doc: 19    Filed: 07/14/2021    Pg: 223 of 523

APP. 147

JA219



**Glow. Sparkle. Shine.**
★★★★★



**Head & Heart Photography by Kiel Rucker**
★★★★★



**JAMIE Y PHOTOGRAPHY**
★★★★★



**Larsen Photo Co.**
★★★★★



**Lindsay Raymondjack Photography**
Serving all of New England; Vermont, ADK Region & Beyond!
★★★★★



**Robot Foto Booth**
★★★★★

**White Light Exposure**
★★★★★



**Island Jenn Photography**
★★★★★

**Lollylah Wedding Photography**
★★★★★

**Photographers of Las Vegas**
★★★★★

**Sally Carpenter Photography**
Woodstock, Vermont
★★★★★

**Shoots the World**
★★★★★

**Studio AC Photography**

**Supreme DJs and Entertainment**

**The Willis Collection**
★★★★★



JA220

USCA4 Appeal: 21-1506      Doc: 19      Filed: 07/14/2021      Pg: 224 of 523

USCA4 Appeal: 21-1506      Doc: 19      Filed: 07/14/2021      Pg: 225 of 523


**Ali V Photographer**
Boulder, CO ★★★★★


**Amber Hempen Photography** ★★★★★

**Brittany Photographs** ★★★★★


**Colorado Photobooth Company**
Denver, CO ★★★★★

**Jessica Hill Photography**
Portland, Oregon ★★★★★


**Kate Merrill Photography**
3275 W. 14th Ave. #101
Denver 80204 ★★★★★



**Pasiflora Photography** ★★★★★


**Sandrachile**
2402 Sidney ★★★★★
St, Pittsburgh, PA
15203

© 2020 Love and Marij. All rights reserved

    

APP. 149

# Rachel Artime Photo

## WHERE WE OPERATE

California - Northern, California - Central, California - Southern, ALL USA, ALL CANADA, WORLDWIDE

**Email:** rachelartimephoto@gmail.com

## Corona Virus Policy

I am comfortable shooting CA weddings and I will attend your wedding wearing a mask to insure my couple feels comfortable and safe.

## WEBSITE

https://www.rachelartimephoto.com

## WHAT WE OFFER

I offer any photo needs! I specialize in wedding and engagement photography. My work is fully based on your love and it's unique quirks and qualities. I'll send a questionnaire your way, my biggest hope being that you will thoughtfully fill it out together so that I can get a sense of who you are and who you hope to become as a married couple. These photos shouldn't be worthy of Pinterest – they should be worthy of reigniting memories every anniversary and reminding you of your love in its earliest stage throughout your lives together. I want to do my best to make that happen – SO TELL ME ABOUT YOURSELVES AND LET'S MAKE SOME MAGIC.

## FUN FACT

If you asked any of my close friends, they'll tell you that my current obsession is cowgirls (and New York). It's sorta a funny thing but also a genuine reflection of me in that I love old timey, reckless, gritty romance. I love that it is passionate. I love that it is playful. I love that it all seems do-or-die. Let's make out on a HORSE riding into the SUNSET after a WILD day. Anyways, giddy up, partners. hehe.

## CANNABIS POLICY

I am open to all things cannabis!

## CONNECT



[ CONTACT ]







Privacy Policy

Privacy Preferences



MENU

# Ralis and Katie's Satanic Wedding

*This page may contain affiliate links. If you buy something via these links, Misfit Wedding may earn a small commission at no extra cost to you. This helps keep our site free for you and our hand picked businesses. Read more here*

**They say the Devil's in the details, well that was certainly the case for Katie and Ralis who planned out and executed their Satanic wedding back in October. Katie was kind enough to talk us through how they put together this unholy matrimony!**



## Can you please introduce yourselves, tell us where you're from and where and when you got married?

We are both in the Los Angeles film industry. Ralis is a special effects makeup artist. I would say he specializes in blood rigging and zombie makeups! He was Marilyn Manson's makeup artist for many years, as well as Slipknot's mask fabricator.

I am a seamstress. I make custom costumes and alter garments for costume designers, as well as manufacture my own designs under the label Insidious Clothing. Together we own a Halloween mask company called Mad Monster Masks. We make two-piece masks that move with your jaw so you can eat, drink, scream, and breathe while wearing the mask.

We moved out of Los Angeles a few years ago so we could grow our business, and we ended up in Yucca Valley (near Joshua Tree National Park). We had our wedding on October 8, 2016, at our half-acre property in the desert.

JA223    **APP. 151**

# And what about the ceremony itself? We're assuming you didn't have traditional vows...

We actually did have traditional vows! Just not traditional in the way most people would think... It was a traditional Satanic wedding, officiated by the Church of Satan. This was the most important thing for Ralis - I got to make all of the decorating decisions, and he was in charge of the ceremony and the food decisions. We didn't have a naked woman for the altar though, and we added the blood at the end, which is not endorsed by the Church of Satan and was almost a reason for them to turn us down! Of course there were a lot of "Hail Satan!"'s throughout and I was surprised how many of our guests got into it by the end! Our Officiant, Ruth Waytz, was just amazing and so much fun!

Here are the vows from a traditional Satanic wedding:

*I desire to live with you just as you are.*

*I choose you above all others, to share my life with me.*

*I promise to always speak the truth to you, to honor and to tenderly care for you.*

*I love you for yourself, in trust that you will become all that you can be, and in turn I promise to be as great as my Nature and Will allow.*

*I will honor this pledge as long as life and love endure.*

APP. 152



## Some of your photos look like movie stills! Do you feel you achieved the mood you were going for?

Our photographer, Alex Solca, was amazing! He did a fantastic job with the photos, and our guests all really liked him too! We met in person to talk about the wedding, and I sent him some inspiration photos of black metal album artwork and noir movie/fashion shots.

In addition to weddings, Alex also shoots metal bands so he knew exactly what to do. He brought lights and a fog machine and back drop and really nailed the fantasy shots before the ceremony. And the shots during and after the ceremony are just so cool!



## Was it difficult to plan your wedding? What was the most stressful part?

We had over a year to plan it, but it was horrifying how quickly the time went by! I started making lists and calendars early on to stay on schedule, but as the day was approaching there were so many little details that got put off and were adding up quickly. My parents stayed with us for a month prior to the wedding and were a huge help tackling everything.

I was the most stressed over the ceremony. When Ralis was determined to have a Satanic wedding, I was worried it would be too serious and too religious. We aren't serious people, we're constantly laughing and goofing around,

APP. 154

and we aren't religious at all. After talking with our Officiant for the first time, my nerves were calmed because she was just like us - a little ball of sunshine with a love for the macabre!



Ralis was the most stressed about the blood rig and timing the makeup application. There's a lot that can go wrong, and you only get one shot. Usually he would use compressed air from a fire extinguisher or an air compressor, but it wouldn't have worked for this. So he ended up using a large syringe covered in fake red hair, safety pinned to the back of my dress!

We were also racing against time because of the lighting - we started the ceremony just as the sun set, and by the end we were in pitch black. It was all perfect!

JA227



## What was your favourite part of your day?

When my dad walked me down the aisle! That was something I added into the ceremony. We walked to the title track of The Omen (Ave Satani), and Ruth, our Officiant, was saying the Infernal Names. I thought I would be too nervous in front of everyone, but I was so happy and lucky to have such an open-minded family, it was just an amazing, beautiful feeling!



## Do you have any advice for couples who are currently planning an alternative wedding?

Definitely use The Knot for general information, timelines, and reminders. There is a lot of good advice that you can tweak to your freak.

JA228   APP. 156

Your ideas will evolve as you go along so don't be stubborn with your original plan - I planned on not having any flowers but we ended up with fake flowers at each table and a real flower bouquet. I also changed the fabric of my dress after two fittings because the first one wasn't quite right.

Don't be afraid to really do your own thing! It makes your wedding more special and people will appreciate something fun and unusual! No one wants to go to a boring wedding. I have had so many strangers see our wedding photos and remark that it's the only wedding they have ever wished they attended!



Thanks for sharing your incredible day with us!

Thanks also to Alex Solca for his killer photos, you can find his website right here.

*Published 09 February 2017*

JA229    <span style="color:red">APP. 157</span>

TRENDING NOW IN WEDDINGS        HASHTAG    WEDDING NEWS

WEDDINGS

## "One Part Wedding, Two Parts Halloween, and One Part Viking Funeral"

You have to see this seriously spooky wedding reception at the Congressional Cemetery.

WRITTEN BY HAYLEY GARRISON PHILLIPS 𝕏 ✉ | PUBLISHED ON **OCTOBER 31, 2018**



All photographs courtesy of Tory Hitchcock Photography.

Kelly Carnes proposed to her boyfriend Ryan Moore in an observatory with skyline views of New York City. But the proposal was more unusual than meets the eye. Instead of producing a diamond ring during the big moment, she went with a custom piece made of meteorite shards and dinosaur bone. If you knew Kelly and Ryan, you'd know that suited them just perfectly. The couple had met a few times before—Kelly often went out dancing on date nights with her ex at Cusbah, a restaurant and club on H Street. Ryan was, as Kelly recalls "the hot bartender."

APP. 158

Though Kelly was dating someone else at the time, she thought Ryan was so great she tried to set him up with her best friend. Alas, the match didn't take. However a year later, Kelly and Ryan fortuitously bumped into one another during a Brightest Young Things party at the National Museum of American History. Kelly was a CEO of her own company and also does PR and event planning, and Ryan was working at the Department of Justice. As they began to spend more time together, they discovered they shared an interest in all things magical, epic, and unearthly. "It struck me how different she was from everyone else, and how unafraid she was to be herself" says Ryan.

A year later, the couple eloped.... in a way only they could pull off. Jetting down to New Orleans for April Fool's Day, Kelly and Ryan strolled through the French Quarter together, getting their palms read, ducking into seance rooms, and even sipping cocktails at a vampire-inspired speakeasy. The day ended with an intimate wedding ceremony at the New Orleans Pharmacy Museum, in which Kelly, decked out in Harry Potter-themed high-tops, swapped vows with a beaming Ryan. But the day was just a prequel to the couple's voodoo-themed wedding back in DC, which a guest described as "one part wedding, two parts halloween, and one part viking funeral"

In early September later that year, friends and family gathered at the Historic Congressional Cemetery to celebrate Kelly and Ryan's marriage. Guests arrived at the cemetery to be welcomed by a colorful carnival troupe including the all-female drum corps from Batalá Washington, a stilt walker, a juggler, an Edgar Allan Poe impersonator, a violin player, a poet doing readings, body painters, magic tricks from magician Alain Nu, and not one, but two fire dancers.

"I loved seeing everyone's faces as they got out of their Lyfts at the cemetery entrance and were completely wowed by the spectacle," says Ryan.

The newlyweds got in on the antics. Needless to say, they were dressed to impress. Ryan wore a pirate coat with a feather top hat and red leather skull mask, while Kelly awed in a custom-made Marie Antoinette style wig and sugar skull makeup. Her two piece attire paired with her "maids of magic" who wore black dresses with red velvet cloaks, but her outfit had an extra feature. "My dress was crimson red, and was made of two pieces so that I could drop the skirt and run amok in a red sequined jumpsuit all night."

Washingtonian Weddings Instagram | Follow Washington Weddings on Facebook

APP. 159



 APP. 160



APP. 161









JA235   APP. 163

RELATED | **The Exorcist Lives On in These Creepy Wedding Photos Taken on the Georgetown Stairs**



## The Details:

Photographer: Tony Hitchcock / Venue: Historic Congressional Cemetery / Event Coordinator: Swoon Soiree / Invitations: Meg Levine / Florist: Apiary Hospitality / Caterers: Eat & Smile Catering / Bride's Attire: Fashion Irina / Groom's Attire: SilverLeaf, Maryland Renaissance Faire / Makeup: Samantha Trionfo / Tablescaping & Decor: Tinsel Events / Drum Corps: Batalá / Costumed Jugglers & Stilt Walkers: Baltimore Hoop Love / Fire Dancer: Jennifer Miesen, "Inaya Renarde" / Live Band: Black Masala / Live Violin: Humberto Gonzalez / Poet: David Dieudonne / Magician: Alain Nu / Body Painters: Hilary-Morgan Watt, Courtney Sexton / Edgar Allan Poe Impersonator: Tim Beasley / Transportation: Lyft Discount Code / Videographer: Clara Ritger

AD

JA236    APP. 164

# CREATRIX
### PHOTOGRAPHY

Select Page ☰

## DALEY & LOGAN // AUSTIN VAMPIRE WEDDING

*by Jenna | Jan 11, 2017 | Weddings | 0 comments*



Looking for other blogs about Daley and Logan, who had an amazing Austin Vampire Wedding? Check it out here!

*"On this day, we gather to bear witness to a union that has been sworn before and will be sworn again – a joining of souls older than the flesh that either of them wears. Through endless cycles of lives, Logan and Daley come together and are parted, only to find one another again. These Twin Flames know this truth above all: worlds are born and die. Empires rise and fall. All material things eventually fall to dust, but love itself lives on. and it is enough."*

The ceremony and vows for Logan and Daley were beautiful, with a Twin Flame candle ceremony, a crowning ceremony, the ring exchange, sealing the whole thing with an epic kiss covered in rose petals. I'm not going to lie, the ceremony made me tear up. The raw emotion on Logan's face, Daley in all of her gorgeous glory...it was too much at times, overwhelming in it's perfection. The guests walked into what I called, "a room of blood," which is fitting for a vampire wedding! The whole mansion was drenched in the color red, creating a surreal experience coming in and out of the room.

JA237    APP. 165

I love that Daley and Logan are Twin Flames that have found one another. It's also rare for Twin Flames to even get along and marry, honestly. Unlike soul mates, Twin Flames are the opposites of one another, which can lead to heartbreak. But these two are perfection for one another. Do you think you've found your Twin Flame? Check out this website to see if you recognize your relationship in any of these signs!

Anyway, once again I want to thank the following professionals for making the day as flawless as possible. Shoutout to Big Dog Pyro for the epic Bride entrance and the rose cannon for the first kiss!

Getting Ready Location: The Driskill Hotel
Venue: Texas Federation of Women's Club Mansion
Bride's Cake: Bakehause Confections
Groom's Cake: Cakes ROCK
Caterer: Pascal's Catering
Stationary: The Pink Tulip
Florist: Floral Renaissance
Ceremony music: Terra Vista Strings
Lighting: Ilios Lighting
Rentals: Marquee Rentals
Special Effects: Big Dog Pyro
Armor: JA Fantasy Art

First, we did a "first touch" around the corner at The Driskill hotel and Daley joked, "you better not have written fart anywhere on this!" Logan laughed and they read their notes for a bit. "I love you," they said to one another and right before we ended the first touch, he said to her, "I wrote donkey fart on the back."

Her reaction was priceless. They know one another so well!

 

## RELATED POSTS

- Chapel Dulcinea Elopements
- A Very Covid Halloween
- Austin LGBT Wedding Photographer

JA238  APP. 166



 



WWW.MYBADASSPHOTOGRAPHER.COM

JA239 APP. 167



 APP. 168





 APP. 169

USCA4 Appeal: 21-1506    Doc: 19       Filed: 07/14/2021    Pg: 246 of 523






 

Designed by CREATRIX and The R2 Design Shop www.ther2designshop.com | All Rights Reserved. CREATRIX is an inclusive LGBT friendly wedding photographer in Austin Texas with a portfolio of wedding photography experiences from around the globe. If you're looking for the best wedding photographer in Austin, CREATRIX will not let you down!

APP. 170





## TAG: STYLED SHOOT

Home / styled shoot



DESTINATION WEDDINGS, INSPIRATION

### COLORFUL TROPICAL WEDDING STYLED SHOOT INSPIRATION

Kirsten Ott Palladino, 2 months ago      💬 0      🕐 4 min    🔖

This colorful tropical wedding styled shoot inspiration features a real same-sex couple whose Playa Del Carmen, Mexico, wedding was postponed from April to July because of covid-19.



INSPIRATION

### NEW ORLEANS INDUSTRIAL WEDDING INSPIRATION SHOOT

Kirsten Ott Palladino, 3 months ago      💬 0      🕐 1 min    🔖

Alex and Devin share their love in a styled New Orleans industrial wedding inspiration shoot.





      APP. 171

INSPIRATION

## MODERN ROMANTIC FALL WEDDING INSPIRATION IN CHARLESTON, SOUTH CAROLINA

Alaina Leary Lavoie, 7 months ago    💬 0    🕐 1 min    🔖

This styled shoot features modern and romantic fall wedding inspiration with lots of red in the color scheme and vintage details.



INSPIRATION

## MODERN WEDDING INSPIRATION INFLUENCED BY ARTIST KATSUSHIKA HOKUSAI

Alaina Leary Lavoie, 8 months ago    💬 0    🕐 2 min    🔖

This modern wedding styled shoot was inspired by "The Great Wave off Kanagawa" by Katsushika Hokusai with a blue, white and gold color scheme.



INSPIRATION

## ROMANTIC VANCOUVER ELOPEMENT INSPIRATION

Kirsten Ott Palladino, 5 months ago    💬 0    🕐 1 min    🔖

A romantic, dreamy elopement styled shoot in Vancouver, British Columbia



INSPIRATION

## FLORAL BOHEMIAN ELOPEMENT INSPIRATION AT JOSHUA TREE

Alaina Leary Lavoie, 8 months ago    💬 0    🕐 1 min    🔖

Jesus and Tommy were part of this romantic, floral bohemian elopement styled shoot at Joshua Tree National Park in California.



INSPIRATION

APP. 172

INSPIRATION

## CHIC TROPICAL WEDDING INSPIRATION IN SAINT PETERSBURG, FLORIDA

Alaina Leary Lavoie, 11 months ago    💬 0    🕐 1 min    🔖

This wedding inspiration at Sunken Gardens in Saint Petersburg, Florida, features a real LGBTQ+ couple, Harry and Chase, who got married a few years ago.



INSPIRATION

## TEAL AND ORANGE FALL WEDDING INSPIRATION IN LAKE MARY, FLORIDA

Alaina Leary Lavoie, 11 months ago    💬 0    🕐 1 min    🔖

This fall wedding inspiration features Steph and Stephanie, a real couple who had been dating for less than a month when they posed for this.



ENGAGEMENT, INSPIRATION

## SUMMER CITRUS WEDDING INSPIRATION AT HISTORIC POST OFFICE

Alaina Leary Lavoie, 10 months ago    💬 0    🕐 2 min    🔖

Justin and Brandon are a real couple who were married a few months before this styled shoot with a summery citrus-inspired theme.



ENGAGEMENT, INSPIRATION

## THIS STYLED SHOOT TURNED INTO A REAL PROPOSAL IN THE MOST ROMANTIC WAY

Alaina Leary Lavoie, 11 months ago    💬 0    🕐 5 min    🔖

While Ali and Cait were participating in this styled ballet-inspired shoot in Dallas, Texas, Ali proposed to Cait for real.



INSPIRATION

## MONOCHROMATIC COUNTRYSIDE DOUBLE WEDDING INSPIRATION

Alaina Leary Lavoie, 12 months ago    💬 0    🕐 1 min    🔖

APP. 173

# DOUBLE ENGAGEMENT INSPIRATION IN THE ARIZONA CACTUS GARDEN

Monochromatic colors and organic beauty were the inspiration behind this styled shoot featuring two real married couples.

Alaina Leary Lavoie, 12 months ago    💬 0    🕐 1 min    🔖

This early summer double wedding inspiration features real couples and takes place at the Arizona Cactus Garden at Stanford University.



**INSPIRATION**

## TIMELESS AND ROMANTIC VINTAGE LIBRARY WEDDING INSPIRATION

Alaina Leary Lavoie, 1 year ago    💬 0    🕐 1 min    🔖

This timeless, romantic vintage wedding inspiration features a real couple at the Library at the Fairmont Empress in Victoria, British Columbia.



**INSPIRATION**

## PINK FEMININE FLORAL GARDEN WEDDING INSPIRATION

Alaina Leary Lavoie, 1 year ago    💬 0    🕐 1 min    🔖

This feminine and floral garden wedding was inspired by LGBTQ+ couples whose stories don't fit into traditional weddings, and featured vintage decor.



**INSPIRATION**

## RUSTIC, MOODY FARM WEDDING INSPIRATION IN PURCELLVILLE, VIRGINIA

Alaina Leary Lavoie, 1 year ago    💬 0    🕐 1 min    🔖

This rustic and moody farm wedding inspiration features two real LGBTQ+ couples for a fun and beautiful shoot in rural Virginia.



**INSPIRATION**

## SHADES OF ORANGE WARM THIS VIRGINIA ELOPEMENT INSPIRATION

 

Alaina Leary Lavoie, 1 year ago  0  1 min

Michael and Martin's Virginia elopement inspiration was based around shades of orange.

1  2  3  NEXT









The Wedding Biz Podcast

Listen to Kirsten & Maria, Equally Wed founders, on the The Wedding Biz podcast.

Login     Forgot your password? Resend verification email?



Casa Marina Hotel & Restaurant

River West Photography

Ecco

OUE Skyspace

Jessica Hunt Photography

Amanda Summerlin Photography

Catering by Central Connections

Omni William Penn Hotel

Castle Green

Lena Mirisola Photography

The Bohlin

Kimpton RiverPlace Hotel

Scarlet Roots

Omni Royal Orleans Hotel

Wyndham Grand Orlando Resort Bonnet Creek

Mia's Martini

Crowne Plaza Suites Pittsburgh South

Rivers Casino Philadelphia

NOPSI Hotel

The Culinary Institute of America

A Monique Affair



## ABOUT US

### Who We Are

Equally Wed is an international online LGBTQ+ wedding magazine, book and education resource for LGBTQ+ couples and LGBTQ+ inclusive wedding professionals. Within our inspirational content, we focus on wedding planning, real weddings and engagements, marriage equality news and spotlights gay-friendly LGBTQ+ inclusive wedding vendors. Our content and founders have been featured in or on media outlets such as The New York Times, Washington Post, NPR, CNN, Pop Sugar, Glamour magazine, The Knot, Huffington Post, Curve magazine, The Advocate magazine, Autostraddle, A Practical Wedding, NPR, Los Angeles Times, Chicago Tribune and AP News.



For DMCA takedown notices or other concerns related to possible infringing content, please email info@equallywed.com.

 APP. 176



Very Limited 2021 Availability! Check Your Date ASAP.

✕

OCTOBER 31, 2017 (/BLOG/THE-EXORCIST-WEDDING-STYLED-SHOOT-FREDERICKSBURG-PHOTOGRAPHER)

# The Exorcist Wedding Styled Shoot // Georgetown Photographer // Washington, DC (/blog/the-exorcist-wedding-styled-shoot-fredericksburg-photographer)

STYLED SHOOT (/BLOG/CATEGORY/STYLED+SHOOT)

**The Exorcist Wedding**

What an excellent day for an exorcism...

Something about this bride is a little off. While there's no projectile vomiting or head spinning, the levitation is still enough to scare off the guests (and the groom). Good thing Regan has her demons to keep her company.

This Exorcist wedding takes advantage of the real-life Exorcist stairs in Georgetown, where Father Karras meets his untimely death, and it's quite easy to say that the setting is just as creepy in real life as it is in the movies. Don't take our word for it, though; see for yourself.

**Amazing Vendors**

Coordination, Design: Bella Giornata Events & Planning (https://www.bellagiornataevents.com/)

Photography: Bakerture Photo & Video (http://www.bakerture.com/)

Dress: Ava Laurenne Bride (https://www.avalaurenne.com/)

Cake Designer: Bijou's Sweets Treats (http://www.bijoussweettreats.com/)

Floral Designer: Blushing Blooms (http://www.blushingbloomsva.com/)

Decor: The Silver Stagg Revival House (https://www.facebook.com/thesilverstagvintagerevival/)

Decor: Medusa's Attic (https://www.facebook.com/Medusas-Attic-282876598886123/?hc_location=ufi)

Invitations: Twila & Co. (http://www.johnnahetrick.com/)

APP. 177



 APP. 178



 APP. 179



 APP. 180

# UCLA
## Other Recent Work

**Title**
LGB Families and Relationships: Analyses of the 2013 National Health Interview Survey

**Permalink**
https://escholarship.org/uc/item/3g07q209

**Author**
Gates, Gary J

**Publication Date**
2014-09-01

eScholarship.org                    Powered by the California Digital Library
                                    University of California

JA253

APP. 181

# LGB Families and Relationships: Analyses of the 2013 National Health Interview Survey



October 2014

by Gary J. Gates

## Executive Summary

The addition of a sexual orientation identity measure to the 2013 National Health Interview Survey (NHIS) offers a new data source to consider characteristics of families and explore differences among those led by same-sex and different-sex married and unmarried couples and LGB individuals who are not married or cohabiting. These analyses consider differences and similarities across these groups with regard to demographic characteristics including gender, age, race/ethnicity, educational attainment, geographic location, and child-rearing.

The analyses suggest that there are an estimated 690,000 same-sex couples in the United States. Approximately 18% of whom, or more than 124,000, reported that they were married. If estimates of married same-sex couples are derived only from the portion of 2013 that followed the US Supreme Court ruling in *United States v. Windsor* and are not based on data collected prior to the ruling (which effectively provided for federal recognition of the marriages of same-sex couples), then the estimate of married same-sex couples increases to 130,000.

Other key findings from the analyses include:

- An estimated 4 in 10 LGB adults (40%) reported either being married or in a cohabiting relationship with a partner compared to 6 in 10 non-LGB adults (60%).
  - Among women, more than half who identified as lesbian (51%) were married or in a cohabiting partnership compared to 57% of non-LGB women. Among bisexual women, the comparable figure was 32%.
  - Just over a third of gay and bisexual men (35% and 34%, respectively) were coupled compared to 63% of non-LGB men.
- A higher proportion of same-sex couples lived in the West when compared to different-sex couples (32% v. 23%, respectively) while a lower portion lived in the Midwest (12% v. 23%, respectively). Among those not in a couple, LGB individuals were less likely than their non-LGB counterparts to live in the Midwest (15% v. 22%).
  - Married same-sex couples were much more likely than their different-sex counterparts to live in the Northeast (39% v. 17%, respectively), where marriage for same-sex couples was the most widely available in 2013. An estimated 12% of married same-sex couples lived in the South compared to 38% of their different-sex counterparts.
  - Unmarried same-sex couples were more likely than their unmarried different-sex couple counterparts to live in the West and less likely to live in the Midwest.
- Those in same-sex couples and LGB individuals who were not part of a couple were generally younger than their different-sex coupled and non-LGB counterparts, respectively.
- Same-sex couples were twice as likely as their different-sex counterparts to be inter-racial/ethnic (19% v. 9%, respectively).
- Those in same-sex couples, particularly married same-sex couples, and LGB individuals who were not in a couple were more likely than those in different-sex couples and non-LGB individuals, respectively, to have a college degree. Two-thirds of individuals in married same-sex couples (66%) had a college degree.
- An estimated 19% of same-sex couples and LGB individuals who were not in a couple were raising children under the age of 18 in the home.
  - An estimated 30,000 children under age 18 have married same-sex parents while 170,000 have unmarried same-sex parents.
  - Between 1.1 and 2 million children under age 18 have an LGB parent who is not part of a married or unmarried couple.

JA254  APP. 182

# Introduction

Substantial demographic research exists focusing on analyses of cohabiting same-sex couples identified in US Census Bureau data (Black et al. 2000; Gates and Ost 2004; Gates and Cooke 2010; Baumle 2013; Kastanis and Wilson 2013). Unfortunately, the Census Bureau data do not provide a very accurate way to identify married same-sex couples (O'Connell and Feliz 2011; Gates and Steinberger 2009; Cohn 2014). Comparisons of demographic and geographic characteristics among those in married and unmarried same-sex couples along with lesbian, gay, or bisexual (LGB) individuals who do not have a spouse or cohabiting partner are relatively rare.

The addition of a sexual orientation identity measure to the 2013 National Health Interview Survey (NHIS) offers a new data source to consider characteristics of families and explore differences among those led by same-sex and different-sex married and unmarried couples and LGB individuals who are not married or cohabiting. These analyses consider differences and similarities across these groups with regard to demographic characteristics including gender, age, race/ethnicity, educational attainment, geographic location, and child-rearing.

# Data and methodology

Table 1 presents details of the NHIS data used in these analyses. It is a publically-funded survey conducted by the National Center for Health Statistics (NCHS). The survey samples families in the US and collects information on all members of those families, including their relationship to a reference person identified in each family. It is this information that allows for identification of families led by married and unmarried same-sex or different-sex couples. An adult-only sample (drawn from the family respondents) includes a question that allows respondents to describe their sexual orientation identity.

Analyses include descriptions of family characteristics (e.g., region of residence, child-rearing) and characteristics of individual adults (e.g., age, race/ethnicity, educational attainment, sexual orientation identity). Estimates use weighting procedures provided by the NHIS that allow for population estimates and interpretation of findings to be considered representative of families and the adult population (aged 18 and older) in the US.

In charts and figures that compare estimates between same-sex and different-sex couples or LGB and non-LGB adults, differences that are statistically significant are shown in **boldface** while differences that are not statistically different are shown in *italics*.

**Table 1.  Survey characteristics.**

| Survey | Survey sponsor | Data collection mode | Sample characteristics | Sexual orientation identity question (asked of adult sample) | Total sample size | LGB and couple sample sizes |
|---|---|---|---|---|---|---|
| National Health Interview Survey (2013) | Centers for Disease Control and Prevention, National Center for Health Statistics | Computer-Assisted Personal Interview conducted in the home. Respondents in the adult sample (aged 18 and older) provide their response to the sexual orientation identity question to an interviewer who then enters the response into a computer. | The NHIS includes three samples:<br>• Representative sample of families residing in the US<br>• Representative sample of the population of the US in those families (all ages)<br>• Representative sample of adults aged 18 and older | Which of the following best represents how you think of yourself?<br>• Lesbian or gay<br>• Straight, that is, not gay<br>• Bisexual<br>• Something else<br>• I don't know the answer | Families: 42,321<br><br>Population: 104,520<br><br>Adults: 34,577 | Individuals:<br>Lesbian/gay: 571<br>Bisexual: 233<br>Heterosexual: 32,546<br>Non-coupled LGB: 548<br><br>Couple families:<br>Same-sex unmarried: 179<br>Same-sex married: 44<br>Different-sex unmarried: 2,599<br>Different-sex married: 19,284 |

2

APP. 183

## Marriage and cohabitation

The NHIS data allow for identification of the gender composition of couples among those who say that they are legally married or in a cohabiting partnership.

An estimated 4 in 10 LGB adults (40%) reported either being married or in a cohabiting relationship with a partner (see Figure 1) compared to 6 in 10 non-LGB adults (60%). However, coupling patterns differed by sexual orientation and gender.

**Figure 1.  Percent of adults who are married or in a cohabiting partnership, by sex and sexual orientation identity.**



Among women, more than half who identified as lesbian (51%) were married or in a cohabiting partnership compared to 57% of non-LGB women, a difference that was not statistically significant. Among bisexual women, the comparable figure was 32%. Just over a third of gay and bisexual men (35% and 34%, respectively) were coupled compared to 63% of non-LGB men.

Just over half of the families in the US (52%) were led by a co-residential married or unmarried couple. Of families led by a couple, approximately 1.1% of the couples were same-sex (see Figure 2). This implies that there are approximately 64.6 million families in the United States and more than 690,000 same-sex couple families. Figures from Census 2010 showed approximately 650,000 same-sex couples in

the United States at that time (Gates and Cooke 2011).

Of the estimated 690,000 same-sex couples in the United States, approximately 18%, or more than 124,000 same-sex couples, reported that they were married. It is important to note that the NHIS data collection occurred throughout 2013 and in June of that year, the US Supreme Court issued it's ruling in *United States v. Windsor* which effectively provided for federal recognition of the marriages of same-sex couples. It is possible that the prospect of federal recognition and the many benefits and protections that accompany that recognition could have prompted many more same-sex couples to marry in the latter part of the year.

**Figure 2.  Couples in the 2013 NHIS, by gender and relationship status.**



Among respondents who were surveyed prior to the *Windsor* decision (from January through June, 2013), approximately 17% of same-sex couples indicated that they were married. Among respondents who were surveyed in the second half of the year (July through December, 2013), after the Supreme Court ruling, the estimate was 19% of same-sex couples who were married. While the difference in these estimates was not statistically significant, it is notable that the proportion of married couples among different-sex couples (94%) did not vary at all in the two halves of the year.

3

APP. 184

If the estimate from the latter half of the year represents a more accurate assessment of the portion of same-sex couples who are legally married, then the figure may be closer to 130,000. These estimates would also imply that approximately one in ten (approximately 13,000) married same-sex couples may have gotten married after the *Windsor* decision.

## Region of residence

Comparing individuals in same-sex couples to different-sex couples, the analyses suggest differences in the geographic distribution across regions in the US (see Figure 3). A higher proportion of same-sex couples lived in the West when compared to different-sex couples (32% v. 23%, respectively) while a lower portion lived in the Midwest (12% v. 23%, respectively).

**Figure 3. Region of residence, by relationship status and sexual orientation.**



Differences in this pattern when comparing same-sex and different-sex married and unmarried couples to each other highlight the likely impact of regional variation in laws regarding availability and recognition of marriages for same-sex couples. In

2013, the Northeast was the region of the country where marriage for same-sex couples was the most widely available for the longest period of time. Not surprisingly, married same-sex couples were much more likely than their different-sex counterparts to live in this region (39% v. 17%, respectively). The South represents the region where residents were least likely to live in a state where marriages of same-sex couples were legal. Only 12% of married same-sex couples lived in the South compared to 38% of their different-sex counterparts.

Like same-sex couples more generally, unmarried same-sex couples were more likely than their unmarried different-sex couple counterparts to live in the West and less likely to live in the Midwest. Among those not in a couple, LGB individuals were less likely than their non-LGB counterparts to live in the Midwest (15% v. 22%).

## Age, race/ethnicity, and educational attainment

Among those in couples, individuals in same-sex couples were, on average, more than five years younger than those in different-sex couples (see Table 1). However, the difference in average age between individuals in married same-sex and different-sex couples was not statistically significant. Among unmarried couples, those in different-sex couples were nearly five years younger than those in same-sex couples. Among those who were not in a couple, LGB individuals were, on average, more than seven years younger than non-LGB individuals.

The analyses do not show significant differences in the portion of those in same-sex and different-sex married couples who were non-white nor were there significant differences in that characteristic between LGB and non-LGB individuals who were not in a couple. However, among unmarried couples, those in different-sex couples were more likely than their same-sex counterparts to be non-white (37% v. 24%, respectively).

Same-sex couples were more likely to be inter-racial/ethnic than their different-sex counterparts. Among all couples, same-sex couples were twice as likely as their different-sex counterparts to be inter-racial/ethnic (19% v. 9%, respectively). When couples were separated by marital status, the differences in the proportion who were inter-racial/ethnic were not statistically significant for either married or unmarried couples.

4

 APP. 185

**Table 1. Age, race/ethnicity, educational attainment, by couple type and relationship status.**

| | Age | | Non-white | | Inter-racial/ethnic | | College (age 25+) | |
|---|---|---|---|---|---|---|---|---|
| | Same-sex | Different-sex | Same-sex | Different-sex | Same-sex | Different-sex | Same-sex | Different-sex |
| All couples | **43.9** | 49.0 | **24%** | 29% | **19%** | 9% | **49%** | 34% |
| Married | **46.5** | 50.5 | *23%* | 28% | *13%* | 8% | **66%** | 36% |
| Unmarried | **43.3** | 37.2 | **24%** | 37% | *21%* | 16% | **45%** | 22% |
| | | | | | | | | |
| | LGB | non-LGB | LGB | non-LGB | LGB | non-LGB | LGB | non-LGB |
| Not in a couple | **37.1** | 44.3 | *35%* | 38% | N/A | N/A | **40%** | 26% |

Those in same-sex couples and LGB individuals who were not in a couple and were aged 25 and older were more likely than those in different-sex couples and non-LGB individuals, respectively, to have a college degree. This is particularly true among married individuals. Two-thirds of individuals aged 25 and older who were part of a married same-sex couple (66%) had a college degree compared to just over one-third of those in married different-sex couples (36%). Among those not in a couple who were aged 25 and older, 40% of LGB individuals had a college degree compared to 26% of their non-LGB counterparts.

## Raising children

An estimated 19% of same-sex couples observed in the NHIS data were raising children under the age of 18 in the home (see Figure 4)[1], lower than the 42% of different-sex couples who were raising children. The portion of LGB individuals who were not in a couple and reported raising children was also 19%. Among same-sex couples, similar portions of married and unmarried couples were raising children (18% and 19%, respectively).

Assuming the NHIS estimate of 690,000 same-sex couples, these figures imply that approximately 131,000 same-sex couples are raising children in the US. Among same-sex couples with children, there was an average of 1.5 children in the home, suggesting that nearly 200,000 children under the age of 18 are being raised by same-sex couples. Of these children, approximately 30,000 have married parents while 170,000 have unmarried parents.

An estimate for the number of LGB individuals who were not in a couple and raising children depends on what figure is used to estimate the overall proportion of LGB adults in the population. The estimate of LGB-identity among adults in the NHIS was 2.2%, which implies approximately 5.2 million LGB individuals (Gates 2014). If, consistent with the NHIS findings, 60% of these LGB individuals are not married or partnered, then the analyses would suggest that nearly 600,000 LGB adults who are not in a couple are raising more than 1.1 million children (on average, this group reported 1.9 children in the home).

**Figure 4. % Raising children under the age of 18, by relationship status and LGB-identity.**



---

[1] Analyses of the 2011 American Community Survey found the same estimate for child-rearing among same-sex couples (Gates 2013).

APP. 186

Data from the Gallup Daily Tracking survey suggest that nearly 4% of adults identify as LGBT, implying that there are an estimated 9.5 million LGBT adults in the US (Gates 2014). Like the NHIS data, the Gallup data also show that about 60% of LGBT identified adults are not part of a married or unmarried couple.[2] If the NHIS figures regarding relationship status and child-rearing are applied to the Gallup estimate, it would mean that more than a million LGBT adults who are not in a couple are raising approximately 2 million children.

These calculations suggest that the estimated number of adults in the US who are raising children under age 18 are either in a married or unmarried same-sex couple or are LGB-identified and not in a couple is between 862,000 and 1.26 million. The estimates for the number of children being raised either by a same-sex couple or a non-coupled LGB parent are between 1.3 and 2.2 million.

In considering the total extent of parenting among LGB adults, it is important to consider that some LGB parents are raising children as part of a different-sex couple. This is particularly true for bisexual parents. Among bisexual adults with children, 51% were married with a different-sex spouse, 11% had a different-sex unmarried partner, and 4% had a same-sex spouse or partner. Among adults who identified as gay or lesbian and were raising children, 18% had a different-sex married spouse and 4% had a different-sex unmarried partner.

Among all LGB-identified adults, regardless of relationship status, NHIS analyses suggest that an estimated 23% were raising children under age 18 (20% among lesbians and gay men and 31% among bisexual men and women). Applying that figure to the NHIS and Gallup estimates of the size of the LGB and LGBT populations, respectively, implies that between 1.2 and 2.2 million LGBT adults in the US are raising from 2.0 to 3.7 million children.[3]

## Discussion

The 2013 NHIS data provide a rare opportunity to consider relationship and family status along with sexual orientation identity within the framework of a population-based survey. Many of the findings in these analyses are consistent with other research. These similarities include estimates of the number of same-sex couples, the proportion of those couples who are raising children, and demographic patterns with regard to age, race/ethnicity, inter-racial and ethnic coupling, and educational attainment.

Because of challenges associated with the measurement of same-sex couples in US Census Bureau data, estimates of the number of married same-sex couples in the US or their geographic distribution are difficult to obtain. Such estimates are further complicated by a legal landscape where the availability of marriage for same-sex couples across states is changing rapidly, as well as likely rapid changes in the number and location of married same-sex couples.

The NHIS data confirm that married same-sex couples live throughout the country, including in many states where their marriages may not be recognized. More than one in ten (12%) reported living in the South, where only Maryland and Washington, DC recognized their marriages.

The estimate of approximately 124,000 married same-sex couples (or the 130,000 estimate derived by using only data from the second half of 2013) offers evidence of substantial change in the last few years.

As of 2010, Badgett and Herman (2011) estimated that about 50,000 same-sex couples had married in the US. A survey conducted in that same year by the Williams Institute suggested that the total number of married same-sex couples in that year (including couples married outside of the US) may have been as high as 80,000. Even under an assumption using the conservative estimate of 124,000 marriages, these figures suggest that the population of married same-sex couples in the US has grown by more than 50% in only three years.

---

[2] Author analyses of Gallup Daily Tracking Survey data, Jan-Jun 2014.
[3] Unfortunately, neither the NHIS nor Gallup data allow for a separate assessment of parenting among the transgender population.

JA259    APP. 187

# References

Badgett, MVL, Durso, LE, Schneebaum, A.  2013.  New Patterns of Poverty in the Lesbian, Gay, and Bisexual Community.  Williams Institute, UCLA School of Law.

Baumle, AK, Editor. 2013. *International Handbook on the Demography of Sexuality*. Dordrecht, The Netherlands: Springer Press.

Black, D, Gates, G, Sanders, Taylor, S.  2000.  Demographics of the gay and lesbian population in the United States: Evidence from available systematic data sources.  *Demography* 37(2): 139-154.

Cohn, D. 2014.  Census confirms more data problems in sorting out the number of US gay marriages.  Factank, News in the Numbers, Pew Research Center, Washington, DC.

Gates, GJ.  2014.  LGBT Demographics: Comparisons among population-based surveys.  Williams Institute, UCLA School of Law.

Gates, GJ.  2013.  Same-sex and Different-sex Couples in the American Community Survey: 2005-2011.  Williams Institute, UCLA School of Law.

Gates, GJ.  2011.  How many people are lesbian, gay, bisexual, or transgender? Williams Institute, UCLA School of Law.

Gates, GJ, Steinberger, MD.  2009.  Same-Sex Unmarried Partner Couples in the American Community Survey: The Role of Misreporting, Miscoding and Misallocation.  Presented at 2009 Population Association of America Meetings, Detroit, MI.

Gates, GJ, Cooke, AM.  2010.  United States Census Snapshot: 2010.  The Williams Institute, UCLA School of Law.

Gates, GJ, Ost, J.  2004.  *The Gay and Lesbian Atlas*.  Washington, DC: Urban Institute Press.

Kastanis, A, Wilson, BDM.  2013.  Race/Ethnicity, Gender and Socioeconomic Wellbeing of Individuals in Same-sex Couples.  Williams Institute, UCLA School of Law.

O'Connell, M, Feliz, S.  2011.  Same-sex Couple Household Statistics from the 2010 Census.  Social, Economic and Housing Statistics Division Working Paper Number 2011-26, U.S. Bureau of the Census.

## About the author

**Gary J. Gates**, PhD is the Williams Distinguished Scholar and a national expert in the demographic, geographic, and economic characteristics of the LGBT population.

## About the Institute

**The Williams Institute** on Sexual Orientation and Gender Identity Law and Public Policy at UCLA School of Law advances law and public policy through rigorous, independent research and scholarship, and disseminates its work through a variety of education programs and media to judges, legislators, lawyers, other policymakers and the public.

## Citation

Gates, GJ.  2014. LGB Families and Relationships: Analyses of the 2013 National Health Interview Survey.  Williams Institute, UCLA School of Law.

**For more information**
The Williams Institute, UCLA School of Law
Box 951476
Los Angeles, CA 90095-1476
(310)267-4382
williamsinstitute@law.ucla.edu www.law.ucla.edu/williamsinstitute

JA260    APP. 188

USCA4 Appeal: 21-1506    Doc: 19    Filed: 07/14/2021    Pg: 265 of 523
Case 1:20-cv-01141    Document 4-1 ... Filed 09/28/20 ... Page 48 ... PageID# 262

# GALLUP®

JUNE 22, 2017

# In U.S., 10.2% of LGBT Adults Now Married to Same-Sex Spouse

BY **JEFFREY M. JONES**

LGBT AMERICANS MARRIED TO A
SAME-SEX PARTNER

## 10.2%

GALLUP DAILY

STORY HIGHLIGHTS

- Percentage married to same-sex spouse up from 7.9% two years ago
- Sharp decline in same-sex domestic partnerships
- LGBT men more likely to be married than LGBT women

WASHINGTON, D.C. -- Two years after the Supreme Court ruled in *Obergefell v. Hodges* that states could not prohibit same-sex marriages, 10.2% of lesbian, gay, bisexual or transgender (LGBT) adults in the U.S. are married to a same-sex spouse. That is up from

APP. 189

USCA4 Appeal: 21-1506    Doc: 19    Filed: 07/14/2021    Pg: 266 of 523

7.9% in the months prior to the Supreme Court decision in 2015, but only marginally higher than the 9.6% measured in the first year after the ruling.

Marital Status of LGBT Americans

|  | Pre-Obergefell decision | Year 1, Post-Obergefell decision | Year 2, Post-Obergefell decision |
|---|---|---|---|
|  | % | % | % |
| Married to same-sex spouse | 7.9 | 9.6 | 10.2 |
| Living with same-sex partner | 12.8 | 10.1 | 6.6 |
| Single/Never married | 47.4 | 49.9 | 55.7 |
| Living with opposite-sex partner | 4.8 | 5.0 | 4.2 |
| Married to opposite-sex spouse | 14.2 | 13.6 | 13.1 |
| Divorced | 7.1 | 6.4 | 5.4 |
| Separated | 2.5 | 2.2 | 2.1 |
| Widowed | 2.8 | 2.9 | 2.2 |
| Sample size | 4,752 | 11,588 | 12,832 |

Dates: Pre-Obergefell (Jan. 28-June 26, 2015); Year 1, Post-Obergefell (June 27, 2015-June 19, 2016); Year 2, Post-Obergefell (June 20, 2016-June 19, 2017)

GALLUP DAILY

On June 26, 2015, the Supreme Court issued the *Obergefell* decision. As would be expected, the number of same-sex marriages has increased, though the rate of increase has slowed.

As the percentage of LGBT adults in same-sex marriages has increased over the past two years, the percentage in same-sex domestic partnerships has fallen sharply from 12.8% before the Supreme Court ruling to 6.6%.

JA262

APP. 190

USCA4 Appeal: 21-1506    Doc: 19    Filed: 07/14/2021    Pg: 267 of 523

Case 1:20-cv-01141   Document 24-1   Filed 09/28/20   Page 42 of 55   PageID# 264

About half of the decline in same-sex domestic partnerships can be explained by the increase in same-sex marriages. The rest of the decline could mean that others formerly in same-sex domestic partnerships may have stopped living together, or no longer consider a same-sex cohabitant as a "partner."

As a result of these shifts, Gallup estimates that 61% of same-sex, cohabiting couples in the U.S. are now married, up from 38% before the Supreme Court legalized same-sex marriage in June 2015, and 49% one year ago.



An increasing percentage of LGBT adults now identify their marital status as single or never married. That has always been the dominant status among LGBT individuals, but has increased from 47.4% to 55.7% over the last two years.

LGBT Americans are still more likely to be married to an opposite-sex spouse (13.1%) than a same-sex spouse (10.2%), but the gap is narrowing. According to prior research on LGBT identification, roughly half of those who self-identify as LGBT are bisexual,

JA263    APP. 191

USCA4 Appeal: 21-1506    Doc: 19    Filed: 07/14/2021    Pg: 268 of 523
Case 1:20-cv-01141    Document 14-1    Filed 09/28/20    Page 43 of 58    PageID# 265
5/29/2020    LGBT 4.1% of U.S. Identifies as Married to Same-Sex Spouse

helping explaining the high proportion of LGBT individuals who are married to opposite-sex partners. Gallup's question does not probe specifically for whether LGBT individuals are lesbian or gay or bisexual or transgender.

The results are based on Gallup Daily tracking interviews since Jan. 28, 2015, when Gallup first asked lesbian, gay, bisexual or transgender (LGBT) individuals who indicated they were married or living with a partner if their spouse or partner was the same sex or the opposite sex.

Overall, 4.3% of U.S. adults identify as lesbian, gay, bisexual or transgender, according to Gallup's latest estimate from its June 2016-June 2017 tracking data. That is up from 3.9% a year ago and 3.4% in Gallup's initial estimate in 2012.

## Same-Sex Marriage More Common Among Men, Older LGBT Adults

Currently, 11.4% of LGBT men versus 9.3% of LGBT women say they are married to a same-sex partner. Also, the marriage rate among older LGBT adults is higher than it is among younger adults.

Marital Status of LGBT Americans, by Gender and Age

|  | Men | Women | 18-29 years old | 30-49 years old | 50+ years old |
|---|---|---|---|---|---|
|  | % | % | % | % | % |
| Married to same-sex spouse | 11.4 | 9.3 | 3.3 | 14.4 | 18.1 |
| Living with same-sex partner | 7.4 | 6.0 | 3.8 | 8.9 | 8.9 |
| Single/Never married | 56.6 | 55.0 | 77.2 | 42.4 | 32.3 |
| Living with opposite-sex partner | 3.0 | 5.2 | 5.5 | 4.1 | 1.8 |
| Married to opposite-sex spouse | 13.2 | 13.1 | 6.2 | 18.4 | 19.3 |
| Divorced | 4.6 | 6.1 | 2.1 | 7.1 | 9.8 |
| Separated | 1.4 | 2.7 | 1.3 | 3.2 | 2.3 |
| Widowed | 2.0 | 2.4 | 0.5 | 0.9 | 7.1 |
| Sample size | 6,789 | 6,043 | 4,340 | 3,641 | 4,777 |

June 20, 2016-June 19, 2017

GALLUP DAILY

JA264

APP. 192

USCA4 Appeal: 21-1506    Doc: 18    Filed: 07/14/2021    Pg: 269 of 523
5/29/2020    Case 1:20-cv-01141    Document 14-1    Filed 05/28/20    Page 44 of 58    PageID# 266

Notably, even older LGBT adults are most likely to identify their marital status as single -- 32% say they have never married. This indicates that many LGBT adults, even at older ages when marriage may be more feasible or desirable than it is for younger adults, are remaining single. By comparison, 11.3% of non-LGBT adults age 50 and older have never married.

Implications

Same-sex marriages are becoming increasingly common, and same-sex domestic partnerships less common, for LGBT Americans. In the first year after the Supreme Court ruled states could not prohibit same-sex marriages, the percentage of LGBT Americans who were married grew nearly two percentage points. In the second year since the ruling, the growth has continued, but at a diminished rate. This suggests an initial burst in the number of same-sex marriages came in response to the legal changes. Now, with those legal changes further in the past, the growth in same-sex marriages may be slower.

However, growth in the rate of same-sex marriages is likely to continue. Younger adults, many who may not be in a position to marry regardless of their sexual identity, are disproportionately likely to identify as LGBT. As they age, their life situations may change and they may want to get married. Also, as future generations of LGBT adults come of age, having grown up in a time when there were no legal restrictions on same-sex marriage and greatly reduced societal norms against it, they may marry at higher rates than LGBT Americans in generations before them.

*These data are available in Gallup Analytics.*

*Editor's Note: A correction was made to the estimated proportions of LGBT adults in cohabiting same-sex couples who are married (from 67% to 61%) or living with a partner (from 33% to 39%).*

SURVEY METHODS

JA265    APP. 193

USCA4 Appeal: 21-1506     Doc: 19        Filed: 07/14/2021     Pg: 270 of 523
5/29/2020            Case 1:20-cv-01141   Document 1-1   Filed 05/26/20   Page 45 of 58   PageID# 267

Results for this Gallup poll are based on telephone interviews conducted June 20, 2016-June 19, 2017, on the Gallup U.S. Daily survey, with a random sample of 352,851 adults, aged 18 and older, living in all 50 U.S. states and the District of Columbia. For results based on the total sample of national adults, the margin of sampling error is ±1 percentage point at the 95% confidence level.

For results based on the total sample of 12,832 lesbian, gay, bisexual or transgender adults, the margin of sampling error is ±1 percentage point at the 95% confidence level. All reported margins of sampling error include computed design effects for weighting.

Each sample of national adults includes a minimum quota of 70% cellphone respondents and 30% landline respondents, with additional minimum quotas by time zone within region. Landline and cellular telephone numbers are selected using random-digit-dial methods.

Learn more about how the Gallup U.S. Daily works.

RELEASE DATE:   June 22, 2017
SOURCE:   Gallup https://news.gallup.com/poll/212702/lgbt-adults-married-sex-spouse.aspx
CONTACT:   Gallup World Headquarters, 901 F Street, Washington, D.C., 20001, U.S.A
+1 202.715.3030

Copyright © 2016 Gallup, Inc. All rights reserved.

Gallup, Inc. maintains several registered and unregistered trademarks that include but may not be limited to: A8, Accountability Index, Business Impact Analysis, BE10, CE11, CE11 Accelerator, Clifton StrengthsExplorer, Clifton StrengthsFinder, Customer Engagement Index, Customer Engagement Management, Dr. Gallup Portrait, Employee Engagement Index, Enetrix, Engagement Creation Index, Follow This Path, Gallup, Gallup Brain, Gallup Business Journal, GBJ, Gallup Consulting, Gallup-Healthways Well-Being Index, Gallup Management Journal, GMJ, Gallup Panel, Gallup Press, Gallup Tuesday Briefing, Gallup University, Gallup World News, HumanSigma, HumanSigma Accelerator, ICE11, I10, L3, ME25, NurseInsight, NurseStrengths, Patient Quality System, Performance Optimization, Power of 2, PrincipalInsight, Q12, Q12 Accelerator, Q12 Advantage, Selection Research, Inc., SE25, SF34, SRI, Soul of the City, Strengths Spotlight, Strengths-Based Selling, StatShot, StrengthsCoach, StrengthsExplorer, StrengthsFinder, StrengthsInsight, StrengthsQuest, SupportInsight, TX(R+E+R)=P3, TeacherInsight, The Gallup Path, The Gallup Poll, The Gallup School, VantagePoint, Varsity Management, Wellbeing Finder, Achiever, Activator, Adaptability, Analytical, Arranger, Belief, Command, Communication, Competition, Connectedness, Consistency, Context, Deliberative, Developer, Discipline, Empathy, Fairness, Focus, Futuristic, Harmony, Ideation, Includer, Individualization, Input, Intellection , Learner, Maximizer, Positivity, Relator, Responsibility, Restorative, Self-Assurance, Significance, Strategic, and Woo. All other trademarks are the property of their respective owners. These materials are provided for noncommercial, personal use only. Reproduction prohibited without the express permission of Gallup, Inc.

JA266     APP. 194

USCA4 Appeal: 21-1506    Doc: 19    Filed: 07/14/2021    Pg: 271 of 523



Home     About Us     Galleries     Info + Pricing     Blog     Contact

# OUR WORK STYLE:

We are laid back and blend into your event without being in the way or making the whole day feel like a photo shoot. We will be chatting it up with your guests so we're not just that creepy person with a bunch of camera gear, and telling your mom how fab she looks in her new outfit.

**We won't overly direct you, interrupt what is naturally happening, or put you in weird awkward poses**.

We also realize how important it is to whole-heartedly trust the person standing in front of you with a camera, asking you to just be yourself. We are here for you, and will enthusiastically support the two of you through this entire process. You can let your guard down around us, and just enjoy your wedding day.

Your expressions will be natural and reflect who you *really* are. We believe the best images are created when your personality gets to shine through an already incredible moment, and we will be right there to capture the magic.

**YOU WANT TO LOOK AMAZING, BUT ALSO LIKE YOURSELF.**
**WE'VE GOT YOU COVERED.**

# SHAWNEE

### OWNER + PHOTOGRAPHER

CAPRICORN. ENFP. GRYFFINDOR.

JA267     APP. 195



**Hi I'm Shawnee! I'm a queer feminist photographer with a big heart and a no-fuss kinda attitude.**

I've been documenting weddings for over 10 years, and feel completely at home when surrounded by a ton of strangers having the time of their lives. I live in Richmond, Virginia with my partner Brooklyn and our crew of animals.

When I'm not photographing rad folks in love, you can find me: exploring the world with friends and checking off a new destination on my travel list, photographing badass babes in my body positive boudoir studio, playing D&D and getting real nerdy, or cuddling with all my loves around the fireplace and watching Netflix. I love a good audiobook (hello Harry Potter!) and am always looking for an excuse to throw an elaborate themed party.

I want you to look back on your wedding photos and remember more than just the pretty details (but don't worry, I'll get those too). I look for the emotion in moments, and follow the action of the day - from the nervous excitement, to the overwhelming joy during your first look, and all the people you love so much in one place dancing their hearts out (I'll be right there on the dance floor with them!).

I support and appreciate all kinds of relationships and celebrations, and will travel wherever your ideal moment will be taking

 APP. 196

place.

Let's make some magic together! 

# CARLY

### PHOTOGRAPHER

SCORPIO. ENFJ. GRYFFINDOR.



Hi babes, I'm Carly! I love love. When I photograph your wedding day, I experience the overwhelming, exalting, glorious abundance of two people in love. It feeds my heart and through photography, I celebrate, create, and foster more love in the world.

**My motto is "I give a fuck." I champion the diversity of love.** I work hard to cultivate a trusting and fun relationship with my couples. I am a guide, helping two people navigate a happy and sometimes bonkers day. I encourage my couples to celebrate the details of their day, whether it's raining, the flowers are wrong, or there's a wild family member. It's all a part of their story. I put my everything into creating wedding photographs that show real moments from your day, moments that transform into heirlooms for you and your family.

I have the laid back vibe of a Californian with the hustle of a New Yorker. My hugs are legendary and I get shit done. I love bright colors, huge roller coasters, and perfect hi5s.

   APP. 197

I photographed my first wedding in 2009 and I love it more each year.

I live in sunlit Los Angeles with my partner and a snaggletooth street cat named Penny. When I'm not photographing humans in love, you can find me scuba diving with squid, making art in a Nevada desert, or right here in LA discovering the magic in gold spray paint, smoke bombs, and googly eyes 😀

# JULIE

## PHOTOGRAPHER

LEO. ENFP. SLYTHERIN.



Hi y'all, I'm Julie! I'm a weirdo, all about that positive mental attitude, and loving those around me whole-heartedly!

I live in Richmond, Virginia with my pug Nola! When I'm not photographing awesome couples you will find me: out taking pictures at the punk/metal/bluegrass/rockabilly shows, roller skating and bowling with my friends, snuggled up with Nola, or going on some type of adventure. I'm a sucker for roadside attractions, and always ready to plan my next cross country trip.

**I'm passionate about storytelling, and creating beautiful and unique images**

APP. 198

**that fully capture all the emotion and action of your wedding day.** From the smallest detail to the craziest dance party, I'll be right there with you. I want you to be able to look back at your photos and be reminded of all the love, excitement, and passion you felt on that day!

I love getting to know my clients! I like to develop a stronger bond than just being another service provider on your wedding day. Things sometimes get hectic, but having a photographer that you are comfortable around and can trust (and also have a blast with) makes it that much more enjoyable! I'm a lover of love and can honestly say I have the raddest job in the world!

I can't wait to create with you! Stay Posi 🤞

# JUSTIN

### PHOTOGRAPHER

CAPRICORN. INFJ. RAVENCLAW.



Hi there! I'm Justin, the guy always behind the lens (and occasionally on the dance floor).

I live in NYC but am always up for traveling to work with wonderful folks. When I'm not photographing weddings you can probably find me at a local drag performance, catching the latest broadway show, or on a

JA271
APP. 199



trip to Disneyland with my wonderful husband.

Joy is what motivates my work. **I'm here for hearty belly laughs, outrageous dance moves, and quiet sweet moments**. I want for you to look back at your wedding photos for years to come, and remember all the love that surrounds you, and how much fun everyone had!

I'm slightly obsessed with campy horror films and drag performers, and will forever be belting out showtunes in the shower.

I can't wait to work with you! 🌈

# ALISON

## STUDIO MANAGER

ARIES. INFJ. HUFFLEPUFF.



Hello friends! I'm Alison, the behind-the-scenes babe for Shawnee and CO living in Richmond, Virginia. I'm just your typical type A perfectionist here to make sure everything is looking good from our Instagram feed to your wedding album. The hardest part of my job is picking out only a handful of photos from your day to be featured on the blog because wowza, our couples are the cutest!

When I'm not turning 1s and 0s into emails and blog posts, I spend my free time watching embarrassing reality TV, splashing

APP. 200

around in the James River, playing Pokémon and eating delicious vegan comfort food.



**THINGS THAT MAKE US RIDICULOUSLY HAPPY:**

Feminist weddings

Non-gendered wedding parties

Fun vibrant colors

Creating our own traditions

Exploring new cities

A really good hug

Breaking it down to the hits

**READ WHAT OTHERS HAVE TO SAY:**

Catalyst Wed Co - Keeping it real with Shawnee C

A Practical Wedding - How to get killer photos when you hate having your picture taken

A Practical Wedding - This is the queer feminist photographer you want for your wedding

A Practical Wedding - Shawnee C has genderless posing on lock

**Shawnee was a guest on the amazing Super Gay Wedding Podcast!**

We talk about all sorts of things, including queering up your wedding, the gendered bullshit of

JA273    APP. 201

the color pink, sheep shearing, and living forever by drinking more wine.

© 2020 Shawnee Custalow | Richmond VA, LA, & Worldwide LGBTQ Photographer | Weddings + Elopements



APP. 202





 APP. 203












Because Love Can't Wait

Congratulations on being engaged ! :)
Gay, Lesbian, Transgender, Same Sex, Black, White or Straight it doesn't matter to me what label you want to put on it or simply no label at all. I love being a wedding photographer and in addition I believe in equality for all!
So, with that being said if you are looking for a LGBTQ wedding photographer you have come to the right place. I have been photographing same sex marriages for years! In fact my first Lesbian wedding was over 10 years ago before marriage was even legal.

Since that time I have photographed hundreds of LGBT weddings. My main coverage area is Virginia, Maryland, Washington D.C. and  North Carolina but I love to travel so we go all over for any type of ceremony.  Click here to see complete weddings

If you are interested in our wedding collections they may be seen HERE

Please feel free to contact me and be sure to connect with us on Facebook or Instagram to see our behind the scenes on wedding days.














This site uses cookies to personalize your experience, analyze site usage, and offer tailored promotions.  www.youronlinechoices.eu     Remind me later     I accept

JA278     APP. 206

 





## WHAT OUR CLIENTS ARE SAYING

Crystal was a great photographer for our wedding! She's definitely LGBT friendly and has some cool rainbow umbrellas to use as props in your pictures - if that's your style. Our friends and family were all very impressed with the number of photos she took and shared with us - and they're all great shots! We would absolutely recommend her to others. - Kelsey and Shannon - Baltimore, Maryland

When I got engaged, I knew who I wanted to take our engagement pictures and also photograph our wedding. I contacted Crystal and asked her if she would be willing to come to Gettysburg, PA to take our engagement pictures and she was more than happy to drive 4 1/2 hours to our farm to capture my 'farmer fiancé' and I in the cornfield, in our sunflower field and on our combine. On the day she drove up to take our pictures, it was a really hot and humid August day. She walked around the farm with us snapping pictures and was willing to do whatever we wanted. She did an amazing job capturing who we were and was patient with us when we changed outfits. We also hired Crystal to also photograph our wedding the following September. We filled out a questionnaire beforehand so she knew exactly what kinds of pictures we were wanting her to take. A few days before our wedding, she called and made sure everything was on schedule and letting us know what time we would expect her to arrive at the wedding. My fiancé and I did a 'First Look' before the wedding and Crystal was so professional and everything went so smoothly. I can't begin to say how satisfied we are with our wedding pictures!! They were absolutely beautiful! She took pictures of all the little detailed things! I would highly recommend Crystal if you are looking for a photographer! - Chrissy and Dave - Gettysburg, PA

Read more reviews here.

## CONTACT US

  

copyright 2019

This site uses cookies to personalize your experience, analyze site usage, and offer tailored promotions. www.youronlinechoices.eu    Remind me later    I accept

# MATT & GREG'S FALL JEWISH WEDDING | KING FAMILY VINEYARDS

Matt & Greg had a gorgeous Jewish wedding at **King Family Vineyards**. The leaves and fall colors were at their peak and we couldn't have asked for a better weekend to celebrate the nicest couple.



We loved how they incorporated the fall leaves into their decor, making everything very colorful! The theme was evident from the save the date through the invitation, and when you walked in the door at King Family Vineyards!



APP. 208







APP. 209





Matt & Greg make for the cutest couple! We love being same-sex wedding photographers, as we support all love! Being a part of their special day was truly a joy!

APP. 210







Fall weddings at **King Family Vineyards** are amongst our favorite.
The views of the mountains are pretty magical!

APP. 211



Aaron Watson Photography is a gay wedding friendly studio, located in Charlottesville, VA. We support all types of marriage, and especially equal rights for our LGBTQ community. If you are looking for same-sex wedding photographers, please be sure to contact us!

Vendors:

Photographer:  **Aaron Watson Photography**

Venue:  **King Family Vineyards**

Catering:  **The Local Catering** | Helen Osinga

Rentals:  **MS Events**

Officiants:  Rabbi Vanessa Ochs & Rev. John Forrest Douglas

Ceremony Music/DJ:  **John Garland**

Transportation:  **Easy Riders**

Grooms Attire: **Indochino**

« CRISTINA & BRIAN'S FALL RICHMOND VIRGINIA WEDDING
DECEMBER NEWSLETTER 2016 – AARON WATSON
PHOTOGRAPHY »

---

SUBSCRIBE TO OUR NEWSLETTER!

you@example.com      Subscribe

434-202-8031
info@aaronwatsonphoto.com

f      𝓟      🄾

Search

JA284   APP. 212

≡

INTERESTED IN MORE INFORMATION OR READY TO BOOK? CONTACT ME HERE!                    ×

# FIRST SAME SEX WEDDING CEREMONIES IN THE STATE OF VIRGINIA | VIRGINIA SAME-SEX WEDDING PHOTOGRAPHER

OCTOBER 6, 2014

*It was an amazing moment today when scrolling through my newsfeed on Facebook just after 10am. I began to see the social media blow up over The US Supreme Courts decision to refuse to hear cases from Oklahoma, Utah, Virginia, Wisconsin and Indiana! With this historical move Same-Sex marriage has been legalized in the State of Virginia where the first marriage ceremonies were performed today!*

*I was able to stop by The General District Courts in Fairfax, Virginia where the first same-sex ceremony was performed in Fairfax County!*

*I snapped an iPhone shot of some of the supporters just outside the courthouse!*



*I am so excited to capture the many upcoming same-sex ceremonies and weddings in Virginia! If you know anyone getting married I would love to have the honor of capturing their day!*

JA285      APP. 213



 APP. 214



 APP. 215





find your way around:

MEET US          THE BRIDE
WEDDINGS         CONTACT
FAMILY PORTRAITS CLIENT GALLERIES
SENIOR PORTRAITS CLIENT ACCESS

BASED IN
CHARLOTTESVILLE, VIRGINIA
•
AVAILABLE
WORLDWIDE

# BLUE RIDGE MOUNTAIN ENGAGEMENT – SAME-SEX WEDDING PHOTOGRAPHER

### VIRGINIA SAME-SEX WEDDING PHOTOGRAPHER –
### BLUE RIDGE MOUNTAIN ENGAGEMENT –

You know, I have to start this saying that google needs to see keywords for my people to find me. I hate to distinguish my beautiful couples by terms like "Virginia same-sex wedding photographer". It feels so debasing. Love is love. Love who you love. I photograph all types of love. Defining it by such narrow language seems so limiting to me and my beautiful couples!

ANYWAY, on to the non-SEO stuff....

I like to spend a little time getting to know my couples before heading up to the mountains. Usually, when we finally get situated, it is windy and difficult to hear each other. My style relies on building relationships, getting to know my couples and bringing out the beauty that I see within them as a couple, but also individually. I learn so much about each person and it helps make everyone feel more relaxed on their wedding day. While I don't like the word "pose", I do like to help couples feel relaxed and comfortable in front of the camera. That definitely requires a little pre-session mini shoot!

Once we drive the drive and hike the hike, everyone is ready for some Blue Ridge Mountain twirling, dancing and snuggling! The fog was starting to roll in, making the experience even more magical! My favorite part of this engagement session (besides my fabulous couple) were Cami's amazing red shoes. And, how about that green flowing gown?

(If you haven't checked out the first part of our session, check it out here: Camie and Jess at the Mudhouse )

 APP. 217



 APP. 218



# CAMIE AND JESS || COFFEE SHOP CROZET ENGAGEMENT SESSION

Coffee shop engagement.... (We were at the fabulous Mudhouse here in Crozet) mountain top engagement...

snowy call-off-work-day engagement.... I adore these two. Their loves of cats immediately makes them kindred

spirits but their kind souls make them friends for life! We had a fantastic time just hanging out together and I

can't wait for their wedding this September. I know it is going to be every bit as incredible as they both are. A little

sad that their fur babies probably won't be cats of honor. ☺

JA291    APP. 219



 APP. 220



 APP. 221



 APP. 222



 APP. 223



 APP. 224





 APP. 226



APP. 227

|  | More |  | Create Blog  Sign In |



**WEDNESDAY, MAY 12, 2010**

## Photography 101: Session 06

I feel like I am constantly learning information that is new to me when it comes to photography. That is to be expected because, for one thing, I have never taken a photography course, so all of my photography knowledge has come from trial and error and reading. But I am also learning new things because modern cameras are able to do things today that they were not able to do years ago. Sure, the basics are all still there: shutter speeds, f-stops, exposure; but today's cameras are essentially very sophisticated dedicated computers. What they can capture, how they can capture it, and how you can pull and craft the image after capture is just amazing. So I am constantly learning how to best make all of that happen with my camera, and with my flash.

As I mentioned in Session 05, flash photography is probably one of the most frustrating aspects for photographers, and that includes me. Inconsistent and unsatisfactory results are my two biggest problems. Much of the reason for these problems is that locations and conditions change. What worked in one area of the room may not work in another area that is just 15 feet away. Or what I am shooting in one area may be different than what I am shooting 15 feet away. So it is difficult to give tips for shooting flash that will work in all circumstances. Below I will offer some techniques that I use when shooting flash. I would encourage you to try these out, shooting multiple times with different settings and flash position, all in an effort to see what works and what doesn't.

If you have not read Session 05 yet, or it has been awhile, I would encourage you to read it now and then come back to this. For now, I would recommend staying in TTL mode with your flash. If you only have a pop up or built in flash, you will be limited in what you can shoot with that flash, and might consider getting a good external flash. Some pop up flash units do have some flexibility in them. You can't move them, but you might be able to adjust how much flash power is coming out of the flash. Check your camera manual for more info on that. If you are limited to a pop up or built in flash, you

### KEEPING IT SIMPLE

Give me a Diet Coke or a nice tall glass of iced tea, and I am one happy guy. Yeah, it doesn't take much. I like keeping things simple and uncomplicated. That is the way God created me. It is probably what draws me so much to the beach. It doesn't get much simpler than the beach: some sand, lots of water, and all the time in the world to just daydream. It is also what draws me to photography: a camera, a subject, and a little bit of my own creativity. I love capturing an awesome image. So what do I do to add some confusion and angst into my life? I follow politics. I have my opinions, and I like having a tool for expressing those opinions. It's also nice to have a vehicle for sharing my relationship with Jesus. So give me a Diet Coke, or a nice tall glass of iced tea (with lots of ice and lots of refills), and I'm sure we could talk for hours. I might need a bathroom. Yeah, definitely will need a bathroom.

Visit my website:
**www.bobupdegrove.com**

LABELS

JA300    APP. 228

will need to be no further than maybe 12-15 feet from your subject for that flash to have any affect. And because the flash is so close to the camera, you have a greater chance for redeye. Bottom line, don't expect super results from a pop up flash. I find them helpful for outdoor photography though when you need a bit of fill in flash (more on that in a later post). The tips below are geared for external flash units.

Probably the least flattering light you can use comes from placing the external flash on the camera and pointing the flash head straight toward your subject, so you want to find ways to provide additional light to the subject without pointing the flash directly toward the subject from the camera. One way to do that is to use a flash bracket. A bracket will elevate your flash a short distance above the camera. This separation gives a better result than having the flash directly on the camera, simply by putting the light on a different plane than the camera. But there are two problems with using a bracket: 1) they are cumbersome to carry around, and 2) they can still produce a shadow, depending on how far your subject is to a wall or other object behind them. I used to use a bracket all the time when shooting film. I just don't see the need for most cases anymore.

Probably the best way to modify your flash is to bounce it. There are basically two ways to bounce a flash that is attached to the flash shoe on your camera: 1) using some kind of flash modifier, or 2) aiming the flash toward a wall, ceiling, or some other kind of object. A flash modifier is a piece of equipment that attaches to your flash head. It could be as simple as a piece of paper, or a translucent molded plastic, or some kind of fabric. If you are not using a plastic "dome" of some kind, you usually want to use something that is white. Some people will use a white card, attached to the flash with a rubber band. The flash is pointed up toward the ceiling, with the card on one side of the flash (away from your subject). When the flash goes off, the light bounces off the ceiling and then back down toward your subject. Some of that light is also bounced off the white card and toward the subject. That is basically the whole concept of bounced flash: the light from the flash is bounced off a larger area and then back toward the subject, wrapping the subject with a softer light.

If I am in a room with a low white ceiling, I will usually bounce the flash toward the ceiling. If I am close to a white wall I might choose to bounce the flash off of that wall. Sometimes I might be in a room with pillars in the room, so I will stand near that pillar and try to bounce the flash off of it. If I am in a room with high ceilings or a dark ceiling, I will rely on some kind of modifier on the flash, usually a small plastic modifier.

Keep this in mind, anytime you use a modifier or bounce your flash you are diffusing the light; or in other words, you are throwing less light onto your subject. With TTL your camera and flash will try to throw out more light in order to illuminate your subject. This will potentially drain your flash batteries quicker or take longer for the batteries to bounce back between images. Or you might need to play around with your shutter speed and f-stop in order to pull in more ambient light so the flash is not carrying the full load. Or you can adjust the flash exposure compensation (see flash manual).

The whole point of this tutorial is not to give a full blown instruction manual on flash photography. My main objective is to get you thinking about how to use your camera and your flash in ways that you maybe have not tried before. Most people throw a flash on their camera, point it straight ahead, and go at it. Others point their flash in all kinds of directions because they see other people doing it, but they have no idea where or why they are pointing the flash in that direction. To me it is amazing how much light gets transmitted toward the subject when you bounce the flash correctly. The best thing you can do is think it through, visualizing how the light will behave if you point it in one direction versus another direction.

I would recommend googling "flash modifiers" and looking through some of the other articles and products that are out there. One word of caution: I have a bag full of modifiers that I have bought over the years, thinking each one was THE one. In the end I end up not using any of them all that often, usually going back to the plastic dome that

Cartoons/Videos (41)

Faith (9)

Family Photos (6)

Global Warming? (20)

Health Care Debate (21)

Obama (82)

Photo Tips/Reviews (24)

Politics (82)

Sample Photos (46)

Wedding Photography Advice (15)

**SEARCH THIS BLOG**

[ ] Search

**SUBSCRIBE TO**

Posts

Comments

came with my flash (Nikon sb900). Generally speaking though, I like the Lumiquest products.

No comments:

Post a Comment

Enter your comment...

Comment as:   Google Accoun

Publish    Preview

Newer Post          Home                Older Post

Subscribe to: Post Comments (Atom)

**LABELS**

photography (55)

**BLOG ARCHIVE**

► 2015 (2)
► 2014 (3)
► 2013 (13)
► 2012 (19)
► 2011 (43)
► 2010 (86)
► 2009 (111)
► 2008 (88)

Picture Window theme. Powered by Blogger.

resolution, that being a Fine quality file. I always recommend that people set their image quality to the highest resolution possible. You can always resize an image downward if you need to, but if you shoot with the image quality of Basic, you end up with an image that has been severely compressed and degraded right out of the camera. There is very little you can do with this kind of image, other than email it or look at it on your iphone. If your photos ultimately don't mean anything to you, then set it at whatever image quality you want. But if you are shooting images with the intent to save and archive and possibly do something with them, then by all means shoot at the Fine image quality.

Now all the previous info had to do with jpg files. On most serious cameras you will also have the option to shoot a Raw file. A raw file is a data file. In a sense all images start as a raw file. When you have your camera set for jpg, you are telling your camera to take all the information, interpret it on its own, then spit out a compressed jpg file. With a raw file, you are asking the camera to just save all the captured data and not to process it. With a raw file you will end up with a great deal more information. In fact a raw file will end up being several times larger than a fine jpg file. Personally I like having all that information. If I am going to spend time composing important shots, I don't want to randomly lose important information from each image. Raw files not only keep all the information, but it keeps that information separate. A jpg file, when it gets compressed, basically mixes the exposure information with the white balance information and all the other information. So when you open the image in Photoshop to tweak it,  when you change the exposure, you are also affecting the white balance. With raw, when you change the exposure, that is all you are affecting.

So what do you do with a raw file, and why would I want to shoot raw files over jpg? I guess I should first of all say that there are many professional photographers who shoot only jpg, and they are fine with that, and that is fine with me. It seems though that there are more and more photographers who are shooting raw files. I think beyond having more information to work with, the main reasons people shoot raw is because it gives them more control in the processing decisions of an image, and they feel they can sort through and edit images quicker with a raw software program than they can with jpg files. Of course if your idea of shooting again is simply point and shoot, you probably don't want to mess with your photos after they have been captured. So jpg would make more sense. But if you want more control and plan on going through your images to edit anyway, then raw might make more sense.

There are several raw software programs on the market today. Probably the most widely used are either Adobe Camera Raw (found in Photoshop), Adobe Photoshop Lightroom or Apple Aperture. Adobe Camera Raw and Adobe Lightroom are essentially the same engine. Lightroom is specifically geared for photographers, is raw specific, and is not just a raw processor but also good for managing your images, composing slideshows, and printing. Aperture likewise is a full featured program. I personally use Lightroom. I find it the more intuitive program, with more flexibility to fine tune your images. There are plenty of places online where you can learn more about these programs. You can also download a 30 day demo to try it out.

I am a big fan of raw files. Raw processing has been the focus for many photographers today. Some are able to do all their image work within a raw program and never need to open it up in Photoshop. If your camera has the ability to save your image files as raw, give it a try. Most higher end cameras give you the ability to save your images as both raw and some form of jpg, so you can have both worlds. Don't be afraid of raw. Give it a try.

No comments:

Post a Comment

Cartoons/Videos (41)
Faith (9)
Family Photos (6)
Global Warming? (20)
Health Care Debate (21)
Obama (82)
Photo Tips/Reviews (24)
Politics (82)
Sample Photos (46)
Wedding Photography Advice (15)

SEARCH THIS BLOG

[            ] Search

SUBSCRIBE TO

Posts
Comments

APP. 231

☐ More                                                                                    Create Blog   Sign In



## BOB UPDEGROVE PHOTOGRAPHY

## FAITH - POLITICS - PHOTOGRAPHY

**FRIDAY, AUGUST 27, 2010**

### Photography 101: Session 07

One of the great things about digital photography is the Menu on your camera. Most point and shoot photographers don't want to mess with details. They just want to point and shoot. So the menu is more of a menace than a help. But inside the menu is a host of settings and preferences that can enhance your photo shooting experience. I'll try to cover some of more important items that you should pay attention to within your camera's menu, starting today with Image Quality. Your camera manufacturer might have a different name for this, but basically it is where you choose the compression level of jpg: usually something like Fine, Normal, and Basic; as well as whether you want to shoot jpg vs raw.

Most people have a familiarity with jpg files. Jpg is what we usually use for getting prints, posting photos online, or emailing to each other. A jpg file is a compressed file. In other words, you take a photo with your camera, your camera takes all the information associated with that image: the exposure, white balance, sharpness settings, saturations settings, etc; and then the camera's built in computer interprets that information, determining which information should be saved and which should be discarded. In the end you have a processed image. Now depending on what setting you had for image quality, your final image will either be lightly compressed (Fine) to heavily compressed (Basic). The primary difference between these settings is the physical size of the file. Depending on your camera, a Fine image file might be 3-5 mb in size, while a Basic might just be around 250-500 kb in size. These settings came in handy when memory cards were only 250 mb in size; but today with cards of 8-32 gb in size, there is no excuse for shooting anything less than Fine.

The "Fine" setting retains the most information your camera can give you with a jpg file. The more information you have (the less compression) translates into an image that you can than print larger. If you plan on bringing the image into Photoshop or some other image program to play with, you definitely want to use an image with the highest

### KEEPING IT SIMPLE

Give me a Diet Coke or a nice tall glass of iced tea, and I am one happy guy. Yeah, it doesn't take much. I like keeping things simple and uncomplicated. That is the way God created me. It is probably what draws me so much to the beach. It doesn't get much simpler than the beach: some sand, lots of water, and all the time in the world to just daydream. It is also what draws me to photography: a camera, a subject, and a little bit of my own creativity. I love capturing an awesome image. So what do I do to add some confusion and angst into my life? I follow politics. I have my opinions, and I like having a tool for expressing those opinions. It's also nice to have a vehicle for sharing my relationship with Jesus. So give me a Diet Coke, or a nice tall glass of iced tea (with lots of ice and lots of refills), and I'm sure we could talk for hours. I might need a bathroom. Yeah, definitely will need a bathroom.

Visit my website:
**www.bobupdegrove.com**

**LABELS**

JA304     APP. 232



| | More | Create Blog   Sign In |

**FAITH - POLITICS - PHOTOGRAPHY**

**TUESDAY, MARCH 30, 2010**

## Photography 101: Session 04

Before I go any further, I mentioned depth of field a couple times in previous sessions. Depth of field is another function of aperture, as well as the focal length of your lens. Macworld recently posted an excellent article that describes depth of field in a much better way than I ever could. I would highly recommend taking the time to read through it if you are interested in learning more about this important tool.

So before we leave the subject of exposure, which has been our subject for the first three sessions, we need to go over one more exposure function in your camera. By now you should know that your camera has a built in exposure meter. This meter will analyze the lighting within the scene as you point your camera toward your subject. Based on that light, your camera will determine what it believes to be the proper exposure (if you have it set to one of the auto exposure modes). It will also tell you in manual mode, but you have to manually make the aperture and shutter speed selections. But depending on your subject, the auto exposure can be fooled. There are ways to control how your exposure meter is reading the light.

Your camera might give you up to three different ways to meter a scene: 1) multi-segment, 2) center weighted, and 3) spot metering. Multi segment usually divides up your meter into 5 or 7 sections. When you point your camera toward your scene, the camera is actually making calculations based on the lighting it reads in each of those 5 or 7 sections, and then averages them out into a proper exposure. This, in most cases, is what I would recommend you set your meter to. It is probably the safest setting. Center weighted takes the exposure reading based on what is in the center circle of the viewfinder. Let's say you have a person in the shadows with brightness all around them. Since the person is the important part of the image, you might want to use center weighted metering, point your camera with the person in the center, and take your exposure based on the light that is falling just on that person. Your meter is ignoring all the other light in the scene. In this situation the person would then be more properly

---

**KEEPING IT SIMPLE**

Give me a Diet Coke or a nice tall glass of iced tea, and I am one happy guy. Yeah, it doesn't take much. I like keeping things simple and uncomplicated. That is the way God created me. It is probably what draws me so much to the beach. It doesn't get much simpler than the beach: some sand, lots of water, and all the time in the world to just daydream. It is also what draws me to photography: a camera, a subject, and a little bit of my own creativity. I love capturing an awesome image. So what do I do to add some confusion and angst into my life? I follow politics. I have my opinions, and I like having a tool for expressing those opinions. It's also nice to have a vehicle for sharing my relationship with Jesus. So give me a Diet Coke, or a nice tall glass of iced tea (with lots of ice and lots of refills), and I'm sure we could talk for hours. I might need a bathroom. Yeah, definitely will need a bathroom.

Visit my website:
**www.bobupdegrove.com**

**LABELS**

JA305   APP. 233

exposed, but all the bright area will get blown out. The third metering method, spot metering, refines the metering even further. The metering is based on a smaller "spot" in your viewfinder. If you wanted to meter the light falling right around a person's eyes, you could use spot metering to get your meter reading from that small of an area (depending on how close you are and what lens you are using), getting a more precise reading.

I shoot mostly in multi-segment metering, largely because I am always afraid that if I change it to spot I won't forget to turn it back, potentially giving me exposure readings that I don't want. As I say this though, I keep thinking I don't utilize these other metering options as much as I should.

One more consideration that fits this discussion: most d-slr cameras have a button near the trigger button that allows you to lock in an exposure. If you are using spot metering or maybe even center-weighted, and the area you want to meter is not in the center of your viewfinder, you might want to point your camera so that the area you want to meter has the spot on it, and while you are taking your reading (by holding down the trigger button half way), you hold down this exposure lock button. That keeps your metered exposure reading locked in while you recompose your scene. You need to keep that button pressed while you shoot your image.

Next session will get into something different: indoor photography and flash.

Cartoons/Videos (41)

Faith (9)

Family Photos (6)

Global Warming? (20)

Health Care Debate (21)

Obama (82)

Photo Tips/Reviews (24)

Politics (82)

Sample Photos (46)

Wedding Photography Advice (15)

**SEARCH THIS BLOG**

[ ] Search

**SUBSCRIBE TO**

Posts ▾

Comments ▾

No comments:

Post a Comment



Comment as: Google Accour ▾

Publish    Preview

**Newer Post**          **Home**          **Older Post**

Subscribe to: Post Comments (Atom)

**LABELS**

photography (55)

**BLOG ARCHIVE**

► 2015 (2)

► 2014 (3)

► 2013 (13)

► 2012 (19)

► 2011 (43)

► 2010 (86)

► 2009 (111)

► 2008 (88)

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF VIRGINIA
# ALEXANDRIA DIVISION

| | |
|---|---|
| **Robert Updegrove**, and **Loudoun Multi-Images LLC** d/b/a **Bob Updegrove Photography**, | |
| Plaintiffs, | Case No. _____ |
| v. | |
| **Mark R. Herring**, in his official capacity as Virginia Attorney General; and **R. Thomas Payne, II**, in his official capacity as Director of the Virginia Division of Human Rights and Fair Housing, | **Declaration of Robert Updegrove in Support of Plaintiffs' Preliminary Injunction Motion** |
| Defendants. | |

I, Robert (Bob) Updegrove, declare as follows:

1. I am over the age of eighteen and competent to testify, and I make this declaration based on my personal knowledge.

2. In 1990, I launched my photography company Loudoun Multi-Images as a sole proprietorship.

3. I was the sole owner and employed photographer for Loudoun Multi-Images.

4. Loudoun Multi-Images mainly offered multi-images services, such as slide shows synchronized to audio, on a commission basis.

5. I later decided to organize Loudoun Multi-Images as a limited liability company to gain the benefits of a limited liability company form.

6. In July 2017, I organized my company under the name Loudoun Multi-Images LLC and filed its Articles of Organization.

JA307

7.      A true and correct screenshot of Loudoun Multi-Images LLC's registration status with the Virginia State Corporation Commission is in the Appendix at page 1.

8.      I am the sole owner, member, and employee of Loudoun Multi-Images LLC.

9.      Loudoun Multi-Images LLC is a for-profit company doing business as Bob Updegrove Photography.[1]

10.     Bob Updegrove Photography has its principal place of businesses located in Leesburg, Virginia.

11.     Bob Updegrove Photography has adopted an Operating Agreement.

12.     A true and correct copy of Bob Updegrove Photography's Operating Agreement is in the Appendix at pages 2–14.

13.     I created a website for Bob Updegrove Photography to promote my photography, my artistic style, and my religious beliefs to the public and prospective clients.

14.     Bob Updegrove Photography's website has sections labeled "Home," "Weddings," "People," "Places," and "Info."

15.     True and correct screenshots of portions of the "Home," "Weddings," "People," "Places," and "Info," from Bob Updegrove Photography are in the Appendix at pages 15–34.

16.     Bob Updegrove Photography's website is viewable here: https://www.bobupdegrove.com/.

17.     I also created a blog for Bob Updegrove Photography to promote my photography and artistic style, as well as my views on faith, politics, and photography to the public and prospective clients.

---

[1] Unless context requires otherwise, the writer refers to Loudoun Multi-Images LLC as Bob Updegrove Photography throughout this Declaration.

JA308

18.     Bob Updegrove Photography's blog is viewable here:

https://bobupdegrove.blogspot.com/.

19.     I no longer create posts on my blog, but my blog remains accessible to the public to

showcase my photography and to communicate my artistic style and personal views.

20.     True and correct screenshots of relevant portions of Bob Updegrove Photography's blog

are in the Appendix at pages 35–47.

21.     I created all written content on Bob Updegrove Photography's website and blog.

22.     I created and edited every photograph published on Bob Updegrove Photography's blog.

23.     I created and edited nearly every photograph on Bob Updegrove Photography's website.

24.     Relevant to this Declaration, I created and edited every photograph of an engagement or

wedding on Bob Updegrove Photography's website.

I became interested in photography as a tool for ministry and as a way to express my creativity.

25.     I am a Christian.

26.     I believe in the Gospel—i.e., that God created humankind, that humankind sinned against

God, that humankind needs forgiveness to be reconciled to God, and that forgiveness and

redemption is available through all who accept and believe in God's son, Jesus. Genesis 1:27;

John 3:16; Romans 6:23.

27.     I became a Christian in high school through an organization called Campus Life, which

focuses on youth ministry.

28.     After high school, I attended college in Springfield, Ohio.

29.     During college, I bought my first camera and began photographing as a hobby.

30.     After college, I moved to Oregon to be closer to my brother.

31.     While I was in Oregon, I learned that Campus Life had an active ministry in the area.

JA309

32.     I became a volunteer for Campus Life.

33.     Shortly after I began to volunteer, Campus Life hired me to work full time.

34.     As a Campus Life staff member, I was responsible for organizing events at different high

schools.

35.     Around that time, I saw a nine-projector slide show that inspired me to create similar

photography for the students I worked with.

36.     I started photographing Campus Life and other school events and interviewing students to

create slide shows overlaid with audio.

37.     The school presented the slide shows at banquets and year-end assemblies for the

students.

38.     I enjoyed creating the slide shows because it gave me a way to connect with the youth.

39.     Photography gave me a reason to interact with students, to get to know them, and to talk

to them about sports, classes, their struggles, and life in general.

40.     In 1984, I moved back to Northern Virginia and began working in real estate.

41.     While working in real estate, I still created photography as a way to express my creativity

and to continue working with youth.

42.     One of the ways I did this was by creating photography for Loudoun County High

School.

43.     Similar to what I previously did with Campus Life, I photographed different student

events, interviewed students, crafted narratives, and created slide shows with audio.

44.     The school presented the slide shows at sports banquets and school assemblies.

45.     I gradually began creating photography for several high schools and elementary schools.

JA310

46.     People in and around Loudoun county began to recognize me because of my photography work for the schools.

47.     Parents of students also began to request photography services for different companies they worked for.

48.     Around 1990, I gave up real estate and created Bob Updegrove Photography to focus on photography full time.

49.     While I expanded my business to creating photographs for schools, businesses, non-profits, and other organizations, I still saw my photography as being primarily a tool for ministry.

50.     By that I mean, I saw my photography as a means to spread the good news about God and what God is doing in the world.

51.     I believe that God desires that everyone should know the truth of the Gospel and come to Him. 1 Timothy 2:4.

52.     I believe that God calls all Christians to serve as witnesses and promote the salvation that God offers humankind through Jesus Christ. Matthew 28:18–20.

53.     I also believe that God created the world from nothing, and that God's creation reflects His beauty, majesty, and artistry. Genesis 1:31; Psalm 19:1.

54.     I believe that God created humans to work, that our work reflects God's work in creation, and that Christians must honor God in their work. Genesis 1:26–28; Genesis 2:15; Psalm 115; Proverbs 16:9; Colossians 3:17; Colossians 3:23–24; 1 Corinthians 10:31.

55.     I believe that God gives people gifts and passions and calls them to steward these gifts and passions in a way that glorifies and honors Him, including by promoting the Gospel. Matthew 28:16–20; 1 Peter 4:10–11.

JA311

56.     I specifically believe that God calls and equips some people to create artistic and
aesthetically pleasing artwork for their vocations. Genesis 4:2, 20–23; Exodus 31:1–11; Psalm
33:2–3.

57.     I believe that God has called and equipped me to use my creative talents to create
beautiful artwork that reflects God's artistry and promotes the Gospel.

58.     For these reasons, my Christian faith motivated me to use photography as a ministry.

<u>I create wedding photography to publicly celebrate God's design for marriage.</u>

59.     When I first started Bob Updegrove Photography, I occasionally created wedding
photography.

60.     After approximately 2000, I began to receive more requests to photograph weddings.

61.     Many of these requests came from students I had previously interacted with while
photographing school events in the 1980s and 1990s.

62.     As these students grew up and became engaged, they began to request photography
services for their weddings.

63.     Around the same time, digital photography became more affordable and popular.

64.     In 2004, I bought my first digital camera; a Nikon D70.

65.     Digital technology introduced new innovations to photography, including techniques and
tools for creating fully customizable art.

66.     I enjoyed learning about the technological features of digital photography in order to
create beautiful, customizable art.

67.     The technological advancements of digital photography gave me a greater amount of
freedom to express my creativity than film photography previously did.

68.     For these reasons, I gladly began to create more wedding photography around 2004.

JA312

69.     I also view wedding photography as another opportunity for ministry.

70.     I believe that part of loving God and serving others involves proclaiming the truth about God's design for humanity. Matthew 28:16–20.

71.     I believe that promoting these truths means promoting views that are often unpopular or counter-cultural. John 15:18–25; James 4:4, 1 John 2:15–17.

72.     These truths include that God designed marriage to be between one man and one woman to point people to the ultimate hope found in Jesus' sacrificial death and covenantal relationship with His church. Genesis 1:27–31, 2:18–24; Matthew 19:3–9; Ephesians 5:22–33; 1 Corinthian 7:10–16.

73.     My beliefs about marriage come from my interpretation of the Bible.

74.     My beliefs about marriage are also informed by the teachings of my church, Cornerstone Chapel.

75.     Cornerstone Chapel's Articles of Faith state that:

> We believe that marriage is exclusively the union between one man and one woman in a lifetime commitment to each other (Genesis 2:23–24; Matthew 19:4–6). Marriage reflects the relationship between Christ and the Church and provides for procreation, intimate companionship, and we believe is the only basis for any form of sexual expression (1 Thess. 4:3; Ephesians 5:3). We believe that any intimate sexual activity outside of marriage is a sin and that God disapproves any attempt to alter one's gender by surgery or appearance (Genesis 19:5; Lev. 18:1–30; Romans 1:26–29; 1 Cor. 5:1, 6:9; Hebrews 13:4).

76.     Cornerstone Chapel's Articles of Faith are viewable here:

https://cornerstonechapel.net/?page_id=149

77.     A true and correct copy of Cornerstone Chapel's Articles of Faith is in the Appendix at pages 48–49.

78.     Cornerstone Chapel is affiliated with Calvary Chapel, an association of evangelical churches.

JA313

79.    Calvary Chapel's Statement of Faith states:

We *believe* that God created human beings, male and female, in His own image. He created them sinless, equal in value, dignity, and worth. According to His purpose and design, God created to fulfill distinct but complementary roles in the contexts of marriage, family, and the local church." [sic] (Genesis 1:26–28, Ephesians 5:22–6:4, 1 Timothy 3:1–7).

80.    Calvary Chapel's Statement of Faith is viewable here:

https://calvarychapel.com/about/statement-of-faith.

81.    A true and correct screenshot of the above statement is in the Appendix at 50–52.

82.    Because of my religious beliefs, I desire to create wedding photography (engagements included) that honors and glorifies God by promoting God's design for marriage.

83.    Before I agree to create photography for an engagement or a wedding, I try to meet with the prospective clients for a consultation so that I can get to know them, ask them about their upcoming ceremony, and make sure that I feel comfortable fulfilling their request according to my artistic discretion and religious beliefs.

84.    To photograph engagement sessions, my starting price is typically $400, which includes all photography and editing and a one to one-and-a-half-hour engagement session.

85.    I charge $200 for the engagement session if I'm also photographing the couple's wedding.

86.    To photograph weddings, my starting price is $1795 for all photography, editing, professional prints, access to a public and private gallery on Bob Updegrove Photography's website, and at least seven hours of coverage on the wedding day (Package A).

87.    In addition to everything listed above, clients can also order a custom-created Bijou album with professional prints (Package B).

88.    If I determine that providing the requested photography is consistent with my artistic and religious beliefs, and the prospective client agrees to hire me, it is my policy that clients agree in substance or in writing to the terms listed in Bob Updegrove Photography's sample service agreement form.

89.    A true and correct copy of the sample service agreement form for wedding photography is in the Appendix at pages 53–58.

90.    I then photograph the client's engagement or wedding.

91.    I aspire to create engagement and wedding photography in a photojournalistic style.

92.    Photojournalism is a style of photography where a person photographs candid and genuine moments to tell a story.

93.    I try to capture as many candid photographs of the couple's engagement session or wedding as possible.

94.    I will also choreograph certain classical poses by, for example, instructing the bride and groom and the bridal couple's families on how to pose for photographs after the ceremony.

95.    I always arrive early, photograph the entire ceremony, photograph most or all of the reception, and create approximately 1500–2000 raw photographs.

96.    After the engagement or wedding, I edit the photographs.

97.    Editing involves a two-step process.

98.    First, I do a "quick edit" where I review of all the photographs and discard the photographs that are blurry, unflattering, or otherwise do not meet my artistic and moral standards.

99.    I also color correct, level, and check exposure for every photograph I take.

100.    During the quick edit, I also keep track of photographs that I want to edit further.

JA315

101.    After I finish the quick edit, I go back to the photographs I previously set aside to create an "enhanced" collection of photographs.

102.    These are photographs that capture special moments, represent a variety of scenes from the wedding, and are suitable for more editing to bring out the photograph's true potential.

103.    After I finish editing, I post the photographs on my website.

104.    Under the "Weddings" tab, there is a "Sample Galleries" page, a "Portfolio" page, and a "Private Galleries" page.

105.    Under the "People" tab, there is an "Engagement Photos" page.

106.    For weddings, I create a gallery of approximately 50 to 200 enhanced photographs in the Sample Galleries page about a week after the ceremony.

107.    The sample gallery is accessible to anyone in the public.

108.    I have created a sample gallery for every wedding I've photographed since approximately 2009.

109.    I intend to post photographs in the sample gallery on my website for every wedding I photograph in the future since this is part of the services I provide.

110.    This gives the bride and groom the ability to share many of the enhanced photographs to friends and family in one easy-to-access location.

111.    I then create a private gallery of all the edited photographs, including the enhanced photographs, in the Private Galleries page.

112.    Each private gallery is password protected.

113.    I give each couple a unique password so they, or anyone they share their password with, can access their gallery at any time.

114.    I will also often post some photographs in the Portfolio page.

JA316

115. The Portfolio page is a publicly accessible gallery that's representative of my wedding photography as a whole.

116. The Portfolio and Sample Galleries pages allow the public and potential clients to familiarize themselves with my artistic style.

117. For engagement photographs, I create a private gallery in the Engagement Photographs page that contains all of the edited photographs.

118. I give each couple a unique password so they, or anyone they share their password with, can access their gallery at any time.

119. In addition to posting the photographs on my website I deliver a hard copy to my clients.

120. For weddings, I order prints and deliver the prints to the couple, along with a starter book, a thumb drive containing all of the edited photographs, and a custom-created Bijou album (last item for package B only).

121. For engagements, I deliver all of the edited photographs on a thumb drive.

122. Creating wedding photography for clients and posting the photographs on my website are part of how I publicly celebrate God's design for marriage and distinguish Bob Updegrove Photography from other photographers.

123. Other photographers use their online presence to strengthen their brand, to publicly advertise their artistic style, and to publicly share their beliefs. *See infra* ¶¶ 237–80, 306–29.

124. Creating prints, albums, and galleries on my website allows me to publicly celebrate and associate my company with the couples I photograph, to publicly promote my wedding photography and artistic style, to allow the couple to publicly associate with Bob Updegrove Photography, and to allow the couple to easily publicize and share their wedding photographs with friends and family to a greater audience than they otherwise could.

JA317

125.    In these ways, I hope to advertise my distinctive approach to photography and to honor and glorify God by promoting God's design for marriage to my clients, their friends, and the public.

<u>My editorial and artistic judgments are motivated by my faith.</u>

126.    I desire to honor and glorify God by creating aesthetically beautiful wedding photography that portrays the love, intimacy, and sacrifice embodied in marriage between one man and one woman.

127.    This helps me promote the message that God designed marriage to be a lifelong union between one man and one woman—a relationship that symbolizes and points people to Jesus' sacrificial and everlasting covenant with His bride, the Church.

128.    In this way, my religious motivation to promote God's design for marriage is inextricably intertwined with my creative and artistic judgment to create aesthetically pleasing artwork.

129.    For these reasons, I only offer wedding photography services and accept and fulfill requests for wedding photography services which are consistent with my artistic and religious judgments.

130.    I also require complete editorial control over my wedding photography so that I can freely express my creativity according to my religious beliefs.

131.    For example, the client contract, *see supra* ¶ 89, states:

- Bob Updegrove Photography shall be granted full artistic license over every aspect of his services, including the poses and content photographed, the locations used, the subsequent edits to all photographs, and the photographs placed on Bob Updegrove Photography's website.

- The Client understands that Bob Updegrove Photography does not photograph from a "shot list" throughout the wedding day. The hallmark of Bob Updegrove Photography's photographic approach is non-posed, journalistic coverage of actions in real time.

JA318

132.    I require full editorial control because, throughout the engagement session or wedding day, I am regularly making artistic and editorial decisions about what and how to photograph and about what to instruct the couple to do so that I can effectively celebrate the couple and to create aesthetically beautiful photographs that communicate the love, intimacy, and sacrifice of God's design for marriage.

133.    When I create engagement photography, for example, I sometimes suggest locations for the engagement session, what style or color of clothes the couple should wear, and what time of day to conduct the session to create the most aesthetically appealing photographs.

134.    I also advise the couple on where to stand, how to pose, when to hold hands, when to embrace, and when to kiss in order to elicit a romantic moment that reflects the intimacy of marriage as God designed it.

135.    I also try to photograph unplanned moments of the couple smiling, looking at each other, or laughing with each other to capture the couple's spontaneous and genuine love for one another, which is symbolic of Jesus' love for the Church.

136.    By way of example, I photographed and edited the following engagement session photographs:

JA319





137.   True and correct copies of the photographs described above, as well as additional

engagement photographs I have taken and edited, are in the Appendix at pages 59–65.

138.   When I photograph engagement sessions, the photographs I create are materially similar

to those photographs cited immediately above.

139.   When I create wedding photography, I'm regularly making the same type of artistic and

editorial decisions to effectively celebrate the couple and to create aesthetically beautiful

photographs that communicate the love, intimacy, and sacrifice of God's design for marriage.

JA320

140.    For example, I will often suggest that couples have their "first look" before the ceremony because I believe it helps relieve the couple's anxiety and stress, allows the bride and groom to spend more time with family and friends after the ceremony, and helps me to capture the couple's genuine emotions and love for each other.

141.    I created several blog posts explaining my views on this, including one entitled, "Some Wedding Advice From A Photographer," where I wrote: "I tend to be a romantic, and to me, if done right, a first look can be much more romantic. I've seen more grooms in tears during a first look than I ever have when they see other [sic] the first time walking down the aisle."

142.    The above blog post is viewable here: https://bobupdegrove.blogspot.com/2012/06/some-wedding-advice-from-photographer.html.

143.    A true and correct copy of the above blog post is in the Appendix at pages 35–36.

144.    Another way I utilize my artistic judgment is by strategically timing my movement and placement during the ceremony and throughout the wedding day to maximize my ability to capture important moments, such as the bride walking down the aisle, the officiant delivering the homily, the couple exchanging their vows, the couple kissing before the attendees, the officiant announcing the couple as husband and wife, the couple walking together from the altar, the attendees cheering during the couple's exit, and other romantic and intimate moments between the couple.

145.    By way of example, I created the following photographs:

 



146.    True and correct copies of the photographs described above, as well as additional wedding photographs I have taken and edited, are in the Appendix at pages 66–74.

147.    My knowledge of digital cameras also informs my artistic judgment calls.

148.    For example, I regularly tinker and experiment with my camera's ISO, aperture, and shutter speed to create photographs in dimly lit settings.

JA322

149.     ISO refers to the camera's light sensitivity and can be adjusted up or down to control how much light the camera picks up.

150.     Aperture refers to the size of the opening in the lens and the amount of light that you allow into a camera.

151.     Shutter speed refers to how long the camera is exposed to light to capture an image.

152.     By way of example, I created the following photograph at 6400 ISO during a wedding ceremony in a dimly lit church:



153.     I wrote about the technical and artistic factors that I considered in creating the above photograph in a blog post that is viewable here:

https://bobupdegrove.blogspot.com/2013/10/high-iso-low-light-photography.html.

154.     A true and correct copy of the above blog post and photograph are in the Appendix at 37–38.

155.     Similarly, I created the following photograph at 6400 ISO in near darkness, while standing approximately 120 feet away from the couple, and I could not see or hear the couple from where I was standing:



156.    I wrote about the technical and artistic factors that I considered in creating the above

photograph in a blog post that is viewable here:

https://bobupdegrove.blogspot.com/2012/09/shooting-in-dark.html.

157.    A true and correct copy of the above blog post and photograph is in the Appendix at page

39.

158.    Similarly, I created the following photograph in poor weather conditions by adjusting my

ISO to 3200:

JA324



159.    I wrote about the technical and artistic factors that I considered in creating the above

photograph in a blog post that is viewable here:

https://bobupdegrove.blogspot.com/2010/12/you-have-to-love-digital.html.

160.    A true and correct copy of the above blog post and photograph is in the Appendix at

pages 40–41.

161.    In a blog post entitled "Photography 101: Session 05," I also explained how my camera's

ISO, aperture, and shutter speed settings influence how I utilize my camera's flash:

> [W]hen it comes to using flash indoors, I always shoot with the camera in manual mode
> (as opposed to aperture or shutter priority, or auto. Manual mode gives you much more
> control over the shutter and the aperture. Typically I will set the aperture somewhere
> between the largest aperture (2.8 on most of my lenses). I want the most light possible to
> come through the lens. Usually the smallest aperture I will use is 5.6. I'll opt for 5.6 over
> the 2.8 when I am shooting group shots or if I have the ISO cranked up.
>
> Shutter speed is where you can really change the affect of flash photography. I will
> typically shoot with my shutter speed set at around 60 or 90 for my longer lenses, and at
> about 30 or 60 with my wider angle lenses. The slower your shutter speed, the more

ambient light you are allowing to affect the image; but the slower the shutter speed, the more blur you will get in your image. With flash however, you can freeze movement within that blur.

162.    The above post is available here:

https://bobupdegrove.blogspot.com/2010/04/photography-101-session-05.html.

163.    A true and accurate copy of the above blog post is in the Appendix at pages 42–43.

164.    I have created other educational blog posts that similarly explain different technical factors and artistic judgments that I take into consideration when I create wedding photography.

165.    True and accurate copies of these posts are in the Appendix at pages 228–234.

166.    The techniques described above illustrate just some of the factors and tools I consider as part of my artistic license.

167.    Other factors include the focus, depth of field, the photograph's subject matter, ambient light, perspective, composition, camera angles, empty space, and background.

168.    When I create wedding photographs, the photographs are materially similar to those described above as well as the wedding photographs that can be seen on my website.

169.    After I photograph an engagement or a wedding, I also edit the photographs so that I can effectively celebrate the couple and create aesthetically beautiful photographs that communicate the love, intimacy, and sacrifice of God's design for marriage.

170.    Modern photo-editing software like Adobe Photoshop or Adobe Lightroom allow photographers to edit digital photographs the way lab technicians used to edit film photography in a darkroom.

171.    In fact, digital editing software allows photographers to do much more than a lab technician could do with film.

JA326

172.    I wrote about this in a blog entitled, "The Value In A Professional Photographer," which is viewable here: https://bobupdegrove.blogspot.com/2009/01/value-in-professional-photographer.html.

173.    A true and accurate copy of the above blog post is in the Appendix at page 44–45.

174.    I consider a variety of factors and tools to edit the photographs.

175.    For example, I created and edited the following photographs by adjusting the color to cool or warm the image and create different moods:





21

JA327







JA328

176.    I wrote about the above photographs in a blog post entitled, "Digital Photography Sure Can Be Fun," which is viewable here: https://bobupdegrove.blogspot.com/2009/04/digital-photography-can-sure-be-fun.html.

177.    A true and accurate copy of the above blog post and photographs are in the Appendix at pages 46–47.

178.    I created and edited the photograph below by creating a black and white version to evoke a more dignified feel:

 

179.    I created and edited the photograph below by reducing the noise to remove grain and by creating a black and white version to evoke a more nostalgic mood:

 

180.    I edited the photograph below (original on the left, finished product on the right) by overlaying a textured canvas and lowering the saturation to place the chromatic emphasis on the couple:

JA329



181.    I edited the photograph below (original on the left, finished product on the right) by slightly cropping the photograph and increasing the vibrance to create a warmer mood:



182.    True and accurate copies of the photographs described above are in the Appendix at pages 75–78.

183.    The techniques described above illustrate just some of the factors and tools I consider as part of my artistic license.

JA330

184.    Other factors include adjusting the white balance to alter a photograph's tint; adjusting the exposure, contrast, highlights, and shadows; sharpening the details in the photograph; straightening an image; constraining an image to particular dimensions; or imposing vignettes.

185.    At a minimum, I color correct, level, and check exposure for every photograph I edit and deliver to the couple.

186.    I use largely the same process and the same artistic judgments described above to edit engagement photographs as well.

187.    By utilizing my artistic license in the ways described above, I can create aesthetically beautiful photography that portrays the love, intimacy, and sacrifice embodied in engagements and weddings to effectively promote God's design for marriage to my clients, their friends, and the public.

188.    I make most of my editorial decisions without any input from clients, including how to take individual photographs, how to edit individual photographs, and what to include in the galleries on my website.

189.    Clients sometimes give me suggestions or general ideas about some of the photographs they want or the types of poses they want depicted.

190.    I take these suggestions into consideration, offer my advice, and blend my clients' suggestions into my own aesthetic vision so that the final product effectively celebrates the couple according to my artistic and religious beliefs.

191.    But even when my clients make suggestions, they rely heavily on my artistic and editorial judgments about what to photograph, how to photograph in a compelling and appealing way, and how to edit the photographs.

192.    Clients typically defer to my suggestions and I always retain ultimate editorial judgment and control over all the photographs I create, and I retain discretion to reject any client suggestion that I think is improper.

I decline to create photographs that violate my beliefs.

193.    Just as my Christian faith motivates me to create wedding photography that honors and glorifies God, it also motivates me to not create photography that celebrates or promotes ideas dishonorable to God or contrary to my religious and moral beliefs.

194.    For example, I believe that God created humankind in His image, Genesis 1:26–27, so I would not create photography that demeans, ridicules, or belittles others.

195.    For example, I believe that religious liberty is a human right, Matthew 22:21, and that a free market and limited government is the best way to promote freedom, Proverbs 6:6–8, 19:17; 2 Corinthians 9:7; 2 Timothy 2:6.

196.    Hence, I have created photography promoting these views or promoting organizations that support these views, like the American Foreign Policy Council, Young America's Foundation, the Claremont Institute, the Clare Booth Luce Center for Conservative Women, and the Center for American Liberty.

197.    But I would not create photography for organizations that promote the censorship of religious beliefs or socialist policies like the Freedom from Religion Foundation, Americans United for Separation of Church and State, or the Democratic Socialists of America.

198.    I would also decline to create wedding photography that celebrates or promotes weddings or engagements that are dishonorable to God or contrary to my religious and moral beliefs.

199.    For example, I believe that weddings are meant to be a joyful occasion, so I would decline to create photography portraying marriage in a negative light.

26

200. For example, I believe that weddings are inherently religious and solemn events that should be revered as initiating an institution created by God, so I would decline to photograph certain themed weddings, like satanic or voodoo-themed weddings, that celebrate sacrilegious ideas.

201. For example, I believe that God created marriage to be a sacred union between one biological man and one biological woman, so I would decline to photograph weddings celebrating polygamous or open-relationships or weddings between individuals of the same-sex.

202. I would decline to photograph weddings celebrating polygamous or open-relationships or weddings between individuals of the same-sex, because I do not want to promote ideas contrary to my beliefs and I do not want to participate in events that violate my beliefs.

203. I believe that all those who attend a wedding necessarily participate in the ceremony by acting as a witness before God and before those assembled as the bride and groom exchange vows, commit their lives to each other, are pronounced man and wife, and share their first kiss as a married couple.

204. I believe that, as a wedding photographer, I necessarily participate in the wedding ceremonies I photograph by personally interacting with the bridal couple, the officiant, family, and friends, by directing members of the wedding party and the bride and groom's family on how to stand, where to position themselves, and what demeanor to display.

205. I believe that, as a wedding photographer, I necessarily express my approval of the wedding ceremonies I photograph by always creating photography that positively portrays the wedding and by appearing joyful and congratulating the couple, their family, and friends on the new marriage.

JA333

206.    I could not effectively provide wedding photography without positively portraying the marriage and personally participating in the ceremony in the ways described above.

207.    My beliefs described above are shaped by my own interpretation of the Bible.

208.    My beliefs described above are also shaped by other Christian pastors and leaders.

209.    For example, John Piper, a pastor, theologian, and author writes in an article entitled "Would you Attend a Gay Wedding?" that he would not attend a same-sex wedding because the "ceremony will defile the drama of Christ and the church. God designed marriage to display Christ's covenant to his bride, the church. To celebrate a brideless union as marriage is to distort and deface the parable of the most beautiful act in the world."

210.    The above statement is viewable here: https://www.desiringgod.org/interviews/would-you-attend-a-gay-wedding.

211.    A true and correct copy of John Piper's statement is in the Appendix at pages 79–80.

212.    For example, Kevin DeYoung, a pastor, theologian, and author, writes in an article entitled "Should I attend a Homosexual Wedding?":

> A wedding ceremony, in the Christian tradition, is first of all a worship service. So if the union being celebrated in the service cannot be biblically sanctioned as an act of worship, we believe the service lends credence to a lie. We cannot in good conscience participate in a service of false worship. I understand that does not sound very nice, but the conclusion follows from the premise, namely, that the "marriage" being celebrated is not in fact a marriage and should not be celebrated.

> Moreover, there has long been an understanding that those present at a marriage ceremony are not just casual observers, but they are witnesses who are granting their approval and support for the vows that are to be made…

> Quite explicitly, the wedding is not a party for friends and family. It's not a mere ceremonial formality. It is a divine event in which those gathered celebrate and honor the "solemnization of matrimony."

213.    The above statement is viewable here: https://www.ligonier.org/learn/articles/should-i-attend-homosexual-wedding/.

28

JA334

214.    A true and correct copy of Kevin DeYoung's statement is in the Appendix at pages 81–82.

215.    Because I would decline to celebrate same-sex weddings, I only want to offer wedding photography for weddings between one man and woman.

216.    I also want to post a statement on my website explaining that I cannot provide wedding photography services for same-sex weddings.

217.    A true and correct copy of my desired statement is attached to the Complaint as Exhibit 2.

218.    I also want to adopt an editorial policy as an addendum to Bob Updegrove Photography's Operating Agreement.

219.    A true and correct copy of the editorial policy is attached to the Complaint as Exhibit 1.

220.    As stated in the editorial policy, the mission of Bob Updegrove Photography is "create unique art, in a photojournalistic fashion, to promote messages consistent with [Bob's] Christian values."

221.    I want to adopt this editorial policy as an addendum to Bob Updegrove Photography's operating agreement because it provides a policy that constrains Bob Updegrove Photography's operations and ensures that its work is consistent with my artistic and religious beliefs; specifies the policies and editorial decisions that Bob Updegrove Photography must follow when determining whether to provide requested services; ensures that the policies and editorial decisions indicated in the editorial policy will be applied consistently; and effectively and thoroughly explains my editorial decisions for not creating certain types of photography.

JA335

222.    I also want to ask prospective clients before or during the initial consultation: "Are you seeking photographs that depict and celebrate a same-sex engagement or wedding?" or something materially similar to this question.

223.    After learning about Virginia's law and the Virginia Attorney General's intention to prosecute individuals or businesses who decline to celebrate same-sex weddings, I want to ask prospective clients this question to be more vigilante about the photography requests I agree to and because I fear I may receive a request to photograph a wedding I object to, despite my openly expressed Christian beliefs, because of Virginia's law.

224.    I also want to ask prospective clients this question because I want to be transparent and honest with prospective clients, value their time, avoid giving a false impression about the types of services I can and cannot provide, and allow myself to focus my time and resources on providing only those services I am willing to provide.

225.    I do not currently do any of the above because I understand that Virginia has a law that prohibits me from doing so.

Other commissioned photographers regularly exercise editorial discretion when they create art.

226.    It is standard practice for commissioned photographers to only create content that promotes their editorial and artistic judgment or to decline to create content that violates or compromises their editorial and artistic judgment.

227.    Many commissioned photographers also limit their photographs based on their artistic vision and values for subject matter and style.

228.    For example, Cristina Mittermeier describes herself as an "adventurer, conservationist, writer and photographer" and explains her photography goals as follows:

> I want my images to make people care. I want to move people away from apathy and into action. I want people to be so overwhelmed by emotion that they are inspired to, first of

30

JA336

all, be aware of what impact their choices have on our environment, and then make some changes that are in alignment with sustainability and climate changes solutions. I want my images to communicate a story of hope by capturing a glimpse into the lives of my subjects, whether that be human, animal or environment, and I want my images to present a dignified portrait that emphasizes empathy and our common humanity. I want my images to show people a new way of seeing things and take them to places that they might never get to visit themselves with the aim of highlighting how everything on this planet is connected. If my work can inspire an army of people who care, then I have done my job.

229.    The above statement is viewable here: https://cristinamittermeier.com/faq/.

230.    A true and correct copy of the statement described above is in the Appendix at pages 83–85.

231.    As for wedding photographers, the website Engaged Legal Collective contains an article entitled "5 Must-Have Wedding Photography Contract Terms."

232.    "Artistic Discretion" is the second must-have term. The article says this discretion is necessary because:

> You're an **artist**, not a dancing monkey.
>
> You've been hired to use **your discretion** to produce images in your own style, with your own eye, and with your own editing techniques.
>
> Make sure you defend your right to take certain photos— and, almost more importantly, the right to *not take certain photos*— by reserving "artistic discretion" and promising "no specific images." Also reserve the right to edit photographs in the styles you choose, so long as they are reflective of your portfolio as a whole. This way, you won't have people demanding for "more white in this photo" or "can you make this photo brighter?!"
>
> *Semi-related side note*: Make sure you're including a statement about **RAW image files** as well.  Tell the couple something along the lines that "under no circumstances shall RAW images be released or delivered to the couple." Why? It's like giving someone a painting when the ink isn't even dry!  Don't feel guilty about protecting your art— and your brand!

233.    The above statement is viewable here: https://blog.engagedlegal.com/blog/wedding-photographer-contract.

234.    A true and correct copy of the statement described above is in the Appendix at pages 86–94.

235.    Alina Thomas Photography, a wedding photography business in Northern Virginia, contains the following term in its wedding photography contract: "The Photographer retains the right to edit and release only the images that are deemed professional in quality and within the Photographer's artistic standards."

236.    The above statement is viewable here: https://alinathomas.com/wedding-photography-contract-associate-photographer/.

237.    A true and correct copy of the statement described above is in the Appendix at pages 95–99.

238.    Brittany Lowe Photography, a wedding photography business based in Richmond, Virginia, describes Brittany Lowe's photography style as follows:

> I use natural lighting (as much as I can!) to create a clean, bright, and airy feel to every photograph I take. Candid, real life moments and emotions are the foundation to building memories. I love capturing the little details as i feel like these are the little things that get forgotten so easily. I love giving my clients the ability to look back at their special day and remember every moment.
>
> I want to create genuine relationships with my clients, so during our time together you can expect us to talk, laugh, and get to know one another. I'm not aiming to take just a few pictures of you, I'm aiming to capture you as you are in that moment and deliver you the story of our time together.

239.    The above statement is viewable here: https://brittanylowephotography.com/about-me#about.

240.    A true and correct copy of the statement described above is in the Appendix at page 100.

241.    Wedding photographer Amanda Summerlin describes her editing style as follows:

> The image is meant to be a blank slate so that the photographer can have complete artistic freedom. So I take your photos into my secret photography laboratory and I process them. I prefer a classic fine art film look to my wedding photos, so I keep the colors clean and

JA338

the skin tones natural. If you have a blemish, my magic wand makes it disappear. If there's a spot on your suit, I use a spot treatment to remove it. If there's a random street sign in an otherwise perfect photo, I chop it out. There's lots of little remodels that I do to make your images just right.

242.    Summerlin also responds to the question "Are you willing to accept a list of 'must-have' photos?" as follows:

That's a loaded question, and the answer is, it depends.… [I]f you need to hand me a seven-page list to follow with checkboxes and you'll be crushed if I don't get *every single one*, then I won't be able to make any of the wonderful candid photos that you see in my portfolio for you because I'll have my nose buried in that list all night. This is one of those defining moments where you have to decide if our philosophies match or not.

243.    The statements described above are viewable here:

https://amandasummerlin.com/wedding-photography-fuqs/.

244.    A true and correct copy of the statements described above is in the Appendix at pages 101–109.

245.    Wedding photographer Susan Stripling describes her style as "a very journalistic style" and responds to the question "Can you take fewer photos that have dark shadows and bright highlights?" as follows:

If what you're looking for is a more evenly lit style of photography then I might not be the photographer for you. I use a great deal of shadow and light in my natural light images as well as my flash/lit images during the receptions. Please make sure that you look through all of my sample galleries provided when you inquire with me to make sure that the style you see in the galleries reflects the style that you want for your wedding day photography.

246.    The above statements are viewable here: https://www.susanstripling.com/info-faq/wedding-photography/frequent-questions.

247.    A true and correct copy of the statements described above is in the Appendix at pages 110–121.

JA339

248.    Robert & Kathleen Photographers, a wedding photography business, describe their style as follows on their website:

> We bring a Fine Art approach to wedding photography, thinking of each wedding as the opportunity to create custom works of art with the two of you, and the way you feel about each other, in the center of it.
>
> We define our work as clean, elegant and timeless.  Our photographic style is reflective of our own personal style where we strive to blend the old with the new to create something fresh yet reminiscent.  We use digital cameras alongside medium format and 35mm film cameras in order to capture classically beautiful images that are modern and timeless at the very same time.
>
> We photograph weddings with a photojournalist style, capturing the candid and unexpected moments while also providing gentle direction during portrait times, giving couples a collection of images that truly encompass the raw emotion of a wedding day.

249.    The above statement is viewable here: https://www.robertandkathleen.com/approach.

250.    A true and correct copy of the statement described above is in the Appendix at page 122.

251.    But other wedding photographers exercise their editorial and artistic judgment about the types of art they create differently than I do.

252.    For example, Creatrix Photography photographed a polygamous engagement and wrote a blog post about the engagement session: "I met these three a few different times, at a couple different expos. I was VERY excited when they finally booked me, because triad weddings are just not common yet. Though, when I say 'wedding,' in this case I mean love party. They are going to have one epic shindig, if their engagement session is any testament!"

253.    Creatrix Photography's engagement photographs include the following:

 

254.    Creatrix Photography also photographed a polygamous marriage and wrote a blog post about the wedding and polygamy: "There is no right way to relationship. Polyamory simply isn't a threat to monogamy. Monogamy is often its own worst enemy, with or without outside influence. Every relationship is different. I've seen polyam relationships grow and fizzle just as rapid and often as monogamous relationships."

255.    Creatrix Photography's wedding photographs include the following:

 

256.    The above statements and photographs are viewable here:

https://creatrixphotography.com/jolene-stephani-david-austin-polyamory-wedding/, and here:

https://creatrixphotography.com/polyamory-wedding/.

257.    True and correct screenshots of the relevant portions of Creatrix Photography's website, including the above statements and photographs, are in the Appendix at pages 123–135.

JA341

258.    Wedding photographer Zoe Larkin wrote an article entitled "Open Marriage, Transitioning and Play Parties: One Couple's Story of Their Thriving Poly Love Life" and photographed engagement photographs of a couple pursuing an open marriage.

259.    The above article is viewable here: https://equallywed.com/open-marriage-transitioning-poly/.

260.    A true and correct copy of Zoe Larkin's article is in the Appendix at pages 136–146.

261.    Several photographers also take photographs of marijuana-themed weddings.

262.    For example, the website Love and Marij describes several photographers across the country as "Cannabis Friendly Wedding Photographers."

263.    The above statement is viewable here: http://loveandmarij.com/vendors/wedding-photo-video-photobooth/.

264.    A true and correct copy of the above statement is in the Appendix at pages 147–149.

265.    Wedding photographer Rachel Artime is listed on Love and Marij's website and states her cannabis policy is that she is "open to all things cannabis!"

266.    Rachel Artime's Love and Marij listing includes the following photograph:



JA342

267.    The above statement and photograph are viewable here:

https://loveandmarij.com/vendor/rachel-artime-photo/.

268.    True and correct screenshots of Rachel Artime's Love and Marij listing, including the

above statement and photograph, are in the Appendix at page 150.

269.    Other photographers take photographs of "satanic" and "voodoo" weddings.

270.    The website Misfit Weddings posted an article featuring one couple's satanic wedding,

where the couple favorably described their photographer Alex Solca, stating: "He did a fantastic

job with the photos, and our guests all really liked him too! We met in person to talk about the

wedding, and I sent him some inspiration photos of black metal album artwork and noir

movie/fashion shots. In addition to weddings, Alex also shoots metal bands so he knew exactly

what to do. He brought lights and a fog machine and back drop and really nailed the fantasy

shots before the ceremony."

271.    The above article includes the following photographs:





272.   The above article and photographs are viewable here:

https://www.misfitwedding.com/blog/ralis-and-katies-satanic-wedding.

273.   True and correct screenshots of the relevant portions of Misfit's Weddings website, including the above statement and photographs, are in the Appendix at pages 151–157.

274.   The website for the Washingtonian featured an article on one couple's voodoo-themed wedding reception in an article entitled: "One Part Wedding, Two Parts Halloween, and One Part Viking Funeral," and credited photographer Tony Hitchcock and filmmaker Clara Ritger for capturing photographs and videos celebrating the wedding.

275.   The above article includes the following photograph:

JA344



276.    The above article and photograph are viewable here:

https://www.washingtonian.com/2018/10/31/halloween-wedding-reception-congressional-cemetery/.

277.    True and correct screenshots of the relevant portions of the Washingtonian article, including the above photograph, are in the Appendix at pages 158–164.

278.    Creatrix Photography also photographed a vampire-themed wedding and wrote a blog post about it entitled "Austin Vampire Wedding." Creatrix Photography explained that the wedding ceremony took place in "what I called, 'a room of blood,' which is fitting for a vampire wedding! The whole mansion was drenched in the color red, creating a surreal experience coming in and out of the room."

279.    Creatrix Photography's photographs included the following:

JA345



280.    The above statement and additional photographs are viewable here:

https://creatrixphotography.com/daley-logan-austin-vampire-wedding/.

281.    A true and correct screenshot of the relevant portion of Creatrix Photography's website,

including the above statement and photographs, are in the Appendix at pages 165–170.

JA346

282.     I would decline to photograph weddings and receptions similar to those listed above, no matter who requested the photography, because of my religious beliefs that satanic, vampire and voodoo-themed ceremonies are profane and trivialize the sacred nature of the wedding ceremony and I cannot tell stories promoting or celebrating a ceremony contrary to my religious beliefs.

283.     I would also decline to photograph a same-sex engagement session or wedding, no matter who requested the photography, because of my religious beliefs that God created marriage to be an exclusive covenant between one man and one woman (Matthew 19:3–9; Hebrews 13:4; 1 Corinthians 6:9–20) and I cannot tell stories promoting or celebrating a ceremony contrary to my religious beliefs.

284.     My decision not to photograph weddings like those described above is always because of the message being celebrated, not the status of the client or the couple getting married.

285.     I would decline a request to create engagement or wedding photography celebrating ideas that violate my beliefs no matter who asked me.

286.     For example, some wedding photographers create photographs of "styled" same-sex engagements and weddings.

287.     "Styled" means the event is staged with models often acting as the marrying couple.

288.     "Styled" photoshoots are designed to inspire creativity in the photographers who participate, create, and build networks with other photographers and create and build a portfolio.

289.     Equally Wed, for example, describes itself as "an international online LGBTQ+ wedding magazine" and lists several posts on "styled" same-sex weddings.

290.     The above statement and posts are viewable here: https://equallywed.com/tag/styled-shoot/.

JA347

291.    I would not photograph a "styled" engagement or wedding celebrating a polygamous, open-relationship, or same-sex wedding, even if one or both of the models were heterosexual, because of the message being promoted.

292.    Bakerture Photography and Video, a wedding photography studio located in Virginia, photographed an "Exorcist Wedding Styled Shoot."

293.    Bakerture Photography and Video's styled wedding photographs include the following:





294.    The above photographs are viewable here: https://www.bakerture.com/blog/the-exorcist-wedding-styled-shoot-fredericksburg-photographer.

JA348

295.    True and correct copies of Bakerture Photography and Video's photographs are in the Appendix at pages 177–181.

296.    I would decline requests to provide photography for a "styled" exorcist-themed wedding because of the message being promoted.

297.    But I will create photographs for anyone, so long as the message is consistent with my artistic and religious beliefs.

298.    I will, for example, create photographs for gay or lesbian clients, such as LGBT business owners seeking event photography.

299.    I will, for example, create photographs for the wedding of one man and one woman if I were hired by the future bride's gay father or by the future groom's lesbian mother.

300.    I will also create photographs for a wedding between a homosexual man and a woman so long as the couple intends the marriage to be a lifelong union between that one man and one woman.

301.    I will also create photographs for a wedding between a bisexual woman and a man so long as the couple intends the marriage to be a lifelong union between that one man and one woman.

302.    As for paragraphs 300 and 301, of adults who identify as gay or lesbian and currently raise children, about 18% have "a different-sex married spouse" according to a report by the Williams Institute.

303.    A true and correct excerpt from the relevant portions of the above report are in the Appendix at pages 182–188.

304.    Similarly, according to a Gallup report, 13.1% of LGBT persons are married to members of the opposite-sex.

43

JA349

305.    A true and correct copy of the above report is in the Appendix at pages 189–194.

<u>Many commissioned photographers and businesses promote same-sex weddings.</u>

306.    There are many photographers in or close to Virginia who freely express their beliefs in favor of same-sex marriage by posting statements supporting same-sex marriage, posting photographs of same-sex marriage on their websites and social media sites, posting statements describing the photographers' beliefs in favor of same-sex engagements and weddings, and acknowledging the photographers' willingness to photograph same-sex weddings.

307.    For example, Shawnee Custalow describes herself as "a queer feminist photographer" and a "Richmond VA, LA, & Worldwide LGBTQ Photographer," states she "support[s] and appreciate[s] all kinds of relationships and celebrations," and claims "Feminist weddings" and "Non-gendered wedding parties" make her "ridiculously happy."

308.    The above statements are viewable here: https://shawneec.com/about.

309.    Shawnee Custalow's website features photographs of same-sex engagements and weddings viewable here: https://shawneec.com/engagements and here: https://shawneec.com/weddings.

310.    A true and correct copy of the statements and some of the same-sex engagement and wedding photographs described above, are in the Appendix at pages 195–204.

311.    Shawnee Custalow's Instagram also contains the following post:

All this to say, that these terms can be so important and grounding in finding yourself in this huge world and the LGBTQ+ community. We love that there are so many ways to describe ourselves, our identities, and our love, and that it is always evolving for the better ❤️ #lesbianvisibilityday #queerlove #queerweddingphotographer

312.    The above post is viewable here: https://www.instagram.com/p/B_dgW7vlAn6/.

313.    A true and correct screenshot of the post described above is in the Appendix at page 205.

JA350

314.    Crystal Image Photography photographs weddings in the Virginia, Maryland, Washington D.C., and North Carolina area, has a section of her website devoted to "LGBTQ Weddings," and states: "Gay, Lesbian, Transgender, Same Sex, Black, White or Straight it doesn't matter to me what label you want to put on it or simply no label at all. I love being a wedding photographer and in addition I believe in equality for all! So, with that being said if you are looking for a LGBTQ wedding photographer you have come to the right place. I have been photographing same sex marriages for years! In fact my first Lesbian wedding was over 10 years ago before marriage was even legal."

315.    Crystal Image Photography's website and instagram page also feature photographs of same-sex engagements and weddings viewable here: https://www.crystalimagephoto.com/lgbt-wedding-planning.html, and here: https://www.instagram.com/crystalimage/.

316.    A true and correct copy of the statement and some of the same-sex engagement and wedding photographs described above are in the Appendix at pages 206–207.

317.    Aaron Watson Photography photographs weddings and posted a blog entitled "Matt & Greg's Fall Jewish Wedding | King Family Vineyards" and wrote "We love being same-sex wedding photographers, as we support all love!" and "Aaron Watson Photography is a gay wedding friendly studio, located in Charlottesville, VA. We support all types of marriage, and especially equal rights for our LGBTQ community. If you are looking for same-sex wedding photographers, please be sure to contact us!" The blog post also features same-sex wedding photographs.

318.    The above statements and photographs are viewable here: https://www.aaronwatsonphoto.com/charlottesville-same-sex-wedding-photographers/.

319.    A true and correct screenshot of the relevant portions of the blog and true and correct copies of some of the same-sex wedding photographs described above are in the Appendix at pages 208–212.

320.    Jon Fleming photographs weddings in the Washington, D.C., Virginia, and Maryland area and posted a blog entitled "First Same Sex Wedding Ceremonies in the State of Virginia | Virginia Same-Sex Wedding Photographer" where he wrote:

> It was an amazing moment today when scrolling through my newsfeed on <u>Facebook</u> just after 10am. I began to see the social media blow up over The US Supreme Courts decision to refuse to hear cases from Oklahoma, Utah, Virginia, Wisconsin and Indiana! With this historical move Same-Sex marriage has been legalized in the State of Virginia where the first marriage ceremonies were performed today!
>
> I was able to stop by The General District Courts in Fairfax, Virginia where the first same-sex ceremony was performed in Fairfax County!
>
> I snapped an iPhone shot of some of the supporters just outside the courthouse! I am so excited to capture the many upcoming same-sex ceremonies and weddings in Virginia! If you know anyone getting married I would love to have the honor of capturing their day!

321.    The above blog is viewable here: https://www.jonflemingphotography.com/blog/same-sex-marriage-legal-in-virginia.

322.    Jon Fleming's website features same-sex wedding photographs viewable here: https://www.jonflemingphotography.com/blog/old-house-vineyards-wedding.

323.    A true and correct screenshot of the relevant portions of the blog and true and correct copies of some of the same-sex wedding photographs described above are in the Appendix at pages 213–216.

324.    3 Cats Photo photographs weddings, is based in Charlottesville, Virginia according to its website, and posted a blog entitled "Blue Ridge Mountain Engagement – Same-Sex Wedding Photographer," and wrote "I hate to distinguish my beautiful couples by terms like 'Virginia

JA352

same-sex wedding photographer'. It feels so debasing. Love is love. Love who you love. I photograph all types of love. Defining it by such narrow language seems so limiting to me and my beautiful couples!" The blog post also features same-sex engagement photographs.

325.  The above statements and photographs are viewable here:

https://3catsphoto.com/virginia-same-sex-wedding-photographer-blue-ridge-mountains/.

326.  More of 3 Cats Photo's same-sex engagement photographs are viewable here:

https://3catsphoto.com/same-sex-engagement-session-coffee-shop/.

327.  A true and correct screenshot of the relevant portions of the blog and true and correct copies of some of the same-sex engagement photographs described above are in the Appendix at pages 217–221.

328.  And there are many other photographers in or close to Virginia who support and celebrate same-sex weddings, as seen on their business and social media sites:

- https://www.amandamaglione.com/blog/2018/charlottesvillelgbtweddingphotographer

- https://brandontemplarphotography.com/portfolio/lgbtq-engagement-portfolio

- http://www.couragecophoto.com/latest-work/2020/2/5/brittany-katie-brandermill-country-club & https://www.instagram.com/couragecophoto/

- https://davidchampagnephotography.com/category/lgbt-weddings/

- https://www.heartofncweddings.com/same-sex-engagement-session-in-downtown-raleigh/

- https://weddings.justinhankins.com/portfolio/featured/barn-timber-creek-wedding-sydney-mandy/

- https://www.karaleighcreative.com/blog/2018/11/9/west-virginia-wedding-photographer-jq-dickenson-wedding & https://www.karaleighcreative.com/about

- https://www.meganreiphotography.com/northern-virginia-wedding-photographer and https://www.meganreiphotography.com/blog/2019/2/23/manassas-battlefield-winter-engagement-pictures-manassas-va-andrea-and-katie

- https://omarzeta.com/contact-wedding-photographer/ & https://omarzeta.com/portfolio/j-e/ & https://omarzeta.com/portfolio/r-t/

- https://www.rebeccaburtphotography.com/rebecca-burt-photography-blog/2018/5/8/julie-kellys-wedding-the-barns-at-timberneck-surry-va

- https://www.romangrinev.com/gay-wedding-photography/

329.    True and correct copies of some of the same-sex engagement and wedding photographs from the websites and social media sites described above are in the Appendix at pages 222–227.

<u>My photography differs from other photographers' work because of my religious beliefs.</u>

330.    I take and edit each photograph with the goal of promoting and celebrating marriages between one man and one woman.

331.    My artistic and editorial judgments about how to create photographs produces a message promoting and celebrating marriages between a man and a woman.

332.    For example, compare my photographs of engagements in the left column below with photographs of same-sex engagements by other photographers in the right column:

JA354

USCA4 Appeal: 21-1506 Doc: 19 Filed: 07/14/2021 Pg: 359 of 523






JA355

 

 

333. True and correct copies of my photographs above (left) are in the Appendix at pages 60 and 63–64, and true and correct copies of other photographers' photographs above (right) are in the Appendix at pages 220 and 223–224.

334. For additional comparisons, compare true and correct copies of my photographs in the Appendix at pages 59–65 with true and correct copies of other photographers' photographs in the Appendix at pages 222–224.

JA356

335.    Also compare my photographs of weddings in the left column below with photographs of same-sex weddings by other photographers in the right column:

 

 

 

51

JA357

 

336.    True and correct copies of my photographs above (left) are in the Appendix at pages 67, 68 and 73, and true and correct copies of other photographers' photographs above (right) are in the Appendix at pages 203, 214, and 226–227.

337.    For additional comparisons, compare true and correct copies of my photographs in the Appendix at pages 66–74 with true and correct copies of other photographers' photographs in the Appendix at pages 203–216 and 225–227.

338.    I have personally visited and viewed each of the websites referred to in this Declaration on September 26, 2020.

339.    None of the statements found on any of the websites referred to in this Declaration were taken from a comment section or other forum for public comment.

340.    I have personally viewed every document and other materials referred to in this Declaration and in the Appendix on September 26, 2020.

JA358

**DECLARATION UNDER PENALTY OF PERJURY**

I, BOB UPDEGROVE , a citizen of the United States and a resident of the State of

Virginia, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing

is true and correct to the best of my knowledge.

Executed this **26** day of **SEPTEMBER** , 2020, at **LEESBURG** , Virginia.

_____

BOB UPDEGROVE

JA359

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | | |
|---|---|---|
| ROBERT UPDEGROVE *et al.*, | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:20-cv-01141-CMH-JFA |
| | ) | |
| MARK HERRING *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' MOTION TO DISMISS THE COMPLAINT

Defendants Attorney General Mark R. Herring and Senior Assistant Attorney General R. Thomas Payne, II move this Court for an order dismissing the complaint under Fed. R. Civ. P. 12(b)(1) and 12(b)(6). This motion is based on the accompanying memorandum, the declaration submitted in support of the motion, and any further arguments defendants may make.

As set forth more fully in the accompanying memorandum, the complaint should be dismissed for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1) because plaintiffs' pre-enforcement challenge to the Virginia Values Act does not satisfy Article III's case or controversy requirement. The complaint should also be dismissed under Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted because plaintiffs' allegations do not assert any infringement on the rights to free speech or freedom of religion, and the Act would survive strict scrutiny in any event.

Pursuant to the Court's order dated October 9, 2020, counsel for defendants will appear before the Court to present this motion at a hearing scheduled for Friday, January 15, 2021, at 10:00 a.m. See Dkt. 19.

JA360

WHEREFORE, defendants respectfully request that the Court grant their motion and dismiss the complaint.

Dated: November 16, 2020

Respectfully submitted,

**MARK HERRING**
**R. THOMAS PAYNE, II**

By: _____*/s/ Jessica Merry Samuels*_____
Jessica Merry Samuels (VSB No. 89537)
*Assistant Solicitor General*

Mark R. Herring
  *Attorney General*

Erin B. Ashwell (VSB No. 79538)
  *Chief Deputy Attorney General*

Samuel T. Towell (VSB No. 71512)
  *Deputy Attorney General*

Toby J. Heytens (VSB No. 90788)
  *Solicitor General*

Michelle S. Kallen (VSB No. 93286)
Martine E. Cicconi (VSB No. 94542)
  *Deputy Solicitors General*

Jessica Merry Samuels (VSB No. 89537)
  *Assistant Solicitor General*

Office of the Attorney General
202 North Ninth Street
Richmond, Virginia 23219
(804) 786-6835 – Telephone
(804) 371-0200 – Facsimile
solicitorgeneral@oag.state.va.us

## CERTIFICATE OF SERVICE

I hereby certify that on November 16, 2020, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to all counsel who have appeared, including:

Charles Douglas Welty
C. Douglas Welty LLC
2111 Wilson Boulevard
Suite 800
Arlington, VA 22201
cdwelty@weltyblair.com

*Counsel for Plaintiffs*

/s/ Jessica Merry Samuels
Jessica Merry Samuels

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| ROBERT UPDEGROVE *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:20-cv-01141-CMH-JFA |
| | ) | |
| MARK R. HERRING *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' COMBINED OPPOSITION TO PRELIMINARY INJUNCTION**
**AND MEMORANDUM IN SUPPORT OF MOTION TO DISMISS**

Mark R. Herring
  *Attorney General*

Erin B. Ashwell (VSB No. 79538)
  *Chief Deputy Attorney General*

Samuel T. Towell (VSB No. 71512)
  *Deputy Attorney General*

Toby J. Heytens (VSB No. 90788)
  *Solicitor General*

Martine E. Cicconi (VSB No. 94542)
Michelle S. Kallen (VSB No. 93286)
  *Deputy Solicitors General*

Jessica Merry Samuels (VSB No. 89537)
  *Assistant Solicitor General*

Office of the Attorney General
202 North Ninth Street
Richmond, Virginia 23219
(804) 786-6835 – Telephone
(804) 371-0200 – Facsimile
solicitorgeneral@oag.state.va.us

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ............................................................................................................. 1

BACKGROUND ............................................................................................................... 2

      A.  The Virginia Values Act ................................................................................ 2

      B.  This Litigation................................................................................................6

LEGAL STANDARDS ...................................................................................................... 7

ARGUMENT ..................................................................................................................... 8

I.    This Court lacks jurisdiction over plaintiff's pre-enforcement challenge to the
Virginia Values Act ............................................................................................8

II.   Plaintiff's free speech claim fails because the Virginia Values Act regulates
what plaintiff does as a participant in commerce, not what he believes or says .............12

      A.  The Virginia Values Act regulates conduct, not speech ...........................................12

      B.  The Act is constitutional because there is no reasonable likelihood that the
public will associate any disputed "message" with plaintiff .....................................14

      C.  The Act does not target speech based on content or viewpoint................................17

III.  Prohibiting discrimination in public accommodations does not violate plaintiff's
right to religious freedom ...................................................................................21

      A.  The Virginia Values Act is a neutral law of general applicability...........................21

      B.  The "hybrid rights" doctrine has not been recognized in this Circuit ......................22

IV.  The Virginia Values Act satisfies strict scrutiny.............................................................23

V.   Plaintiff is not entitled to a preliminary injunction ........................................................25

CONCLUSION................................................................................................................ 26

CERTIFICATE OF SERVICE ....................................................................................... 28

JA364

# TABLE OF AUTHORITIES

**Page**

## Cases

*303 Creative LLC v. Elenis,*
   385 F. Supp. 3d 1147 (D. Colo. 2019) ............................................ 19

*Abbott v. Pastides,*
   900 F.3d 160 (4th Cir. 2018) ........................................................ 10

*Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel. Barez,*
   458 U.S. 592 (1982) ...................................................................... 24

*Allen v. College of William & Mary,*
   245 F. Supp. 2d 777 (E.D. Va. 2003) ............................................... 7

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) ........................................................................ 8

*Axson-Flynn v. Johnson,*
   356 F.3d 1277 (10th Cir. 2004) .................................................... 23

*Baskin v. Bogan,*
   766 F.3d 648 (7th Cir. 2014) .......................................................... 4

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544 (2007) ........................................................................ 8

*Board of Directors of Rotary Int'l v. Rotary Club of Duarte,*
   481 U.S. 537 (1987) ...................................................................... 23

*Burson v. Freeman,*
   504 U.S. 191 (1992) ...................................................................... 23

*Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of New York,*
   447 U.S. 557 (1980) ...................................................................... 18

*Christ Coll., Inc. v. Board of Sup'rs, Fairfax Cty.,*
   944 F.2d 901, 1991 WL 179102 (4th Cir. 1991) ............................ 23

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,*
   508 U.S. 520 (1993) ...................................................................... 21

*Combs v. Homer-Ctr. Sch. Dist.,*
   540 F.3d 231 (3d Cir. 2008) .......................................................... 23

*DaimlerChrysler Corp. v. Cuno,*
   547 U.S. 332 (2006) ........................................................................ 9

*Democratic Nat'l Comm. v. Wisconsin State Legislature,*
   No. 20A66, 592 U.S. __ (2020) .................................................... 25

JA365

*Dewhurst v. Century Aluminum Co.*,
  649 F.3d 287 (4th Cir. 2011) ............................................................................. 8, 26

*Doe v. Virginia Dep't of State Police*,
  713 F.3d 745 (4th Cir. 2013) ................................................................................ 12

*Elane Photography, LLC v. Willock*,
  309 P.3d 53 (N.M. 2013) ............................................................................. passim

*Employment Div., Dep't of Human Res. of Oregon v. Smith*,
  494 U.S. 872 (1990) ........................................................................................ 21, 23

*Giboney v. Empire Storage & Ice Co.*,
  336 U.S. 490 (1949) ............................................................................................ 14

*Heart of Atlanta Motel, Inc. v. United States*,
  379 U.S. 241 (1964) ............................................................................................ 25

*Hishon v. King & Spalding*,
  467 U.S. 69 (1984) .............................................................................................. 13

*Hurley v. Irish-American Gay, Lesbian & Bisexual Grp. of Boston*,
  515 U.S. 557 (1995) ........................................................................................ passim

*In re KBR, Inc., Burn Pit Litig.*,
  744 F.3d 326 (4th Cir. 2014) ................................................................................. 7

*Kenny v. Wilson*,
  885 F.3d 280 (4th Cir. 2018) ............................................................................... 11

*Lawrence v. Texas*,
  539 U.S. 558 (2003) ............................................................................................ 24

*Maryland Shall Issue, Inc. v. Hogan*,
  971 F.3d 199 (4th Cir. 2020) .......................................................................... 10, 11

*Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n*,
  138 S. Ct. 1719 (2018) ................................................................................... passim

*Miami Herald Pub. Co. v. Tornillo*,
  418 U.S. 241 (1974) ........................................................................................ 20, 21

*Miller v. City of Wickliffe, Ohio*,
  852 F.3d 497 (6th Cir. 2017) ............................................................................ 9, 11

*National Park Hosp. Ass'n v. Department of Interior*,
  538 U.S. 803 (2003) .............................................................................................. 9

*Newman v. Piggie Park Enterprises, Inc.*,
  390 U.S. 400 (1968) ............................................................................................ 22

*Obergefell v. Hodges*,
  576 U.S. 644 (2015) ............................................................................................ 24

*Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*,
  413 U.S. 376 (1973) ............................................................................................ 18

iii

JA366

*Raines v. Byrd,*
  521 U.S. 811 (1997) ............................................................................ 9

*Reed v. Town of Gilbert,*
  576 U.S. 155 (2015) .......................................................................... 19

*Roberts v. United States Jaycees,*
  468 U.S. 609 (1984) ................................................................... passim

*Romer v. Evans,*
  517 U.S. 620 (1996) ....................................................................... 2, 12

*Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.,*
  547 U.S. 47 (2006) ..................................................................... passim

*Sorrell v. IMS Health Inc.,*
  564 U.S. 552 (2011) ..................................................................... 18, 19

*Spokeo, Inc. v. Robins,*
  136 S. Ct. 1540 (2016) ....................................................................... 9

*State by McClure v. Sports & Health Club, Inc.,*
  370 N.W.2d 844 (Minn. 1985) ......................................................... 25

*State v. Arlene's Flowers, Inc.,*
  193 Wash. 2d 469 (2019), .................................................... 12, 22, 25

*Susan B. Anthony List v. Driehaus,*
  573 U.S. 149 (2014) ................................................................ 9, 10, 11

*Telescope Media Grp. v. Lucero,*
  936 F.3d 740 (8th Cir. 2019) ....................................................... 11, 21

*Trustgard Ins. Co. v. Collins,*
  942 F.3d 195 (4th Cir. 2019) ........................................................... 12

*United States v. Hopkins,*
  427 U.S. 123 (1976) .......................................................................... 25

*United States v. Lee,*
  455 U.S. 252 (1982) .......................................................................... 22

*Ward v. Rock Against Racism,*
  491 U.S. 781 (1989) .......................................................................... 19

*Warfaa v. Ali,*
  33 F. Supp. 3d 653 (E.D. Va. 2014) .................................................. 7

*Windsor v. United States,*
  699 F.3d 169 (2d Cir. 2012), ............................................................. 4

*Winter v. Natural Res. Def. Council, Inc.,*
  555 U.S. 7 (2008) .............................................................................. 26

*Workman v. Mingo Cty. Bd. of Educ.,*
  419 Fed. Appx. 348 (4th Cir. 2011) .................................................. 22

JA367

## Constitutional Provisions

U.S. Const. art. III, § 2 ............................................................................................ 8, 9, 11, 12

U.S. Const. amend. I ...................................................................................................... passim

## Statutory Authorities

20 U.S.C. § 1681 .................................................................................................................. 3

42 U.S.C. § 3604 .................................................................................................................. 3

42 U.S.C. § 12182 ................................................................................................................ 3

42 U.S.C. § 2000e-2 ............................................................................................................. 3

Va. Code Ann. § 2.2-520 ...................................................................................................... 4

Va. Code Ann. § 2.2-3900 ........................................................................................... 2, 3, 26

Va. Code Ann. § 2.2-3904 ........................................................................................... 3, 13, 22

Va. Code Ann. § 2.2-3905 .................................................................................................... 22

Va. Code Ann. § 2.2-3906 ...................................................................................................... 4

Va. Code Ann. § 2.2-3907 ...................................................................................................... 4

Va. Code Ann. § 2.2-3908 ...................................................................................................... 4

1987 Va. Acts 938 ................................................................................................................. 3

2020 Va. Acts ch. 1140 ......................................................................................................... 3

## Rules

Fed. R. Civ. P. 12 ............................................................................................................. 7, 8

## Other Authorities

Christy Mallory, Taylor N.T. Brown & Brad Sears, *The Impact of Stigma and Discrimination Against LGBT People in Virginia*, Williams Institute, UCLA School of Law (Jan. 2020) .... 5, 6

Housing Opportunities Made Equal of Virginia, Inc., *A Study of Housing Discrimination Against Same-Sex Couples in Virginia* (Nov. 16, 2015) ...................................................................... 6

Justin Mattingly, *'Virginia is for all Lovers': House and Senate Pass Legislation to Ban LGBTQ Discrimination*, Richmond Times-Dispatch (Feb. 6, 2020) ...................................................... 6

Kerith J. Conron and Shoshana K. Goldberg, *LGBT People in the US Not Protected by State Non-Discrimination Statutes*, Williams Institute, UCLA School of Law (Apr. 2020) ............... 5

Office of the Governor, *Governor Northam Signs Virginia Values Act* (Apr. 11, 2020) ............... 6

Pew Research Center, *A Survey of LGBT Americans: Attitudes, Experiences and Values in Changing Times* (June 13, 2013) .................................................................................... 5

Sejal Singh and Laura E. Durso, *Widespread Discrimination Continues to Shape LGBT People's Lives in Both Subtle and Significant Ways*, Center for American Progress (May 2, 2017) ........ 5

## INTRODUCTION

"Our society has come to the recognition that gay persons and gay couples cannot be treated as social outcasts or as inferior in dignity and worth." *Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n*, 138 S. Ct. 1719, 1727 (2018). Earlier this year, the Commonwealth of Virginia acknowledged that principle by adopting the Virginia Values Act—a law that specifically prohibits discrimination based on sexual orientation for the first time in Virginia's history. The Act also declares that all Virginians have a right to be free from discrimination in public accommodations and that no one may be turned away from a public-facing business on account of race, sex, religion, disability, or sexual orientation, among other characteristics.

Anti-discrimination laws like the Virginia Values Act "plainly serve[] compelling state interests of the highest order." *Roberts v. United States Jaycees*, 468 U.S. 609, 624 (1984). And by forbidding certain *conduct*—discrimination based on protected characteristics—without regulating what those in the business world *believe* or *say* about the customers they serve, such laws further those interests without infringing First Amendment rights.

Myriad anti-discrimination laws across the country have been upheld against constitutional challenges, and the Virginia Values Act should be no different. The Virginia General Assembly chose to take affirmative steps to guard against discrimination in the public marketplace, aiming to foster a more inclusive Commonwealth free from the sort of unequal treatment that has long infected public life. And it did so with due regard for the religious convictions of those affected by the law. That choice should be respected, plaintiff's complaint should be dismissed, and the motion for a preliminary injunction should be denied.

JA369

# BACKGROUND

## A.    The Virginia Values Act

1.      Public accommodations laws have "a venerable history" that can be traced back to
the common law. *Hurley v. Irish-American Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S.
557, 571 (1995). In the decades following the Civil War, many States codified access to public
accommodations regardless of race, particularly after the Supreme Court invalidated the federal
prohibition on race discrimination adopted during Reconstruction. See *Roberts v. United States
Jaycees*, 468 U.S. 609, 624 (1984). "[U]ntil the Federal Government reentered the field in 1957,"
State laws "provided the primary means for protecting the civil rights of historically
disadvantaged groups." *Id.* Even after Congress passed federal anti-discrimination laws, States
remained at the forefront of the fight against unequal treatment based on immutable
characteristics. By 1996, "most States ha[d] chosen to counter discrimination by enacting
detailed statutory schemes." *Romer v. Evans*, 517 U.S. 620, 628 (1996).

Today, these state laws complement anti-discrimination protections that have been
enacted at the federal level. Federal statutes—including the Civil Rights Act of 1964, the Age
Discrimination in Employment Act, the Americans with Disabilities Act, and Title IX of the
Education Amendments of 1972—prohibit discrimination in different aspects of society such as
employment (*e.g.*, 42 U.S.C. § 2000e-2), public accommodations (*e.g.*, 42 U.S.C. § 12182),
education (see 20 U.S.C. § 1681), and housing (see 42 U.S.C. § 3604).

2.      Virginia's primary anti-discrimination statute—the Virginia Human Rights Act,
Va. Code Ann. § 2.2-3900 *et seq.*—dates back to 1987. That year, the General Assembly
declared that "[i]t is the policy of the Commonwealth . . . [t]o safeguard all individuals within the
Commonwealth from unlawful discrimination because of race, color, religion, national origin,
sex, age, marital status or disability." 1987 Va. Acts 938.

JA370

Earlier this year, the General Assembly significantly expanded the anti-discrimination protections available under Virginia law by adopting the Virginia Values Act. See 2020 Va. Acts ch. 1140. The bill passed with bipartisan support, making Virginia the first southern State to adopt comprehensive legal protections against discrimination for the LGBTQ community.

As relevant here, the Virginia Values Act added a new section expressly prohibiting discrimination in public accommodations, including on the basis of sexual orientation. Specifically, as of July 1, 2020, it is "an unlawful discriminatory practice for any person . . . to refuse, withhold from, or deny any individual . . . any of the accommodations, advantages, facilities, services, or privileges made available in any place of public accommodation . . . on the basis of race, color, religion, national origin, sex, pregnancy, childbirth or related medical conditions, age, sexual orientation, gender identity, marital status, disability, or status as a veteran." Va. Code Ann. § 2.2-3904(B). The statute defines "[p]lace of public accommodation" to mean "all places or businesses offering or holding out to the general public goods, services, privileges, facilities, advantages, or accommodations." § 2.2-3904(A). The new law also added "sexual orientation" to the list of protected characteristics in the statute's "declaration of policy." § 2.2-3900.

The Virginia Human Rights Act (including the Virginia Values Act) is enforced by the Division of Human Rights in the Office of the Attorney General. See Va. Code Ann. §§ 2.2-520, 2.2-3907. The Division investigates complaints alleging unlawful discrimination, makes determinations about whether there is reasonable cause to believe state or federal laws have been violated, and facilitates conciliation efforts among the parties to resolve disputes. See § 2.2-3907; see also Declaration of Mona Hafeez Siddiqui ¶¶ 4–6 (Siddiqui Decl.) (attached as Exhibit A). A complaint alleging unlawful discrimination may be filed either by individuals "claiming to be

aggrieved" or the Division itself. Va. Code Ann. § 2.2-3907(A). Once a complaint is filed, the

Division conducts an investigation and prepares a report on the reasonable cause determination.

§ 2.2-3907(D). The parties may also agree to participate in mediation. § 2.2-3907(C).

Separate from the administrative enforcement process, the Attorney General may

"commence a civil action" to seek "appropriate relief" in cases involving a "pattern or practice"

of discrimination or "an issue of general public importance." Va. Code Ann. § 2.2-3906(A). The

Attorney General may also "intervene" in civil actions brought by private parties alleging

unlawful discrimination where "the case is of general public importance." § 2.2-3908(C).

3.      The General Assembly had ample reasons to include sexual orientation as a

protected characteristic. As many courts have noted, anti-LGBTQ discrimination has long been a

feature of American society. See, *e.g.*, *Baskin v. Bogan*, 766 F.3d 648, 658 (7th Cir. 2014)

("[H]omosexuals are among the most stigmatized, misunderstood, and discriminated-against

minorities in the history of the world."); *Windsor v. United States*, 699 F.3d 169, 182 (2d Cir.

2012), aff'd, 570 U.S. 744 (2013) ("It is easy to conclude that homosexuals have suffered a

history of discrimination.").

Despite progress in recent decades, this discrimination persists. In 2016, a national survey

showed that 1 in 4 LGBT people had experienced discrimination because of their sexual

orientation or gender identity within the prior year, and that 68.5% of those who had experienced

discrimination reported that it had "at least somewhat negatively affected their psychological

well-being."[1] Data specific to public accommodations show similar trends: In 2013, 23% of

---

[1] Sejal Singh and Laura E. Durso, *Widespread Discrimination Continues to Shape LGBT People's Lives in Both Subtle and Significant Ways*, Center for American Progress (May 2, 2017), https://www.americanprogress.org/issues/lgbtq-rights/news/2017/05/02/429529/ widespread-discrimination-continues-shape-lgbt-peoples-lives-subtle-significant-ways/.

JA372

LGBT adults reported that they "received poor service in a restaurant, hotel or other places of business" because of their sexual orientation or gender identity.[2]

Virginia's record is no better. Although the Commonwealth has more than 300,000 LGBT residents,[3] an analysis from January 2020—before the Virginia Values Act was enacted—concluded that Virginia ranked 24th in the nation in terms of "[s]ocial acceptance of LGB people" and that "historical anti-LGBT laws likely have lingering negative effects on the social climate for LGBT people."[4] A study from 2014 that examined the prevalence of discrimination in housing in Richmond showed that opposite-sex couples were treated more favorably than same-sex couples 44% of the time.[5]

The Virginia Values Act was born out of the General Assembly's recognition of this persistent and unremitting discrimination. One of the sponsors of the bill, Senator Adam Ebbin, explained that the legislation was "needed" and "urgent" because "discrimination is still happening in Virginia."[6] Upon signing the new law, the Governor remarked that "LGBTQ

---

[2] Pew Research Center, *A Survey of LGBT Americans: Attitudes, Experiences and Values in Changing Times* at 42 (June 13, 2013), https://www.pewsocialtrends.org/2013/06/13/a-survey-of-lgbt-americans/.

[3] Kerith J. Conron and Shoshana K. Goldberg, *LGBT People in the US Not Protected by State Non-Discrimination Statutes* at 4, Williams Institute, UCLA School of Law (Apr. 2020), https://williamsinstitute.law.ucla.edu/wp-content/uploads/LGBT-ND-Protections-Update-Apr-2020.pdf.

[4] Christy Mallory, Taylor N.T. Brown & Brad Sears, *The Impact of Stigma and Discrimination Against LGBT People in Virginia* at 2, 12, Williams Institute, UCLA School of Law (Jan. 2020), http://williamsinstitute.law.ucla.edu/wp-content/uploads/Impact-LGBT-Discrimination-VA-Jan-2020.pdf.

[5] Housing Opportunities Made Equal of Virginia, Inc., *A Study of Housing Discrimination Against Same-Sex Couples in Virginia* (Nov. 16, 2015), https://homeofva.org/wp-content/uploads/2019/01/HousingDiscriminationAgainstSameSexCouplesinVA.pdf.

[6] Justin Mattingly, *'Virginia is for all Lovers': House and Senate Pass Legislation to Ban LGBTQ Discrimination*, Richmond Times-Dispatch (Feb. 6, 2020), https://richmond.com/news/plus/virginia-is-for-all-lovers-house-and-senate-pass-legislation-to-ban-lgbtq-discrimination/article_71712074-184d-524a-895f-e6e03fff7350.html.

JA373

Virginians" would no longer "have to fear being fired, evicted, or denied service in public places because of who they are."[7]

The expanded legal protections for LGBTQ people in the Virginia Values Act are also consistent with public opinion. According to a survey in 2018, 68% of Virginians "support policies that would protect LGBT people from discrimination."[8]

### B.    This Litigation

1.    Plaintiff Robert Updegrove (plaintiff) alleges that he is the sole owner of a "for-profit photography business that offers and provides photography services to the general public on a commission basis." Compl. ¶¶ 6, 8, 18, 19.[9] Through his business, plaintiff "offers several kinds of photography services to the public, including services for religious organizations, corporations, non-profits, and other organizational events," as well as "engagement and wedding photography." ¶¶ 21, 26. To identify business opportunities, plaintiff "solicits and receives inquiries for his photography from the general public through his business website" and also relies on "referrals from clients[] and referrals from his personal and professional network." ¶ 20.

According to plaintiff, he cannot accept requests to "create . . . wedding photography" for same-sex couples, because doing so "would promote activities contrary to his beliefs, express messages contradicting his beliefs, and express messages contradicting messages that [he] wants to and does promote elsewhere." Compl. ¶ 107. Plaintiff likewise alleges that photographing same-sex engagements or weddings would "violate his religious beliefs." ¶ 117.

2.    Plaintiff filed this suit on September 28, 2020. The complaint asserts three claims, all of which allege violations of the First Amendment to the United States Constitution:

---

[7] Office of the Governor, *Governor Northam Signs Virginia Values Act* (Apr. 11, 2020), https://www.governor.virginia.gov/newsroom/all-releases/2020/april/headline-856051-en.html.

[8] Mallory et al., *supra* note 4, at 18.

[9] The business entity is also a plaintiff in this action.

JA374

(a) freedom of speech, association, and press; (b) free exercise of religion; and (c) the establishment clause. Compl. ¶¶ 263–96. As relief, plaintiff seeks a preliminary and permanent injunction against enforcement of the public accommodation law both as applied to him and facially, as well as declarations that the law violates the First Amendment on an as-applied and facial basis. Compl. at 45. Plaintiff also moved for a preliminary injunction, asking the Court to enjoin defendants from enforcing the public accommodation law against plaintiff in any way that would (among other things): (a) require "offer[ing] or provid[ing] . . . wedding photography services . . . for same-sex weddings or engagements," and (b) prevent plaintiff "from asking prospective clients whether they seek photography services celebrating a same-sex wedding or engagement." Dkt. 2 at 2; see also Dkt. 6 (supporting memorandum) (Mem.).

The parties agreed that the preliminary injunction motion could be heard simultaneously with defendants' motion to dismiss, and the Court set a combined briefing schedule. See Dkt. 19.

## LEGAL STANDARDS

"Under Rule 12(b)(1), a court must dismiss an action if finds subject-matter jurisdiction lacking." *Warfaa v. Ali*, 33 F. Supp. 3d 653, 658 (E.D. Va. 2014). As the party "seek[ing] to invoke the court's authority," plaintiff bears "[t]he burden of establishing the existence of subject matter jurisdiction." *Allen v. College of William & Mary*, 245 F. Supp. 2d 777, 782 (E.D. Va. 2003). Where "a defendant challenges subject matter jurisdiction via a Rule 12(b)(1) motion to dismiss," the court "may consider evidence outside the pleadings." *In re KBR, Inc., Burn Pit Litig.*, 744 F.3d 326, 333 (4th Cir. 2014).

Defendants' argument that the claims in the complaint fail as a matter of law is governed by Rule 12(b)(6). Under that rule, a complaint should be dismissed if it "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief

that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Although the court "must accept as true" all "well-pleaded factual allegations" in the complaint, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678–79.

This combined memorandum also opposes plaintiff's motion for a preliminary injunction. See Dkt. 2. "A preliminary injunction is an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Dewhurst v. Century Aluminum Co.*, 649 F.3d 287, 290 (4th Cir. 2011). To obtain a preliminary injunction, a party "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.*

## ARGUMENT

Plaintiff's complaint should be dismissed—and the preliminary injunction denied—for several independent reasons. This Court lacks subject matter jurisdiction because plaintiff's pre-enforcement challenge does not satisfy Article III's case or controversy requirement. See Part I, *infra*. In the alternative, the complaint should be dismissed under Rule 12(b)(6) because it fails to allege infringement on the rights to free speech or freedom of religion and the Act would survive strict scrutiny in any event. See Parts II–IV, *infra*. And even if the Court does not dismiss the complaint, it should deny the motion for a preliminary injunction because plaintiff has failed to satisfy any of the four requirements for obtaining that "extraordinary remedy." *Dewhurst*, 649 F.3d at 290. See Part V, *infra*.

**I.     This Court lacks jurisdiction over plaintiff's pre-enforcement challenge to the Virginia Values Act**

Under Article III, federal court jurisdiction is limited to "Cases" and "Controversies."

U.S. Const. art. III, § 2. Whether viewed through the lens of standing or ripeness, that "bedrock" jurisdictional requirement is not met here. *Raines v. Byrd*, 521 U.S. 811, 818 (1997).

1.      The doctrines of standing and ripeness are closely related, both "originat[ing] in Article III's 'case' or 'controversy' language." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006). Whereas standing "limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong," *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016), ripeness is designed "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies." *National Park Hosp. Ass'n v. Department of Interior*, 538 U.S. 803, 807 (2003). Carefully scrutinizing the nature and timing of a plaintiff's alleged injury in this way ensures that federal courts are "confine[d] . . . to a properly judicial role." *Spokeo*, 136 S. Ct. at 1547; see also *National Park Hosp. Ass'n*, 538 U.S. at 808 ("The ripeness doctrine is drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction.").

Where a plaintiff seeks to invalidate a duly enacted law before the law has actually been enforced, the standing and ripeness requirements "boil down to the same question." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 n.5 (2014) (*SBA List*); see also *Miller v. City of Wickliffe, Ohio*, 852 F.3d 497, 506 (6th Cir. 2017) ("In the pre-enforcement First Amendment context, the line between Article III standing and ripeness has evaporated."). Specifically, to satisfy Article III, the plaintiff must show "a credible threat of prosecution" under the challenged law that makes "threatened enforcement sufficiently imminent." *SBA List*, 573 U.S. at 159. Absent such a showing, a pre-enforcement challenge is not justiciable and must be dismissed. *Id.*

2.      a.      Plaintiff has failed to carry his burden of establishing a constitutionally cognizable injury. See *SBA List*, 573 U.S. at 158 (burden is on "[t]he party invoking federal

JA377

jurisdiction" to establish it). "The most obvious way to demonstrate a credible threat of enforcement in the future" is to establish that there has been "an enforcement action in the past," *Abbott v. Pastides*, 900 F.3d 160, 176 (4th Cir. 2018), but plaintiff attempts no such showing here: Nowhere in either the complaint or his preliminary injunction filings does plaintiff contend that he has been sued by the Attorney General or faced any administrative charges of discrimination under the Virginia Values Act.

That silence is telling, and there is a good reason for it. The Virginia Values Act has only been effective since July 1 of this year and, as of the date of this filing, the public accommodation provision has not yet been enforced against *anyone*—much less plaintiff. See Siddiqui Decl. ¶ 11. Indeed, in the fewer than six months that the new law has been on the books, no complaints alleging sexual orientation discrimination have been filed. *Id.* ¶ 9. Plaintiff therefore cannot offer any "evidence of the law having been enforced as [he] fear[s]." *Maryland Shall Issue, Inc. v. Hogan*, 971 F.3d 199, 218 (4th Cir. 2020). Nor can plaintiff show an imminent threat of enforcement by analogizing to historical patterns of anti-discrimination enforcement because, before the Virginia Values Act was adopted, state law did not prohibit discrimination based on sexual orientation. See Siddiqui Decl. ¶ 8.

b.    Without any relevant prior enforcement action—whether for sexual-orientation-based discrimination or any other form—plaintiff must look elsewhere to establish an injury that satisfies Article III. But the complaint comes up short there as well. Plaintiff does not assert that he has ever actually been approached by potential clients about photographing a same-sex wedding or that he has refused service to any LGBTQ individuals—either before or after the Virginia Values Act took effect. Nor does plaintiff assert that the Division (or the Office of the Attorney General more broadly) has "threatened prosecution for the supposedly proscribed

JA378

conduct," or even suggested that any enforcement action against plaintiff may be imminent. *Maryland Shall Issue*, 971 F.3d at 218. On these facts, any "threat of future enforcement" is too "speculative" and "conjectural" to allow plaintiff's pre-enforcement challenge to proceed. *Kenny v. Wilson*, 885 F.3d 280, 288 (4th Cir. 2018).[10]

3.    Courts facing similar challenges have recognized that Article III's case or controversy requirement cannot be satisfied absent a concrete threat of enforcement. The Sixth Circuit, for example, rejected as non-justiciable a challenge to an Ohio city's ordinance where the law "ha[d] not yet been applied to [the plaintiffs]." *Miller*, 852 F.3d at 503. The claimed injury, the court explained, was "conjectural and hypothetical, rather than concrete and particularized" and "[a]ny decision" about how the law might apply to plaintiff "would be advisory." *Id.* By contrast, the Eighth Circuit allowed a challenge to Minnesota's anti-discrimination law to proceed, but only after pointing out that the State had "employed 'testers' to target noncompliant businesses" and "already pursued a successful enforcement action against a wedding vendor who refused to rent a venue for a same-sex wedding." *Telescope Media Grp. v. Lucero*, 936 F.3d 740, 750 (8th Cir. 2019). Because neither step has been taken in the fewer than six months that the Virginia Values Act has been in effect, the Eighth Circuit's decision underscores why plaintiff's complaint falls short of establishing Article III jurisdiction.

4.    The fact that plaintiff's current challenge is not justiciable will not leave him without a remedy should one become necessary. Plaintiff would, of course, be free to raise a First Amendment defense in response to any civil suit or administrative charge that could be filed in the future. And even before that, plaintiff could seek affirmative relief if and when the

---

[10] The public statement and *amici curiae* briefs on which plaintiff relies say nothing about how this statute will be enforced. See Compl. ¶¶ 181–82. These generalized statements—mostly involving out-of-State conduct and other States' laws—cannot show that "threatened enforcement" is "sufficiently imminent" to satisfy Article III. *SBA List*, 573 U.S. at 159.

JA379

threat of enforcement becomes sufficiently credible and imminent to satisfy Article III. Waiting

to resolve plaintiff's claims until such a threat materializes—if it ever does—ensures that any

controversy will be "presented in clean-cut and concrete form," *Doe v. Virginia Dep't of State*

*Police*, 713 F.3d 745, 758 (4th Cir. 2013), thereby avoiding the risk of an advisory opinion in a

hypothetical dispute, see *Trustgard Ins. Co. v. Collins*, 942 F.3d 195, 200–01 (4th Cir. 2019).

## II.    Plaintiff's free speech claim fails because the Virginia Values Act regulates what plaintiff does as a participant in commerce, not what he believes or says

For decades, anti-discrimination laws have been adopted and implemented at both the

state and federal levels without running afoul of the constitutional guarantee of free speech. Like

those laws, the Virginia Values Act prohibits specific discriminatory *acts* but has nothing to say

about any particular message or expression. In other words, plaintiff's free speech claim fails on

every level: the Act regulates conduct, not speech; it does not compel plaintiff to engage in

speech with which he disagrees; and it is content neutral.[11]

### A.    The Virginia Values Act regulates conduct, not speech

1.    a.    The Supreme Court has long recognized that it is "well within the State's

usual power" to adopt laws protecting its residents from discrimination and that these laws "do

not, as a general matter, violate the First . . . Amendment[]." *Hurley v. Irish-American Gay,*

*Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 572 (1995); see also *Romer v. Evans*, 517 U.S.

620, 628 (1996) (noting that "state and municipal laws" developed into an "emerging tradition of

statutory protection" against discrimination). Prohibiting "the *act* of discriminating against

individuals in the provision of publicly available goods, privileges, and services" does not "target

---

[11] See also *State v. Arlene's Flowers, Inc.*, 193 Wash. 2d 469, 514 (2019) (rejecting argument that design and sale of custom floral arrangements is expressive conduct requiring exemption from public accommodation law), pet. for cert. filed, No. 19-333 (U.S. Sept. 12, 2019); *Elane Photography, LLC v. Willock*, 309 P.3d 53, 71 (N.M. 2013) ("[T]he First Amendment does not exempt creative or expressive businesses from antidiscrimination laws.").

JA380

speech . . . on the basis of its content." *Hurley*, 515 U.S. at 572 (emphasis added). For this reason, "[i]t is unexceptional" that state law may "protect . . . classes of individuals[] in acquiring whatever products and services they choose on the same terms and conditions as are offered to other members of the public." *Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n*, 138 S. Ct. 1719, 1728 (2018).

The public accommodation provision of the Virginia Values Act does just that. As relevant here, the Act makes it unlawful to "refuse" or "deny" services that are otherwise open to the public based on certain protected characteristics, including race, religion, national origin, sex, pregnancy, sexual orientation, gender identity, disability, or status as a veteran. Va. Code Ann. § 2.2-3904(B). Just as Title VII of the Civil Rights Act of 1964 prohibits firing an employee "because of such individual's race, color, religion, sex, or national origin," 42 U.S.C. § 2000e-2(a)(1), the Virginia Values Act also governs behavior—here, by prohibiting the refusal to provide services because of certain trait. See *Hishon v. King & Spalding*, 467 U.S. 69, 78 (1984) (rejecting argument that Title VII infringes employers' First Amendment rights). Like Title VII, then, the Virginia Values Act "affects what [certain businesses] must *do* . . . not what they may or may not *say*," and therefore "regulates conduct, not speech." *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 60 (2006) (*FAIR*); accord *Wisconsin v. Mitchell*, 508 U.S. 476, 487 (1993) (noting that "federal and state antidiscrimination laws" have been "previously upheld against constitutional challenge" under the First Amendment).

b.    In compelled-speech challenges, this distinction between conduct and speech is critical. In upholding a law requiring equal treatment of military recruiters on law school campuses, the Supreme Court emphasized that any impact on speech was "plainly incidental to [a law]'s regulation of conduct." *FAIR*, 547 U.S. at 62. The fact that some regulated conduct may

JA381

be "carried out by means of language, either spoken, written, or printed," the Court explained, "has never been deemed an abridgement of freedom of speech." *Id.* "[M]ak[ing] a course of conduct illegal"—even where the prohibited conduct might involve some "incidental" speech—"is simply not the same" as, for example, "forcing a student to pledge allegiance." *Id*; accord *Giboney v. Empire Storage & Ice Co*., 336 U.S. 490, 502 (1949) ("[I]t has never been deemed an abridgement of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed.").

2.    Plaintiff fails entirely to grapple with the conduct/speech distinction, focusing instead on the fact that some courts have recognized photography as a form of protected speech. See Mem. 9–11. But even assuming that to be true, the fact remains that the Virginia Values Act does not dictate the images plaintiff creates or displays. Rather, the Act provides only that plaintiff must offer his services as a photographer to all Virginians on an equal basis and may not discriminate based on protected characteristics. "While photography may be expressive, the operation of a photography business is not," and the latter may be subject to anti-discrimination laws. *Elane Photography*, 309 P.3d at 68; see also *Roberts v. United States Jaycees*, 468 U.S. 609, 634 (1984) (O'Connor, J., concurring) ("The Constitution does not guarantee a right to choose . . . customers . . . in simple commercial transactions, without restraint from the State."). Accordingly, as in *FAIR*, the equal-access requirement in the Virginia Values Act does not offend the First Amendment even if its conduct-focused provisions have some "incidental" impact on speech. *FAIR*, 547 U.S. at 62.

**B.    The Act is constitutional because there is no reasonable likelihood that the public will associate any disputed "message" with plaintiff**

Even if the Virginia Values Act were properly understood as regulating speech rather

14

than conduct, it would still pass constitutional muster.

1.    As the Supreme Court has recognized, compelled speech challenges fail where there is no reasonable likelihood that the public will associate the disputed "message" with the speaker. *FAIR*, 547 U.S. at 65. In *FAIR*, a group of law schools claimed that a federal law requiring them to host military recruiters impermissibly compelled them to associate with the military's then-existing discriminatory policies toward gay and lesbian service members. *Id.* But "[n]othing about recruiting," the Court explained, "suggest[ed] that law schools agree with any speech by recruiters." *Id.* The Court observed that even high school students "can appreciate the difference between speech a school sponsors and speech the school permits because legally required to do so, pursuant to an equal access policy." *Id.* The same would be true of those seeing military recruiters on campus because "[s]urely students have not lost that ability by the time they get to law school." *Id.* For that reason, the Court held, "accommodating the military's message does not affect the law schools' speech." *Id.* at 64.

The Supreme Court's reasoning in *FAIR* applies in full force here. For one thing, plaintiff's claim rests on the dubious proposition that photographs of a same-sex wedding make a political statement, rather than simply celebrating a marriage between two people. But see *Masterpiece Cakeshop*, 138 S. Ct. at 1750 (Ginsburg, J., dissenting) ("When a couple contacts a bakery for a wedding cake, the product they are seeking is a cake celebrating *their* wedding—not a cake celebrating heterosexual weddings or same-sex weddings."). Even leaving that aside, as the photographs in plaintiff's brief show, *it is the couple and their guests* who are celebrating, not the photographer. The fact that plaintiff may maintain "editorial control" and make decisions to "tell a cohesive story about the love, intimacy, and sacrifice of marriage" (Mem. 14) does not somehow transform the couple's story into his own. What may be associated with the

JA383

photographer is the quality of the photographs, not the character or piety of the subjects, or the legality or propriety of their marriages. Accordingly, plaintiff's compelled speech challenge fails because, to the extent he is "forced to accommodate" any speech at all, his "own message [is not] affected." *FAIR*, 547 U.S. at 63.

2.     Plaintiff's contrary argument relies heavily on *Hurley v. Irish-American Gay, Lesbian and Bisexual Grp. of Boston*, 515 U.S. 557 (1995), where the Supreme Court held that application of a public accommodation law to require a parade sponsor to include a gay, lesbian, and bisexual group was impermissible compelled speech. That case is inapposite.

a.     In *Hurley*, the Court emphasized that "[p]arades are . . . a form of expression," citing "the inherent expressiveness of marching to make a point." *Hurley*, 515 U.S. at 568. In addition, the group attempting to participate "was formed for the very purpose of marching . . . to celebrate its members' identity as openly gay, lesbian, and bisexual descendants of the Irish immigrants, to show that there are such individuals in the community, and to support the like men and women who sought to march in the New York parade." *Id.* at 570. "[O]nce the expressive character of both the parade and the marching . . . contingent is understood," the Court explained, "it becomes apparent that the state courts' application of the statute had the effect of declaring the sponsors' speech *itself* to be the public accommodation." *Id.* at 573 (emphasis added). It was that aspect of the State's application of the public accommodation law that "violate[d] the fundamental rule of protection under the First Amendment, that a speaker has the autonomy to choose the content of his own message." *Id.*

b.     The features of *Hurley* that drove the Court's conclusion are not present here. Even if a photograph *itself* may constitute speech, plaintiff is in the business of earning money by photographing other people's events for their personal use—not using photographs to present

JA384

his own messages to the public. That is a far cry from the "inherent expressiveness" of a parade, which is so dependent on "watchers" that it "may as well not have happened" without them. *Hurley*, 515 U.S. at 568; accord *FAIR*, 547 U.S. at 63 ("The expressive nature of a parade was central to our holding in *Hurley*."). Unlike in *Hurley*, therefore, plaintiff's speech *itself* is not the public accommodation—his commercial business is. *Hurley*, 515 U.S. at 573; see also *Elane Photography*, 309 P.3d at 67 ("[Plaintiff]'s choice to offer its services to the public is a business decision, not a decision about its freedom of speech.").[12]

Likewise, the same-sex couples whose marriages plaintiff does not wish to photograph are fundamentally different from the group that wanted to participate in the parade in *Hurley*. As the Supreme Court explained in *Hurley*, the group's "participation as a unit in the parade" was as "expressive" as the parade itself. 515 U.S. at 570. By contrast, a couple getting married is celebrating their *wedding*, not making a statement about the virtues, legality, or politics of same-sex marriage. Because neither of the points on which the Court relied in *Hurley* exists in this case, the Court's conclusion that application of the public accommodation law violated the First Amendment does not apply.

### C.    The Act does not target speech based on content or viewpoint

Plaintiff's assertion (Mem. 21) that the Virginia Values Act unconstitutionally "restricts" speech based on content and viewpoint largely repeats his argument that the Act impermissibly compels speech. And, like plaintiff's previous argument, this one lacks merit.

1.    As already explained, plaintiff's claims fail at the threshold because the law

---

[12] For the same reason, plaintiff is equally wrong (Mem. 15, 19) that *Hurley* would preclude application of public accommodation laws to other professionals, such as lawyers, graphic designers, and advertisers engaged in commerce who preferred to discriminate against customers on the basis of sexual orientation or other protected characteristics. Indeed, that point reveals that it is *plaintiff*, not the Commonwealth, who advocates a "dangerous and limitless principle." *Id.*

JA385

regulates conduct, not speech. The Supreme Court has consistently held that any incidental regulation of speech flowing from constitutional regulation of conduct is likewise constitutional. See *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011) ("[T]he First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech."). Moreover, there is no debate that "[t]he government may ban . . . commercial speech related to illegal activity." *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of New York*, 447 U.S. 557, 563–64 (1980). Indeed, the Supreme Court has emphasized that "[a]ny First Amendment interest . . . is altogether absent when the commercial activity itself is illegal and the restriction on advertising is incidental to a valid limitation on economic activity." *Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*, 413 U.S. 376, 389 (1973).

This precedent squarely defeats not only plaintiff's challenge to the requirement that he offer his photography services on an equal basis to same-sex couples (the so-called "Accommodations Clause"), but also his challenge to the Act's "Publication Clause." See Mem. 21–22 (explaining that plaintiff wishes to distribute an "editorial policy" and "statement" describing his religious and artistic reasons for declining to photograph same-sex weddings); see also Compl. Ex. 1 & 2. The fact that a law prohibiting discrimination in employment "will require an employer to take down a sign reading 'White Applicants Only' hardly means that the law should be analyzed as one regulating the employer's speech rather than conduct." *FAIR*, 547 U.S. at 62; see also *Sorrell*, 564 U.S. at 567 (noting that "an ordinance against outdoor fires might forbid burning a flag," and "antitrust laws can prohibit agreements in restraint of trade"). Just as employment discrimination laws may constitutionally prohibit an employer from announcing its intent to make hiring decisions based on an applicant's race, so too may a public accommodation law prohibit a vendor from announcing its intent to withhold goods or services

JA386

based on a customer's sexual orientation. Any incidental burden on speech in connection with regulation of that unlawful conduct does not infringe constitutional rights. See *303 Creative LLC v. Elenis*, 385 F. Supp. 3d 1147, 1159 (D. Colo. 2019) (public accommodation law may prohibit "specific promise to engage in unlawful discrimination against customers based on their sexual orientation" without "run[ning] afoul of the Free Speech clause of the First Amendment"), appeal filed, No. 19-1413 (10th Cir.).

2.     Once again, however, plaintiff's argument fails even leaving the conduct/speech distinction aside. "Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). A content-based law "'on its face' draws distinctions based on the message a speaker conveys," *id.*, or is designed to suppress speech "because of disagreement with the message it conveys," *Sorrell*, 564 U.S. at 566 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)). A law is content neutral, by contrast, if it "serves purposes unrelated to the content of expression . . . even if it has an incidental effect on some speakers or messages but not others." *Ward*, 491 U.S. at 791. Put differently, "[g]overnment regulation of expressive activity is content neutral so long as it is justified without reference to the content of the regulated speech." *Id.* (quotation marks and emphasis omitted).

The Virginia Values Act falls into the latter category. Indeed, the Supreme Court has *already rejected* the notion that public accommodation laws discriminate on the basis of viewpoint. In *Roberts v. United States Jaycees*, 468 U.S. 609 (1984) (*Jaycees*), the Court rejected a constitutional challenge to a state law that prohibited "deny[ing] any person the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of a place of public accommodation because of race, color, creed, religion, disability, national origin

or sex." *Id.* at 615. "On its face," the Court held, "the . . . Act does not aim at the suppression of speech, does not distinguish between prohibited and permitted activity on the basis of viewpoint, and does not license enforcement authorities to administer the statute on the basis of such constitutionally impermissible criteria." *Id.* at 623.

Plaintiff offers no basis for ignoring the Supreme Court's clear statement in *Jaycees*. Like the law at issue in that case, the Virginia Values Act neither targets speech nor defines what is prohibited or authorizes enforcement on the basis of viewpoint. Moreover, as described *supra* at 4–6, the General Assembly's motivation in passing the Act was to eliminate discrimination, not to "suppress[] . . . expression." *Jaycees*, 468 U.S. at 624.[13]

Although *Hurley* held that a "peculiar" *application* of a content-neutral public accommodation law unconstitutionally burdened speech, see 515 U.S. at 572, the facts of this case are distinguishable for the reasons already explained. Specifically, requiring plaintiff to photograph same-sex couples does not compel him to adopt anyone's message as his own, much less to "create photographs for those seeking to promote only one view—celebrating same-sex engagements or weddings." Mem. 21. As noted above, photographs of same-sex weddings celebrate the couple being married, not the notion of same-sex marriage. Plaintiff's analogy to *Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241 (1974), also fails. "That a law regulating the *content* of a *newspaper* was deemed a content-based regulation of speech has no bearing on whether a law regulating *discrimination* in places of *public accommodation* also so qualifies." *Telescope Media Grp. v. Lucero*, 936 F.3d 740, 773 (8th Cir. 2019) (Kelly, J., dissenting); see

---

[13] Contrary to plaintiff's contention (Mem. 21–22), the Publication Clause does not "facially" restrict speech based on content or viewpoint. If a law prohibiting discrimination on the basis of protected characteristics "[o]n its face . . . does not distinguish between prohibited and permitted activity on the basis of viewpoint," *Jaycees*, 468 U.S. at 623, the same must be said of a law that prohibits public statements promising to engage in precisely the same discrimination.

JA388

also *Elane Photography*, 309 P.3d at 67 (distinguishing *Tornillo* from application of public accommodation law to wedding photographer and noting that "[t]he government has not interfered with Elane Photography's editorial judgment; the only choice regulated is Elane Photography's choice of clients").

## III. Prohibiting discrimination in public accommodations does not violate plaintiff's right to religious freedom

Plaintiff also fails to state a valid religious liberty claim under the First Amendment.

### A. The Virginia Values Act is a neutral law of general applicability

Supreme Court precedent has long made clear that the right to free exercise of religion "does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability." *Employment Div., Dep't of Human Res. of Oregon v. Smith*, 494 U.S. 872, 879 (1990). For that reason, "a law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993). A law is "neutral" so long as its "object" is not "to infringe upon or restrict practices because of their religious motivation." *Id.* at 533. And a law is generally applicable so long as it does not "impose burdens only on conduct motivated by religious belief" in a "selective manner." *Id.* at 543.

1. Anti-discrimination laws are precisely the type of neutral, generally applicable laws that withstand First Amendment scrutiny under *Smith*. As the Supreme Court recently explained, "it is a general rule that [religious and philosophical] objections do not allow business owners and other actors in the economy and in society to deny protected persons equal access to goods and services under a neutral and generally applicable public accommodations law." *Masterpiece Cakeshop*, 138 S. Ct. at 1727; see also *United States v. Lee*, 455 U.S. 252, 261

JA389

(1982) ("When followers of a particular sect enter into commercial activity as a matter of choice, the limits they accept on their own conduct as a matter of conscience and faith are not to be superimposed on the statutory schemes which are binding on others in that activity."). The Court has likewise rejected free-exercise objections to federal laws prohibiting discrimination in public accommodations, describing those challenges as "patently frivolous." *Newman v. Piggie Park Enterprises, Inc.*, 390 U.S. 400, 403 n.5 (1968).

2.      The Virginia Values Act is a neutral law of general applicability. Nothing about Virginia's law targets religion or religious activities in any way. To the contrary, both the public accommodation and employment provisions specifically protect *against* discrimination based on religion. See Va. Code Ann. §§ 2.2-3904(B), 2.2-3905(B), and there are no exceptions that suggest the law selectively burdens only religious conduct.[14] Under *Smith*, that is the end of the matter. See *Arlene's Flowers*, 193 Wash. 2d at 523; *Elane Photography*, 309 P.3d at 73.

**B.      The "hybrid rights" doctrine has not been recognized in this Circuit**

Attempting to avoid this clear outcome under *Smith*, plaintiff insists that the religious freedom claim combined with the free speech claim trigger strict scrutiny under the so-called "hybrid-rights doctrine." Mem. 25–26. As plaintiff acknowledges, however, the Fourth Circuit has never recognized this doctrine or applied strict scrutiny in these circumstances. See *Workman v. Mingo Cty. Bd. of Educ.*, 419 Fed. Appx. 348, 353 (4th Cir. 2011) (observing that "there is a circuit split over the validity of this 'hybrid-rights' exception" and declining "to decide this issue here"). And the language from *Smith* on which plaintiff's hybrid rights theory relies is dicta and has not been applied by the Supreme Court since *Smith* was decided in 1990. See *Combs v.*

---

[14] Of the three exceptions to which plaintiff points (see Mem. 27–28), only one is found in the public accommodation law. And even that exception—which allows for differential treatment of those younger than 18 and assistance for those over 50, see Va. Code Ann. § 2.2-3904(D)—has nothing to do with religious beliefs or equal treatment based on sexual orientation.

JA390

*Homer-Ctr. Sch. Dist.*, 540 F.3d 231, 246–47 (3d Cir. 2008) (describing circuit split and controversy over hybrid-rights theory). In any event, even if the hybrid rights doctrine had been recognized, it would not apply here because (as discussed in Part II, *supra*) plaintiff has failed to allege a viable free-speech claim. Cf. *Christ Coll., Inc. v. Board of Sup'rs, Fairfax Cty.*, 944 F.2d 901 (Table), 1991 WL 179102, *4 (4th Cir. 1991) (declining to "decide whether appellants' claim is indeed a hybrid" where no burden on religion had been established).[15]

## IV.    The Virginia Values Act satisfies strict scrutiny

For the reasons just explained, plaintiff is wrong that the Virginia Values Act is subject to strict scrutiny. See Parts II & III, *supra*. But even if strict scrutiny applied, the Act would satisfy that standard because it furthers the "compelling state interest" in combatting discrimination and "is narrowly drawn to achieve that end." *Burson v. Freeman*, 504 U.S. 191, 198 (1992).[16]

1.    Plaintiff does not seriously dispute that the public accommodation law promotes a compelling government interest. Nor could he. The Supreme Court has squarely held that a State's interest in "eliminating discrimination and assuring its citizens equal access to publicly available goods and services . . . serves compelling state interests of the highest order." *Jaycees*, 468 U.S. at 624; see also *Board of Directors of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537, 549 (1987) ("[P]ublic accommodations laws plainly serv[e] compelling state interests of the highest order." (internal quotation marks and citation omitted)). Because "acts of invidious discrimination in the distribution of publicly available goods, services, and other advantages" can "cause unique evils" in our society, the government "has a compelling interest to prevent" these

---

[15] The few courts that have adopted plaintiff's theory have required a heightened showing as to the independent constitutional claim. See, *e.g.*, *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1295 (10th Cir. 2004) ("We . . . will only apply the hybrid-rights exception to *Smith* where the plaintiff establishes a fair probability, or a likelihood, of success on the companion claim.").

[16] The handful of out-of-circuit decisions on which plaintiff relies that reach a different conclusion are not binding on this Court.

JA391

harms. *Jaycees*, 468 U.S. at 628; see also *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel. Barez*, 458 U.S. 592, 609 (1982) (recognizing, in *parens patriae* context, "state interest in securing residents from the harmful effects of discrimination").

That public interest is no less compelling when it comes to discrimination based on sexual orientation. As the Supreme Court recently reiterated, our laws "can, and in some instances must, protect" LGBTQ individuals "in the exercise of their civil rights . . . on terms equal to others." *Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n*, 138 S. Ct. 1719, 1727 (2018). Plaintiff's argument (Mem. 27) that "Virginia cannot identify an 'actual problem' that justifies" prohibiting unequal treatment based sexual orientation disregards the well documented history of discrimination against same-sex couples, and LGBTQ individuals more broadly. See *Obergefell v. Hodges*, 576 U.S. 644, 675 (2015) (noting "long history of disapproval of [same-sex couples'] relationships" that "works a grave and continuing harm"); see also *Lawrence v. Texas*, 539 U.S. 558, 571 (2003) ("[F]or centuries there have been powerful voices to condemn homosexual conduct as immoral."); *supra* at 4–6.

2.      The public accommodation law is also narrowly tailored to serve that indisputably compelling public interest. See *Jaycees*, 468 U.S. at 628 (finding that any "incidental abridgement of . . . protected speech" was "no greater than . . . necessary to accomplish the State's legitimate purposes" of combatting discrimination). Although plaintiff insists that "Virginia has many better options" (Mem. 28) to narrowly tailor the public accommodation law, his argument ignores the goal at the heart of the anti-discrimination project: equality. "[C]arv[ing] out a patchwork of exceptions for ostensibly justified discrimination"—such as the wedding industry, as plaintiff suggests—would "fatally undermine[]" the compelling interest that justifies the law in the first place. *Arlene's Flowers*, 193 Wash. 2d at 531; see also *State by*

JA392

*McClure v. Sports & Health Club, Inc.*, 370 N.W.2d 844, 853 (Minn. 1985) (noting that "state's overriding interest" in prohibiting discrimination "permits of no exemption"); *supra* at 4–6. Indeed, plaintiff's proposals—eliminating the Publication Clause; allowing exemptions for "bona fide relationship[s]"; exempting individuals, small businesses, and "highly selective" entities; or limiting the law to "essential" services like "restaurants, hotels, and stadiums" (Mem. 28–30)— would fundamentally alter the goals of the Virginia Values Act from eliminating discrimination in public life to simply mitigating it. That is not "narrow tailoring"; it is "legislating by judicial fiat." *United States v. Hopkins*, 427 U.S. 123, 125 (1976); accord *Democratic Nat'l Comm. v. Wisconsin State Legislature*, No. 20A66, 592 U.S. __ (2020) (Roberts, C.J., concurring in denial of application to stay) (rejecting "federal [court] intrusion on state lawmaking processes").[17]

By adopting the Virginia Values Act, the people of the Commonwealth sought to ensure that no one would feel the "humiliation, frustration, and embarrassment" that comes from being told you are "unacceptable as a member of the public" because of some aspect of your identity. *Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 292 (1964) (Goldberg, J., concurring). That judgement should be respected, not disregarded.

## V.    Plaintiff is not entitled to a preliminary injunction

To obtain a preliminary injunction, plaintiff must establish: (1) that he is "likely to succeed on the merits," (2) that he is "likely to suffer irreparable harm in the absence of preliminary relief," (3) that "the balance of equities tips in his favor," and (4) that "an injunction

---

[17] Nor is it relevant that plaintiff does not otherwise discriminate against the LGBTQ community. See Mem. 17–18. When approaching a photographer—or any other vendor—in the hopes of procuring their services for a wedding, many same-sex partners are unable to hide their sexual orientation. By contrast, another couple whose marriage plaintiff might not support—such as a couple intending to have an "open relationship[]" (Mem. 4)—need not reveal the aspect of their life plaintiff is likely to denounce. Such unequal treatment based solely on sexual orientation is exactly what the Virginia Values Act is designed to prevent. Accepting plaintiff's argument that he should be permitted to discriminate in the specific context of weddings and engagements would undermine the broad remedial purposes of the Act.

JA393

is in the public interest." *Dewhurst v. Century Aluminum Co.*, 649 F.3d 287, 290 (4th Cir. 2011)

(citing *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).

Plaintiff cannot satisfy that standard. For all of the reasons discussed above, plaintiff has

not established likelihood of success on the merits. See Parts I–IV, *supra*. And the same reasons

why this pre-enforcement challenge is not ripe and plaintiff currently lacks standing to bring it

defeat any notion that plaintiff has shown he is "*likely* to suffer irreparable harm in the absence

of preliminary relief." *Dewhurst*, 649 F.3d at 290 (emphasis added).

Plaintiff has also failed to establish that the balance of equities tips in his favor or that an

injunction is in the public interest. In the Virginia Human Rights Act, the General Assembly

expressly declared that "[i]t is the policy of the Commonwealth to . . . [s]afeguard all individuals

. . . from unlawful discrimination . . . in places of public accommodation." Va. Code Ann. § 2.2-

3900(B)(1). To the extent this Court does not dismiss the complaint, enjoining any part of the

public accommodation law while this litigation proceeds would frustrate public policy as adopted

by the General Assembly and leave at least some Virginians vulnerable to discrimination. For all

of these reasons, should any of plaintiff's claims survive defendants' motion to dismiss, the

Court should deny plaintiff's request for a preliminary injunction.

## CONCLUSION

Defendants' motion to dismiss should be granted, and plaintiff's motion for a

preliminary injunction should be denied.

JA394

Dated: November 16, 2020

Respectfully submitted,

**MARK R. HERRING**
**R. THOMAS PAYNE, II**

By: _____*/s/ Jessica Merry Samuels*_____
Jessica Merry Samuels (VSB No. 89537)
*Assistant Solicitor General*

Mark R. Herring
   *Attorney General*

Erin B. Ashwell (VSB No. 79538)
   *Chief Deputy Attorney General*

Samuel T. Towell (VSB No. 71512)
   *Deputy Attorney General*

Toby J. Heytens (VSB No. 90788)
   *Solicitor General*

Martine E. Cicconi (VSB No. 94542)
Michelle S. Kallen (VSB No. 93286)
   *Deputy Solicitors General*

Office of the Attorney General
202 North Ninth Street
Richmond, Virginia 23219
(804) 786-6835 – Telephone
(804) 371-0200 – Facsimile
solicitorgeneral@oag.state.va.us

JA395

## CERTIFICATE OF SERVICE

I hereby certify that on November 16, 2020, I will electronically file the foregoing with

the Clerk of Court using the CM/ECF system, which will then send a notification of such filing

(NEF) to all counsel who have appeared, including:


Charles Douglas Welty
C. Douglas Welty LLC
2111 Wilson Boulevard
Suite 800
Arlington, VA 22201
cdwelty@weltyblair.com


By:    */s/ Jessica Merry Samuels*
Jessica Merry Samuels
*Assistant Solicitor General*
Office of the Attorney General
202 North Ninth Street
Richmond, Virginia 23219
(804) 786-6835 – Telephone
(804) 371-0200 – Facsimile
solicitorgeneral@oag.state.va.us

JA396

# Exhibit A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

ROBERT UPDEGROVE *et al.*,      )
                                )
                                )
                                )
            Plaintiffs,         )
                                )
      v.                        )      Civil Action No. 1:20-cv-01141-CMH-JFA
                                )
MARK HERRING, *et al.*,         )
                                )
            Defendants.         )

### DECLARATION OF MONA HAFEEZ SIDDIQUI

I, Mona Hafeez Siddiqui, declare as follows:

1.      I am currently employed as an Assistant Attorney General in the Division of Human Rights at the Virginia Office of the Attorney General ("Division"). I have worked in this position since November 2017. Prior to that, I was employed as an Assistant Attorney General in the Education Section of the Virginia Office of the Attorney General from January 2015 to November 2017.

2.      In my current role as Assistant Attorney General, I have direct knowledge of the Division's efforts to enforce state and federal anti-discrimination laws. I am familiar with all complaints that have been submitted to the Division and am able to review those records.

3.      I submit this declaration in support of defendants' motion to dismiss the above-captioned action, as well as defendants' opposition to plaintiffs' motion for a preliminary injunction against the recently enacted Virginia Values Act. I am over the age of 18, competent to offer testimony, and have personal knowledge of the facts set forth in this declaration and/or the supporting information, as stated below.

1

JA398

4.      The Division is primarily responsible for enforcing anti-discrimination laws in Virginia. See Va. Code Ann. § 2.2-520. The Division receives and investigates complaints alleging unlawful discrimination in employment, places of public accommodation, and education institutions in violation of state and/or federal civil rights laws. The complaint process is governed by the Virginia Human Rights Act (Va. Code Ann. § 2.2-3907) and the Act's corresponding administrative regulations (1 Va. Admin. Code § 45-20). The Virginia Human Rights Act is Virginia's primary anti-discrimination statute.

5.      To investigate complaints of discrimination, Division staff review documentation and witness affidavits, interview any parties or witnesses as may be necessary, and conduct on site visits where appropriate. At the conclusion of an investigation, the Division is charged with determining whether there is reasonable cause to believe discrimination occurred. Where reasonable cause is found, the Division attempts to resolve unlawful discriminatory practices through conciliation and/or other informal methods such as conference and negotiation.

6.      Throughout the complaint process, the Division also facilitates mediation efforts to provide the parties the opportunity to resolve a matter privately.

7.      Senate Bill 868, also known as the Virginia Values Act, was adopted by the General Assembly and signed by the Governor earlier this year. The new law took effect on July 1, 2020 and made significant changes to the Virginia Human Rights Act.

8.      Before the Virginia Values Act took effect, the Virginia Human Rights Act did not prohibit discrimination based on sexual orientation or gender identity. The Virginia Values Act created a separate prohibition on discrimination based on sexual orientation and gender identity.

9.      As of the date of this declaration, the Division has not received, filed, or

JA399

investigated any complaints of unlawful discrimination on the basis of sexual orientation or gender identity.

10.    The Virginia Values Act also created a separate state-law prohibition on discrimination in places of public accommodation. See Va. Code Ann. § 2.2-3904.

11.    Since the passage of the Virginia Values Act, the Division has not received, filed, or investigated any complaints of unlawful discrimination in places of public accommodations.

12.    As of the date of this declaration, the Attorney General has not initiated or intervened in any civil actions under the Virginia Human Rights Act.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on November 16, 2020 at Richmond, Virginia.

_____
Mona Hafeez Siddiqui

3

JA400

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| **Robert Updegrove**; and **Loudoun Multi-Images LLC** d/b/a **Bob Updegrove Photography**, | |
| Plaintiffs, | Case No. 1:20-cv-01141-CMH-JFA |
| v. | **Brief in Response to Defendants' Motion to Dismiss** |
| **Mark R. Herring**, in his official capacity as Virginia Attorney General; and **R. Thomas Payne, II**, in his official capacity as Director of Virginia Division of Human Rights and Fair Housing, | |
| Defendants. | |

## TABLE OF CONTENTS

Table of Authorities ........................................................................................... ii

Introduction ....................................................................................................... 1

Argument ........................................................................................................... 2

I.    Bob has standing to challenge Virginia's law because it credibly threatens
      and chills his expressive activities. ......................................................... 3

      A.    Bob faces a credible threat that the law will be enforced against him
            because it facially restricts his desired expression. ........................ 4

      B.    Additional factors bolster Bob's standing, such as Virginia's refusal to
            disavow. ........................................................................................... 10

      C.    Bob need not show a specific enforcement threat or past request for
            objectionable photography for standing. ........................................ 14

      D.    Bob also has standing to challenge the law under the competitor-standing
            doctrine. .......................................................................................... 18

II.   Bob states a plausible claim that Virginia's law compels and restricts his protected
      speech, compels him to participate in religious ceremonies, and regulates a
      hybrid of rights. ...................................................................................... 20

III.  Bob states a plausible First Amendment claim that Virginia's law compels him to
      expressively associate and restricts his expressive association. ............... 21

IV.   Bob states plausible First Amendment claims that Virginia's law infringes on his
      religious exercise. ................................................................................... 24

Conclusion ......................................................................................................... 28

JA402

# TABLE OF AUTHORITIES

## Cases

*Abbott v. Pastides*,
   900 F.3d. 226 (4th Cir. 2013) ..................................................................4, 8, 9

*Accord Lexmark International Inc. v. Static Control Components, Inc.*,
   572 U.S. 118 (2014) ..........................................................................................19

*ACLU v. Johnson*,
   194 F.3d 1149 (10th Cir. 1999) ........................................................................ 9

*ACLU of Illinois v. Alvarez*,
   679 F.3d 583 (7th Cir. 2012) ...........................................................................16

*Adams v. Bain*,
   697 F.2d 1213 (4th Cir. 1982) .........................................................................15

*Adams v. Watson*,
   10 F.3d 915 (1st Cir. 1993) ............................................................................. 16

*American Booksellers Ass'n*,
   484 U.S. 414 (2013) ......................................................................................8, 10

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) .....................................................................................3, 20

*Babbitt v. United Farm Workers National Union*,
   442 U.S. 289 (1979) .....................................................................................5, 17

*Beck v. McDonald*,
   848 F.3d (4th Cir. 2017) ...................................................................................2

*Bell Atlantic Corporation v. Twombly*
   550 U.S. 544 (2007) ........................................................................................20

*Blackhawk v. Pennsylvania*,
   381 F.3d 202 (3rd Cir. 2004) ......................................................................... 25

*Boy Scouts of American v. Dale*,
   530 U.S. 640 (2000) ............................................................................21, 22, 23

*Brown v. Government of D.C.*,
   390 F. Supp.3d 114 (D.D.C. 2019) ................................................................ 20

*Brush & Nib Studio, LLC, et al., v. City of Phoenix*,
   484 P.3d 890 .......................................................................................... 8, 16, 17

*Buchanan v. Fed. Election Commission*,
   112 F. Supp.2d 58 (D.D.C. 2000) ............................................................. 19, 20

*California Democratic Party v. Jones*,
   530 U.S. 567 (2000) ........................................................................................23

JA403

*Cedars-Sinai Medical Center v. Watkins,*
  11 F.3d 1573 (Fed. Cir. 1993) ......................................................................... 63

*Charter v. U.S. Department of Agriculture,*
  412 F.3d 1017 (9th Cir. 2005) ........................................................................23

*Chelsey Nelson Photography LLC v. Louisville/Jefferson County Metro Government,*
  No. 3:19-CV-851-JRW, 2020 WL 4745771 (W.D. Ky. August 14, 2020) .......8, 17

*Chin v. Port Authority of New York and New Jersey,*
  685 F.3d 135 (2d Cir. 2012) ........................................................................6, 19

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah,*
  508 U.S. 520 (1993) ...........................................................................25, 26, 27

*City of Revere v. Massachusetts General Hospital,*
  463 U.S. 239 (1983) .......................................................................................15

*Clapper v. Amnesty International USA,*
  568 U.S. 398 (2013) .......................................................................................16

*Cooksey v. Futrell,*
  721 F.3d 226 (4th Cir. 2013) ............................................................................4

*Department of Commerce v. New York,*
  139 S. Ct. 2551 (2019) ...................................................................................16

*Doe v. Bolton,*
  410 U.S. 179 (1973) ..................................................................................12, 14

*Employment Division, Department of Human Recourses of Oregon v. Smith,*
  494 U.S. 872 (1990) .......................................................................................25

*Fulton v. City of Philadelphia,*
  No. 19-123 2019 WL 3380520 (July 22, 2019) .................................................28

*Fulton v. City of Philadelphia, Pennsylvania.,*
  140 S. Ct. 1104 (2020) ...................................................................................28

*Gibbs v. Buck,*
  307 U.S. 66 (1939) ...........................................................................................3

*Griswold v. Driscoll,*
  616 F.3d 53 (1st Cir. 2010) .......................................................................12, 15

*Harrell v. Florida Bar,*
  608 F.3d. 1241 (11th Cir. 2010)..................................................................11, 12

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC,*
  565 U.S. 171 (2012) .................................................................................27, 28

*International Society for Krishna Consciousness of Atlanta v. Eaves,*
  601 F.2d. 809 (5th Cir. 1979)..........................................................................12

*Jesus Christ is the Answer Ministries, Inc. v. Baltimore City.,*
  915 F.3d 256 (4th Cir. 2019)...........................................................................26

JA404

*Johanns v. Livestock Marketing Association,*
   544 U.S. 550 (2005) ..................................................................................23

*Kenny v. Wilson,*
   885 F.3d. 280 (4th Cir. 2018) ..............................................................4, 5

*Kerns v. United States,*
   585 F.3d.187 (4th Cir. 2009) ....................................................................12

*Lexington Fayette Urban County Human Rights Commission v. Hands on Originals,*
   529 S.W. 3d 291 (Ky. 2019)......................................................................2

*Liberty University Inc. v. Lew,*
   733 F.3d 72 (4th Cir. 2013) ..................................................................9, 18

*Lujan v. Defenders of Wildlife,*
   504 U.S. 555 (1992) ....................................................................................3

*Maryland Shall Issue, Inc. v. Hogan,*
   971 F.3d 199 (4th Cir. 2020) ....................................................................9

*Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Commission,*
   138 S. Ct. 1719 (2018) ...............................................................2, 21, 26, 27

*Masterpiece Cakeshop v. Elinis,*
   445 F. Supp.3d 1266 (D. Colo 2019) .......................................................2

*Matal v. Tam,*
   137 S. Ct. 1744 (2017) .............................................................................21

*McDermott v. Ampersand Pub., LLC,*
   593 F.3d 950 (9th Cir. 2010) ...................................................................23

*MedImmune, Inc. v. Genentech, Inc,*
   549 U.S. 118 (2007) ..............................................................................1, 10

*National Institute of Family & Life Advocates v. Becerra,*
   138 S. Ct 2361 (2018)...............................................................................9

*National Institute of Family & Life Advocates v. Harris,*
   839 F.3d 823 (9th Cir. 2016) ....................................................................9

*Nelson v. Warner,*
   No. CV 3:19-0898, 2020 WL 40024224 (S.D.W. Va. July 15, 2020) ...............20

*North Carolina Right to Life Inc. v. Bartlett,*
   168 F.3d 705 (4th Cir. 1999)..................................................................4, 9

*Miami Herald Publishing Co. v. Tornillo,*
   418 U.S. 241 (1974) ..................................................................................17

*Miller v. City of Wickliffe, Ohio,*
   852 F.3d 497 (2017) ...............................................................................9, 10

*Mobil Oil Corporation v. Attorney General of Virginia,*
   940 F.2d. 73 (4th Cir. 1991)........................................................8, 10, 11, 13

JA405

*New Hampshire Right to Life Political Action Committee v. Gardner,*
   99 F.3d 8 (1st Cir. 1996) ........................................................................................12

*People for the Ethical Treatment of Animals, Inc. v. Stein,*
   737 F. App'x 122 (4th Cir. 2018).................................................9, 10, 11, 13

*Perry v. Judd,*
   471 F. App'x 219 (4th Cir. 2012)......................................................................28

*Planned Parenthood of Central New Jersey v. Farmer,*
   220 F.3d 127 (3rd Cir 2000)................................................................................9

*Preston v. Leake,*
   660 F.3d. 726 (4th Cir. 2011)..............................................................................4

*Richmond, Fredericksburg, & Potomac R.R. Co. v. United States,*
   945 F.2d 765 (4th Circ. 1991) .............................................................................3

*Roberts v. United States Jaycees,*
   468 U.S. 609 (1984)...........................................................................................21

*Rothamel v. Fluvanna County, Virginia,*
   810 F. Supp. 2d 771 (W.D. Va. 2011)...............................................................10

*Scardina v. Masterpiece,*
   19CV32214 (Colo. Dist. Ct. 2020) .....................................................................2

*Sherley v. Sebelius,*
   610 F.3d 69 (D.C. Cir. 2010) ............................................................................18

*South Carolina Citizens for Life, Inc. v. Krawcheck,*
   317 F.3d. 719 (7th Cir. 2003)............................................................................14

*Stilwell v. Office of Thrift Supervision,*
   569 F.3d. 514 (D.C. Cir. 2009)..........................................................................11

*St. Paul Area Chamber of Commerce v. Gaertner,*
   439 F.3d 481 (8th Cir. 2006) ............................................................................17

*Susan B. Anthony List v. Driehaus (SBA List),*
   573 U.S. 149 (2014) .......................................................................3, 4, 10, 13, 16

*Telescope Media Group v. Lucero (TMG),*
   936 F.3d 740 (8th Cir. 2019)..............................................5, 6, 7, 15, 17, 18

*United States In re Catholic Conference v. Baker,*
   885 F.2d 1020 (2d. Cir. 1989) ......................................................................18, 19

*United States v. City of Chicago Heights,*
   161 F. Supp. 2d 819 (N.D. Ill. 2001).................................................................6

*United States v. Commonwealth of Virginia.,*
   139 F.3d 984 (4th Cir. 1998) ............................................................................12

*United States v. Gregory,*
   871 F.2d 1239 (4th Cir. 1989)........................................................................6, 7

JA406

*Valencia v. City of Springfield, Illinois,*
   No. 3:17-cv-03278, 2019 WL 4386551 (C.D. Ill. 2019)......................................6

*Valle del Sol, Inc. v. Whitting,*
   737 F.3d 1006 (9th Cir. 2013).....................................................................14

*Virginia v. American Booksellers Association Inc.,*
   484 U.S. 383 (1988)...........................................................................8, 9, 10

*Washington v. Arlene's Flowers, Inc.,*
   441 P.3d 1203 (Wash. 2019).........................................................................2

*Wolfson v. Brammer,*
   626 F.3d 1045 (9th Cir. 2019).....................................................................12

*Zeneca, Inc. v. Shalala*
   213 F.3d 161 (4th Cir. 2000).......................................................................18

## **Statutes**

42 U.S.C. § 2000 a-5...........................................................................................6

42 U.S.C. § 2000e-6............................................................................................6

42 U.S.C. § 3614(a)............................................................................................6

Va. Code § 2.2-3902......................................................................................6—8

Va. Code § 2.2-3904............................................................................................1

Va. Code § 2.2-3904(B)......................................................................................7

Va. Code § 2.2-3906(A)......................................................................................6

Va. Code § 2.2-3907(A)....................................................................................13

## **Other Authorities**

*Susan Selasky,* Lesbian baker in Detroit got homophobic cake order: Why she made it
   anyway, Detroit Free Press (Aug. 13, 2020) *http://bit.ly/freearticle*

Press Release, Office of the Attorney General, Attorney General Herring Defends Virginia
   Values Act in Court (Nov. 17, 2020) https://bit.ly/AGpressrelease

JA407

## Introduction

Bob Updegrove is a photographer who wants to create and post photographs online consistent with his religious beliefs and explain those beliefs to others. But Virginia's law requires Bob to offer, create, and post photographs he disagrees with; forbids him from formalizing a policy explaining his editorial choices; and prevents him from expressing this policy to others.[1] If Bob acts as he wants, Virginia's law threatens him with large fines, damages, attorneys' fees, injunctions, administrative procedures, and lawsuits. This has reasonably chilled Bob's expression, which infringes his First Amendment rights.

In its motion to dismiss, Virginia does not deny that its law forbids Bob's expression or that it will prosecute Bob. To the contrary, Virginia unreservedly defends its law and declares it has a "compelling" need to force Bob to use his artistic talents to commemorate and celebrate same-sex weddings. Defs.' Combined Opp. to Prelim. Inj. and Mem. in Supp. of Mot. to Dismiss ("MTD") 23, ECF Nos. 20, 22. Nonetheless, Virginia calls Bob's fears of enforcement too speculative because its law is new. So Virginia advises Bob not to worry. He can always raise his constitutional defenses after he is sued in state court—forgoing any federal forum, wagering his business, and risking severe fines for the opportunity to vindicate his rights.

Virginia's theory would make pre-enforcement challenges against new laws nearly impossible. Bob doesn't have to "bet the farm" and risk losing his business just to protect his rights. *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 129 (2007). For standing in this circuit, Bob merely needs to show that a law's text arguably forbids his desired activities. He has done that and much more, especially since Virginia's Attorney General has all but promised

---

[1] "Bob" refers to Plaintiffs collectively. "Virginia" refers to Defendants collectively. "Division" refers to the Division of Human Rights. "Virginia's law" or "the law" refers to the Virginia Humans Rights Act as amended by the Virginia Values Act. Va. Code § 2.2-3904 *et seq.*

to sue Bob and people like him, just as other officials and private individuals have done across the country.[2]

Virginia's merits argument fares no better. Labeling Bob's speech as conduct does not make it so. And whether Bob's speech—the photography Bob creates and distributes on his own website—can be attributed to him or his clients is, for one, legally irrelevant, and two, something this Court should not decide at the motion-to-dismiss stage. Bob has already shown that he will likely prevail on several claims under a preliminary-injunction standard. Reply Br. in Supp. of Pls.' Prelim. Inj. Mot. ("MPI Reply") 2–20 (filed concurrently). These claims necessarily satisfy the less demanding motion-to-dismiss standard. For Bob's claims under other legal theories, Virginia does not even address them in its motion to dismiss. Bob need only show these theories are plausible. He has done so. Virginia's motion to dismiss should be denied in full.

### **Argument**

Virginia first brings a Rule 12(b)(1) motion to dismiss for lack of standing. "A defendant may challenge subject-matter jurisdiction in one of two ways: facially or factually." *Beck v. McDonald*, 848 F.3d 262, 270 (4th Cir. 2017). A facial attack considers only the

---

[2] *See Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 138 S. Ct. 1719 (2018); *Washington v. Arlene's Flowers, Inc.*, 441 P.3d 1203 (Wash. 2019); *Lexington-Fayette Urban Cty. Human Rights Comm'n v. Hands On Originals*, 529 S.W.3d 291 (Ky. 2019); *Masterpiece Cakeshop Inc. v. Elenis*, 445 F. Supp. 3d 1226, 1236–37 (D. Colo. 2019) (describing second civil rights complaint against cake designer Jack Phillips following a request to design a gender-transition cake); Defs.' Mot. to Dismiss Compl., *Scardina v. Masterpiece Cakeshop*, 19CV32214 (Colo. Dist. Ct. 2020) (describing lawsuit against Jack Phillips by same complainant as *Masterpiece Cakeshop Inc. v. Elenis*), available at: https://bit.ly/MP3motiontodismiss. *See also* Susan Selasky, *Lesbian baker in Detroit got homophobic cake order: Why she made it anyway*, DETROIT FREE PRESS (Aug. 13, 2020), http://bit.ly/freeparticle (describing how someone targeted and asked a lesbian cake designer for a cake condemning homosexuality).

JA409

complaint and accepts its allegations as true. *Id.* A factual attack considers evidence beyond the complaint to determine whether the court has jurisdiction. *Id.* Here, Virginia cites evidence outside the complaint. *See* MTD Ex. A, ECF Nos. 20-1, 22-1. But Virginia's evidence does not contradict any allegation in Bob's verified complaint or declaration. So Bob's allegations should be taken as true. *See Cedars-Sinai Med. Ctr. v. Watkins*, 11 F.3d 1573, 1583 (Fed. Cir. 1993) (in considering factual challenge to court's jurisdiction, "uncontroverted factual allegations are accepted as true" (citing *Gibbs v. Buck*, 307 U.S. 66, 72 (1939)). Only when "the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law" should the court grant a motion to dismiss for lack of standing. *Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991).

Virginia also brings a Rule 12(b)(6) motion to attack the complaint's allegations. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678–80 (2009). A complaint overcomes this motion if it states a plausible claim for relief when a court views the complaint most favorably to the plaintiff and takes all well-pleaded factual allegations as true. *Id.* at 678–79.

Bob satisfies these standards because (I) Virginia's law credibly threatens and chills his expressive activities; (II) Bob has plausibly alleged that the law compels and restricts his speech, forces him to participate in religious events, and burdens a hybrid of rights; (III) Bob has plausibly alleged that the law violates his right to expressive association; and (IV) Bob has plausibly alleged that the law violates his right to freely exercise his religion.

## I. Bob has standing to challenge Virginia's law because it credibly threatens and chills his expressive activities.

To sue, Bob must prove standing and ripeness. *Susan B. Anthony List v. Driehaus* (*SBA List*), 573 U.S. 149, 157 n.5 (2014). For Article III standing, a plaintiff must show an injury-in-fact, causation, and redressability. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).

JA410

Here, Virginia only challenges injury-in-fact. And the injury-in-fact that establishes standing also establishes ripeness, as Virginia acknowledges. MTD 9.

To show injury-in-fact in the pre-enforcement context, plaintiffs must typically show a "substantial risk" of future harm. *SBA List*, 573 U.S. at 158. But "standing requirements are somewhat relaxed in First Amendment cases." *Cooksey v. Futrell*, 721 F.3d 226, 235 (4th Cir. 2013). In this context, Bob can prove a substantial risk of harm by showing 1) that he intends to engage in speech and faces a credible enforcement threat if he does so, or 2) that he has refrained from engaging in speech because of the law's "objectively reasonable chilling effect." *Id.* at 235–37. Both prongs require a credible-enforcement threat. *See Abbott v. Pastides*, 900 F.3d 160, 176 (4th Cir. 2018), *cert. denied*, 139 S. Ct. 1292 (2019).

Bob can show both a credible threat of enforcement and an objective, ongoing chilling effect because (A) Virginia's law facially restricts his desired expression. That alone justifies standing. Besides that, (B) Bob has identified many other factors that bolster his standing, such as Virginia's refusal to disavow enforcement. (C) Nor must Bob prove anything else for standing, such as past enforcement threats or requests to photograph same-sex weddings. And finally (D), Bob also has standing because Virginia's law burdens him in comparison to his competitors.

### A.   Bob faces a credible threat that the law will be enforced against him because it facially restricts his desired expression.

To show a credible threat of enforcement, Bob need only show that a "non-moribund statute … facially restricts expressive activity by the class to which the plaintiff belongs." *N.C. Right to Life, Inc. v. Bartlett*, 168 F.3d 705, 710 (4th Cir. 1999) (cleaned up); *Kenny v. Wilson*, 885 F.3d 280, 288 (4th Cir. 2018) (acknowledging this "presumption" of enforcement); *Preston v. Leake*, 660 F.3d 726, 735–36 (4th Cir. 2011) (same). And Bob does not have to show that a

JA411

law definitely covers his desired expression, only that the law "arguably" does so. *Kenny*, 885 F.3d at 288 (quoting *Babbitt v. Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)). Bob meets this standard because his desired activities are expressive and arguably forbidden by Virginia's law.

First, Bob wants to offer, create, and post photographs consistent with his religious beliefs about marriage; adopt and distribute a policy explaining and formalizing this editorial choice; post a statement on his website explaining this policy; and ask potential clients whether they want photography services violating Bob's beliefs. Compl. ¶¶ 150–65. *See also* Compl. Ex. 1 (desired editorial policy); Ex. 2 (desired public statement). The First Amendment protects all these activities. Pls.' Br. in Supp. of Prelim. Inj. Mot. ("MPI") 9–10.

Second, Virginia's law arguably forbids all these desired activities. The law defines public accommodations as "businesses offering or holding out to the general public goods, [and] services" Va. Code § 2.2-3904(A). Bob's photography business does this. Compl. ¶ 18.

As a result, Bob's business must comply with the law's Accommodations Clause which requires Bob to offer, create, and post photographs celebrating same-sex weddings because Bob already offers, creates, and posts photographs celebrating opposite-sex weddings. *See* Va. Code § 2.2-3904(B) (making it illegal "to refuse, withhold from, or deny any individual, or to attempt to refuse, withhold from, or deny any individual, directly or indirectly, any" service "made available in any place of public accommodation, or to segregate or discriminate … on the basis of … sexual orientation"); *see also Telescope Media Group v. Lucero* (*TMG*), 936 F.3d 740, 748–49 (8th Cir. 2019) (explaining how similarly worded law required film studio to offer to create films celebrating same-sex weddings); *id*. at 768–69 (Kelly, J., concurring in part and

JA412

dissenting in part) (agreeing that same law forbid film studio's "business model" of offering films celebrating only opposite-sex weddings).

Virginia and amici implicitly agree with this statutory understanding. *See* MTD 12–14 (arguing that law targets act of discriminating and effect on Bob's speech is incidental); ACLU 4 (arguing that Bob "plans to violate the statute" by offering to celebrate only opposite-sex weddings and posting his desired statements).

Virginia's law also forbids Bob from even implementing policy or maintaining a practice of offering to create and post wedding photographs only celebrating opposite-sex weddings. Specifically, the law allows the Attorney General to sue someone if that official "has reasonable cause to believe that any person or group of persons is engaged in a pattern or practice of resistance to the full enjoyment of any of the rights granted by this chapter." Va. Code § 2.2-3906(A).

Courts have interpreted this pattern-or-practice language to forbid merely adopting a policy officials considered discriminatory. *See Chin v. Port Auth. of N.Y. & N.J.*, 685 F.3d 135, 149 (2d Cir. 2012) (mere "existence of a discriminatory policy" is evidence of pattern or practice under Title VII); *United States v. City of Chicago Heights*, 161 F. Supp. 2d 819, 842 (N.D. Ill. 2001) ("The Attorney General may demonstrate the existence of a 'pattern or practice' of discrimination by showing the existence of a discriminatory policy alone.").[3] *See also United*

---

[3] These cases interpret federal statutes that have nearly identical language as Virginia's law. *See* 42 U.S.C. § 2000e-6 (Attorney General can sue "[w]henever the Attorney General has reasonable cause to believe that any person or group of persons is engaged in a pattern or practice of resistance to the full enjoyment of any of the rights" of the statute); 42 U.S.C. § 2000a-5 (same); 42 U.S.C. § 3614(a) (same). And the Department of Justice has also taken the position that this statutory language forbids adopting a discriminatory policy as well. *See* The United States' Mot. for Partial Summ. J. on Liability, *Valencia v. City of Springfield, Ill.*, No. 3:17-cv-03278, 2019 WL 4386551, at *28–30 (C.D. Ill. 2019). Virginia's law also incorporates federal discrimination laws into its own. Va. Code § 2.2-3902 ("Conduct that violates any

JA413

*States v. Gregory*, 871 F.2d 1239, 1242 (4th Cir. 1989) ("The Supreme Court has recognized that when an employer's discriminatory policy is known, subjecting oneself to the humiliation of explicit and certain rejection is not required to make out a case of discrimination.").

Next, because the Accommodations Clause forbids Bob from exercising his editorial discretion or adopting his desired editorial policy, the Clause also prohibits him from publishing the policy, explaining the policy to others, or asking questions to implement the policy. Va. Code § 2.2-3904(B) (making it illegal "to attempt to refuse, withhold from, or deny any individual, directly or indirectly, any" service "made available in any place of public accommodation, or to segregate or discriminate … on the basis of … sexual orientation"); *see also TMG*, 936 F.3d at 757 n.5 (interpreting similar language to forbid film studio from publishing statement declining to create films celebrating same-sex weddings).

Virginia and amici implicitly agree. MTD 18–19, 20 n.13; ACLU 4 ("The Photography Studio plans to violate the statute … by displaying and distributing a written policy stating that its wedding photography services will not be provided to same-sex couples."); ACLU 13 ("Just as there is no constitutional right to discriminate, there is no concomitant right to publish a policy of discrimination.").

The law's Publication Clause also acts like the Accommodations Clause. The Publication Clause prohibits Bob from publishing his desired policy or his website statement or otherwise informing clients that he will only create wedding photographs consistent with his beliefs. *See* Va. Code § 2.2-3904(B) (making it unlawful "to publish, circulate, issue, display, post, or mail, either directly or indirectly, any communication" that services will be "refused,

---

Virginia or federal statute or regulation governing discrimination … is an unlawful discriminatory practice under this chapter.")

JA414

withheld from, or denied" on basis of sexual orientation). Virginia and amici again concur. *See* MTD 18–19, ACLU 13; *see also Chelsey Nelson Photography LLC v. Louisville/Jefferson Cty. Metro Gov't*, No. 3:19-CV-851-JRW, 2020 WL 4745771, at *4 (W.D. Ky. Aug. 14, 2020) (interpreting similar statutory language to ban photographer's desired statement declining to photograph same-sex weddings); *Brush & Nib Studio, LC v. City of Phoenix* (*B&N*), 448 P.3d 890, 920 (Ariz. 2019) (interpreting similar statutory language to prohibit calligraphy studio's desired statement declining to promote same-sex weddings).

Finally, the law itself contemplates a broad interpretation of its provisions. Va. Code § 2.2-3902 (stating that "[t]he provisions of this chapter shall be construed liberally for the accomplishment of its policies"). Add this to the law's text and Virginia's stated position and positions taken elsewhere about similar laws, and Virginia's law more than meets the threshold of arguably covering Bob's desired activities. This Court should therefore assume a credible threat of enforcement.

Ignoring the standard in this circuit, Virginia argues that Bob must prove an actual "enforcement action in the past," either against him or someone else. MTD 10 (citing *Abbott*, 900 F.3d at 176). But the Fourth Circuit has rejected this argument, which "is apparently a favorite of the Virginia Attorney General." *Mobil Oil Corp. v. Att'y Gen. of Va.*, 940 F.2d 73, 76 (4th Cir. 1991) (finding standing for plaintiff to challenge law before it went into effect because "[w]e see no reason to assume that the Virginia legislature enacted this statute without intending it to be enforced").

Indeed, the U.S. Supreme Court and Fourth Circuit have often found standing when plaintiffs challenged laws before they were enforced, whether against plaintiffs or anyone else. *See Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 392–93 (1988) (finding standing to

JA415

challenge law before it became effective because danger was "one of self-censorship; a harm that can be realized even without an actual prosecution"); *People for the Ethical Treatment of Animals, Inc. v. Stein* (*PETA*), 737 F. App'x 122, 126 (4th Cir. 2018) (finding standing to challenge law "[s]hortly after the Act became effective"); *Liberty Univ., Inc. v. Lew*, 733 F.3d 72, 90 (4th Cir. 2013) (finding standing to challenge statute before going into effect because university had to "take measures to ensure compliance in advance"); *N.C. Right to Life*, 168 F.3d at 710 (finding standing even though "the State points out that in the twenty-five years since the statute's enactment, it has never interpreted it to apply to groups engaging only in issue advocacy").[4]

The cases Virginia cites do not say otherwise. Virginia's Fourth Circuit cases do not concern First Amendment rights, or they involved plaintiffs who had no concrete intent to violate the law, or they involved officials who allowed plaintiffs to engage in their desired activities. *See Maryland Shall Issue, Inc. v. Hogan*, 971 F.3d 199, 218 (4th Cir. 2020) (Second Amendment plaintiffs "have not alleged any concrete intention to (arguably) violate" challenged law); *Abbott*, 900 F.3d at 176 (officials provided "written notice that neither investigation nor sanction was forthcoming" for plaintiffs' past actions). And Virginia's Sixth Circuit case involved a permitting system where the plaintiff never sought a permit. *Miller v. City of Wickliffe, Ohio*, 852 F.3d 497, 505–06 (2017) ("And merely applying for a license …. carried

---

[4] Other circuit courts agree. *See Nat'l Inst. of Family & Life Advocates v. Harris*, 839 F.3d 823, 833 (9th Cir. 2016) (finding standing where plaintiffs sued before law became effective so they "could not have demonstrated a significant history of enforcement"), *rev'd and remanded on other grounds sub nom. Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361 (2018); *Planned Parenthood of Cent. N.J. v. Farmer*, 220 F.3d 127, 147 (3rd Cir. 2000) (finding credible fear where lawsuit "filed the day the Act was to have become effective and before the Act had been interpreted by the state courts or enforcement agencies"); *ACLU v. Johnson*, 194 F.3d 1149, 1153, 1155 (10th Cir. 1999) (finding standing where lawsuit was filed two months before law became effective).

JA416

no risk."). In other words, the law did not facially forbid the plaintiffs' desired behavior. None of this is true in Bob's situation.

Because Virginia can cite no case requiring past enforcement, Bob need not wait to "raise a First Amendment defense" until he has been sued. MTD 11. If Bob were forced to wait until a lawsuit was filed against him, Bob could only raise his defense in a state court or administrative proceeding. That would force Bob to forgo his right to protect his federal constitutional rights in federal court. Pre-enforcement suits exist so that citizens don't have to wait, get sued, and then raise defenses in a forum of the state's choosing. No one has to choose "between abandoning [their] rights or risking prosecution." *MedImmune*, 549 U.S. at 129. *See also Mobil Oil*, 940 F.2d at 76 (rejecting Virginia Attorney General's argument that plaintiff "should violate the law and wait to see what happens"); *Rothamel v. Fluvanna Cty., Va.*, 810 F. Supp. 2d 771, 779 (W.D. Va. 2011) (rejecting argument that plaintiff could "go ahead and do it and if he infringes [the law] then it will be up to the county to decide if it wants to try and to enforce this against him and if it does then he will have an opportunity to defend it").

Simply put, past prosecution in this Circuit is not necessary; being covered by the statute is. Bob has shown that. So he has standing.

## B. Additional factors bolster Bob's standing, such as Virginia's refusal to disavow future enforcement.

Although Bob has established standing because the law arguably forbids his expression, several other factors bolster the credible threat Bob faces.

First, Virginia has not disavowed future enforcement against Bob if he engages in his desired activities *See SBA List*, 573 U.S. at 165 (finding that absence of disavowal favored standing); *Am. Booksellers*, 484 U.S. at 393 (finding standing in part because "[t]he State has not suggested that the newly enacted law will not be enforced"); *PETA*, 737 F. App'x at 130–31

JA417

(finding that a failure to disavow supported "reasonable and well-founded fear that the Act *will be* enforced against [PETA] if they carry out their plans"); *Mobil Oil* , 940 F.2d at 76 (highlighting that "Attorney General has not, however, disclaimed any intention of exercising her enforcement authority"). Virginia cannot have it both ways—denying any credible threat of enforcement yet reserving its right to investigate and prosecute Bob at any moment.

Second, Virginia does not simply refuse to disavow but actively defends its authority to prosecute Bob, declares a "compelling interest" in doing so, and refuses to provide any exception for Bob. MTD 23–24 (arguing that the law must comprehensively cover the commercial marketplace and an exception for Bob "would fatally undermine" state's "interests of the highest order"); Press Release, Office of the Attorney General, Attorney General Herring Defends Virginia Values Act in Court (Nov. 17, 2020) https://bit.ly/AGpressrelease ("I will do everything in my power to defend the Virginia Values Act and make sure that it continues to protect Virginia's LGBTQ community.").

This too bolsters standing. *See Mobil Oil*, 940 F.2d at 77  ("[The Attorney General's] willingness to attack the substance of Mobil's claims creates the odor of a 'case or controversy'—precisely what she claims is absent."); *Harrell v. Fla. Bar*, 608 F.3d 1241, 1257 (11th Cir. 2010) ("[I]f the enforcing authority is defending the challenged law or rule in court, an intent to enforce the rule may be inferred."); *Stilwell v. Office of Thrift Supervision*, 569 F.3d 514, 518 (D.C. Cir. 2009) (finding it "more than a little ironic that [the government] would suggest Petitioners lack standing and then, later in the same brief, label Petitioner Stilwell as a prime example of … the very problem the Rule was intended to address") (cleaned up).

In fact, the Attorney General filed briefs elsewhere supporting enforcement of laws like Virginia's against businesses like Bob's. Compl. ¶¶ 181, 185. While Virginia claims that these

"public statement and *amici curiae* briefs … say nothing about how this statute will be enforced" (MTD 11 n.10), they do. The laws are similar (public accommodation laws), the plaintiffs are similar (businesses creating speech), and the legal issues are similar (compelled speech, restricted speech, free exercise). Virginia cites no case and provides no reason why this Court should disregard the state's formal legal position in similar litigation involving similar litigants. *See United States v. Com. of Va.*, 139 F.3d 984, 987 n.3 (4th Cir. 1998) (finding credible enforcement threat because Virginia officials, including Attorney General, made several statements indicating that law applied to plaintiffs).

Third, Virginia recently enacted its law. Contrary to Virginia's argument, this recency makes enforcement more likely, not less. *See Doe v. Bolton*, 410 U.S. 179, 188 (1973) (physicians had standing to challenge abortion restriction that was "recent and not moribund"); *Harrell*, 608 F.3d at 1257 ("If a challenged law or rule was recently enacted … an intent to enforce the rule may be inferred."); *Int'l Soc. for Krishna Consciousness of Atlanta v. Eaves*, 601 F.2d 809, 821 (5th Cir. 1979) ("[T]he ordinance was enacted only months ago and we are probably entitled to assume that law enforcement agencies will not disregard such a recent expression of the legislature's will.").[5]

---

[5] The more recent a law is, the less relevant its enforcement history becomes. *See Wolfson v. Brammer*, 616 F.3d 1045, 1060 (9th Cir. 2010) (giving past enforcement "little weight" in part because law was recent); *N.H. Right to Life Political Action Comm. v. Gardner*, 99 F.3d 8, 13 (1st Cir. 1996) ("[A] credible threat of present or future prosecution itself works an injury that is sufficient to confer standing, even if there is no history of past enforcement."). If the Court believes that the enforcement history is still relevant though, the Court should allow Bob to conduct jurisdictional discovery in this case since Virginia's factual attack goes to the merits of Bob's claim. *See infra* § I.C; *Kerns v. United States*, 585 F.3d 187, 193 (4th Cir. 2009) (concluding that a district court erred by failing to give "procedural safeguards—such as discovery," where jurisdiction was intertwined with merits).

JA419

Fourth, the law makes it easy for multiple parties to begin enforcement proceedings against Bob. The Attorney General, the Division, or any aggrieved party can file an administrative complaint with the Division. Va. Code § 2.2-3907(A). This complaint triggers a long and burdensome administrative process involving an investigation, responding to the complaint, discovery exchange, and hearings. Compl. ¶¶ 190–201. Merely going through this process causes harm, no matter its outcome. *SBA List*, 573 U.S. at 165–66 (noting burdens caused by administrative process).

Adding to that, the Attorney General may sue Bob at any time in state court. Compl. ¶ 179. And private parties may also file a lawsuit after receiving a right-to-sue letter from the Division. *Id.* ¶ 204. These judicial proceedings will require even more time and resources to defend than administrative proceedings. *See SBA List*, 573 U.S. at 165 (noting that proceedings inflict injury by forcing person "to divert significant time and resources to hire legal counsel and respond to discovery requests").

Fifth, the law threatens serious penalties, including attorneys' fees, costs, damages, injunctions, and fines up to $50,000 for first-time violations and $100,000 for subsequent violations. Compl. ¶ 208. Courts have found pre-enforcement standing when laws threatened much less than this. *See PETA*, 737 F. App'x at 131 n.4 (standing because law provides for "stiff civil remedies," including "damages in the amount of $5,000 per day … plus attorneys' fees and costs"); *Mobil Oil*, 940 F.2d at 75 (standing challenge law which created a "stiff civil remedy": $2,500 in liquidated damages, actual damages, and attorneys' fees).

Not only is Bob covered by the statute, there are multiple additional reasons for Bob to fear enforcement. Bob has far exceeded the minimum showing to prove standing.

JA420

**C.    In order to have standing, Bob need not show a specific enforcement threat or past request for objectionable photography for standing.**

Virginia tries to place two more standing requirements on Bob: that he prove that (1) Virginia officials "threatened prosecution" or (2) he has "been approached by potential clients about photographing a same-sex wedding or that he has refused service." MTD 10–11 (citation omitted). Neither is necessary.

As for a specific threat, courts in this circuit and elsewhere do not require it. "[B]ecause free speech can be chilled prior to enforcement, a plaintiff bringing a First Amendment claim need only show a 'credible threat of prosecution,' rather than a 'threat of specific future harm.'" *S.C. Citizens for Life, Inc. v. Krawcheck*, 301 F. App'x 218, 221 (4th Cir. 2008) (citation omitted); *see also Bolton*, 410 U.S. at 188 (concluding that plaintiffs had standing even though no plaintiff has "been prosecuted, or threatened with prosecution"); *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1015 n.5 (9th Cir. 2013) ("[W]e have never held that a specific threat is necessary to demonstrate standing."). Bob need not wait for the Attorney General to come knocking on his door. Of course, that knock has come already. As noted above, Virginia's briefs and press releases indicate Virginia's intent to enforce its law against Bob. *Supra* § I.B.

Moreover, to have standing Bob need not identify a past request to photograph same-sex weddings or a denial of a request. This is so for at least three reasons. First, Bob can offer to create photographs celebrating only opposite-sex weddings, formally adopt his desired editorial policy, distribute his desired policy, publish his desired website statement, and ask clients particular questions without any pending request to photograph a same-sex wedding. Bob *alone* controls whether he takes these actions, he can immediately do so, and doing so instantly violates the law. That in turn allows the Attorney General, the Division, and private parties to immediately file administrative complaints or lawsuits against Bob. Past request or not. *See*

JA421

*supra* § I.A. (explaining how Virginia's law works). So Bob has reasonably restricted his expression. Past request or not.

Second, as explained below, the provisions in Virginia's law regulate Bob's speech in an intertwined way. If Bob has standing to challenge one provision, he can challenge the others. *See City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 243 n.5 (1983) (addressing constitutional challenge because "we could not resolve the question … [of] standing without addressing the constitutional issue"); *Adams v. Bain*, 697 F.2d 1213, 1220 (4th Cir. 1982) (reversing dismissal because jurisdictional facts were "so intertwined" with merits "that 12(b)(1) is an inappropriate basis upon which to ground the dismissal"); *Griswold v. Driscoll*, 616 F.3d 53, 56 (1st Cir. 2010) (exercising jurisdiction because "the dispositive questions of standing and statement of cognizable claim are difficult to disentangle").

For example, in deciding whether Bob can constitutionally adopt or distribute his desired policy declining to create photographs celebrating same-sex weddings, this Court will need to determine whether Bob can constitutionally decline to create these photographs. The ability to adopt or communicate the policy turns on Bob's right to engage in the underlying activity discussed in the policy. *See* MPI Reply § III (explaining this point). So, because Bob has standing to challenge the provisions restricting his speech and his policy, he has standing to challenge the provisions compelling his speech as well.

Even Virginia and amici agree with this intertwinement analysis. MTD 18–19; ACLU 13 ("Just as there is no constitutional right to discriminate, there is no concomitant right to publish a policy of discrimination."). And courts do too. *See TMG*, 936 F.3d at 757 n.5 ("If creating videos were conduct that Minnesota could regulate, then the State could invoke the incidental-burden doctrine to forbid the Larsens from advertising their intent to engage in discriminatory conduct.

JA422

But in this case, Minnesota cannot compel the Larsens to speak, so it cannot force them to remain silent either." (citations omitted)); *B&N*, 448 P.3d at 926 (art studio could post statement because its "intended refusal to make custom wedding invitations celebrating a same-sex wedding is legal activity").

Third, even setting aside that Bob can violate the law and Virginia can prosecute him without any pending request, Bob does not need to identify a pending request were Virginia to change its law and require requests before enforcement. Bob merely needs to show a "substantial risk that the harm will occur," *SBA List*, 573 U.S. at 158 (cleaned-up), not a "literal[] certain[ty]" of future harm. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013). *See also ACLU of Ill. v. Alvarez*, 679 F.3d 583, 594 (7th Cir. 2012) ("Preenforcement suits always involve a degree of uncertainty about future events.").

Bob has established a substantial risk of receiving objectionable requests. Not only does Bob operate in the wedding industry, receive wedding requests, and promote his wedding business online (Compl. ¶¶ 20, 95–96), officials and private individuals have targeted wedding professionals like Bob all across the country. *See supra* n.2. Virginia, meanwhile, has indicated its intent to enforce, facilitated easy enforcement by officials and private individuals, and threatened severe penalties. *See supra* § I.B.

These factors show that Bob faces much more than a substantial risk of receiving an objectionable request. The risk is overwhelming—it is "predicated on actual market experience and probable market behavior." *Adams v. Watson*, 10 F.3d 915, 923 (1st Cir. 1993); *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2565–66 (2019) (standing supported because plaintiff relies "on the predictable effect of Government action on the decisions of third parties"). In this seek-and-destroy environment for creative professionals, Bob would be foolish to do anything

JA423

but restrict his own speech. *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 257 (1974)
("right-of-access statute" caused newspapers to "avoid controversy" and had chilling effect even
before third party could request access and trigger statutory obligations).

Unsurprisingly then, many courts have allowed creative professionals to challenge laws
like Virginia's—even without identifying any pending request for same-sex weddings. *See TMG*,
936 F.3d at 749–50 (film studio had standing in part because state "publicly announced" that its
law "requires all private businesses … to provide equal services for same- and opposite-sex
weddings"); *B&N*, 448 P.3d at 901–02 (art studio had standing "given the City's assertion [in
litigation] that it can apply the Ordinance to Plaintiffs' custom wedding invitations"); *Chelsey
Nelson*, 2020 WL 4745771, at *4 (wedding photographer had standing in part because city
refused to disavow and any member of public could initiate enforcement).

While Virginia objects that *TMG* cited the state's past enforcement and use of testers
(MTD 11), *B&N* did not require or rely on these factors. 448 P.3d at 901 (plaintiff could show
standing despite "lack of … criminal enforcement" (citing *Babbitt*, 442 U.S. at 298, 300–01)).
And *TMG* did not require these factors either. Indeed, the Eighth Circuit (like the Fourth) does
not require past enforcement (or testers) for standing, but merely requires that a law "on [its]
face, prohibit" a plaintiff's desired activities. *St. Paul Area Chamber of Commerce v. Gaertner*,
439 F.3d 481, 485 (8th Cir. 2006) (finding standing even though state "never prosecuted anyone
under the Minnesota Statutes or made any public statements threatening to do so" (cleaned up));
*see also Chelsey Nelson*, 2020 WL 4745771, at *4 (citing multiple factors to assess credible
threat and awarding standing although some factors absent). Once again, Virginia mistakes
sufficient conditions for necessary ones.

JA424

No matter, Virginia checks more standing boxes here than Minnesota did in *TMG*. Virginia has made more public statements indicating enforcement; Virginia passed its law much more recently; and Virginia has encouraged and deputized everyone to be a tester by allowing private individuals and certain state officials to initiate administrative complaints and lawsuits on their own, whether Bob receives an objectionable request or not. *Supra* § I.B. Put it all together and Bob has as strong, if not stronger, basis for standing than these other cases. That in turn justifies standing under any standard, including the Fourth Circuit's.

### D. Bob also has standing to challenge the law under the competitor-standing doctrine.

Apart from standing based on enforcement and chilling effect, Bob also has standing because Virginia's law gives his competitors an unfair advantage in the marketplace.

Under the competitor-standing doctrine, a plaintiff can suffer an injury-in-fact when government action gives a competitor an illegal benefit, leading to increased competition. *Zeneca, Inc. v. Shalala*, 213 F.3d 161, 170 n.10 (4th Cir. 2000) (finding standing where drug manufacturer suffered increased competition from agency approval of generic drug); *Sherley v. Sebelius*, 610 F.3d 69, 73 (D.C. Cir. 2010) ("basic requirement" of competitor standing is "that the complainant show an actual or imminent increase in competition, which increase we recognize will almost certainly cause an injury in fact"). And at this stage, Bob "need not prove that the [law] will increase [his] costs" or otherwise cause him economic injury; he "need only plausibly allege that it will." *Liberty Univ.*, 733 F.3d at 90.

Here, Virginia's law places unconstitutional burdens on Bob that do not affect his direct competitors—other wedding photographers in the Virginia wedding market. *See In re U.S. Catholic Conference*, 885 F.2d 1020, 1029 (2d Cir. 1989) (to show competitor standing,

JA425

plaintiff "must show that he personally competes in the same arena with the party to whom the government has bestowed the assertedly illegal benefit").

For example, Virginia's law hinders Bob's ability to operate efficiently and to tailor his business and message the way he wants by prohibiting Bob from offering his desired services, adopting his editorial policy, posting his statement, or even asking potential clients what type of services they seek. Compl. ¶¶ 150–65. The law also causes Bob to lose time researching requests out of fear that they may seek services he cannot provide consistent with his beliefs. *Id.* ¶¶ 159–61. And the law causes reputational harm too by requiring him to offer services that he cannot carry out and by preventing him from being transparent with the public and potential clients. *Id.* ¶¶ 164, 169. *Accord Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 125 (2014) (standing under Lanham Act where reputational injury caused by defendant's false advertising). Bob simply cannot operate or promote his business the way he wants because of Virginia's law.

In contrast, many other Virginia wedding photographers do not face these burdens because they photograph both opposite-sex and same-sex weddings and promote their willingness to do so. Compl. ¶¶ 222–27; Decl. ¶¶ 306–29. So these photographers can operate, adopt policies, convey their beliefs, promote their services, and interact with clients much more efficiently and freely than Bob while competing to photograph the same opposite-sex weddings as Bob. This differential treatment gives these competitors an advantage and Bob one more basis for standing to challenge Virginia's law.[6]

---

[6] Courts have not confined the competitor standing doctrine solely to economic injuries either. *See Buchanan v. Fed. Election Comm'n*, 112 F. Supp. 2d 58, 63 (D.D.C. 2000) ("Courts within this Circuit and elsewhere have expanded the competitor standing doctrine to the political arena, recognizing that political actors may bring suit when they are competitively disadvantaged by

JA426

## II.    Bob states a plausible claim that Virginia's law compels and restricts his protected speech, compels him to participate in religious ceremonies, and regulates a hybrid of rights.

Bob has shown elsewhere that he will likely prevail on his free-speech claim, his claim against compelled participation in religious ceremonies, and his hybrid-rights claim. MPI Reply 2–20. For the same reasons, Bob should prevail under the more lenient motion-to-dismiss standard where all his factual allegations should be taken as true and any facts outside the complaint ignored. *Iqbal*, 556 U.S. at 678 (2009) ("The plausibility standard is not akin to a 'probability requirement.'" (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).

For example, Bob has alleged his desire to shape the public debate using his photographs and website. Compl. ¶¶ 37–42. Bob has also alleged that he posts his photographs on his website with his name, his url, and his picture. Compl. ¶¶ 72, 85; Decl. ¶¶ 15–16. These allegations support a plausible inference that Bob is speaking, that he is speaking a message of public concern, that others would understand Bob to be speaking, and that others would associate Virginia's compelled message with Bob. Bob need not show the latter three points to prove his claims (MPI Reply § 1.B). But Bob has *still* alleged enough facts at this stage to prove these unnecessary points anyway. *See Brown v. Gov't of D.C.*, 390 F. Supp. 3d 114, 123 (D.D.C. 2019) ("[C]ourts typically do not reach the *merits* of a First Amendment challenge at the motion-to-dismiss stage.").

Along with the claims briefed in the MPI Reply, the complaint alleges another free speech-theory: that Virginia interprets and applies its law selectively based on content and viewpoint. In amicus briefs, the Attorney General has taken the position that creative

---

government action."); *Nelson v. Warner*, No. CV 3:19-0898, 2020 WL 4004224, at *3 (S.D.W. Va. July 15, 2020) (collecting cases of competitor standing in political election challenges).

JA427

professionals (cake designers) can decline to create speech (design a cake) condemning same-sex weddings because of secular objections, but creative professionals cannot decline to create speech (design a cake) celebrating same-sex weddings because of religious objections. Compl. ¶ 218. This raises the plausible inference that the Attorney General interprets and applies Virginia's law the same way.

But the U.S. Supreme Court condemned this approach in *Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Commission* because this "difference in treatment" was "based on the government's own assessment of offensiveness." 138 S. Ct. 1719, 1731 (2018). And that in turn violated First Amendment principles requiring content and viewpoint neutrality. *Id.* (citing *Matal v. Tam*, 137 S. Ct. 1744, 1762–64 (2017) (opinion of Alito, J.), a viewpoint-discrimination case, to say it is not "the role of the State or its officials to prescribe what shall be offensive"). The same logic applies to Virginia's enforcement of its law. Virginia cannot allow some speakers to avoid speaking certain viewpoints offensive to them but force Bob to speak viewpoints offensive to him. This differential treatment alleges a plausible First Amendment claim.

## III.    Bob states a plausible First Amendment claim that Virginia's law compels him to expressively associate and restricts his expressive association.

Because Bob seeks to protect his First Amendment rights, he has "a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Roberts v. United States Jaycees*, 468 U.S. 609, 622 (1984). And the freedom to associate "plainly presupposes a freedom not to associate." *Id.* at 623.

To show compelled association, a plaintiff must show (1) the group "engage[s] in some form of expression"; (2) the "forced inclusion … affects in a significant way the group's ability

JA428

to advocate public or private viewpoints"; and (3) this application fails strict scrutiny. *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648 (2000). Bob satisfies each of these factors.

First, Bob engages in expression as discussed thoroughly above. He wants to communicate a message celebrating marriage between a man and woman by creating and posting photographs honoring this concept of marriage and by discussing his desire to do so with others. *See supra* § I.A; MPI 9 (explaining this desire). This is protected speech. *Id*. And this Court must "give deference to [Bob's] assertions regarding the nature of [his] expression." *Dale*, 530 U.S. at 653.

Second, the law infringes Bob's speech in two distinct ways: (i) forcing him to join with others who want to send messages he disagrees with, and (ii) forcing him to associate with messages he disagrees with. Here too, this Court should "give deference to [Bob's] view of what would impair [his] expression." *Id*. at 653.

Take the first infringement. Bob wants to create photographs celebrating marriage between a man and a woman, but Virginia's law requires Bob to join together with others who want to create and convey different and conflicting messages—messages celebrating same-sex weddings. Virginia even concedes this. *See* MTD 15–17 ("as the photographs in plaintiff's brief show, *it is the couple and their guests who are celebrating*…a couple getting married is *celebrating their wedding*") (emphasis in original).

This compulsion would in turn "impair" Bob's ability to express his different religious views about marriage, "and only those views." *Dale*, 530 U.S. at 648. Indeed, if a gay scoutmaster's mere presence affected the Boy Scout's ability to "not promote homosexual conduct," then Virginia's law must affect Bob's ability to promote his particular view on marriage by forcing him to join with others to actually create and distribute speech conveying a

JA429

different and opposing view. *Id.* at 654 (cleaned up). In other words, "to the extent [Bob's] choice of [clients based on the message requested] affects the expressive content of [his photography], the First Amendment protects that choice." *McDermott v. Ampersand Pub., LLC*, 593 F.3d 950, 962 (9th Cir. 2010) (newspaper could not be forced to hire certain reporters and editors because it was "bound to affect what gets published"); *see also Cal. Democratic Party v. Jones*, 530 U.S. 567, 581–82 (2000) (proposition allowing unaffiliated voters to vote in political party's primary "adulterate[d] their candidate-selection process … by opening it up to persons wholly unaffiliated with the party" and thereby had "the likely outcome—indeed, in this case the intended outcome—of changing the parties' message").

As to the second impediment, Virginia's law forces Bob to associate himself with messages he disagrees with. While this type of association is not necessary to prove a compelled speech claim or other types of compelled association (MPI Reply 7–8), it is enough to establish an expressive-association claim here. *See Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550, 564–66 (2005) (acknowledging that beef producers might be able to establish First Amendment violation when forced to pay for beef advertisements they disagree with "if it were established, that is, that individual beef advertisements were attributed to respondents"); *id.* at 568, (Thomas, J., concurring) (going further and saying "if the advertisements associated their generic pro-beef message with either the individual or organization respondents, then respondents would have a valid as-applied First Amendment challenge"); *Charter v. U.S. Dep't of Agric.*, 412 F.3d 1017, 1020 (9th Cir. 2005)) (applying *Johanns* and remanding for district court to determine whether beef producers had viable speech attribution claim when forced to pay for beef advertisements they disagreed with).

JA430

Bob has plausibly alleged enough facts to suggest this association. Whenever Bob photographs a wedding, he physically attends and participates in the wedding, witnesses the couple's union, and interacts with and encourages the wedding party, the couple, the couple's family, and their friends. Compl. ¶¶ 108–11. Bob then posts the wedding photographs on his website where "'Bob Updegrove Photography' is always displayed at the top of each page and every [photography] gallery." *Id.* at ¶ 85; ¶¶ 72–74. Like Bob, other wedding photographers also do this "to associate their business with their photographs and photographic style, and to allow the couple to associate with their business." *Id.* at 95. These allegations suggest that Bob's wedding clients, their friends and family, and the general public would associate the message of Bob's photography with Bob. And that association would apply if Bob were forced to create and display photographs celebrating same-sex weddings. That in turn would affect and undermine Bob's efforts to convey a different message through his photographs, website, and client communications.

And this effect cannot survive strict scrutiny, the third *Dale* factor. For the same reasons Virginia cannot justify compelling Bob's speech or restricting that speech, Virginia cannot justify compelling his expressive association and undermining his efforts to convey his particular message about marriage. *See* MPI § V; MPI Reply § V (explaining strict scrutiny point). So for these reasons, Bob has adequately pleaded an expressive-association claim.

**IV.    Bob states plausible First Amendment claims that Virginia's law infringes on his religious exercise.**

Bob states plausible Free Exercise claims in two ways. Virginia's law is not generally neutral and applicable, and it contradicts our history and tradition of protecting religious exercise.

JA431

Starting with the first, a law is not neutral or generally applicable if its object is to "infringe upon or restrict practices because of their religious motivation," or if it selectively burdens only religious practices. *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 532–33, 542–43 (1993). The government also fails this standard if it puts "in place a system of individual exemptions," allowing it to treat secular conduct more favorably than religiously motivated conduct. *Emp't Div., Dep't of Human Res. of Or. v. Smith*, 494 U.S. 872, 884 (1990) (explaining that "good cause" standard considered in *Sherbert v. Verner*, 374 U.S. 398 (1963), for determining unemployment eligibility, "created a mechanism for individualized exemptions," meriting strict scrutiny (citation omitted)); *see Blackhawk v. Pennsylvania*, 381 F.3d 202, 209 (3d Cir. 2004) (Alito, J.) ("[A] law must satisfy strict scrutiny if it permits individualized, discretionary exemptions because such a regime creates the opportunity for a facially neutral and generally applicable standard to be applied in practice in a way that discriminates against religiously motivated conduct."). And importantly, these requirements go beyond a law's text, which "is not determinative." *Lukumi*, 508 U.S. at 534. The First Amendment forbids even "subtle departures from neutrality." *Id.* at 534.

Virginia's actions here go well beyond subtle. First, Virginia has selectively burdened religious speakers like Bob and created a system of individualized assessments by forcing Bob to speak messages inconsistent with his religious beliefs while allowing secular speakers to decline to speak messages inconsistent with their secular beliefs. *Compare supra* § II (describing Attorney General's position that religious speakers must create speech despite religious objections, but other speakers need not create speech if they have secular objections) *with Lukumi*, 508 U.S. at 537 ("The problem … is the interpretation given to the ordinance by respondent….").

JA432

But Virginia "cannot in a selective manner impose burdens only on conduct motivated by religious belief." *Lukumi*, 508 U.S. at 543. Either Virginia must interpret and then enforce its law the same way against everyone (which would still compel and restrict speech), or else extend the same protections to people like Bob. Virginia cannot take its chosen route: create a system where it gives favorable treatment to secular speakers and "refuse[s] to extend [a system of exemptions] to cases of 'religious hardship' without compelling reason." *Id.* at 537 (quoting *Smith*, 494 U.S. at 884); *see also Masterpiece*, 138 S. Ct. at 1730–31 (concluding that similar practice violated Free Exercise Clause); *id.* at 1734–40 (Gorsuch, J., concurring) (explaining that similar system could not possibly comply with Free Exercise requirements).

Second, Virginia has shown hostility toward Bob's beliefs as evidenced by religiously hostile statements made by those passing Virginia's law. These statements are relevant. *Masterpiece*, 138 S. Ct. at 1731 (identifying relevant factors as "the historical background of the decision under challenge, the specific series of events leading to the enactment or official policy in question, and the legislative or administrative history, including contemporaneous statements made by members of the decisionmaking body" (citing *Lukumi*, 508 U.S. at 540)); *Lukumi*, 508 U.S. at 540–41 (Kennedy, J., joined by Stevens) (assessing legislator statements to assess neutrality); *Jesus Christ Is the Answer Ministries, Inc. v. Baltimore Cty.*, 915 F.3d 256, 263–65 (4th Cir. 2019) (assessing statements by community members that influenced government zoning process to assess neutrality) *as amended* (Feb. 25, 2019).

For example, legislators debating Virginia's law or similar laws in recent years made negative statements about those who believe marriage is between one man and one woman and want to live or operate a business consistent with those beliefs. Compl. ¶¶ 236–57. Legislators

JA433

also made statements that they intended to deter people like Bob from exercising their constitutional freedoms through the law's penalty provisions. *Id.* ¶ 215.

In substance, these statements mimic those in *Masterpiece* where the Supreme Court condemned officials' statements criticizing a cake designer's religious views in favor of marriage between a man and a woman. *Compare Masterpiece*, 138 S. Ct. at 1729 (official saying "[i]f a businessman wants to do business in the state and he's got an issue with the—the law's impacting his personal belief system, he needs to look at being able to compromise" (cleaned up)) *and id.* (saying the baker "can believe 'what he wants to believe,' but cannot act on his religious beliefs 'if he decides to do business in the state'") *with* Compl. ¶ 215 ("If you don't want to be subject to unlimited punitive damages, don't discriminate on the basis of sexual orientation.") *and id.* at ¶ 247 ("[I]f you are a public organization, your doors are supposed to be open to everyone in the public. Now I don't know what type of Christianity you come from, but the type of Christianity I come from, the Apostle Paul said 'Try with everything within you to live peaceably with all men.'") *and id.* at ¶ 248 (saying "religious bigotry is bad" in reference to religious views on sexual ethics and sexual orientation). Like the statements in *Masterpiece*, the statements here show a "lack of due consideration for [Bob's] free exercise rights and the dilemma he face[s]." *Masterpiece*, 138 S. Ct. at 1729.[7]

Setting these other problems aside, Virginia's law also deserves strict scrutiny for burdening Bob's religious exercise in ways inconsistent with our nation's history and tradition. Laws that do this must always overcome strict scrutiny. *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 190 (2012) ("The contention that *Smith* forecloses

---

[7] To be clear, Bob seeks only as-applied relief for all his claims except the religious hostility theory. For this theory, Bob seeks both facial and as-applied relief. *Lukumi*, 508 U.S. at 547 (finding religious hostility rendered statute void).

JA434

recognition of" well-established historical precepts "rooted in the Religion Clauses has no

merit."). And we know burdening Bob falls outside this tradition because *Smith* itself

recognized the historical anomaly of compelling and silencing religious speakers. *See supra* § II

(discussing hybrid-rights claims); MPI § IV. To the extent that courts interprets *Smith*

differently, *Smith* should be overruled. While this Court cannot do that, Bob wishes to preserve

this issue for appeal, especially because the Supreme Court is currently considering whether to

overturn *Smith*. *See* Pet. for a Writ of Cert., *Fulton v. City of Philadelphia*, No. 19-123, 2019

WL 3380520, at *i (July 22, 2019) (stating second question presented as "[w]hether

*Employment Division v. Smith* should be revisited?"); *Fulton v. City of Philadelphia*, 140 S. Ct.

1104 (2020)) (granting certiorari).

## <u>Conclusion</u>

While Virginia wants to escape scrutiny of its law until another day, its law harms

people like Bob right now. "[E]quity ministers to the vigilant, not to those who sleep upon their

rights." *Perry v. Judd*, 471 F. App'x 219, 224 (4th Cir. 2012) (citation omitted). The fact that

Bob seeks clarity now before enforcement should count for him, not against. And Bob has

shown that his claims are much more than plausible. Federal courts have uniformly held that

laws like Virginia's transgress fundamental freedoms when they compel and restrict speech or

target religious exercise. So Bob asks this Court to deny Virginia's motion to dismiss in

its entirety.

Respectfully submitted this 14th day of December, 2020.

By: *s/  C. Douglas Welty*

Jonathan A. Scruggs                              C. Douglas Welty
Arizona Bar No. 030505                           Virginia Bar No. 29480
**Alliance Defending Freedom**                   **C. Douglas Welty PLC**

JA435

15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
(480) 444-0028 (facsimile)
jscruggs@ADFlegal.org

2111 Wilson Boulevard
Suite 800
Arlington, Virginia 22201
(703) 276-0114
(844) 456-7800 (facsimile)
cdwelty@weltyblair.com

David A. Cortman
Georgia Bar No. 188810
**Alliance Defending Freedom**
1000 Hurricane Shoals Rd. NE
Ste. D-1100
Lawrenceville, GA 30043
(770) 339-0774
(770) 339-6744 (facsimile)
dcortman@ADFlegal.org

Johannes S. Widmalm-Delphonse
Minnesota Bar No. 396303
**Alliance Defending Freedom**
20116 Ashbrook Place, Suite 250
Ashburn, VA 20147
(571) 707-4655
(571) 707-4656 (facsimile)
jwidmalmdelphonse@ADFlegal.org

ATTORNEYS FOR PLAINTIFFS

JA436

## CERTIFICATE OF SERVICE

I hereby certify that on the 14th day of December, 2020, I electronically filed the above

paper with the Clerk of Court using the CM/ECF system, which automatically sent an electronic

notification to the attorneys of record:

Mark R. Herring, Attorney General
Commonwealth of Virginia
Office of the Attorney General
202 North Ninth Street
Richmond, VA 23219

R. Thomas Payne, II, Director
Civil Rights Unit/SAAG Fair Housing
Division of Human Rights and Fair Housing
Office of the Attorney General
202 North Ninth Street
Richmond, VA 23219


/s/ *C. Douglas Welty*
C. Douglas Welty
*Attorney for Plaintiffs*

JA437

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
**Alexandria Division**

| | | |
|---|---|---|
| ROBERT UPDEGROVE *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:20-cv-01141-CMH-JFA |
| | ) | |
| MARK R. HERRING *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS

Mark R. Herring
   *Attorney General*

Erin B. Ashwell (VSB No. 79538)
   *Chief Deputy Attorney General*

Samuel T. Towell (VSB No. 71512)
   *Deputy Attorney General*

Toby J. Heytens (VSB No. 90788)
   *Solicitor General*

Martine E. Cicconi (VSB No. 94542)
Michelle S. Kallen (VSB No. 93286)
   *Deputy Solicitors General*

Jessica Merry Samuels (VSB No. 89537)
   *Assistant Solicitor General*

Kendall T. Burchard (VSB No. 95710)
   *John Marshall Fellow*

Office of the Attorney General
202 North Ninth Street
Richmond, Virginia 23219
(804) 786-6835 – Telephone
(804) 371-0200 – Facsimile
solicitorgeneral@oag.state.va.us

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................... ii

INTRODUCTION ..................................................................................................... 1

ARGUMENT ............................................................................................................ 1

    I.    Plaintiff's pre-enforcement challenge does not satisfy Article III's case or controversy requirement .................................................................................... 2

    II.   Plaintiff's free speech claim fails as a matter of law ................................... 5

        A.   Prohibiting discrimination regulates conduct, not speech ........................... 6

        B.   The Virginia Values Act does not require plaintiff to adopt or convey any message as his own ......................................................................................... 9

        C.   Speech incidental to lawful regulation of conduct has never been protected by the First Amendment ....................................................................................... 12

        D.   Plaintiff's freedom of association claim also fails ...................................... 13

    III.  Plaintiff's religious freedom claim fails as a matter of law ........................ 14

        A.   The Virginia Values Act is neutral and generally applicable ..................... 14

        B.   Plaintiff's other theories are not cognizable ............................................. 17

    IV.  The Virginia Values Act satisfies strict scrutiny ....................................... 18

CONCLUSION ....................................................................................................... 20

CERTIFICATE OF SERVICE ................................................................................. 21

# TABLE OF AUTHORITIES

**Page**

**Cases**

*303 Creative LLC v. Elenis,*
   385 F. Supp. 3d 1147 (D. Colo. 2019) ................................................... 18

*Abbott v. Pastides,*
   900 F.3d 160 (4th Cir. 2018) ................................................................ 4

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) ............................................................................ 15

*Babbitt v. United Farm Workers Nat. Union,*
   442 U.S. 289 (1979) ............................................................................. 3

*Billups v. City of Charleston, S.C.,*
   961 F.3d 673 (4th Cir. 2020) ................................................................ 7

*Boy Scouts of Am. v. Dale,*
   530 U.S. 640 (2000) ...................................................................... 13, 14

*Burson v. Freeman,*
   504 U.S. 191 (1992) ............................................................................ 18

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,*
   508 U.S. 520 (1993) ...................................................................... 15, 16

*Cornerstone Bible Church v. City of Hastings,*
   948 F.2d 464 (8th Cir. 1991) ............................................................... 18

*Elane Photography, LLC v. Willock,*
   309 P.3d 53 (N.M. 2013) .................................................................. 6, 18

*Employment Div., Dep't of Human Res. of Oregon v. Smith,*
   494 U.S. 872 (1990) ...................................................................... 14, 15

*Hurley v. Irish-American Gay, Lesbian and Bisexual Grp. of Boston,*
   515 U.S. 557 (1995) ...................................................................... 10, 14

*In re U.S. Catholic Conference,*
   885 F.2d 1020 (2d Cir. 1989) ............................................................... 4

*Kenny v. Wilson,*
   885 F.3d 280 (4th Cir. 2018) ................................................................ 4

*Maryland Shall Issue, Inc. v. Hogan,*
   971 F.3d 199 (4th Cir. 2020) ................................................................ 4

*Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n,*
   138 S. Ct. 1719 (2018) ........................................................... 7, 8, 16, 17

JA440

*MD Pharm., Inc. v. Drug Enforcement Admin.*,
    133 F.3d 8 (D.C. Cir. 1998) ................................................................ 4

*Miami Herald Publ'g Co. v. Tornillo*,
    418 U.S. 241 (1974) ...................................................................... 10

*Mink v. Suthers*,
    482 F.3d 1244 (10th Cir. 2007) ........................................................ 3

*Mobil Oil Corp. v. Attorney General of Va.*,
    940 F.2d 73 (4th Cir. 1991) .............................................................. 4

*National Park Hospitality Ass'n v. Department of Interior*,
    538 U.S. 803 (2003) ........................................................................ 5

*North Carolina Right to Life, Inc. v. Bartlett*,
    168 F.3d 705 (4th Cir. 1999) ............................................................ 4

*Pacific Gas & Elec. Co. v. Public Utilities Comm'n of Cal.*,
    475 U.S. 1 (1986) ........................................................................ 10

*People for the Ethical Treatment of Animals, Inc. v. Stein*,
    737 Fed. Appx. 122 (4th Cir. 2018) .................................................. 4

*Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*,
    413 U.S. 376 (1973) ................................................................ 10, 12

*Roberts v. United States Jaycees*,
    468 U.S. 609 (1984) ...................................................... 6, 7, 13, 19

*Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*,
    547 U.S. 47 (2006) ................................................................ passim

*Sorrell v. IMS Health Inc.*,
    564 U.S. 552 (2011) ...................................................................... 12

*Spokeo, Inc. v. Robins*,
    136 S. Ct. 1540 (2016) .................................................................... 5

*State v. Arlene's Flowers, Inc.*,
    193 Wash. 2d 469 (2019) ........................................................ 13, 18, 19

*Susan B. Anthony List v. Driehaus*,
    573 U.S. 149 (2014) .................................................................. 2, 3, 4

*Telescope Media Grp. v. Lucero*,
    936 F.3d 740 (8th Cir. 2019) ........................................................ 7, 17

*Trustgard Ins. Co. v. Collins*,
    942 F.3d 195 (4th Cir. 2019) ............................................................ 5

*United States v. O'Brien*,
    391 U.S. 367 (1968) ........................................................................ 6

*West Virginia State Bd. of Educ. v. Barnette*,
    319 U.S. 624 (1943) ...................................................................... 14

JA441

*Williamson v. Lee Optical of Okla., Inc.*,
   348 U.S. 483 (1955) ............................................................................................ 7

## Constitutional Provisions

U.S. Const. art. III ............................................................................... 2, 3, 4, 5

U.S. Const. amend. I ................................................................................... passim

## Statutes

Va. Code Ann. § 2.2-3900 *et seq* ............................................................... 19

Va. Code Ann. § 2.2-3904 ..................................................................... 6, 15

## Other Materials

Bob Updegrove, *A New Virginia Law is Censoring Artists Like Me*,
   Wash. Post (Oct. 30, 2020) ........................................................................ 11

JA442

## INTRODUCTION

In adopting the Virginia Values Act, the General Assembly did something that state and federal governments have done numerous times before: prohibit discrimination in the public sphere based on protected characteristics. Like other anti-discrimination laws that came before it, nothing in the Act requires covered persons to say anything, adopt any specific belief, or subscribe to any particular creed. Instead, the law simply—but critically—requires businesses that serve the public to serve all customers equally, regardless of who they are. Courts have long rejected constitutional challenges to such statutes, and this Court should do the same.

Plaintiff's litany of arguments to the contrary all suffer from the same fatal flaw: attempting to re-cast a rule regulating the *conduct* of businesses that choose to serve the public as a government-issued command to personally and publicly endorse a particular "Government-mandated pledge or motto." *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 62 (2006). The Virginia Values Act does no such thing. The Act regulates what plaintiff must do, not what he must say, and there is no risk that the Act's equal-access rule will unduly interfere with any expressive message plaintiff wishes to convey on his own. The Act does not target anyone's religious beliefs and it has the same effect across the board. And even if the Act triggered strict scrutiny, it would survive in any event. For all of these reasons, plaintiff's claims fail as a matter of law, and the complaint should be dismissed in its entirety.

## ARGUMENT

The Virginia Values Act is no different than scores of other federal, state, and local anti-discrimination laws that have been adopted and upheld for more than a century. As a threshold matter, this Court lacks subject-matter jurisdiction over plaintiff's pre-enforcement challenge. See Part I, *infra*. The complaint also fails to allege any viable First Amendment claims because the Virginia Values Act neither regulates plaintiff's speech, see Part II, *infra*, nor targets or

JA443

disfavors any religious practice, see Part III, *infra*. In any event, plaintiff's claims also fail because the Virginia Values Act is narrowly tailored to achieve the compelling state interest in combatting discrimination. See Part IV, *infra*.

## I.    Plaintiff's pre-enforcement challenge does not satisfy Article III's case or controversy requirement

For this Court to have jurisdiction, Article III requires that plaintiff have standing and that his claims are currently ripe. Where, as here, the challenged law has not yet been enforced against plaintiff, those two requirements present "the same question": whether "threatened enforcement [is] sufficiently imminent." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 & n.5 (2014) (*SBA List*). "Specifically," the Supreme Court has emphasized, a plaintiff raising a pre-enforcement challenge must show *both* "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute" *and* that "there exists a credible threat of prosecution thereunder." *Id.* at 159 (quotation marks and citation omitted).

1.      Plaintiff has failed to establish the "credible threat" element. See Dkt. 20 (Defs.' Mem.) 9–11. Most obviously, the complaint does not allege that plaintiff has ever been asked to photograph a same-sex wedding, nor does it provide any basis to think such a request is likely anytime soon.

Plaintiff responds that he can violate the Act without actually receiving or declining any such requests. See Dkt. 47 (Pl.'s Resp.) 14–15. But plaintiff does not allege—much less show— that the Division of Human Rights or the Office of the Attorney General has threatened his business with potential enforcement proceedings, and most of the evidence to which plaintiff points has nothing to do with the Virginia Values Act. For example, although plaintiff cites a series of amicus briefs that Virginia's Attorney General has joined in other cases, see Pl.'s Resp. 11 (citing Compl. ¶¶ 181, 185), none of those cases involved enforcement decisions regarding

this statute or plaintiff's business. Accord Defs.' Mem. 11 n.10. And despite insisting that

"creative professionals" operate in a "seek-and-destroy environment" with respect to anti-

discrimination laws, Pl.'s Resp. 16, plaintiff cites no evidence from Virginia in support of that

heated claim. Indeed, the only evidence plaintiff cites that has anything to do with this case is a

press release where Attorney General Mark R. Herring stated: "I will do everything in my power

to defend the Virginia Values Act." Pl.'s Resp. 11. But a pledge by a state's Attorney General to

defend a duly enacted state law against a constitutional challenge is hardly a threat—or even a

suggestion—that administrative enforcement proceedings against a specific party may be

imminent. In any event, "[i]t is not necessary for defendants to refute and eliminate all possible

risk that the statute might be enforced to demonstrate a lack of a case or controversy." *Mink v.

Suthers*, 482 F.3d 1244, 1255 (10th Cir. 2007) (quotation marks omitted).

       2.      Having failed to demonstrate any "credible threat" of enforcement against him,

plaintiff insists that no such showing is required. Instead, plaintiff asserts that all he needs to do

to satisfy Article III is show that he is "covered by the statute." Pl.'s Resp. 10. The Supreme

Court and the Fourth Circuit have held otherwise.

       As early as 1979, the Supreme Court emphasized that a plaintiff bringing a pre-

enforcement challenge must establish *both* that his intended conduct is "proscribed by a statute,

*and* [that] there exists a credible threat of prosecution thereunder." *Babbitt v. United Farm

Workers Nat. Union*, 442 U.S. 289, 298 (1979) (emphasis added). The Court repeated the same

language 35 years later, confirming there are two requirements, not one. See *SBA List*, 573 U.S.

at 159. The Fourth Circuit has likewise emphasized that "a credible threat of enforcement is

critical" to the standing analysis, even in the First Amendment context where a litigant asserts

"self-censoring" or some kind of "chilling effect." *Abbott v. Pastides*, 900 F.3d 160, 176 (4th

Cir. 2018); accord *Maryland Shall Issue, Inc. v. Hogan*, 971 F.3d 199, 218 (4th Cir. 2020) (rejecting pre-enforcement challenge where plaintiffs "offered no evidence to support a credible threat of prosecution").[1]

There is a good reason why statutory coverage and a credible threat of enforcement are separate requirements for establishing a justiciable pre-enforcement challenge. Accepting plaintiff's suggestion to ignore the threatened enforcement prong would mean that *anyone* who has a colorable claim that a statute *might* apply to them would be permitted to bring suit, thus eviscerating Article III's strict limits on federal court authority to hear pre-enforcement challenges. As explained above, that is not the law.

3.    Plaintiff's attempted analogy to "competitor standing" fares no better. See Pl.'s Resp. 18–19. For one thing, none of the decisions plaintiff cites suggests that complying with anti-discrimination laws can (or should) be understood to impose any kind of "efficien[cy]" or "reputational" harm on a business relative to its competitors. *Id.* at 19.

There is, moreover, a fundamental disconnect between a theory of competitor standing, on the one hand, and the "harm" plaintiff asserts and the relief he seeks on the merits. The whole idea behind competitor standing is that the complaining party is *losing out on business* because "the government has bestowed [an] assertedly illegal benefit" on other participants in the same market. *In re U.S. Catholic Conference*, 885 F.2d 1020, 1029 (2d Cir. 1989); see also *MD Pharm., Inc. v. Drug Enforcement Admin.*, 133 F.3d 8, 11 (D.C. Cir. 1998) ("We have previously

---

[1] The cases on which plaintiff relies either pre-date the Supreme Court's decision in *SBA List*, see *North Carolina Right to Life, Inc. v. Bartlett*, 168 F.3d 705, 711 (4th Cir. 1999); *Mobil Oil Corp. v. Attorney General of Va.*, 940 F.2d 73, 76 (4th Cir. 1991); or involved relevant past enforcement action, see *Kenny v. Wilson*, 885 F.3d 280, 289 (4th Cir. 2018) (plaintiffs "ha[d] been prosecuted under the laws in the past"), or prior conduct by the plaintiffs, see *People for the Ethical Treatment of Animals, Inc. v. Stein*, 737 Fed. Appx. 122, 130 (4th Cir. 2018) (plaintiffs "ha[d] in the past conducted" the type of investigations at which the relevant statute "was specifically targeted").

JA446

held that increased competition represents a cognizable Article III injury."). But plaintiff does not assert that the Virginia Values Act has caused him to lose business—to the contrary, the point of this suit is that plaintiff wishes to do *less* business than the law requires. See, *e.g.*, Compl. ¶ 130 ("[I]t is [plaintiff]'s pattern and practice to decline requests to create photographs that violate his religious beliefs."). And the relief that plaintiff seeks—to be exempted from a law that otherwise applies to all public businesses—is inconsistent with a theory of standing that is supposedly premised on leveling the playing field vis-à-vis competitors.

4.      Requiring a plaintiff to establish a credible threat of enforcement to bring a pre-enforcement challenge is more than a pleading technicality. Adjudicating claims that are unripe or where the plaintiff has experienced no injury-in-fact would reach beyond "a properly judicial role," *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016), and risk "entangling [courts] in abstract disagreements," *National Park Hospitality Ass'n v. Department of Interior*, 538 U.S. 803, 807 (2003). More specifically, where a law has never been—and may never be—enforced against plaintiff, his request for a judicially granted "exemption" from that law (Compl. ¶ 284) seeks what would effectively be an advisory opinion on hypothetical or abstract facts, a step that would contravene "one of the most long-standing and well-settled jurisdictional rules." *Trustgard Ins. Co. v. Collins*, 942 F.3d 195, 200 (4th Cir. 2019).

## II.      Plaintiff's free speech claim fails as a matter of law

Plaintiff's free speech arguments confuse what the Virginia Values Act does (prohibit public-facing businesses from discriminating against certain groups by refusing to serve them) with something it does not (require plaintiff to adopt or profess any particular message or belief of his own). But the Act regulates what plaintiff does, not what he must believe or say. And that distinction makes all the difference.

JA447

### A.    Prohibiting discrimination regulates conduct, not speech

Although the impact of the law is no doubt significant, the way the Virginia Values Act works is simple. As of July 1, 2020, any "business[]" that "offer[s] or hold[s] out to the general public goods[ or] services" may not "refuse . . . or deny any individual . . . any of the . . . services . . . made available" by that business "on the basis of" several protected characteristics, including "race, . . . religion, . . . sex, . . . [or] sexual orientation." Va. Code Ann. § 2.2-3904.

1.    The statutory text makes clear that "the only choice regulated" by the Virginia Values Act is plaintiff's "choice of clients," not his "editorial judgment" or system of beliefs. *Elane Photography, LLC v. Willock*, 309 P.3d 53, 67 (N.M. 2013). The only legal requirement that the Act imposes on plaintiff's "for-profit photography business that offers and provides photography services to the general public on a commission basis," Compl. ¶ 18, is that it may not refuse to provide LGBT individuals the same *services* it provides others. Accord Pl.'s Resp. 5 (agreeing that the Act requires plaintiff to serve same-sex couples in the same way that he serves opposite-sex couples). For that reason, the Act regulates what plaintiff "must *do*," not what he "may or may not *say*." *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 60 (2006) (*FAIR*). And, under well-established precedent, that sort of regulation does not implicate—much less violate—the First Amendment. Accord *Roberts v. United States Jaycees*, 468 U.S. 609, 634 (1984) (*Jaycees*) (O'Connor, J., concurring) ("A shopkeeper has no constitutional right to deal only with persons of one sex.").

Plaintiff's contrary argument ignores the fundamental distinction between forbidding discriminatory conduct and compelling speech. See Dkt. 46 (Pl.'s Reply) 2–4. But courts have long recognized the importance of the conduct/speech distinction, see, *e.g.*, *United States v. O'Brien*, 391 U.S. 367, 376 (1968), and state regulation of commercial conduct in the public marketplace is neither new nor controversial, see *Williamson v. Lee Optical of Okla., Inc.*, 348

JA448

U.S. 483, 491 (1955); see also *Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n*, 138 S. Ct. 1719, 1728 (2018) ("It is unexceptional that Colorado law can protect gay persons, just as it can protect other classes of individuals, in acquiring whatever products and services they choose on the same terms and conditions as are offered to other members of the public.").[2]

The categorical way that the Act operates also underscores why its prohibition on discriminatory conduct applies the same way regardless of viewpoint. As with the Minnesota law upheld in *Jaycees*, the Virginia Values Act "[o]n its face . . . does not distinguish between prohibited and permitted activity on the basis of viewpoint," nor does it "license enforcement authorities to administer the statute on the basis of such constitutionally impermissible criteria." 468 U.S. at 623; see also Pl.'s Reply 12 (agreeing that *Jaycees* concluded that the state anti-discrimination law at issue "was facially content-neutral" (emphasis omitted)). Plaintiff is therefore wrong that the Act "changes the content of [his] speech" and "requires access only to certain viewpoints." *Id.* Instead, the anti-discrimination rule applies to all public accommodations irrespective of the beliefs or viewpoints a given business's owners may hold.[3]

2.    Plaintiff responds that content-neutrality on the face of the Virginia Values Act is irrelevant because he brings an as-applied challenge. Pl.'s Reply 2, 12–13. According to plaintiff, a "facially content-neutral" law may nonetheless "act[] as a content-based regulation as applied to" a particular plaintiff. *Id.* at 12–13 (emphases omitted).

That simply cannot be right. To be sure, it would not be constitutional to *selectively enforce* a facially neutral law on the basis of content or viewpoint. But plaintiff is not

---

[2] *Billups v. City of Charleston, S.C.*, 961 F.3d 673 (4th Cir. 2020), is not to the contrary because the regulation there "completely prohibit[ed]" an expressive activity and therefore was not "a restriction on economic activity that incidentally burdens speech." *Id.* at 683.

[3] Plaintiff attempts to distinguish *Jaycees* based on the Eighth Circuit's sharply divided decision in *Telescope Media Grp. v. Lucero*, 936 F.3d 740 (8th Cir. 2019). See Pl.'s Reply 12. That decision, of course, is not binding here.

JA449

challenging a pattern of enforcement—he is seeking an exemption from the Act itself. And

although the determination of whether a law unconstitutionally infringes on an individual's

freedom of speech necessarily looks to the text of the statute to understand how the law affects

that individual, that context-specific analysis (which is necessary to any constitutional claim)

does not somehow transform a content-neutral law into one that is content-based. Indeed,

adopting plaintiff's theory would mean that *every* law is content-based because *all* laws apply to

different people in different situations.[4]

3.      Plaintiff also tries to bring himself within the Free Speech Clause's protection by

insisting he wishes to refuse service to customers based on the "message" their proposed

photographs would convey rather than their "status" as members of a protected group. Pl.'s

Reply 10. But there is no way around the fact that plaintiff's preferred "practice" of "declin[ing]

any photography requests celebrating . . . same-sex engagements or weddings" discriminates

based on *status*. Compl. ¶ 119. Even if plaintiff would accept a request by "a gay wedding

planner" to "photograph someone's opposite-sex wedding," or agree to "serve" a "lesbian,

bisexual, or pansexual woman [who] asked [plaintiff] to photograph her wedding to a man," Pl.'s

Reply 10, his refusal to photograph same-sex weddings still discriminates against same-sex

couples who are consistently and intentionally turned away. See *Masterpiece Cakeshop*, 138 S.

Ct. at 1727 (describing "community-wide stigma" that would "result[ ]" if "a long list of persons

who provide goods and services for marriages and weddings . . . refuse[d] to do so for gay

persons"). The fact that plaintiff may not discriminate against *all* LGBT individuals in *all*

contexts does not mean that he does not do so in any context, in the same way that a hotel that

---

[4] If anyone has "confuse[d] facial and as-applied challenges," Pl.'s Reply 2, it is plaintiff.
Although plaintiff insists that the Act should be analyzed "as applied to [his] photographs," *id.* at
13, he later argues that the entire statute is "void," Pl.'s Resp. 27 n.7. Further confusing matters,
the complaint seeks relief both "facially" and "as applied." Compl. at 45.

did not allow Black guests could not raise as a defense the fact that it would accept reservations and payments from Black individuals for stays by white guests.

### B.   The Virginia Values Act does not require plaintiff to adopt or convey any message as his own

Seeking to overcome the critical difference between conduct and speech, plaintiff contends that "his photography is speech" and that the Virginia Values Act "forces him to create and post speech he disagrees with" by requiring that he provide the same event photography services to same-sex couples that he provides to opposite-sex couples. Pl.'s Reply 2. Although photographs certainly have expressive qualities, plaintiff's argument ignores several crucial aspects of First Amendment jurisprudence.

1.    Unlike core compelled speech cases, the Virginia Values Act does not "dictate the content of [plaintiff's] speech at all" or announce "a Government-mandated pledge or motto that [plaintiff] must endorse." *FAIR*, 547 U.S. at 62. Instead, all the Act requires is that businesses offer their services—in this case, wedding photography—to all customers on an equal basis. As the Supreme Court explained in *FAIR*, this type of equal access requirement is "a far cry from . . . forcing a student to pledge allegiance, or forcing a Jehovah's Witness to display the motto 'Live Free or Die.'" *Id.* For that reason, most of the compelled-speech cases on which plaintiff relies have no application to the facts of this case. Contra Pl.'s Reply 2 (asserting that the Act compels plaintiff "to utter what is not in his mind").

2.    Plaintiff is also wrong because *his own* expression is not affected by stating that he must provide the same photography services to same-sex couples that he provides to opposite-sex couples. The Supreme Court rejected a similar argument in *FAIR* by law schools that did not wish to host military recruiters, explaining that "compelled-speech violation[s]" typically

"result[] from the fact that the complaining speaker's own message [i]s affected by the speech [he is] forced to accommodate." 547 U.S. at 63.

a.     This relationship between speaker and speech shows why *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston*, 515 U.S. 557 (1995), and the newspaper cases came out the way they did. In *FAIR*, the Court highlighted "[t]he expressive nature of a parade" as "central" to the Court's holding in *Hurley*. See *FAIR*, 547 U.S. at 63. "[B]ecause every participating unit affects the message conveyed by the parade's private organizers," the Court explained, "a law dictating that a particular group must be included in the parade alters the expressive content of the parade." *Id.* (citing *Hurley*, 515 U.S. at 572–73); accord *Hurley*, 515 U.S. at 573 (stating that "the [parade] sponsors' speech itself" was "declar[ed] . . . to be the public accommodation").

The same standard applies to newspapers, although sometimes with a different result. The "right-of-reply" statute at issue in *Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241 (1974), "infringed the newspaper editors' freedom of speech by altering the message the paper wished to express," *FAIR*, 547 U.S. at 64, just as the mandatory inclusion a of a third-party newsletter in a utility's regular mailing at issue in *Pacific Gas & Electric Co. v. Public Utilities Commission of California*, 475 U.S. 1 (1986), "interfered with the utility's ability to communicate its own message." *FAIR*, 547 U.S. at 64. In contrast—and similar to this case—in *Pittsburgh Press Co. v. Pittsburgh Commission on Human Relations*, 413 U.S. 376 (1973), the Supreme Court upheld a rule barring a newspaper from publishing help-wanted ads in sex-specific columns, in part because the restriction had no effect on the newspaper's own message and its editorial decisions about what to publish and what to leave out. See *id.* at 391.

b.      Here, even assuming that photographs may constitute speech as a general matter,

a particular couple's "message" is not attributable to plaintiff any more than it would be to a

caterer or lighting designer. Just like other service professionals, wedding vendors serve many

clients in many different contexts, and no one reasonably associates the views of every one of

those clients with the vendor itself.[5] Providing wedding photography services does not in any

way "suggest[] that [plaintiff] agree[s] with any speech" by the couples he serves, and nothing in

the Virginia Values Act "restricts what [plaintiff] may say"—in conversations, editorials,

billboards, or otherwise—about the morality or permissibility of same-sex marriage. *FAIR*, 547

U.S. at 65.[6] Because there is no significant risk of "interference with [plaintiff]'s desired

message," the Virginia Values Act does not infringe plaintiff's free speech rights. *Id.* at 64.

Plaintiff's contrary arguments are not limited to Bob Updegrove photography or

plaintiff's specific views. To take just one example, under plaintiff's view that his commercial

conduct is necessarily his own expression, a photographer who regularly documents important

milestones such as high school graduations could refuse to photograph female graduates based

on the sincerely held religious belief that women are meant to only work in the home and

therefore should not be educated. On plaintiff's theory, such discrimination would be exempt

from a public accommodations law under the First Amendment because photographing female

graduates would—according to plaintiff—"forc[e]" the photographer "to personally

communicate messages he disagrees with." Pl.'s Reply 5. Once again, that cannot be right.

---

[5] Plaintiff's theory also rests on the deeply flawed assumption that all same-sex weddings are inherently political statements or celebrations of the concept of "same-sex marriage" itself. Regardless of a given couple's genders or sexual orientation, a wedding ceremony celebrates the union of two individuals, not the lawfulness or propriety of same-sex (or opposite-sex) marriage.

[6] See, *e.g.*, Bob Updegrove, *A New Virginia Law is Censoring Artists Like Me*, Wash. Post (Oct. 30, 2020), https://www.washingtonpost.com/opinions/local-opinions/a-new-virginia-law-is-censoring-artists-like-me/2020/10/27/bb2fe248-117d-11eb-ba42-ec6a580836ed_story.html.

JA453

**C.    Speech incidental to lawful regulation of conduct has never been protected by the First Amendment**

It is well-accepted that "restrictions directed at commerce or conduct" are constitutional even if they "impos[e] incidental burdens on speech." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011). "[W]hen [a] commercial activity itself is illegal," the First Amendment permits restrictions of speech that are "incidental to a valid limitation on economic activity." *Pittsburgh Press*, 413 U.S. at 389. For example, "a newspaper constitutionally could be forbidden to publish a want ad proposing a sale of narcotics or soliciting prostitutes," *id.* at 388, and anti-discrimination laws do not regulate an employer's speech just because they would "require an employer to take down a sign reading 'White Applicants Only,'" *FAIR*, 547 U.S. at 62.

This clear rule is likely why plaintiff's arguments under the "Publication Clause" of the Virginia Values Act collapse into his arguments about the "Accommodations Clause." Indeed, plaintiff specifically concedes this point in his opposition brief by stating that "in deciding whether [plaintiff] can constitutionally adopt or distribute his desired policy declining to create photographs celebrating same-sex weddings, this Court will need to determine whether [plaintiff] can constitutionally decline to create these photographs." Pl.'s Resp. 15.

Consistent with that concession, plaintiff does not separately analyze his claims under the Publication and Accommodations Clauses. Instead, plaintiff asserts that his Publication Clause claim is viable *because* his desire "to exercise control over his photography" by declining to serve same-sex couples "is protected speech." Pl.'s Reply 14. But that is precisely the same argument plaintiff advances under the Accommodations Clause, which fails as outlined above. For that reason, the Publication Clause claim adds nothing to the analysis.

JA454

### D.    Plaintiff's freedom of association claim also fails

As just explained, plaintiff has not alleged a viable free speech claim because the Virginia Values Act does not regulate *his* speech, nor does it compel him to adopt any specific message as his own. Plaintiff's association-based claim suffers from the same flaw: Nothing about the Act forces plaintiff to associate with anyone, much less in an expressive way.

The right to expressive association is rooted in "collective effort on behalf of shared goals" and the "right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Jaycees*, 468 U.S. at 622. The First Amendment "extend[s]" to that context because "[t]he right to speak is often exercised most effectively by combining one's voice with the voices of others." *FAIR*, 547 U.S. at 68. "[T]o come within [the] ambit" of expressive association, therefore, "a *group* must engage in some form of expression." *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648 (2000) (emphasis added).

This constitutional protection simply has no application to plaintiff's commercial relationship with his paying customers. By offering a service—documenting a wedding for a couple in exchange for money—plaintiff is no more "associating" with the couple or their guests than a bartender, a shuttle driver, or any other vendor. Nor is plaintiff conveying a recognizable message or "combining [his] voice" with anyone in pursuit of a particular goal. *FAIR*, 547 U.S. at 68; see *State v. Arlene's Flowers, Inc.*, 193 Wash. 2d 469, 533 (2019) ("[T]he Supreme Court has never held that a commercial enterprise, open to the general public, is an 'expressive association' for purposes of First Amendment protections." (quoting *Dale*, 530 U.S. at 648)). Similar to the recruiters in *FAIR*, plaintiff is an "outsider[]" who attends a couple's wedding "for the limited purpose of" taking photographs—"not to become members of the [couple]'s expressive association." *FAIR*, 547 U.S. at 69. Plaintiff may not invoke the First Amendment

"simply by asserting that mere association would impair [his] message," and his conclusory allegations to the contrary are not sufficient on a motion to dismiss. *Id.* at 69.

*     *     *

This is not the first time a litigant has "attempted to stretch a number of First Amendment doctrines well beyond the sort of activities these doctrines protect." *FAIR*, 547 U.S. at 70. The Supreme Court has already rejected that strategy, and plaintiff's claims fail for the same reason. "To the extent that the [Act] incidentally affects expression, [plaintiff's] effort to cast [himself] as just like the schoolchildren in *Barnette*, the parade organizers in *Hurley*, and the Boy Scouts in *Dale* plainly overstates the expressive nature of [his] activity and the impact of the [Act] on it, while exaggerating the reach of [the Supreme Court's] First Amendment precedents." *Id.* Plaintiff's free speech claim should therefore be dismissed.

## III.    Plaintiff's religious freedom claim fails as a matter of law

### A.    The Virginia Values Act is neutral and generally applicable

Plaintiff's contrary suggestions aside (see Pl.'s Reply 15–16; Pl.'s Resp. 27–28), the religious-freedom analysis adopted by the Supreme Court in *Employment Division v. Smith*, 494 U.S. 872 (1990), remains the law of the land. And, as *Smith* made clear, the free exercise of religion protected by the First Amendment does not extend so far as to "relieve an individual of the obligation to comply with a valid and neutral law of general applicability." *Id.* at 879. The Virginia Values Act is precisely such a law.[7]

1.    As previously noted, the text of the Virginia Values Act does not single anyone out for differential treatment. See page 6–7, *supra*. The Act's prohibition on discrimination

---

[7] Plaintiff also urges this Court to recognize a religious-freedom theory that applies strict scrutiny because the Virginia Values Act is (alleged to be) "inconsistent with our nation's history and tradition." Pl.'s Resp. 27. Plaintiff concedes that such a theory would require "*Smith* [to] be overruled," which "this Court cannot do." *Id.* at 28.

14

JA456

applies equally to all businesses that "offer[] . . . goods[ or] services" to "the general public," Va. Code Ann. § 2.2-3904, and nowhere does the statute prescribe certain rules that apply only to religious conduct or individuals who adhere to certain beliefs. Plaintiff's suggestion that the Act "gives favorable treatment to secular speakers" depends entirely on his flawed argument that the law "forc[es] [him] to speak messages inconsistent with his religious beliefs," Pl.'s Resp. 26, which lacks merit for the reasons already discussed—including that such a theory would make every law viewpoint-based when applied to people who may disagree. See page 7–8, *supra*. And plaintiff's conclusory allegations that he "actively participates in the weddings he photographs" for the purposes of asserting a religious-freedom claim, see Compl. ¶ 108, are legal conclusions that should be disregarded under Rule 12(b)(6). See *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("A pleading that offers labels and conclusions . . . will not do."). Because the Virginia Values Act does not selectively "impose burdens only on conduct motivated by religious belief," it is generally applicable under *Smith* and its progeny. *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 543 (1993).

Plaintiff insists that a handful of exceptions across multiple different statutes undermine the general applicability of the Virginia Values Act. See Pl.'s Reply 18; see also Dkt. 6 (Pl.'s Mem.) 27–28. But none of those exceptions—either separately or together—amounts to broad carve-outs that show the General Assembly "decide[d] that the governmental interests" in prohibiting discrimination "are worthy of being pursued only against conduct with a religious motivation," as was the case with the severely "underinclusive" animal sacrifice law in *Lukumi*. 508 U.S. at 542–44. And the two specific exceptions on which plaintiff focuses—private clubs and age restrictions in the context of government programs, see Pl.'s Reply 18—do not in any

way differentiate between religious and secular conduct, much less suggest that the Act was designed to compel only certain people to violate their sincerely held religious beliefs.

2.      The Virginia Values Act is also "neutral" because its "object" is not to "restrict practices because of their religious motivation." *Lukumi*, 508 U.S. at 533. Again, the structure of the law is instructive on this point, as the Act, "by [its] own terms" does not "target" a particular "religious exercise"—all the law does is require *every* public accommodation to serve customers equally. *Id.* at 542.

Nor has plaintiff shown that the history of the Act "discloses animosity to [religious] adherents and their religious practices." *Lukumi*, 508 U.S. at 542. The statements by legislators on which plaintiff relies do not criticize or belittle any particular religion or sect, but instead focus on discrimination and bigotry more generally. See Compl. ¶ 247 ("if you are a public organization, your doors are supposed to be open to everyone in the public"); ¶ 248 (criticizing *all* forms of "bigotry," including "religious bigotry"). The only thing these statements show "hostility" toward is turning someone away because of who they are—whatever the motivation—which plaintiff expressly disavows as connected to his religious beliefs. Pl.'s Resp. 27; accord Pl.'s Reply 10 ("[plaintiff] *never* discriminates based on status"); Compl. 1 (plaintiff has "never declined to serve anyone because of who they are").

Plaintiff's reliance on *Masterpiece Cakeshop* in support of this point is equally misplaced for two related reasons. First, *Masterpiece Cakeshop* was not a pre-enforcement challenge. Instead, the plaintiff there challenged a completed enforcement action against his specific business, see 138 S. Ct. at 1723, and the statements that the Court found evidenced a "clear and impermissible hostility" toward religion came from the administrative proceeding in that plaintiff's own case before the state's Civil Rights Commission, *id.* at 1729. Here, by contrast,

the statements plaintiff cites are not hostile to religion in general or him in particular and they come from the broad legislative debate that took place as the General Assembly considered various proposals for amending Virginia's anti-discrimination laws. As already explained, plaintiff has no specific enforcement history on which to rely because the public accommodation provision has not been enforced against him or his business. See page 2, *supra*.

Second, *Masterpiece Cakeshop* squarely reaffirmed that States *may* constitutionally enact laws that ban discrimination against LGBT individuals in public accommodations. See 138 S. Ct. at 1728 (state law may "protect . . . classes of individuals," including "gay persons," in "acquiring whatever products and services they choose on the same terms and conditions as are offered to other members of the public"). And although "religious and philosophical objections to gay marriage" may be "protected views and in some instances protected forms of expression," the Court explained, "it is a general rule that such objections *do not allow* business owners and other actors in the economy and in society to deny protected persons equal access to goods and services under a neutral and generally applicable public accommodations law." *Id.* at 1727 (emphasis added). Because plaintiff's pre-enforcement challenge attacks just such a rule, *Masterpiece Cakeshop* weighs strongly in favor of upholding the Virginia Values Act.

### B.    Plaintiff's other theories are not cognizable

All of plaintiff's remaining religion-based theories also lack merit. As defendants have already explained, the "hybrid rights" claim plaintiff asserts has never been recognized in this circuit. See Defs.' Mem. 22–23. Plaintiff never disputes that point; instead he relies on out-of-circuit cases to urge the Court to break new ground here. See Pl.'s Reply 16. But plaintiff cites no case where any court has allowed a "hybrid rights" theory to proceed in the absence of a viable First Amendment claim standing alone. See *Telescope Media Grp. v. Lucero*, 936 F.3d 740, 760 (8th Cir. 2019) ("[I]t is not at all clear that the hybrid-rights doctrine will make any real

JA459

difference in the end."); *Cornerstone Bible Church v. City of Hastings*, 948 F.2d 464, 473 (8th Cir. 1991) (allowing consideration of "hybrid rights" claim in connection with viable free speech claim). Because plaintiff's First Amendment claims fail, see Parts II and III(A), *supra*, the complaint does not allege an independently viable "hybrid rights" theory.

Plaintiff invokes a similar "hybrid" theory in asserting that a judicial consensus has emerged in favor of overturning anti-discrimination laws like the Virginia Values Act. See Pl.'s Reply 1–2; Pl.'s Resp. 28. But plaintiff's claim that federal courts have "unanimously" or "uniformly" invalidated these laws based on religious objections is both inaccurate and incomplete. Pl.'s Reply 2, Pl.'s Resp. 28. In particular, plaintiff's argument does not account for *303 Creative LLC v. Elenis*, 385 F. Supp. 3d 1147 (D. Colo. 2019), where a federal court rejected free speech and free exercise challenges to Colorado's public accommodations law. See *id.* at 1150. It also completely ignores the two decisions by state high courts that decisively rejected the same arguments offered here. See *Arlene's Flowers, Inc.*, 193 Wash. 2d at 536; *Elane Photography*, 309 P.3d at 77. In any event, it goes without saying that the cases on which plaintiff relies—the vast majority of which engendered thorough and impassioned dissents—do not bind this Court.

## IV.    The Virginia Values Act satisfies strict scrutiny

Even if the Virginia Values Act implicated protected speech or religious exercise, the law would still pass constitutional muster. For the reasons defendants have already explained, the Act is "narrowly drawn to achieve" the "compelling state interest" in combatting discrimination in public accommodations. *Burson v. Freeman*, 504 U.S. 191, 198 (1992); see Defs.' Mem 23–25.

Other than rehashing prior arguments that lack merit for the reasons already explained, plaintiff offers only two responses. First, plaintiff quibbles with the level of specificity required to define a compelling government interest, arguing that the Commonwealth may not act to

JA460

prohibit discrimination generally but must instead root out inequality one situation at a time. See Pl.'s Reply 17 (identifying the relevant state interest as "wedding photographers discriminating and impeding access to photography in Virginia"). But the statute being challenged in this case is the Virginia Values Act, not the "LGBT Rights in Potentially Expressive Wedding-Related Services Act."[8] And, as the statutory text makes clear, the goal of the General Assembly in adopting this law was eradicating discrimination across many contexts, including employment and *all* places of public accommodation. See Va. Code Ann. § 2.2-3900 *et seq.* Plaintiff cites no authority for the proposition that courts hold legislatures to such granular exercises of their power to combat invidious discrimination. Accord *Jaycees*, 458 U.S. at 623 (upholding state statute based on "compelling interest in eradicating discrimination against its female citizens").

Plaintiff also criticizes the Commonwealth for not "tr[ying] other methods" to tailor the Act more narrowly. Pl.'s Reply 19. But the "alternatives" plaintiff offers up are not different *means* of achieving the same goal (rooting out all discrimination in public accommodations). Rather, they are a suggestion that Virginia should have identified certain contexts in which that goal will not be pursued and where forms of otherwise-unlawful discrimination will simply be permitted. See Pl.'s Mem. 29 (asserting that Virginia should "exempt individuals and small businesses that celebrate weddings"). Because such "a patchwork of exceptions for ostensibly justified discrimination" would "fatally undermine[]" the "broader societal purpose" of "eradicating barriers to the equal treatment of all citizens in the commercial marketplace," plaintiff's proposals are neither relevant nor necessary to a narrow-tailoring analysis. *Arlene's Flowers, Inc.*, 193 Wash. 2d at 531.

_____

[8] Indeed, adopting a law as specific as plaintiff appears to demand could invite even fiercer criticism under the First Amendment that the law targeted for regulation certain individuals or views. Cf. Pl.'s Resp. 21 (objecting to "differential treatment"); *id.* at 25 (arguing that Act "selectively burden[s] religious speakers like [plaintiff]").

JA461

# CONCLUSION

The complaint should be dismissed in its entirety.

Dated: December 23, 2020

Respectfully submitted,

**MARK R. HERRING**
**R. THOMAS PAYNE, II**

By: ___*/s/ Jessica Merry Samuels*_____
    Jessica Merry Samuels (VSB No. 89537)
    *Assistant Solicitor General*

Mark R. Herring
  *Attorney General*

Erin B. Ashwell (VSB No. 79538)
  *Chief Deputy Attorney General*

Samuel T. Towell (VSB No. 71512)
  *Deputy Attorney General*

Toby J. Heytens (VSB No. 90788)
  *Solicitor General*

Martine E. Cicconi (VSB No. 94542)
Michelle S. Kallen (VSB No. 93286)
  *Deputy Solicitors General*

Kendall T. Burchard (VSB No. 95710)
  *John Marshall Fellow*

Office of the Attorney General
202 North Ninth Street
Richmond, Virginia 23219
(804) 786-6835 – Telephone
(804) 371-0200 – Facsimile
solicitorgeneral@oag.state.va.us

JA462

## CERTIFICATE OF SERVICE

I hereby certify that on December 23, 2020, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to all counsel who have appeared.

By:    */s/ Jessica Merry Samuels*
Jessica Merry Samuels
*Assistant Solicitor General*
Office of the Attorney General
202 North Ninth Street
Richmond, Virginia 23219
(804) 786-6835 – Telephone
(804) 371-0200 – Facsimile
solicitorgeneral@oag.state.va.us

JA463



1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

ROBERT UPDEGROVE, *ET AL.*          )
                                    )
                                    )
    VS.                             )   1:20-CV-1141  CMH/JFA
                                    )
                                    )   ALEXANDRIA, VIRGINIA
                                    )   JANUARY 15, 2021
                                    )
MARK R. HERRING, *ET AL.*           )
_____)

_____

**TRANSCRIPT OF MOTION HEARING**
**BEFORE THE HONORABLE CLAUDE M. HILTON**
**UNITED STATES DISTRICT JUDGE**

_____

**Proceedings reported by stenotype, transcript produced by**

**Julie A. Goodwin.**

Julie A. Goodwin, CSR, RPR

2

1                    **A P P E A R A N C E S**

2

3  FOR THE PLAINTIFF:
        ALLIANCE DEFENDING FREEDOM
4       By:  MR. JOHANNES S. WIDMALM-DELPHONSE
        20116 Ashbrook Place
5       Suite 250
        Ashburn, Virginia  20147
6       jwidmalmdelphonse@ADFlegal.org

7       ALLIANCE DEFENDING FREEDOM
        MR. JONATHAN A. SCRUGGS
8       15100 N. 90th Street
        Scottsdale, Arizona  85260
9       480.444.0020
        jscruggs@ADFlegal.org

10

11      C. DOUGLAS WELTY LLC
        By:  MR. CHARLES DOUGLAS WELTY
12      2111 Wilson Boulevard
        Suite 800
13      Arlington, Virginia  22201
        cdwelty@weltyblair.com

14

15

16  FOR THE DEFENDANT:
        OFFICE OF THE ATTORNEY GENERAL
17      By:  MR. TOBY J. HEYTENS
        Solicitor General
18      By:  MS. JESSICA M. SAMUELS
        Assistant Solicitor General
19      202 North Ninth Street
        Richmond, Virginia 23219
20      804.786.6835
        jsamuels@oag.state.va.us

21

22

23  OFFICIAL U.S. COURT REPORTER:
        MS. JULIE A. GOODWIN, CSR, RPR
24      United States District Court
        401 Courthouse Square
25      Alexandria, Virginia  22314
        512.689.7587

JA465

3

1  (JANUARY 15, 2021, 10:02 A.M., OPEN COURT.)

2          THE COURTROOM DEPUTY:  Civil Action Number

3  2020-CV-1141, *Robert Updegrove, et al. versus Mark R. Herring,*

4  *et al.*

5          If counsel would please note their appearance for

6  the record.

7          MS. SAMUELS:  Good morning, Your Honor.  Jessica

8  Samuels for the Commonwealth defendants.  With me at counsel

9  table is also Mr. Toby Heytens.

10          THE COURT:  All right.  Good morning.

11          MR. WIDMALM-DELPHONSE:  Good morning, Your Honor.

12  Johannes Widmalm-Delphonse on behalf of Bob Updegrove and Bob

13  Updegrove Photography, together with Jonathan Scruggs and

14  Charles Douglas Welty.

15          THE COURT:  All right.  Good morning.

16          All right.  This comes on on your motion.  And if

17  you want to take your mask off while you're talking, you're

18  welcome to.

19          MS. SAMUELS:  Thank you, Your Honor.  Good morning.

20          We are here this morning on two motions, both of

21  which implicate the same question, whether the First Amendment

22  prohibits the Commonwealth of Virginia through its elected

23  leaders from expanding protections against discrimination and

24  public life to members of the LGBT community.  The answer to

25  that question is no, and the complaint should therefore be

Julie A. Goodwin, CSR, RPR

JA466

4

1   dismissed.

2           In this suit, plaintiff challenges the Virginia

3   Values Act, a law adopted by the general assembly last year

4   that makes our Commonwealth a more equal and inclusive place.

5   While the impact of the Virginia Values Act is significant, the

6   basic premise of the law is no different than the scores of

7   other anti-discrimination laws that have been adopted at the

8   state and federal levels for over a century, such as Title VII

9   in the Americans with Disabilities Act.  Like these other laws,

10  the Virginia Values Act makes it unlawful to discriminate on

11  the basis of certain protected characteristics.  One of those

12  protected characteristics is sexual orientation.

13          The general assembly had ample reason to include

14  sexual orientation in the Virginia Values Act.  As many courts

15  have noted, anti-LGBT discrimination has long been a feature of

16  our society, and despite progress in recent decades, that

17  discrimination still persists today.

18          The legislative determination that no Virginian

19  should be denied service on account of sexual orientation is

20  consistent with Justice Kennedy's observation for a majority of

21  the Supreme Court over two years ago, that, quote, our society

22  has come to the recognition that gay persons and gay couples

23  cannot be treated as social outcasts or as inferior in dignity

24  and worth.

25          Also like other anti-discrimination laws, the

Julie A. Goodwin, CSR, RPR

JA467

5

1  Virginia Values Act says nothing about what someone must

2  believe or the views they must espouse.  All it does is require

3  businesses that set up shop and choose to sell their goods or

4  services to the general public to treat customers equally

5  regardless of who they are.

6          Nowhere does the law endorse or compel a particular

7  view or creed.  To the contrary, one of its most important

8  features is that the law applies across the board to all forms

9  of discrimination and public accommodations.  Just as the law

10  protects the same-sex couple looking for a professional

11  photographer to document their wedding, it also protects a

12  devout Christian who wears a cross from being denied service at

13  a coffee shop or a restaurant merely because of her religious

14  beliefs.  In this way, the Virginia Values Act does not

15  restrict how a business owner may express his own message.

16          This case is a perfect example.  Plaintiff is

17  completely free to convey his views about same sex marriage

18  with his own speech, as he did recently in an editorial

19  published by a national newspaper.  These features of the

20  Virginia Values Act show why courts, including the Supreme

21  Court, have consistently upheld state authority to enact this

22  type of anti-discrimination law.

23          Even the cases on which plaintiff relies accept as

24  uncontroversial the proposition that the government, when a

25  majority of our elected representatives choose to do so, may

6

1   prohibit discrimination in public life.  These laws date back

2   to the decades following the Civil War when many states

3   codified access to public accommodations regardless of race.

4   These laws were expanded with the Civil Rights Act of 1964

5   where Congress prohibited discrimination in certain public

6   accommodations across the country on the basis of race,

7   religion, or national origin.  And this threat continues

8   through today as more than 20 states have enacted public

9   accommodation laws to include protections for LGBT individuals.

10           Against this historical backdrop, it is

11  unsurprising that both the plaintiffs' First Amendment claims

12  fail as a matter of law.  But this Court need not even reach

13  those questions on the merits to rule in defendants' favor

14  because plaintiffs' claims do not satisfy Article III's case or

15  controversy requirement.  This argument under Rule 12(b)(1) is

16  itself dispositive of both motions, and indeed the entire case.

17  So before we turn to the merits, I would like to emphasize two

18  points on the question of justiciability.

19           First, there is no dispute that the Virginia Values

20  Act has not been enforced against the plaintiff.  That means

21  there is also no dispute that this case is a pre-enforcement

22  challenge.  Under the test outlined by the Supreme Court in

23  *Susan B. Anthony List* and applied by the Fourth Circuit in

24  *Abbott*, this court lacks jurisdiction unless plaintiff can show

25  a credible threat of enforcement.

7

1              Based on the complaint and the record presented

2    here, plaintiff has failed to carry that burden.  He does not

3    assert that he has ever been approached by a same-sex couple

4    seeking his photography services for their wedding, nor does he

5    give any reason to think he might face such a request in the

6    near future.

7              Plaintiff has also not offered any evidence to

8    substantiate a credible fear that the law will be enforced

9    against him and his business specifically, much less that any

10   such enforcement action would necessarily be imminent.

11   Instead, plaintiff points to evidence that has nothing to do

12   with Virginia, nothing to do with this law, or nothing to do

13   with this agency's administrative proceedings.

14             By comparison, many of the cases on which plaintiff

15   relies involved a history of past enforcement action against

16   the very plaintiffs themselves, as in *Susan B. Anthony List* and

17   *Kenny*.  Even in the *North Carolina Right to Life* case, that

18   plaintiff had been engaged in a back and forth with the state

19   enforcement agency.  We have nothing similar here.

20             Second, while the standard may seem rigid in some

21   respects, it is not just a technical pleading rule.  From a

22   practical perspective, the requirements of standing in ripeness

23   ensure that the Court has the facts necessary to adjudicate a

24   concrete dispute.  Without those facts, such as who approached

25   the plaintiff, what was requested, whether plaintiff provides

8

1  similar services to others, and why the customers were denied,

2  we are left with only hypotheticals and abstract questions

3  about what may or may not come to pass.

4          That is not the stuff of a case or controversy

5  under Article III and for good reason.  This Court is not

6  presented with any real world facts on which to base its

7  decision.  From a constitutional perspective, and perhaps most

8  importantly, these doctrinal requirements go to fundamental

9  questions about judicial authority and separation of powers.

10          Without a specific factual scenario before the

11  Court, plaintiff in effect asks for a ruling that outlines in

12  advance when and in what circumstances in the future plaintiff

13  would have a right to violate the law.  That is exactly the

14  kind of advisory opinion that Article III does not permit, and

15  for that reason alone this case should be dismissed.

16          Turning to the merits, I'll take each claim in

17  turn.

18          On the free speech claim, first, it is helpful to

19  take a step back and focus on what it is this law actually

20  does.  The text of the statute is really quite simple.  Under

21  code section 2.2-3904, any business that offers or holds out to

22  the general public goods or services may not refuse or deny

23  those goods or services to an individual on the basis of

24  several protected characteristics, including sexual

25  orientation.  This provision is primarily directed at conduct.

9

1          All it says is that public accommodations may not

2     refuse to serve certain customers for discriminatory reasons.

3     And the First Amendment has never applied to grant a blanket

4     exemption from government regulation to businesses that rely on

5     creative or artistic skill to create the products they sell.

6     To follow plaintiffs' logic would lead -- would leave a broad

7     swath of the commercial marketplace free to discriminate

8     however they see fit.

9          Nothing about this provision drags plaintiff or his

10    business into the public's sphere, nor does it require him to

11    take photos in a certain way or affirmatively offer particular

12    services.  All the law requires is equal treatment among the

13    services plaintiff chooses to provide.  Whatever is offered to

14    some must be offered to all.

15         That is why contrary to plaintiffs' arguments, this

16    is not a compelled speech case.  The state is not forcing

17    plaintiff to say anything, the way the students in *Barnette*

18    were forced to say a pledge and salute the flag.

19         That is also why plaintiffs' comparison to

20    newspaper and free press cases falls flat.  Making it unlawful

21    to deny service at a hotel or a florist for a discriminatory

22    reason, simply not the same as telling a newspaper what it must

23    print.

24         The way the law works also shows why it is not

25    based on viewpoint.  Under section 2.2-3904, it does not matter

Julie A. Goodwin, CSR, RPR

JA472

10

1    what a business owner believes or does not believe about

2    religion, morals, politics, or anything else.  Whatever the

3    owner's motivation, he may not discriminate against customers

4    on the basis of protected characteristics, no matter the

5    reasoning behind that decision.

6            Second, on the free speech claim, despite

7    plaintiffs' insistence to the contrary, the Supreme Court's

8    decision in *Hurley* is not on point.  That case arose from

9    Massachusetts public accommodation law being applied in what

10   the Court called a peculiar way, which had the effect of

11   declaring the parade organizer's speech itself to be the public

12   accommodation.  The Court explained that it was this particular

13   interpretation of the state law that drove the outcome of the

14   case, and that is why *Hurley* is the exception and not the rule.

15           We also know that *Hurley* does not control, because

16   if it did, the *Rumsfeld v. FAIR* case would have come out the

17   other way and that would have been the end of the matter in

18   *Masterpiece Cakeshop*.  If *Hurley* meant, as plaintiff contends,

19   that public accommodation laws may not constitutionally be

20   applied where potentially expressive activity is involved, then

21   the underlying law in *Masterpiece* would have been invalid and

22   the Court would have had no reason to examine the statements

23   from the enforcement proceedings there that ultimately decided

24   that case.

25           For all of these reasons, *Hurley* does not win this

11

1  case for plaintiff.  Instead, cases like *Jaycees, FAIR, and*

2  *Pittsburgh Press*, all of which upheld anti-discrimination rules

3  against First Amendment challenges, should guide this Court's

4  analysis.

5           Turning next to the religion claim, the Supreme

6  Court's decision in *Employment Division versus Smith* is binding

7  and it is dispositive.  Under *Smith*, which remains the law of

8  the land, unless and until it is overturned by the Supreme

9  Court, a law that is neutral and generally applicable does not

10 raise any problem under the First Amendment even if that law

11 may have the incidental effect of burdening certain religious

12 practices.

13          Section 2.2-3904 meets both of these requirements.

14 It is neutral because it does not single out or target only

15 religious conduct for regulation.  Instead, the broad

16 nondiscrimination rule applies uniformly to all places of

17 public accommodation.

18          The law is also generally applicable for the same

19 reason the law is not based on viewpoint.  The state has

20 pursued its interest in rooting out discrimination without

21 regard to whether that conduct is or is not motivated by

22 religious belief.  Plaintiffs' other arguments on the religion

23 claim are either inconsistent with *Smith* or based on theories

24 that have not been recognized in this circuit and fail for

25 those reasons as well.

12

1        Finally, even if you disagree with us on either

2   claim on the merits, the result is not that the law must fall.

3   All it means is that strict scrutiny applies.  And even though

4   this may be a high bar, the Virginia Values Act clears it.  The

5   Supreme Court has already held in the *Jaycees* case that

6   eliminating discrimination in public accommodations is a public

7   interest of the highest order.  That is the same interest here,

8   and it is no less compelling.

9        The law is also narrowly tailored to achieve that

10  interest.  To carve out a patchwork of exemptions, as plaintiff

11  proposes, would undermine the goal at the heart of this law to

12  ensure that no one is refused service or turned away because of

13  who they are.  Where, as here, the state's interest is to

14  prohibit all discrimination, not just some.  Allowing

15  discrimination to exist in certain circumstances frustrates

16  rather than furthers that interest.

17        Your Honor, I have a few points to make on the

18  preliminary injunction motion as well.  Would you like me to

19  wrap up with those now or wait till after?

20        THE COURT:  You can go ahead.

21        MS. SAMUELS:  Okay.

22        I'll wrap up by noting that if the Court were to

23  deny our motion to dismiss, plaintiffs still would not be

24  entitled to the preliminary injunction they seek.  For all of

25  the reasons I've already discussed, plaintiff has failed to

13

1  show a likelihood of success on the merits, as would be
2  necessary for this Court to enter an injunction.
3        In addition to that, though, for this Court to
4  grant such an extraordinary remedy, it is plaintiffs' burden to
5  prove the other injunction factors as well.  Even if the Court
6  decides that plaintiff has done enough to plead a justiciable
7  case in controversy and even if this Court accepts plaintiffs'
8  legal arguments on the merits, plaintiff has still failed to
9  carry his burden as a factual matter under the second winter
10 factor, which is likelihood of irreparable harm.
11       The record before this Court does not prove that
12 the plaintiff is likely to face any harm, much less harm that
13 is irreparable in nature.  For one thing, the law has not been
14 enforced against the plaintiff, and plaintiff has offered no
15 evidence to show a credible fear that it will be.
16       There is also no evidence that plaintiff has ever
17 been approached by a same-sex couple seeking photography
18 services for their wedding, nor is there anything in the record
19 that would support the inference that a same-sex couple will
20 request plaintiffs' services anytime soon.  If this situation
21 plaintiff hypothesizes never comes to be, it is hard to
22 understand how he is currently experiencing irreparable harm.
23       Without any record evidence showing that
24 irreparable harm is likely in the absence of an injunction,
25 plaintiff has failed to carry his burden in seeking that

14

1  affirmative relief.  Even if this case is to proceed, this

2  Court should not on this record take the extraordinary step of

3  enjoining the law at this stage of the litigation.

4          Thank you for your time this morning, Your Honor.

5  If there are no questions, we would ask that the Court deny the

6  preliminary injunction and dismiss the complaint in its

7  entirety.

8          THE COURT:  All right.  Thank you.

9          MR. WIDMALM-DELPHONSE:  Good morning again, Your

10 Honor.  Again, my name is Johannes Widmalm-Delphonse.  I just

11 want to briefly address standing, and then my colleague,

12 Mr. Scruggs, will address the merits of our claim for the

13 motion to dismiss and the preliminary injunction motion.

14         THE COURT:  Very well.

15         MR. WIDMALM-DELPHONSE:  Thank you, and may it please

16 the Court, Your Honor.

17         In the pre-enforcement context to show standing,

18 plaintiff need only establish three things:  He intends to

19 engage in the course of activity arguably effective with a

20 constitutional interest, that that activity is arguably

21 prescribed by the law, and that he faces a credible threat of

22 prosecution for engaging in that activity.  And here, the

23 Commonwealth does not dispute the first two factors, as the

24 Court need only decide the credible threat of prosecution.

25         Your Honor, there is such a threat here.  And the

15

1  Court can arrive at that conclusion any number of ways, but

2  really there's just two things that the Court needs to know to

3  find a credible threat here.

4          First, in the Fourth Circuit, cases like *North*

5  *Carolina Right to Life*, *Preston v. Leake*, *Kenny v. Wilson*, a

6  slew of Fourth Circuit cases have all said that where the text

7  of a non-moribund statute facially restricts the expressive

8  activity that a plaintiff wants to engage in, courts simply

9  presume that there's a credible threat of enforcement.

10         And we have that here.  This is a recent statute.

11  It was passed six months ago.  And the plain text of the

12  statute prohibits Mr. Updegrove from doing any of the things

13  that he wants to do.  He can't post a statement on his website

14  explaining his religious beliefs about weddings and that he

15  will only celebrate weddings between one man and one woman

16  because that would violate the publication clause.

17         He can't ask clients who come to him if they seek

18  his services to celebrate a wedding that he can't fulfill

19  consistent with his beliefs because that would violate -- that

20  would be an attempt to decline services in violation of the

21  law.  He can't adopt the -- his editorial policy or simply have

22  it be his practice to only celebrate weddings between one man

23  and a woman and decline to celebrate same-sex weddings because

24  that would be a pattern or a practice of resistance to the

25  right to the statute.

Julie A. Goodwin, CSR, RPR

JA478

16

1          So, we have a recent statute that facially

2    restricts his expressive activity, and there's a presumption

3    that there's a credible threat of enforcement.  And nothing

4    that the Commonwealth has said here today or in the briefs

5    rebuts that presumption, which leads to my second point.  We

6    don't need to show that there's past enforcement.  We know that

7    because of cases like *Virginia v. American Booksellers*

8    *Association*, *Mobil Oil Corporation*, *Liberty University v. Lew*,

9    which all allowed challenges to statutes before the statute was

10   even enacted.  And we don't need to show that he's received the

11   request because he can violate the law right now.

12         And that's what this case comes down to because in

13   their briefs, and in court here today, the Commonwealth admits

14   that the law prohibits Mr. Updegrove from doing the things that

15   he wants to do, the speech that he wants to engage in.  They

16   concede that -- so, they admit that he can't do those things,

17   they defend their ability to enforce the law against him in

18   this way, and they haven't disavowed any intention of

19   prosecuting him should he do any of the things that he wants to

20   do.

21         That's it.  That's all the Court needs to find a

22   live case or controversy, and that puts this case squarely

23   within precedent, like *Virginia v. American Booksellers*

24   *Association* -- excuse me -- and *Mobil Oil Corporation*.

25         Mobil -- in *Mobil Oil*, for instance, the

17

1  Commonwealth made the same argument that they're making here

2  today.  They said, well, if plaintiff can't prove -- or they

3  can't show how this law would be enforced, so we don't know if

4  there's a live case or controversy.

5         And the Fourth Circuit said, no, if you haven't

6  disavowed, you haven't given us any reason to believe that the

7  law won't be enforced the way that it's written, and so we're

8  going to assume that there is a credible threat of enforcement.

9         And why wouldn't there be?  Why wouldn't they

10  enforce it the way -- the way that the law is written?

11        They've said in court here today and in their

12  briefs that they have a compelling interest.  They said, even

13  if the Court applies strict scrutiny, they have a heightened

14  interest in forcing Mr. Updegrove to celebrate weddings that

15  violate his beliefs so long as he remains in the wedding

16  industry and celebrate weddings between one man and one woman.

17        And, Your Honor, they actually said just the

18  opposite.  If -- if the Commonwealth comes into the courtroom

19  and attacks the substance or the merits of the plaintiffs'

20  claim, that's -- that creates the order of a case or

21  controversy is what the Court -- is what the Fourth Circuit

22  said in *Mobil Oil*.  And again, we have the exact same thing

23  here today.

24        So, Your Honor, there is a presumption of credible

25  threat.  The prosecutor -- the prosecution -- I'm sorry -- the

18

1  Commonwealth hasn't rebutted that presumption, and some

2  concluding thoughts.

3          I would just remind the Court about what the

4  practical effects of this are for Mr. Updegrove.  He can't post

5  a statement on his website to be upfront and transparent with

6  the public about the services that he provides.  He can't adopt

7  his editorial policy.  He can't simply have it be his practice

8  to only celebrate weddings between one man and one woman

9  consistent with his beliefs, so Mr. Updegrove is in a position

10 where he simply has to hope that no one comes to him and asks

11 for a service that he can't fulfill.  And if they do, he is in

12 a position where he has to choose between violating his beliefs

13 or violating the law, something that no one should be in a

14 position to have to choose between.

15          And if he violates the law in any of the ways that

16 I've just talked about, he could face a lawsuit by a private

17 citizen who feels aggrieved by his actions or the Attorney

18 General could file their own complaint without waiting for

19 someone to come to them complaining that Mr. Updegrove wouldn't

20 celebrate their wedding.  And in that lawsuit he could face

21 fines and fees of up to $50,000 for a first-time violation and

22 $100,000 for a second violation.  So, every day that he lacks

23 clarity about what this law does and how it affects him is --

24 he's operating under a cloud of uncertainty and risking his

25 entire business.

19

1           Your Honor, I would just conclude by also reminding
2    the Court that other courts have found standing in cases just
3    like this one where creative professionals brought
4    pre-enforcement challenges against public accommodation laws
5    that threatened to force them -- to compel or restrict their
6    speech in the wedding context, whether it be the Eighth Circuit
7    in *Telescope Media Group*, whether it be the Arizona Supreme
8    Court in *Brush & Nib Studio*, or whether it be the Western
9    District of Kentucky in *Chelsey Nelson Photography*.  All of
10   those courts found standing in cases just like this one.
11          So, Your Honor, unless there's any other
12   question -- unless you have any questions, I will turn over to
13   Mr. Scruggs to address the merits of our claim.
14          THE COURT:  Very well.
15          MR. WIDMALM-DELPHONSE:  Thank you.
16          MR. SCRUGGS:  Thank you.  Good morning, Your Honor,
17   and may it please the Court.  As my colleague noted, my name is
18   Jonathan Scruggs, and I'll be talking about the merits issues
19   today.
20          Your Honor, the motion to dismiss and motion for a
21   preliminary injunction raised a whole host of interesting
22   merits issues, and we might be all -- all day here to discuss,
23   so I want to focus -- and of course I'm happy to answer
24   questions about any of those things, but I want to focus my
25   affirmative discussion on the compelled speech issue since it

20

1    seems to be the topic of major discussion here this morning.

2           And regarding your -- that matter, Your Honor, I

3    think there are three important points that the Commonwealth

4    has not disputed.  First, that Mr. Updegrove's photographs are

5    protected speech; second, that Mr. Updegrove -- Updegrove's

6    photograph -- weddings photographs convey a message celebrating

7    the particular wedding and particular marriage being

8    photographed; and third, that Mr. Updegrove actually creates

9    himself and exercises editorial control over these photographs.

10   Your Honor, those points are decisive under the *Hurley* case --

11   it's been talked about -- and also the *Billups* case that the

12   Fourth Circuit recently issued just this past year.

13          As *Hurley* shows, public accommodation laws that --

14   public accommodation laws cannot compel someone to speak a

15   message that they disagree with, that violates their beliefs.

16   And *Billups* shows that although a law that facially -- that a

17   law that facially regulates business conduct can still regulate

18   speech as applied.

19          Well, here, Your Honor, we have protected speech,

20   as I noted, and although the accommodations clause facially

21   regulates conduct, the effect of that clause here is still to

22   force Mr. Updegrove to create speech, create and convey speech,

23   convey in a message he disagrees with.  And, Your Honor, that

24   means essentially what is going on is unconstitutional

25   compelled speech, but it's important to stress that this

21

1    conclusion in no way impedes the Commonwealth's ability to

2    accomplish any legitimate interest.  The Commonwealth can still

3    stop actual status discrimination by hotels, by restaurants,

4    and by every other business without forcing Mr. Updegrove to

5    speak a message he disagrees with.

6            Mr. Updegrove serves clients regardless of their

7    status, including those in the LGBT community.  He just simply

8    cannot convey certain messages for anyone no matter who has

9    asked him to do so, whether that be photographs belittling

10   others, demeaning others, whether that be photographs as we put

11   in the record of voodoo themed weddings or satanic themed

12   weddings.  Well, that's true for weddings celebrating same-sex

13   marriages.  He won't convey, create photographs celebrating

14   that message for anyone.

15           In contrast, Your Honor, the Commonwealth's theory

16   really has no limiting point.  It would allow the government to

17   use anti-discrimination laws to force paid speakers to convey

18   any message they disagreed with, whether it be Mr. Updegrove

19   here or even foreseeing an LGBT artist to create artwork

20   criticizing same-sex marriage, or as the Eighth Circuit noted

21   that nothing prevents the Commonwealth from making political

22   belief a protected class and thereby then forcing a democratic

23   or republican speech writer to create campaign speeches, write

24   campaign speeches for a candidate that they disagree with.

25           The First Amendment simply doesn't allow that, Your

Julie A. Goodwin, CSR, RPR

JA484

22

1    Honor, and for good reason in our pluralistic society.  So

2    those are kind of the general principles.  I want to dig a

3    little bit deeper into *Hurley* and *Billups* and kind of explain

4    some points in response to my friend's arguments.

5            First, and then second, we'll explain how the Court

6    should weigh the competing interest in this case.  And again, I

7    think *Hurley* and *Billups* guide that analysis.

8            So first, as has been noted, *Hurley* involved a

9    public accommodation law.  And as my friend correctly quoted,

10   even though that law facially regulated conduct and facially

11   was appropriate, that as applied the Court said, you can't

12   apply public accommodation to speech itself to alter the

13   expressive content of speech.

14           Well, here, Your Honor, photographs, as I noted,

15   are protected speech.  Photographs are more expressive than a

16   parade.  In a parade, people are marching and walking.

17           Courts have said that photographs are inherently

18   expressive, so that logic applies here, that because the

19   accommodations clause is applying to these photographs, to

20   change their content to change their message from celebrating

21   an opposite sex wedding to celebrating a same-sex wedding, that

22   we fall right under the -- the logic of *Hurley*.

23           Now, my -- my friends would argue, well, the law

24   here doesn't regulate anything.  It doesn't regulate what types

25   of photographs that Mr. Updegrove writes or how he does his

23

1  photography or anything like that.

2          Well, Your Honor, again, that's true on its face,
3  but not as applied.  If we look at the actual as applied
4  application, it literally forces Mr. Updegrove to change the
5  content of his photographs.

6          The same thing could have been said in *Hurley*, Your
7  Honor.  The law in *Hurley* didn't tell the parade organizers
8  what color of floats to use or didn't tell them what direction
9  to go in the parade, and not on its face but as applied it
10  certainly did.  It forced them to admit a banner that they
11  didn't want to admit into the parade and that altered the
12  expressive content.

13          And it cannot be said, Your Honor, that *Hurley* only
14  applies to nonprofits.  Well, *Hurley* itself said that these
15  principles of speaker autonomy apply to, quote, business
16  corporations generally as well as professional publishers,
17  unquote.

18          Well, Your Honor, that's just what is happening
19  here.  And I think especially -- this is where *Billups* comes
20  in, which is the Fourth Circuit decision, which helps us,
21  because *Billups* involved a law that facially regulated business
22  conduct.  It applied to paid tour guides to require a license
23  for paid tour guides.  And the City of Charleston came to court
24  making the exact same argument that the Commonwealth is making
25  now that, hey, this law only regulates business conduct, that

24

1    it only has an incidental burden on speech, that there's no
2    speech at all being regulated.

3          But the Fourth Circuit rejected that argument
4    expressly citing cases like *Holder versus Humeri --*
5    *Humanitarian Law Project* and said, look, because the law is
6    regulating an inherently expressive median speaking about the
7    City of Charleston, that would trigger First Amendment
8    scrutiny.

9          Well, Your Honor, I think that logic applies
10   squarely here, and let me give an example.  I think there's
11   some confusion over how facial versus as applied works out, and
12   I think a simple example can prove our point.

13         Let's take a law like a labor law that regulates
14   child labor, says no child labor by any business.  That lie --
15   that law applies across the board and it can apply to a
16   business that creates speech, such as a wedding photographer,
17   and that would be totally fine.  But when that law is applied
18   to the wedding photographer, that law doesn't alter or tell the
19   photographer in application what photographs that photographer
20   must create or not create or what content must be put in those
21   photographs.  That law -- law applies across the board and
22   applies regardless of what photographs the photographer makes
23   and doesn't affect anything in the photographs.

24         We can make a stark contrast to the law here as
25   we've put those pictures in our brief highlighting essentially

25

1  the difference in how this law plays out when applied to
2  Mr. Updegrove.
3          A second point that I think highlights why this law
4  is different is that labor law example.  Again, it doesn't --
5  it applies regardless of what type of photographs the
6  photography studio wants to create or doesn't want to create.
7          Here, in contrast, Your Honor, the only reason the
8  law is triggered, the only reason the liability is triggered to
9  force Mr. Updegrove to create photographs celebrating a
10 same-sex wedding is because he wants to create and does create
11 wedding photographs celebrating the opposite sex marriage,
12 opposite sex wedding.
13         So, you see, the law is triggered by the content.
14 If Mr. Updegrove, say, stopped all wedding photographs and only
15 photographed businesses, there would no -- be no obligation
16 under the law to create photographs celebrating the same-sex
17 marriage.  It's only because he creates photographs celebrating
18 an opposite sex marriage that the law is triggered and applied.
19 And that brings, again, the case straightly under principles
20 like *Billups* and like *Holder*.
21         It's important to stress, Your Honor -- and these
22 principles are not new.  The U.S. Supreme Court has applied
23 this logic consistently for the past 80 years.  There have been
24 numerous Supreme Court cases that involve laws regulating
25 conduct, but the Supreme Court strikes down their application

Julie A. Goodwin, CSR, RPR

26

1  as applied when they apply to speech.

2  One of the first First Amendment cases, Your Honor,

3  *Cantwell versus Connecticut*, was that logic.  It involved a

4  breach of the peace statute, or probably maybe more famously

5  *Cohen versus California*.  It involved a breach of the peace

6  statute that regulated conduct on its face, but the Court

7  applied strict scrutiny because in that situation it was

8  applied.  It was triggered by the expressive content of the

9  jacket.

10  So, respectfully, Your Honor, the Commonwealth's

11  position runs in conflict with all these cases that date back

12  not just in the Fourth Circuit, but the U.S. Supreme Court for

13  a while.

14  So, I think we see *Hurley* and *Billups* provide a

15  fair amount of guidance here and explains what they apply, and

16  that's exactly why we have cases that we've cited outside the

17  circuit like the Eighth Circuit *Telescope Media* case; the

18  Arizona Supreme Court, the Russian dip (phonetic) case; the

19  recent photographer case out of the Western District of

20  Kentucky.  All these cases apply this logic from *Hurley* and

21  *Holder versus Humanitarian Law Project* and say, you can't force

22  a creative professional to celebrate marriages -- celebrate

23  same-sex marriages.  So, we see those kind of general

24  principles.

25  Now that we see that the First Amendment kicks in

27

1  and strict scrutiny applies under the logic of these cases, I

2  want to talk a little bit about how that plays out in the

3  balancing of interest.  And as I noted, Your Honor, the state

4  might have a general compelling interest in play, but that's

5  not the question.  The question is, can they justify compelling

6  Mr. Updegrove in this particular application?

7            In *Hurley*, the Court didn't say, well, let's look

8  at the public accommodation generally and does it serve a

9  compelling interest.  The Court said, is there a compelling

10 interest to regulate this parade.

11           And again, I'd note the Court to look at the

12 *McManus versus Washington Post* [sic] case, the Fourth Circuit

13 case.  In that case, the Fourth Circuit in -- really analyzed

14 the law that was compelling online platforms to publish ads.

15 And in the -- even in intermediate scrutiny, the Court there

16 didn't say, well, what's the compelling interest generally.

17 The Court said, what's the compelling interest to apply this to

18 the plaintiffs, which were the newspapers in that situation.

19           So the compelling interest analysis is fact

20 specific to these plaintiffs.  We're not seeking a facial

21 challenge in our preliminary injunction motion, Your Honor.  We

22 are only seeking an as applied challenge to protect Mr.

23 Updegrove.

24           And it goes back to the simple principles I noted

25 before.  Mr. Updegrove doesn't discriminate based on status.

Julie A. Goodwin, CSR, RPR

JA490

28

1    He -- he chooses what messages he wants to speak, like in the

2    *Hurley* case.

3              I think the principle would be similar, Your Honor,

4    if you take a Muslim -- a calligrapher.  That person might

5    serve Christians generally, but he might have a general rule, I

6    don't write the statement Jesus is Lord on a banner for

7    anybody, no matter who asks me to do so.

8              Well, that's not status discrimination, Your Honor.

9    That's just a speaker choosing what he or she wants to say.

10   And that same type of logic applies perfectly here.  It's a

11   logic that was adopted in *Hurley*.  *Hurley* said, look, in that

12   situation the parade organizers allowed LGBT persons to walk in

13   the parade, but they just couldn't celebrate a message they

14   disagreed with, the banner that said gay, lesbian, bisexual

15   organization of Boston, because it conveyed a message they

16   disagreed with.

17             So, Your Honor, there's no interest, legitimate

18   interest at least, under *Hurley* to actually apply this law to

19   Mr. Updegrove to force him to speak a message he disagreed

20   with.  Secondarily, Your Honor, there are many other options

21   the city has.  We've put forth a lot of -- or the County -- or

22   the Commonwealth has, excuse me.  We've put forth those options

23   in our brief.

24             And the Commonwealth comes back and says, look,

25   they're not effective.

29

1          But look at the *Billups* decision, Your Honor.

2  *Billups* says under even intermediate scrutiny the government

3  can't just say they're not effective.  The government's burden

4  is to provide actual evidence that they considered or tried

5  those alternatives, and those alternatives are not effective.

6          Your Honor, there is absolutely nothing in the

7  record to suggest that, and *Billups* provides the guidelines to

8  say, that fails the standard.

9          Your Honor, so those are kind of my -- my major

10  points.  And I would like to note finally that in weighing

11  these burdens this is a situation where the Commonwealth can

12  have its cake and eat it too.  Right?  Because the Commonwealth

13  can actually stop status discrimination in so many different

14  applications all across the board, it can allow speakers to

15  choose what they -- they want to say.

16          The burden on a speaker, as the Supreme Court has

17  recently said in cases like *Janus* and further back in *Hurley*

18  and the *NIFLA* decision, that forcing someone to speak a message

19  they disagreed with is always demeaning, the Court said, and

20  that it, quote, violates a cardinal constitutional requirement,

21  and in most circumstances would be universally condemned.  And

22  that's because if the First Amendment means anything, as the

23  Court has said, it means that speakers get to choose what they

24  want to say.  That infringing on editorial control and

25  editorial discretion strikes at the heart of the doctrine, and

30

1   the doctrine is to protect the individual freedom of mind and

2   speaker autonomy.

3          And, Your Honor, the First Amendment says that

4   speakers get to make that choice, not the government.

5          So, unless the Court has any questions for me, I

6   will go ahead and sit down.

7          THE COURT:  All right.  Thank you.

8          MR. SCRUGGS:  Thank you, Your Honor.

9          THE COURT:  Do you want 30 seconds?  I've heard a lot

10  of argument here this morning, but go ahead if there's

11  something you really want to tell me.

12         MS. SAMUELS:  Thank you, Your Honor.  I'll be very

13  quick.

14         I just have three points in reaction to plaintiffs'

15  arguments.  The first is on the justiciability point, which is

16  just to note that all of the reasons the plaintiff offers here

17  for why the Court should take up this challenge and has

18  jurisdiction are exactly the same as any other pre-enforcement

19  challenge, so to accept those arguments would be to eviscerate

20  the Article III limitations about what we look to when a law

21  hasn't been enforced.  And recent cases from the Supreme Court,

22  like *SBA List*, which we think controls, shows that you have to

23  have a credible threat of enforcement.

24         Plaintiff tries to replace the standard with older

25  cases like *Mobil Oil* from 1991 and references to presumptions

Julie A. Goodwin, CSR, RPR

JA493

31

1    about non-moribund statutes.  But what that boils down to, Your

2    Honor, is under plaintiffs' theory that a law is on the books

3    at all would -- would invoke this Court's jurisdiction where

4    it's never been enforced and where there's no harm, and so

5    to -- to accept that standard again would be to completely gut

6    this test that the Supreme Court laid out in *SBA List* and that

7    the Fourth Circuit has continuously applied since.

8            One last point on justiciability, Your Honor, is

9    that the publications clause point that plaintiff raises about

10   the statements that Mr. Updegrove would like to post on his

11   website, in the briefing plaintiff has conceded that the claims

12   about what Mr. Updegrove may or may not post or say all

13   collapses into the question of whether he can or cannot decline

14   to photograph same-sex couples.  Those -- those questions rise

15   and fall together, and so the way this case has been argued,

16   and also the constitutional merits of the question, those are

17   linked, and so there's no reason to split that out for the

18   justiciability analysis when -- when plaintiffs aren't even

19   splitting that out on the merits.

20           I'll also, Your Honor, just make one -- one note

21   on -- or three notes briefly on lines that plaintiffs blur in

22   the doctrine that I think it's very important to keep separate.

23   And the first is that line between speech and conduct.

24           Plaintiff here has spent a lot of time talking

25   about the *Billups* case, but *Billups* was not an

32

1  anti-discrimination case and so we have to understand that is a

2  speech case.  But -- but this is an anti-discrimination case

3  that of course affects speech principles, but -- but *Billups*

4  does not control.  Cases like *Jaycees* where we were looking at

5  an anti-discrimination public accommodations law are -- are a

6  better model.

7          *Billups* is also helpful because it shows what this

8  law does not do.  What *Billups* did was went straight to the

9  heart of an expressive activity, literally speaking on a public

10  sidewalk giving a public tour.  The law here says nothing about

11  what the plaintiff must say.  All it says is that when he

12  chooses to enter commerce and when he chooses to photograph

13  weddings, he cannot turn down couples seeking his services on

14  the basis of protected characteristics.

15          And that -- that distinction, Your Honor, between

16  being a public accommodation and not is the other line that

17  plaintiff blurs.  All of these hypotheticals that -- that

18  plaintiff offers if you zoom out and start with:  Is this

19  business a public accommodation, what service is being asked,

20  and is that being provided to others, and why did this service

21  get turned down.  Those hypotheticals turn on different

22  questions all along the way.  And so to offer examples like a

23  Muslim calligrapher, you need to look at:  What is that

24  service, who is asking for it, what is provided elsewhere, and

25  why is it being denied.  And so those hypotheticals collapse

33

1  all of these important questions onto each other.

2      The last point I'll make on the expression point,

3  Your Honor - and this is probably the most important one - is

4  that all of plaintiff's argument assumes that the photographs

5  he is taking on a commission basis of other couples' weddings

6  are not his speech; they're not his message.  And this point

7  was dispositive in the *Rumsfeld v. FAIR* case because if all

8  this came down to is when plaintiff opens his mouth the First

9  Amendment insulates him from any government regulation, all of

10 the other cases would have come out the same way.  Cases

11 like -- come out the other way.

12     Cases like *Ward versus Rock Against Racism*.  If all

13 that mattered was that those concerts were speech, then that

14 would be the end of it.  And we know that that's not how that

15 case turned out.  It upheld a regulation, government regulation

16 of expression.

17     And so the question about whether it is plaintiff's

18 message and whether it is his message he is conveying with his

19 speech ignores the fact that he is holding himself out to the

20 general public to take photographs of all number of people at

21 all number of events at all number of weddings, and that is not

22 his message.  In the same way that the law schools in *FAIR* by

23 being required to accommodate the military recruiters were not

24 using their expression to convey their message about the -- the

25 good or evil of military policy at the time.

34

1          I'll just wrap up, Your Honor - thank you for your

2    patience this morning - by saying that the -- the interest at

3    play here are, again, plaintiff would like to ignore that this

4    is an anti-discrimination case.  Of course speakers can choose

5    what they want to say, but the government also can prohibit

6    discrimination, the conduct of discriminating against somebody.

7    Governments have done that for over a century, and the Court's

8    decision here should be no different.

9          Thank you.

10          THE COURT:  All right.  Thank you.

11          I'm going to look at this a little further.  I'll

12    get you-all an answer as quickly as I can.

13          MS. SAMUELS:  Thank you, Your Honor.

14          THE COURT:  And we'll adjourn until Monday morning at

15    9:30.

16          THE LAW CLERK:  All rise.

17          (PROCEEDINGS CONCLUDED AT 10:47 A.M.)

18                          -o0o-

19

20

21

22

23

24

25

Julie A. Goodwin, CSR, RPR

JA497

35

1  UNITED STATES DISTRICT COURT    )

2  EASTERN DISTRICT OF VIRGINIA    )

3

4           I, JULIE A. GOODWIN, Official Court Reporter for

5  the United States District Court, Eastern District of Virginia,

6  do hereby certify that the foregoing is a correct transcript

7  from the record of proceedings in the above matter, to the best

8  of my ability.

9           I further certify that I am neither counsel for,

10  related to, nor employed by any of the parties to the action in

11  which this proceeding was taken, and further that I am not

12  financially nor otherwise interested in the outcome of the

13  action.

14           Certified to by me this 3RD day of JUNE, 2021.

15

16

17

18                        __/s/_____

19                        JULIE A. GOODWIN, RPR
                          Official U.S. Court Reporter
20                        401 Courthouse Square
                          Eighth Floor
                          Alexandria, Virginia  22314
21

22

23

24

25

Julie A. Goodwin, CSR, RPR

JA498

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

ROBERT UPDEGROVE, ET AL.,                )
                                         )
          Plaintiffs,                    )
                                         )
                                         )
v.                                       )    Civil Action No. 1:20-cv-1141
                                         )
                                         )
MARK R. HERRING,                         )
*in his official capacity*               )
*as Virginia Attorney General,*          )
ET AL.,                                  )
                                         )
          Defendants.                    )

## MEMORANDUM OPINION

THIS MATTER comes before the Court on Plaintiffs' Motion for Preliminary Injunction and Defendants' Motion to Dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

On July 1, 2020, the Virginia General Assembly's update to the Virginia Human Rights Act went into effect. The update, named the Virginia Values Act ("VVA"), expanded protections for LGBTQ individuals accessing public accommodations. The VVA states, "It is an unlawful discriminatory practice for any person . . . to refuse, withhold from, or deny any individual . . . made available in any place of public accommodation . . . on the basis of . . . sexual orientation." Va. Code § 2.2-3904

(2020). The VVA does not only prevent the withholding of accommodations. Under the VVA it is also "an unlawful discriminatory practice for any person . . . to publish, circulate, issue, display, post, or mail . . . any communication, notice, or advertisement to the effect that any of the accommodations . . . shall be refused, withheld from, or denied to any individual on the basis of . . . sexual orientation[.]" Id. To summarize, the VVA makes two things unlawful: (1) to withhold a public accommodation on the basis of sexual orientation, and (2) to publish a statement saying that a public accommodation will be withheld on the basis of sexual orientation.

Under the VVA, any injured party can file a complaint with the Division of Human Rights of the Department of Law. Va. Code § 2.2-3907(A). The Division will then investigate. If it believes that unlawful discrimination has occurred, it can (upon the written request of the injured party) issue a "notice of the right to file a civil action." Va. Code § 2.2-3907(H). But this is not the statute's only enforcement mechanism. The Attorney General can bring civil actions on behalf of any injured party when he has reason to believe that the VVA has been violated. Va. Code § 2.2-3906. Anyone bringing a civil case can seek preventative relief, a civil fine of up to $50,000 for a first-

JA500

time violation, and "reasonable attorney fees and costs." Va.
Code § 2.2-3906(B).

Plaintiff Robert Updegrove operates a photography business
that provides photography services for anything from weddings to
conservative political events. Plaintiff offers his services to
the public, but he also uses his business to promote his own
ideas and beliefs. One of the beliefs Plaintiff communicates
through his photography is that marriage is intended to be
between one man and one woman. Plaintiff uses his wedding
photography as an opportunity to promote his own religious
message about marriage, "that God designed marriage as a
permanent institution that symbolically points people to Jesus'
sacrificial death and covenantal relationship with His Church."
Because of Plaintiff's beliefs about marriage, he will not offer
wedding photography to marriages that he believes contradict his
religious message. This includes same-sex marriages. Plaintiff
offers his photography services to members of the LGBTQ
community but will not photograph a same-sex wedding, regardless
of the sexual orientation of the person who hires him.

In response to the VVA, Plaintiff asserts that he would
like to do four things. First, Plaintiff would like to decline
photography services to any client seeking wedding photography
for a same-sex wedding ceremony. Second, Plaintiff would like to
publish a statement on his business's website expressing his

3

JA501

"inability to celebrate same-sex weddings." Third, Plaintiff
wants to adopt and publish an editorial policy that explains his
views and his reasons for declining certain events. Fourth,
Plaintiff wants to ask prospective clients if they plan to
celebrate a same-sex wedding, or any other event that violates
Plaintiff's beliefs. As of the date of filing the Complaint,
Plaintiff did not have an editorial policy or statement of
beliefs on his website and he had never been asked to photograph
a same-sex wedding.

To proceed with a claim in federal court, plaintiffs must
have standing to assert their claims. Standing requires that a
plaintiff show an injury-in-fact that is fairly traceable to the
defendant and capable of redress by a court. See Spokeo, Inc. v.
Robins, 136 S. Ct. 1540, 1547 (2016). Without these elements, a
case or controversy does not exist that allows for Article III
jurisdiction. Id. When a plaintiff brings a pre-enforcement
challenge to a statute, the plaintiff must prove injury-in-fact
by showing a "substantial risk" of future harm. Susan B. Anthony
List v. Driehaus, 573 U.S. 149, 158 (2014). Constitutional
standing requirements have been "somewhat relaxed in First
Amendment cases." Cooksey v. Futrell, 721 F.3d 226, 235 (4th
Cir. 2013). "[A] plaintiff satisfies the injury-in-fact
requirement where he alleges 'an intention to engage in a course
of conduct arguably affected with a constitutional interest, but

4

JA502

proscribed by a statute, and there exists a credible threat of prosecution thereunder.'" Susan B. Anthony List, 573 U.S. at 159 (quoting Babbitt v. Utd. Farm Workers Nat'l Union, 442 U.S. 289, 298 (1979)).

Plaintiff desires to publish two statements sharing his views of marriage and giving reasons for his refusal to photograph same-sex weddings. He also desires to ask couples about the kind of wedding they would like to have and decline to photograph those weddings that contradict his statements. Plaintiff's desired actions arguably fall under the First Amendment because he is choosing how to express his own message using a creative medium. See Brown v. Entm't Merchants Ass'n, 413 U.S. 786, 790 (2011) (holding that the First Amendment protects mediums like "books, plays, and movies [that] communicate ideas"). Plaintiff's desired actions also arguably fall under the text of the VVA because Plaintiff operates a business that provides goods to the public, and the law could be interpreted to require Plaintiff to provide wedding photography for same-sex weddings.

When assessing a credible threat of prosecution, the Supreme Court looks at several factors: the history of past enforcement, who has the authority to file a complaint, and how often complaints are filed or threatened. See Susan B. Anthony List, 573 U.S. at 164-65. In Susan B. Anthony List v. Driehaus,

JA503

an Ohio statute criminalized making false statements during the
course of a campaign for public office. Id. at 152. The statute
allowed any person to file a criminal complaint, and members of
the public regularly filed such complaints—around twenty to
eighty of them each year. Id. at 154, 164. After the plaintiff
posted an advertisement against a candidate for public office,
the candidate filed a complaint with the state election agency
in charge of enforcing the statute. Id. at 154. The candidate's
complaint was eventually withdrawn, but the plaintiff still
brought a pre-enforcement challenge to the law claiming that the
threat of future enforcement chilled its constitutionally
protected speech. Id. at 155. The Supreme Court held that the
plaintiff had standing because the threat of enforcement was
sufficiently credible to create a case or controversy. Id. at
156-57. The threat was sufficiently credible because the statute
had been consistently enforced for many years (including past
enforcements against the plaintiff), the likelihood of future
enforcement was high because complaints could be brought by
anyone, and many complaints were filed each year. Id. at 164-65.

     In this case, the factors weigh against Plaintiff. Unlike
in Susan B. Anthony List, the VVA has never been enforced
against anyone. In the almost nine months since the statute
became effective, no complaint has been filed under the statute.
Plaintiff asserts that these facts carry less weight since

6

JA504

states will presumably enforce recently enacted statutes and
past enforcement is not necessary to establish standing. See
Mobil Oil Corp. v. Att'y Gen. of Va., 940 F.2d 73, 76 (4th Cir.
1991). Plaintiff is correct that past enforcement is not a
necessary condition for standing. However, that does not mean
that Plaintiff automatically has standing simply because his
conduct arguably falls under the text of the statute. The lack
of enforcement cuts against the idea that Plaintiff currently
faces a credible threat that Virginia will enforce the VVA
against him. Unlike other jurisdictions, Virginia has not
"employed 'testers' to target noncompliant businesses" or
pursued other successful actions against businesses like
Plaintiff's. Telescope Media Group v. Lucero, 936 F.3d 740, 750
(8th Cir. 2019). Since enforcement has been non-existent to this
point, the potential threat against Plaintiff is diminished.

Instead of looking at past enforcement, Plaintiff points to
the promise of future enforcement, giving examples of instances
when Defendant has refused to disavow enforcement of the law.
These statements lend support to the argument that the statute
is "non-moribund," but they do not decide the issue. See N.C.
Right to Life, Inc. v. Bartlett, 168 F.3d 705, 710 (4th Cir.
1999). Even with the presumption that the statute will be
enforced, Plaintiff has not demonstrated that he personally
faces a threat of enforcement. Injury-in-fact must not be

7

JA505

"conjectural or hypothetical," but must be "actual or imminent."
Susan B. Anthony List, 573 U.S. at 158 (quoting Lujan v.
Defenders of Wildlife, 504 U.S. 555, 560 (1992)). The
Defendant's plan to enforce the statute *generally* does not mean
that Plaintiff *specifically* faces an imminent threat of
enforcement. Plaintiff's theory of standing would collapse the
credible threat and arguable violation prongs into one. It is
not sufficient that a plaintiff's conduct arguably violates an
actively enforced statute; there must be a credible threat of
prosecution as well. See Susan B. Anthony List, 573 U.S. at 159.

The VVA, like the Ohio statute in Susan B. Anthony List,
allows for complaints to be filed by anyone, so the likelihood
of enforcement is much greater. This factor weighs in
Plaintiff's favor, but its impact is dulled because Plaintiff
has never actually acted in a way that would arguably violate
the statute. Plaintiff has never been approached by anyone
seeking his photography services for a same-sex wedding.
Plaintiff also has never published any statement reflecting his
decision not to provide wedding photography for same-sex
weddings. At the moment, Plaintiff has no reason to suspect that
Defendant might attempt to penalize him using a statute he has
never violated.

Even though he has not violated the statute, Plaintiff
argues that he would have violated the statute if not for his

8

self-censorship. Plaintiff claims his speech has been chilled because he cannot publish his beliefs on his website or in his editorial policy without risking a civil fine. Several cases recognize that an "objectively reasonable chilling effect" can give a plaintiff standing. See Virginia v. Amer. Booksellers Ass'n, 484 U.S. 383, 393 (1988); Abbott v. Pastides, 900 F.3d 160, 176 (4th Cir. 2018); Cooksey v. Futrell, 721 F.3d 226, 235-37 (4th Cir. 2013). When the threat of criminal prosecution looms, many people self-censor and choose not to exercise their constitutional rights because the cost is too high. Courts have recognized that self-censoring can create standing when the perceived threat is reasonable. Compare Steffel v. Thompson, 415 U.S. 452, 459 (1974) ("[I]t is not necessary that petitioner first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights."), with Younger v. Harris, 401 U.S. 37, 42 (1971) (holding that the plaintiffs' allegations of "feeling inhibited" were not sufficient to confer standing).

A plaintiff has standing when he ceases to engage in certain speech because an enforcement agent has said that the speech violates the law. See Cooksey, 721 F.3d at 236. The plaintiff in Cooksey ran a diet-advice website where he provided different recipes and responded to user questions through a

9

JA507

"Dear Abby-style" advice column. Id. The plaintiff operated this website for many months without issue. Id. The state agency responsible for dietetics licensing discovered the plaintiff's business and told the plaintiff that he had to eliminate several portions of his website or risk a misdemeanor charge. Id. at 231-32. Not wanting to take any chances, the plaintiff took down the questionable portions of his website and sued the agency claiming that the agency violated his First Amendment rights. Id. at 233. The Fourth Circuit held that the plaintiff had standing to seek an injunction because he stopped engaging in certain speech due to the unsolicited actions of the state agency. Id. at 237.

In this case, Plaintiff never previously engaged in the type of speech that he claims is currently being chilled. Unlike the plaintiff in Cooksey, who operated an advice column for multiple years before self-censoring, Plaintiff never posted a statement of his own view of marriage on his website and he never before crafted an editorial policy explaining his reasons for declining to photograph same-sex weddings. Nothing in the record shows that Plaintiff ever sought to engage in this type of speech prior to the passage of the VVA. However, now that the speech is arguably restricted, Plaintiff claims that he would like to post a statement which might violate that law. In other self-censorship cases, the plaintiffs ceased engaging in an

10

activity or speaking on a subject. See, e.g., Amer. Booksellers
Ass'n, 484 U.S. at 392 (noting that the plaintiffs were forced
to cease displaying books in a certain way); Babbitt v. United
Farm Workers Nat'l Union, 442 U.S. 289, 298 (1979) (stating that
the plaintiffs had "actively engaged in consumer publicity
campaigns in the past" and alleged "an intention to continue"
those campaigns in the future); Steffel v. Thompson, 415 U.S.
452, 455-56 (1974) (noting that the plaintiff ceased
distributing handbills after plaintiff's companion was arrested
for that activity); N.C. Right to Life, Inc., 168 F.3d at 709
(noting that the plaintiff ceased distributing handbills after a
threat of enforcement); see cf. Mobil Oil Corp., 940 F.2d at 76
(bringing suit to avoid making costly changes to existing
franchise contracts that were affected by a new law).

Plaintiff in this case never ceased any protected activity
because he never started. If Plaintiff can now allege that his
speech has been chilled because he cannot say something that he
has never said before, then anyone has standing to challenge any
statute simply by alleging that they would like to make a future
statement that the statute arguably prohibits. Cases and
controversies require more than just hypothetical future
activity. Susan B. Anthony List, 573 U.S. at 158 (quoting
Defenders of Wildlife, 504 U.S. at 560).

JA509

Other cases differ from the present case in another important aspect, most pre-enforcement challenges have generally been available to plaintiffs because their only alternative is to risk criminal prosecution by violating the law. Amer. Booksellers Ass'n, 484 U.S. at 392. In American Booksellers Association, Virginia passed a law requiring booksellers to keep books away from juveniles that could be "harmful" to them. Id. at 387. Virginia booksellers brought a pre-enforcement challenge to the law claiming that they had standing because they were left with no choice but to either undertake costly compliance measures or engage in criminal activity. Id. at 392. The Supreme Court agreed with the plaintiff, explaining that self-censorship is the primary First Amendment harm that comes from potential criminal penalties. Id. at 393.

Here, Plaintiff does not face the risk of criminal prosecution. The potential fine for violations of the VVA is up to $50,000. This is not a trivial sum. However, Plaintiff does not face imprisonment or the long-term penalty of a criminal record. Unlike other chilled speech cases, and unlike the similar case decided by the Eighth Circuit, Plaintiff cannot be criminally prosecuted for violating the VVA. Va. Code § 2.2-3906(B); see also Telescope Media Group, 936 F.3d at 750. Whether a statute falls under the criminal or civil code is not decisive, but the absence of criminal penalties decreases the

12

severity of potential violations, which in turn decreases the potential chilling effect of the statute. In almost every case where standing was found based on a chilling effect, the plaintiff faced the threat of criminal penalty. See, e.g., Susan B. Anthony List, 573 U.S. at 151; Holder v. Humanitarian Law Project, 561 U.S. 1, 15 (2010); Amer. Booksellers Ass'n, 484 U.S. at 387; Steffel, 415 U.S. at 455-56 (1974); N.C. Right to Life, Inc., 168 F.3d at 709.

Plaintiff claims to be chilled by a potential civil fine that accompanies a law that has never been enforced against Plaintiff or any other person. Aspects of this case create "the odor of a case or controversy," but the scent is not strong enough to convince this Court that a case or controversy exists. Mobil Oil Corp., 940 F.2d at 77. No case or controversy exists when a person expresses a desire to change his previously compliant conduct to violate a new statute that no person, government or otherwise, has ever sought to enforce. Plaintiff must provide more before this Court may exercise jurisdiction.

For the forgoing reasons, this Court finds that Defendants' 12(b)(1) Motion to Dismiss should be granted. Plaintiff lacks standing to bring these claims. An appropriate order shall issue.

13

JA511

CLAUDE M. HILTON
UNITED STATES DISTRICT JUDGE

Alexandria, Virginia
March 30, 2021

JA512

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

|  |  |  |
|---|---|---|
| ROBERT UPDEGROVE, ET AL., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:20-cv-1141 |
| | ) | |
| | ) | |
| MARK R. HERRING, | ) | |
| *in his official capacity* | ) | |
| *as Virginia Attorney General*, | ) | |
| ET AL., | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

In accordance with the accompanying Memorandum Opinion, it is hereby

ORDERED that Defendants' 12(b)(1) Motion to Dismiss is GRANTED, and the case is DISMISSED.


CLAUDE M. HILTON
UNITED STATES DISTRICT JUDGE


Alexandria, Virginia
March 30, 2021

JA513

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### ALEXANDRIA DIVISION

| | |
|---|---|
| **Robert Updegrove**, and **Loudoun Multi-Images LLC** d/b/a **Bob Updegrove Photography**, <br><br> Plaintiffs, <br><br> v. <br><br> **Mark R. Herring**, in his official capacity as Virginia Attorney General; and **R. Thomas Payne, II**, in his official capacity as Director of the Virginia Division of Human Rights and Fair Housing, <br><br> Defendants. | Civil Action No. 1:20-cv-1141 <br><br> **NOTICE OF APPEAL** |

PLEASE TAKE NOTICE that Plaintiffs, Robert Updegrove and Loudoun Multi-Images LLC dba Bob Updegrove Photography, hereby appeal to the United States Court of Appeals for the Fourth Circuit from the Memorandum Opinion (Doc. 60) and Order (Doc. 61) granting Defendants' Rule 12(b)(1) Motion to Dismiss and denying Plaintiffs' Motion for Preliminary Injunction, entered in this action on March 30, 2021.

Respectfully submitted.

s/ *C. Douglas Wenty*

Jonathan A. Scruggs
Arizona Bar No. 030505
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
jscruggs@ADFlegal.org

C. Douglas Welty
Virginia Bar No. 29480
C. DOUGLAS WELTY PLC
2111 Wilson Boulevard
Suite 800
Arlington, Virginia 22201
(703) 276-0114
cdwelty@weltyblair.com

JA514

David A. Cortman
Georgia Bar No. 188810
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Rd. NE
Suite D-1100
Lawrenceville, GA 30043
(770) 339-0774
dcortman@ADFlegal.org

Johannes S. Widmalm-Delphonse
Minnesota Bar No. 396303*
ALLIANCE DEFENDING FREEDOM
20116 Ashbrook Place, Suite 250
Ashburn, VA 20147
(571) 707-4655
jwidmalmdelphonse@ADFlegal.org

*Attorneys for Plaintiffs*

April 28, 2021

JA515

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

ROBERT UPDEGROVE *et al.*,        )
                                  )
        Plaintiffs,               )
                                  )
    v.                            )        Civil Action No. 1:20-cv-01141-CMH-JFA
                                  )
MARK HERRING *et al.*,            )
                                  )
        Defendants.               )

**DECLARATION OF R. THOMAS PAYNE, II**

I, R. Thomas Payne, II, declare as follows:

1.      I am currently employed as Senior Assistant Attorney General and Section Chief of the Office of Civil Rights at the Virginia Office of the Attorney General. I have worked in my current position since July 1, 2012.

2.      On November 16, 2020, Mona Hafeez Siddiqui executed a declaration in this matter in her capacity as an Assistant Attorney General at that time. See Dkt. 20-1. Ms. Siddiqui has since departed the Office of the Attorney General and is no longer employed as Assistant Attorney General or in any other role in that Office.

3.      It has come to my attention that certain statements in Ms. Siddiqui's declaration were not accurate at the time they were made. I submit this declaration in my capacity as Senior Assistant Attorney General and Section Chief to correct the record.

4.      Specifically, the statement that "the Division" (now the Office of Civil Rights) had not "received" complaints alleging "unlawful discrimination on the basis of sexual orientation or gender identity" was inaccurate. Upon further review of our records, the Office of Civil Rights, from July 1, 2020, through November 16, 2020, received eight complaints in which

1

JA516

the complainants' alleged bases of discrimination included "Sexual Orientation," "Gender Identity," or both.  Six of these complaints involved employment discrimination and were referred to the U.S. Equal Employment Opportunity Commission (EEOC) for further processing under our work-sharing agreement with the EEOC.  One complaint involved the provision of medical services and was referred to the U.S. Department of Health and Human Services for further processing.  This complaint identified the respondent entity as both a "place of public accommodation" and "Other," noting "doctor's office."  The final complaint in this timeframe was from a member of a private club and regarded action taken on the complainant's membership in that club, and we determined that the Office of Civil Rights did not have jurisdiction to further process or investigate that complaint.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on May 26, 2021 at Richmond, Virginia.

R. Thomas Payne II
Senior Assistant Attorney General/Section Chief
Office of Civil Rights
Office of the Attorney General of Virginia

JA517

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
**Alexandria Division**

| | |
|---|---|
| ROBERT UPDEGROVE *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Civil Action No. 1:20-cv-01141-CMH-JFA |
| | ) |
| MARK HERRING *et al.*, | ) |
| | ) |
| Defendants. | ) |

**DECLARATION OF MONA HAFEEZ SIDDIQUI**

I, Mona Hafeez Siddiqui, declare as follows:

1.      I am currently employed as Deputy Chief Diversity Officer for Virginia Governor Ralph S. Northam and Senior Policy Advisor to the Office of New Americans. I have worked in this role since November 18, 2020. Prior to that, I served as an Assistant Attorney General in the Virginia Office of the Attorney General.

2.      In my capacity as Assistant Attorney General, I executed a declaration in this matter on November 16, 2020. See Dkt. 20-1.

3.      It has since come to my attention that certain statements in that declaration were not accurate at the time they were made. I submit this declaration to alert the Court of the error, and I understand that the Office of the Attorney General will be submitting a new declaration to correct the record.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

1

JA518

Executed on May 27, 2021 at Richmond, Virginia.

Mona Hafeez Siddiqui

2

JA519